IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SKYPORT GLOBAL | § | CASE NO. 08-36737-H4-11 |
| COMMUNICATIONS, INC., | § | (Chapter 11) |
|     Debtor | § | |
| SkyPort Global Communications, Inc., Balaton Group, Inc., and Robert Kubbernus, | § | |
| | § | |
|     Plaintiffs | § | |
| | § | |
| Vs. | § | ADVERSARY NO. 10-_____ |
| | § | |
| Joanne Schermerhorn, John K. Waymire, Chet Gutowsky, John Llewellyn, Joseph A. Lopez, Robert Foote, BLF Partners, Ltd., ECAL Partners, Ltd, Whiz Kid Ventures, LLC, Bella Krieger, Martin Pollak, Gloster Holdings, LLC, Melvyn Reiser, Barry Klein, Cheskel Kahan, John A. Rees, Brian W. Harle, MD, Michael Stein, Lawrence Solomon, Tracy Elstein & David Togut, Jason Charles Togut Trust, BMT Grantor Trust, Lynn Joyce Elstein Trust, Charles Stack, Joseph Baker, Movada, Ltd., Puddy, Ltd., Draco Capital, Inc., Edward Pascal, Robert Mendel, Stanley Beraznik, Don Bui, Ben Ariano, 3790168 Canada, Inc., Peter Taylor, John E. Panneton, Wayne C. Fox, David Currie, Byron Messier, Darshan Khurana, Mateo Novelli, Diya Al-Sarraj, Sequoia Aggressive Growth Fund, Ltd., Sequoia Diversified Growth Fund, Ltd., Rig III Fund, Ltd., Aran Asset Management SA, Semper Gestion SA, and Eosphoros Asset Management, Inc., | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
|     Defendants | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT AND APPLICATION FOR PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

TO THE HONORABLE JEFF BOHM, UNITED STATES BANKRUPTCY JUDGE:

      SkyPort Global Communications, Inc., Robert Kubbernus, and Balaton Group, Inc. (collectively, "Plaintiffs"), file this Original Complaint and Application for a Preliminary Injunction and Permanent Injunction and would respectfully show the Court as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334 because this is a proceeding arising in or related to a case under the Bankruptcy Code.  Pursuant to Federal Rule of Bankruptcy Procedure 7008(a), the Plaintiffs state that this is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (L), and (O).

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because the Chapter 11 case this proceeding relates to is pending in this District.

## PARTIES

3.      Plaintiff SkyPort Global Communications, Inc. (the "Reorganized Debtor") successfully reorganized under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and now operates as a post-confirmation going concern, and is current with respect to all obligations set forth under the terms of its confirmed plan.

4.      Plaintiff Balaton Group, Inc. ("Balaton") is a Canadian corporation, which received a release under the terms of the Reorganized Debtor's confirmed plan.

5.      Plaintiff Robert Kubbernus ("Kubbernus") is an individual residing in the State of Texas and is Chief Executive Officer of SkyPort and President of Balaton, who received a release under the terms of the Reorganized Debtor's confirmed plan.

6.      The Defendants are former minority shareholders of Skycomm Technologies, Inc. ("Skycomm"), an entity that was the pre-petition parent of the Reorganized Debtor.[1]  Their names are as follows:

---

[1] Pursuant to the terms of the confirmed plan and Delaware law, Skycomm was merged into the Debtor and the Defendants shares were cancelled.  This was done with notice to all of the Skycomm shareholders known by Balaton and Kubbernus.  The only possible reason certain of the Defendant shareholders/Defendants might not have received notice of the merger was because they failed to provide the Debtor, Balaton and Kubbernus with notice that they acquired shares from other record shareholders.

(a)     Upon information and belief, Defendant Joanne Schermerhorn is a resident of the State of Texas.

(b)     Upon information and belief, Defendant John K. Waymire is a resident of the State of Texas.

(c)     Defendant Chet Gutowsky is a resident of the State of Texas and may be served with process by personal service at 302 Pinesap Dr., Houston, TX 77079.

(d)     Defendant John Llewellyn is a resident of the State of Texas and may be served with process by personal service at 1778 CR 407, Gonzales, TX 78629.

(e)     Defendant Joseph A. Lopez is a resident of the State of New Jersey and may be served with process by personal service at 237 N. Mountain Ave., Montclair, NJ 07042.

(f)     Upon information and belief, Defendant Robert Foote is a resident of the State of Florida.

(g)     Defendant BLF Partners, Ltd., is a Texas corporation and may be served with process through its registered agent, Dudley D. Baker, 6526 Radley Dr., Spring, TX 77379-2917.

(h)     Defendant ECAL Partners, Ltd. is a Texas corporation and may be served with process through its registered agent, Marlon White, 6611 Centre Place Circle, Spring, TX 77379.

(i)     Upon information and belief, Defendant Whizkid Venture, LLC is a Nevada limited liability company.

(j)     Defendant Bella Krieger is a resident of the State of Florida and may be served with process by personal service at 3912 South Ocean Blvd. #404, Highland Beach, FL 33487.

(k)     Defendant Martin Pollak is a resident of the State of New York and may be served with process by personal service at 16 Springwood Path, Laurel Hollow-Syosset, NY 11791.

(l)     Upon information and belief, Defendant Gloster Holdings, LLC is a Delaware limited liability company.

(m)     Defendant Melvyn Reiser is a resident of the State of New York and may be served with process by personal service at 996 Henhawk Rd., Baldwin, NY 11510.

(n)     Defendant Barry Klein is a resident of the State of New York and may be served with process by personal service at 77 Ross St., Brooklyn, NY 11211.

(o)     Defendant Cheskel Kahan is a resident of the State of New York and may be served with process by personal service at 3 Kalev Way, #302, Monroe, NY 10950.

(p)    Defendant John A. Rees is a resident of the State of Arkansas and may be served with process by personal service at 11719 Hinson Rd., Suite 130, Little Rock, AR 72212.

(q)    Defendant Brian W. Harle is a resident of the State of Texas and may be served with process by personal service at 7711 Louis Pasteur, Ste. 200, San Antonio, TX 78229.

(r)    Defendant Michael Stein is a resident of the State of New York and may be served with process by personal service at 385 South End Ave., Apt #6-C, New York, NY 10280-1041.

(s)    Defendant Lawrence Solomon is a resident of the State of Florida and may be served with process by personal service at 5419 N.W. 42nd Ave., Boca Raton, FL 33496.

(t)    Defendant Tracy Elstein is a resident of the State of New York and may be served with process by personal service at 422 E. 72nd St. -8A & 8B, New York, NY 10021.

(u)    Defendant David Togut is a resident of the State of New York and may be served with process by personal service at 422 E. 72nd St. -8A & 8B, New York, NY 10021.

(v)    Defendant Jason Charles Togut Trust is a New York trust and may be served with process through its trustees at 422 E. 72nd St. -8A & 8B, New York, NY 10021.

(w)    Defendant BMT Grantor Trust is a New York trust and may be served with process through its trustees at 422 E. 72nd St. -8A & 8B, New York, NY 10021.

(x)    Defendant Lynn Joyce Elstein Trust is a New York trust and may be served with process through its trustees at 485 Oriskany Ct., Osprey, FL 34229.

(y)    Upon information and belief, Defendant Charles Stack is a resident of the State of Texas.

(z)    Upon information and belief, Defendant Joseph Baker is a resident of the State of Texas.

(aa)   Defendant Movada, Ltd. is a Texas limited liability company and may be served with process through its registered agent, Bill B. McCrary, 6193 Hickory Hollow Ln., Conroe, TX 77304-1423.

(bb)   Defendant Puddy, Ltd. is a Texas limited liability company and may be served with process through its registered agent, Nelda V. McCrary, 6193 Hickory Hollow Ln., Conroe, TX 77304-1423.

(cc)   Defendant Draco Capital, Inc. is a Canadian corporation and may be served with process at 345 av. Woodlea, Mont-Royal, QC H3P 1R4, Canada.

(dd)   Upon information and belief, Defendant Edward Pascal is a resident of Montreal, Quebec, Canada.

(ee)   Upon information and belief, Defendant Robert Mendel is a resident of Montreal, Quebec, Canada.

(ff)   Upon information and belief, Defendant Stanley Beraznik is a resident of the State of California.

(gg)   Upon information and belief, Defendant Don Bui is a resident of Montreal, Quebec, Canada.

(hh)   Upon information and belief, Defendant Ben Ariano is a resident of Montreal, Quebec, Canada.

(ii)   Upon information and belief, Defendant 3791068 Canada, Inc. is a corporation organized in the Province of Quebec, Canada.

(jj)   Upon information and belief, Defendant Peter Taylor is a resident of Sutton West, Ontario, Canada.

(kk)   Defendant John E. Panneton is a resident of Toronto, Ontario, Canada and may be served with process by personal service at Suite 5865, The First Canadian Palace, P.O. Box 291, 100 King Street West, Toronto, ON, M5X 1C9, Canada.

(ll)   Defendant Wayne C. Fox is a resident of Toronto, Ontario, Canada and may be served with process by personal service at Suite 5865, The First Canadian Palace, P.O. Box 291, 100 King Street West, Toronto, ON, M5X 1C9, Canada.

(mm)   Defendant David Currie is a resident of Toronto, Ontario, Canada and upon information and belief may be served with process by personal service at Suite 5865, The First Canadian Palace, P.O. Box 291, 100 King Street West, Toronto, ON, M5X 1C9, Canada.

(nn)   Defendant Byron Messier is a resident of Toronto, Ontario, Canada and upon information and belief may be served with process by personal service at Suite 5865, The First Canadian Palace, P.O. Box 291, 100 King Street West, Toronto, ON, M5X 1C9, Canada.

(oo)   Defendant Darshan Khurana is a resident of Montreal, Quebec, Canada and upon information and belief may be served with process by personal service at 6110 Bernard Mergler, Cote St. Luc, QC H3X 4A5, Canada.

(pp)   Defendant Mateo Novelli is a resident of France and upon information and belief may be served with process by personal service at 51 Rue De Naples, 75008 Paris, France.

(qq)   Defendant Diya Al-Sarraj is a resident of the United Arab Emirates and upon information and belief may be served with process by personal service at P.O. Box 42042, Abu Dhabi, United Arab Emirates.

(rr)   Defendant Sequoia Aggressive Growth Fund, Ltd., is a British Virgin Islands limited company and upon information and belief may be served with process through its registered agent, Semper Gestion SA, 5 rue Pedro-Meylan, 1208 Geneva, Switzerland.

(ss)   Upon information and belief, Defendant Sequoia Diversified Growth Fund is an offshore fund managed by Nemo Asset Management in Abu Dhabi, UAE.

(tt)   Defendant Rig III, Ltd. is a British Virgin Islands limited company and upon information and belief may be served with process through its registered agent, Semper Gestion SA, 40 A route de malagnou, 1208 Geneva, Switzerland.

(uu)   Defendant Aran Asset Management SA is a Swiss corporation and upon information and belief may be served with process through its registered agent, Aran Asset Management SA, Bahnofplatz, P.O. Box 4010, 6304 Zug, Switzerland.

(vv)   Defendant Semper Gestion SA is a Swiss corporation and upon information and belief may be served with process through its registered agent at 40 A route de malagnou, 1208 Geneva, Switzerland.

(ww)   Upon information and belief, Defendant Eosphoros Asset Management, Inc. is a Canadian corporation.

7.      Defendants have already placed themselves within this Court's jurisdiction by the pleadings they have filed in Adversary No. 10-3150.  Plaintiffs seek to consolidate Adversary No. 10-3150 with this adversary proceeding by the filing of their Motion to Consolidate.

8.      Therefore, at this time, and given the timely relief requested herein, Plaintiffs seek to serve process on all Defendants via their attorneys of record in Adversary No. 10-3150.  Thus, and as further means to give full notice of this Original Complaint and Application, Plaintiffs are serving this Complaint by electronic mail on Defendants through their attorneys of record in Adversary No. 10-3150.

## FACTUAL BACKGROUND

9.      This Court entered a confirmation order (the "Confirmation Order"), after notice to all affected parties (including Defendants)[2] that merged SkyComm (the parent company) into the Debtor, Skyport Global Communications, Inc. (the wholly owned subsidiary of Skycomm), which then became the Reorganized Debtor.  The Plan then cancelled the SkyComm pre-petition shares,[3] and issued new shares to Balaton.  The Plan also released Balaton and Kubbernus from alleged claims arising post-petition out of the Chapter 11 process as well as all derivative claims (the "Plan Injunction").[4]

10.     The Confirmation Order was not appealed, and the Plan was consummated. Money was disbursed, and the Reorganized Debtor has been operating under the Plan for nearly a year.  The Court has not been asked to vacate the Confirmation Order.  Indeed, nothing challenging the releases or confirmation has been raised to this Court.

11.     However, on or about February 12, 2010, Defendants (former shareholders of Skycomm who had notice of the bankruptcy) sued Balaton, Kubbernus, and other related parties in a 111-page derivative petition (the "Petition").  A copy of the Petition is attached as *Exhibit A*.  No advance notice was given of the Petition and no demand letter was sent.

12.     In their Petition, Defendants allege the following causes of action against Balaton and Kubbernus:

---

[2]    Some Defendants have claimed they received no notice, but docket #43 (main case, filed in November 2008) is the Debtor's notice of equity interest holders listing most, if not all, of the Defendants.  Thus, the clerk and Debtor repeatedly served these parties during the case.  Defendants had notice.  The Petition at ¶262 admits notice of the bankruptcy by most Defendants: "The existence and identity of [recent stockholders] did not become known to SkyComm's Original Shareholders until late 2008 when Balaton [sic] listed them as shareholders in a second SkyPort Bankruptcy filing…."

[3]    Plan at 6.3, Final Disclosure Statement [docket #264] at p. 21: "Because the Holders of Interests (after Merger with SkyComm) receive nothing on account of its interests, they are deemed to reject the plan and not entitled to vote."; Confirmation Order [docket #340] at p. 10: "Specifically, the merger of SkyComm into Skyport is approved such that Skyport will be the surviving entity."

[4]    Plan at 13.7 and 13.8.

(a)     Claim for appointment provisional director, trustee, managing agent, fiscal agent or other court appointed fiduciary for the Reorganized Debtor;

(b)     Claim for breach of fiduciary duty;

(c)     Claim against for unjust enrichment;

(d)     Claim against for aiding and abetting a breach of fiduciary duty;

(e)     Claim against for aiding and abetting a breach of fiduciary duty;

(f)     Claim for fraud through active concealment of material facts;

(g)     Claim for fraud through silence in the face of a duty to disclose;

(h)     Claim for wrongful equity dilution; and

(i)     Claim for an accounting.

(together, the foregoing causes of action are referred to herein as the "Defendants' Claims").

**CAUSES OF ACTION**
**COUNT ONE: DECLARATORY JUDGMENT**

13.     To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

14.     Under the Uniform Declaratory Judgment Act, this Court has the power to declare rights, status and other legal relations whether or not further relief could be claimed.  A person interested under a deed, will, written contract or whose rights, status or other legal relations are affected by a statute, ordinance or contract may have any question of construction or validity arising under an instrument, statute, ordinance or contract determined and obtain a declaration of their rights, status or other legal relations thereunder.  *See* 28 U.S.C. § 2201 *et. seq*.

15.     Declaratory relief is proper here because a bona fide dispute exists as to the ownership of Defendants' Claims and the extent to which the Defendants' Claims are barred by the Plan Injunction.  Specifically, Plaintiffs assert that some or all of Defendants' Claims are barred by the Plan Injunction.

16.     Further, Plaintiffs assert that some or all of Defendants' Claims may be properly categorized as derivative claims, in which case such causes of action are the property of the

Reorganized Debtor, which have been released.  *See Tooley v. Donaldson, Lufkin, & Jenrette, Inc., et al.*, 845 A.2d 1031 (Del. 2004); *see also In re Dexterity Surgical, Inc.*, 365 B.R. 690, 695 (Bankr. S.D. Tex. 2007) (J. Isgur) (citing and applying *Tooley*).

17.     Defendants appear to believe that their claims are not barred by the Confirmation Order and Plan Injunction.  However, the relief requested substantially affects the Reorganized Debtor's ability to comply with and complete its reorganization plan.  Specifically, in the Petition, Defendants repeatedly request control over the Reorganized Debtor.

18.     Bankruptcy courts retain jurisdiction over reorganized debtors.  Specifically, bankruptcy jurisdiction extends to matters that "impact the compliance with or completion of the reorganization plan."  *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001).

19.     Plaintiffs therefore request that this Court determine the applicability of Sections 541, and 1141 of the Bankruptcy Code as to Defendants' Claims and declare the rights of the reorganized Debtor and Plaintiffs with respect thereto.

### COUNT TWO: ENFORCEMENT OF THE PLAN INJUNCTION

20.     To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

21.     Pursuant to Count One above, if the Court declares that any or all of Defendants' Claims violate the Plan Injunction, then Plaintiffs request that the Court enforce the Plan Injunction by barring Defendants from further attempting to seize control of the Reorganized Debtor by pursuing barred claims and claims owned by the Reorganized Debtor.

22.     Further, the Defendants are attempting to contact customers, vendors, government agencies and employees of the Plaintiffs.  The Defendants have requested documentation from

the Plaintiffs through a Freedom of Information Act request.  The intent of these actions is to harass the Plaintiffs and to negatively affect their business.

23.     As it stands now, Defendants have filed a Motion to Remand in Adversary No. 10-3150 contending that the Claims are not barred by the Plan injunction.  The Motion to Remand is without merit.

24.     Upon issuing a declaratory judgment finding that some or all of Defendants' Claims are barred by the Plan Injunction and are owned by the Plaintiffs, Plaintiffs request that the Court enforce the Plan Injunction, bar Defendants from prosecuting Defendants' Claims or seeking to violate the Plan Injunction without further order of this Court, and prohibit the Defendants from further harassing the Plaintiffs via information requests or contact with employees and vendors.

### COUNT THREE: DAMAGES AND ATTORNEYS' FEES

25.     To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

26.     Defendant's actions have strained the relations of the Plaintiffs with key vendors and employees.  Further, the Defendants' actions create a substantial financial burden to the Plaintiffs.  To the extent monetary damages will make the Plaintiffs whole, Plaintiffs request that payment of monetary damages.

27.     Plaintiffs expended significant time and substantial resources in dealing with the Defendants' actions.  The Plaintiffs request that the Court order the Defendants to pay all costs, fees, and expenses incurred in prosecuting this Action.

### APPLICATION FOR PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION

28.     Pursuant to Section 105 of the Bankruptcy Code, a "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11

U.S.C. § 105(a).  Plaintiffs submit that the relief requested herein is necessary and appropriate to carry out the provisions of the Bankruptcy Code.  The purpose of Section 105(a) is "to assure the Bankruptcy Court's power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction."  2 COLLIER BANKRUPTCY ¶105.02, at 105-4 (15th rev. ed. 1988). Thus, Section 105 essentially codifies the Bankruptcy Court's inherent equitable powers.  *See Management Tech. Corp. v. Pardon*, 56 B.R. 337, 339 (Bankr. D.N.J. 1985) (court's equitable power derived from Section 105 of the Bankruptcy Code).

29.     The facts set out above establish that Plaintiffs are entitled to injunctive relief. First, Defendants' actions as described herein have caused immediate and irreparable injury to the Reorganized Debtor for which there is no adequate remedy at law.

30.     Specifically, if Defendants are allowed to proceed with Claims that are eventually determined to be barred by the Plan Injunction, the Reorganized Debtor will be imminently injured by prosecution of the case in a manner in which it has not approved and has not participated.  For example, *during the post-confirmation period* Defendants have contacted customers, employees, government agencies and vendors of the Reorganized Debtor regarding Defendants' Claims and have requested information under the Freedom of Information Act.  All of these actions compromise the rights and interests related to Defendants' Claims.

31.     Moreover, the Reorganized Debtor will have no adequate remedy at law because its business is being damaged and it does not otherwise have the resources to withstand the attacks of the Defendants.  Therefore, Defendants should be immediately enjoined from prosecution of their Claims and otherwise interfering with the ability of the Reorganized Debtor to satisfy its obligations under the confirmed plan, pending a determination that Defendants' Claims violate the Plan Injunction.

32.     Furthermore, there is a substantial likelihood that Plaintiffs will succeed on the merits of their claim that some or all of Defendants' Claims violate the Plan Injunction.  The standard for determining whether a cause of action is a direct claim or derivative claim focuses on the following: who suffered the alleged harm – the corporation or the suing stockholder individually – and who would receive the benefit of the recovery or other remedy (i.e. the "Tooley Standard" as annunciated in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc., et al.*, 845 A.2d 1031 (Del. 2004) and applied by this Court in *In re Dexterity Surgical, Inc.*, 365 B.R. at 695-702).  Indeed, the bulk of Defendants' Claims focus on the harm to the Reorganized Debtor, as the crux appears to be alleged harm to the Reorganized Debtor.  Per Defendants' own colorful language in their Petition (*see Exhibit A*), it was the Reorganized Debtor who allegedly suffered the harm by allegedly being "looted," "corrupted," "destroyed," "ruined," etc.  *Accord In re Dexterity Surgical, Inc.*, 365 B.R. at 697-98 ("The Court notes that there is a recurring theme in Plaintiffs' allegations …: Dexterity suffered injury.").

33.     The standard for determining whether a bankruptcy court maintains jurisdiction over matters pertaining to a reorganized debtor after confirmation is whether those matters impact compliance with or completion of the reorganization plan.  *Craig's Stores*, 266 F.3d at 390.

34.     As here, Defendants seek, amongst other remedies, control of the Reorganized Debtor.  Defendants specifically request that the State Court:

> [E]nter an Order appointing a provisional director, Trustee managing agent, fiscal agent or other court appointed fiduciary for SkyComm and SkyPort.

*Exhibit A* at ¶¶72, 81.  Plaintiffs, however, are entitled to rely on the Confirmation Order and Plan Injunction.

35.     Additionally, the balance of hardships favors the Reorganized Debtor, one of the Plaintiffs herein, as the injunctive relief sought herein will only preserve the status quo pending determination of the causes of action set forth in this Original Complaint producing no harm to Defendants other than a brief delay while this Court determines the merits of this Original Complaint.  Conversely, if a preliminary injunction is not issued, the rights of the Reorganized Debtor in its property will be irreparably damaged, and its post-confirmation business will be harmed.

36.     Accordingly, Plaintiffs seek a hearing before this Court to determine whether issuing a preliminary injunction restraining Defendants from taking any further action in or affecting Defendants' Claims is proper, until such time as the Court can determine the merits of Plaintiffs' causes of action set forth in this Complaint.

37.     Plaintiffs request that after notice and a hearing a preliminary injunction be issued until the time of trial on the permanent injunction.  Following trial, Plaintiffs seeks a declaration that Plan Injunction applies to Defendants' Claims (in essence, a permanent injunction).

38.     The Application for Temporary Restraining Order is supported by the verification of Robert Kubbernus attached hereto and incorporated herein by reference.

### BOND

39.     Plaintiffs are willing to post a bond, if necessary, in a reasonable amount.

### REQUESTED RELIEF

40.     In accordance with the pleadings set forth herein Plaintiffs request the following:

(a)     a hearing within twenty (20) days to determine whether a preliminary injunction should be issued and the issuance of a permanent injunction set for trial;

(b)     a hearing on Plaintiffs' cause for declaratory judgment and a declaratory judgment by the Court that Defendants' Claims are property of the Reorganized Debtor and/or barred by the Plan Injunction;

(c)     an order enjoining Defendants from any act to obtain possession or exercise control over the Reorganized Debtors;

(d)     that Plaintiffs be awarded their actual damages;

(e)     that Plaintiffs be awarded reasonable and necessary attorney's fees;

(f)     that Plaintiffs be awarded their costs of suit;

(g)     that Defendants be found in contempt of Court and sanctioned as this Court deems appropriate;

(h)     an order requiring Defendants to turn over Defendants' Claims to the Reorganized Debtor; and

(i)     that Plaintiffs are awarded such other and further relief as the Court deems just, equitable and proper.

DATED: May 17, 2010.

Respectfully submitted,

HOOVER SLOVACEK, L.P.

By:___*/s/ Edward L. Rothberg*_____
       EDWARD L. ROTHBERG
       State Bar No. 17313990
       MELISSA A. HASELDEN
       State Bar No. 00794778
       ANNIE E. CATMULL
       State Bar No. 00794932
       5847 San Felipe, Ste 2200
       Houston, Texas 77057
       Telephone: (713) 977-8686
       Facsimile: (713) 977-5395

       ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of the above and foregoing were forwarded via DLR 5.1 and the ECF system and U.S. first class mail, postage prepaid, to Defendants' counsel at the addresses noted below on May 18, 2010:

<u>Defendants' Counsel</u>:
Eric Fryar
The Fryar Law Firm
1001 Texas Ave, Ste 1400
Houston, TX 77002-3194

Samuel Goldman
Samuel Goldman & Assoc.
100 Park Ave 20th FL
New York, NY 10017

Harold B. Obstfeld
Harold B. Obstfeld, P.C.
100 Park Ave 20th FL
New York, NY 10017

                        */s/ Edward L. Rothberg*
                        EDWARD L. ROTHBERG

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SKYPORT GLOBAL | § | CASE NO. 08-36737-H4-11 |
| COMMUNICATIONS, INC., | § | (Chapter 11) |
| Debtor | § | |
| SkyPort Global Communications, Inc., Balaton | § | |
| Group, Inc., and Robert Kubbernus, | § | |
| Plaintiffs | § | |
| | § | |
| Vs. | § | ADVERSARY NO. 10-_____ |
| | § | |
| Joanne Schermerhorn, John K. Waymire, Chet | § | |
| Gutowsky, John Llewellyn, Joseph A. Lopez, | § | |
| Robert Foote, BLF Partners, Ltd., ECAL Partners, | § | |
| Ltd, Whiz Kid Ventures, LLC, Bella Krieger, | § | |
| Martin Pollak, Gloster Holdings, LLC, Melvyn | § | |
| Reiser, Barry Klein, Yecheskel Kahan, John | § | |
| A. Rees, Brian W. Harle, MD, Michael Stein, | § | |
| Lawrence Solomon, Tracy Elstein & David | § | |
| Togut, Jason Charles Togut Trust, BMT Grantor | § | |
| Trust, Lynn Joyce Elstein Trust, Charles Stack, | § | |
| Joseph Baker, Movada, Ltd., Puddy, Ltd., Draco | § | |
| Capital, Inc., Edward Pascal, Robert Mendel, | § | |
| Stanley Beraznik, Don Dui, Ben Ariano, 3790168 | § | |
| Canada, Inc., Peter Taylor, John E. Panneton, | § | |
| Wayne C. Fox, David Currie, Byron Messier, | § | |
| Darshan Khurana, Mateo Novelli, Diya Al-Sarraj, | § | |
| Sequoia Aggressive Growth Fund, Ltd., Sequoia | § | |
| Diversified Growth Fund, Ltd., Rig III Fund, Ltd., | § | |
| Aran Asset Management SA, Semper Gestion | § | |
| SA, and Eosphoros Asset Management, Inc., | § | |
| Defendants | § | |

**VERIFICATION OF ROBERT KUBBERNUS IN SUPPORT OF**
**ORIGINAL COMPLAINT AND APPLICATION FOR PRELIMINARY**
**INJUNCTION AND PERMANENT INJUNCTION**

1.      My name is Robert Kubbernus. I am the Chief Executive Officer and President of the Reorganized Debtor, SkyPort Global Communications, Inc. I am also the President of Balaton Group, Inc.

2.      I have read the Original Complaint and Application for a Preliminary Injunction and Permanent Injunction.

672594-1

3.      Pursuant to 28 U.S.C. §1746, I verify that facts set forth in the Original Complaint and Application for a Preliminary Injunction and Permanent Injunction are true and correct.

Robert Kubbernus

Harris County Docket Sheet

# 2010-09675

**COURT:** 113th
**FILED DATE:** 2/12/2010
**CASE TYPE:** FRAUD



## SCHERMERHORN, JOANNE

Attorney: FRYAR, FRED ERIC

VS.

## CENTURYTEL INC (A/K/A CENTURYLINK)

| Docket Sheet Entries | |
|---|---|
| **Date** | **Comment** |

EXHIBIT
tabbies
A

CERTIFIED FILE DATE: 3/8/2010

577X
SSL

②

CAUSE NO. 201009675

RECEIPT   NO. 6251
02-17-2010

8

ENTERED
LP

65.00        CO1
TR # 72507960

PLAINTIFF: SCHERMERHORN, JOANNE
        vs.
DEFENDANT: CENTURYTEL INC (A/K/A CENTURYLINK)

In The   113th
Judicial District Court
of Harris County, Texas
113TH DISTRICT COURT
Houston, TX

THE STATE OF TEXAS
County of Harris

**FILED**
Loren Jackson
District Clerk

MAR 0 8 2010

Time: _____
Harris County, Texas

CITATION

Delivered this ___ day of ___ 20 __
BILL BAILEY, CONSTABLE

By _____

309

TO: KUBBERNUS, ROBERT
    11140 AEROSPACE AVENUE HOUSTON TX 77034

        Attached is a copy of PLAINTIFFS' ORIGINAL PETITION REQUEST FOR DISCLOSURE REQUEST FOR
PRODUCTION

This instrument was filed on the 17th day of February, 2010, in the above cited cause number
and court. The instrument attached describes the claim against you.

    YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a
written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday
next following the expiration of 20 days after you were served this citation and petition,
a default judgment may be taken against you.

TO OFFICER SERVING:
    This citation was issued on 26th day of February, 2010, under my hand and
seal of said Court.

Issued at request of:
FRYAR, FRED ERIC
1001 TEXAS AVE #1400-111
HOUSTON, TX 77002
Tel: (281) 715-6396
Bar No.: 7495770

LOREN JACKSON, District Clerk
Harris County, Texas
201 Caroline        Houston, Texas 77002
(P.O. Box 4651, Houston, Texas 77210)

GENERATED BY: DARRINGTON, NATRICE        19C/ULW/8634730

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at _____ o'clock _____ .M., on the _____ day of _____, _____.

Executed at (address) _____ in

_____ County at _____ o'clock _____.M., on the _____ day of _____,

_____, by delivering to _____ defendant, in person, a
true copy of this Citation together with the accompanying _____        copy(ies) of the
                                                                            Petition
attached thereto and I endorsed on said copy of the Citation the date of delivery.
To certify which I affix my hand officially this _____ day of _____, _____.

Fee: $_____

**FILED**

MAR 0 8 2010

Time: _____

Affiant    By _____

_____

_____ of _____ County, Texas

By _____
        Deputy

On this day, _____, known to me to be the person whose
signature appears on the foregoing return, personally appeared . After being by me duly sworn,
he/she stated that this citation was executed by him/her in the exact manner recited on the
return.

SWORN TO AND SUBSCRIBED BEFORE ME, on this ___ day of _____, _____.

Notary Public

NJNT.CTRF

Certified Document Number: 44769781 - Page 1 of 2

## CONSTABLE'S RETURN

**Cause Number:** 201009675

Came to hand    2    day of    March    ,    2010    , at 12:55 PM

### SERVICE TO INDIVIDUAL ✓

Executed in HARRIS COUNTY, Texas by delivering to each of the within named defendant(s), In Person, a true copy of this Citation together with the accompanying copy of the Plantiff's Original Petition Request for Disclousure Request for Production at the following times and places to-wit:

| Name | Date Delivered | Time | Street Address   City, State, Zip |
|------|----------------|------|-----------------------------------|
| Robert Kubbernus , | March 2, 2010 | 2:09 PM | 11140 Areospace Ave ,Houston ,Texas 77034 |

### Attempted Service

| Date | Time | Information / Notes | Date | Time | Information / Notes |
|------|------|---------------------|------|------|---------------------|
| 3/2/2010 | 2:09 PM | Served On Above Date and Time | | | |

### RETURNED NOT EXECUTED

Returned NOT Executed this        day of            , 2010        , at

for the following reasons:

### CORPORATION

Executed the same in Harris County, Texas on the        day of            , 2010        , at

By summoning the    a corporation of:    , Texas   , Harris County, by delivering to  , in person  of the said Corporation at  .. Texas  a true copy of this  Citation, together with the accompanying copy of:

### TRANSFER TO HARRIS COUNTY CONSTABLE PCT.   0

NOT Executed this   day of    2010, at    as to the Defendant or the Person To Be Served  Robert Kubbernus

The information received as to the whereabouts of said Defendant(s), or peson to be served being;

Fee:  65.00
Fee Paid/Due:  Due
Deputy Constable Attempts:____1__

BILL BAILEY, Constable Precinct 8
Harris County, Texas

By        *E. Ervin*
Edward Ervin, Deputy, Unit # 8880

Certified Document Number: 44769781 - Page 2 of 2



I, Loren Jackson, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this _____ March 24, 2010 _____

Certified Document Number: ___44769781___ (Total Pages 2)


LOREN JACKSON, DISTRICT CLERK
HARRIS COUNTY, TEXAS


**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

**2010-09675 / Court: 113**

Filed 10 February 12 P3:47
Loren Jackson - District Clerk
Harris County
ED101J015668122
By: Nelson Cuero

No. _____

| | | |
|---|---|---|
| JOANNE SCHERMERHORN, JOHN K. WAYMIRE, | § | |
| CHET GUTOWSKY, JOHN LLEWELLYN, JOSEPH A. | § | |
| LOPEZ, ROBERT FOOTE, BLF PARTNERS, LTD., | § | |
| ECAL PARTNERS, LTD., WHIZKID VENTURE, LLC, | § | |
| BELLA KRIEGER, MARTIN POLLAK, GLOSTER | § | |
| HOLDINGS, LLC, MELVYN REISER, BARRY KLEIN, | § | |
| CHESKEL KAHAN, JOHN A. REES, BRIAN W. | § | |
| HARLE, MICHAEL STEIN, LAWRENCE SOLOMON, | § | |
| TRACY ELSTEIN & DAVID TOGUT, JASON | § | |
| CHARLES TOGUT TRUST, BMT GRANTOR TRUST, | § | |
| LYNN JOYCE ELSTEIN TRUST, CHARLES STACK, | § | |
| JOSEPH BAKER, MOVADA, LTD., PUDDY, LTD., | § | IN THE DISTRICT COURT OF |
| DRACO CAPITAL, INC., EDWARD PASCAL, | § | |
| ROBERT MENDEL, STANLEY BERAZNIK, DON | § | |
| DUI, BEN ARIANO, 3791068 CANADA, INC., PETER | § | |
| TAYLOR, JOHN E. PANNETON, WAYNE C. FOX, | § | |
| DAVID CURRIE, BYRON MESSIER, DARSHAN | § | |
| KHURANA, MATEO NOVELLI, DIYA AL-SARRAJ, | § | |
| SEQUOIA AGGREESSIVE GROWTH FUND, LTD., | § | |
| SEQUOIA DIVERSIFIED GROWTH FUND, LTD., RIG | § | |
| III FUND, LTD., ARAN ASSET MANAGEMENT SA, | § | |
| SEMPER GESTION SA, and EOSPHOROS ASSET | § | |
| MANAGEMENT, INC. | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| CENTURYTEL, INC. (a/k/a CENTURYLINK), | § | |
| CLARENCE MARSHALL, R. STEWART EWING, JR., | § | |
| MICHAEL E. MASLOWSKI, HARVEY P. PERRY, | § | |
| ROBERT KUBBERNUS, BALATON GROUP, INC., | § | |
| BANKTON FINANCIAL CORPORATION, BANKTON | § | |
| FINANCIAL CORPORATION, LLC, CLEARSKY | § | |
| MANAGEMENT, INC., WILSON VUKELICH, LLP and | § | |
| CLEARSKY INVESTMENTS, LP | § | |
| | § | |
| Defendants | § | |
| | § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION, REQUEST FOR DISCLOSURE, AND REQUEST FOR PRODUCTION OF DOCUMENTS

TO THE HONORABLE JUDGE OF SAID COURT:

Certified Document Number: 44550657 - Page 1 of 111

Plaintiffs Joanne Schermerhorn, John K. Waymire, Chet Gutowsky, John Llewellyn, Joseph A. Lopez, Robert Foote, BLF Partners Ltd., ECAL Partners, Ltd., Whizkid Venture, LLC, Bella Krieger, Martin Pollack, George Metcalf, Gloster Holdings, LLC, Melvyn Reiser, Barry Klein, Cheskel Kahan, John A. Rees, Brian W. Harle, Michael Stein, Lawrence Solomon, Tracy Elstein & David Togut, Jason Charles Togut Trust, BMT Grantor Trust, Lynn Joyce Elstein Trust, Charles Stack, Joseph Baker, Movada, Ltd, Puddy, Ltd, Draco Capital, Inc., Edward Pascal, Robert Mendel, Stanley Beraznik, Don Bui, Ben Ariano, 3791068 Canada, Inc., Peter Taylor, John E. Panneton, Wayne C. Fox, David Currie, Byron Messier, Darshan Khurana, Mateo Novelli, Diya Al-Sarraj, Sequoia Aggressive Growth Fund, Ltd., Sequoia Diversified Growth Fund, Rig III Fund, Ltd., Aran Asset Management SA, Semper Gestion SA and Eosphoros Asset Management, Inc., file this Original Petition complaining of defendants CenturyTel, Inc. (a/k/a CenturyLink), Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski, Harvey P. Perry, Robert Kubbernus, Balaton Group, Inc., Bankton Financial Corporation, Bankton Financial Corporation, LLC, ClearSky Management, Inc., Wilson Vukelich, LLP, and ClearSky Investments LP and for cause of action would show to the Court the following:

## DISCOVERY PLAN CONTROL

1.     Plaintiffs request entry of a Scheduling Order under Level 3 as provided by Rule 190.4 of the Texas Rules of Civil Procedure.

## INTRODUCTION AND SUMMARY OF THE CASE

2.     This is a case in which Plaintiffs seek redress for the massive fraud, oppression, breach of fiduciary duties, and other violations of their legal rights that were perpetrated by Defendants and resulted in the loss by them of their entire investments in SkyComm

2

Technologies, Inc. ("SkyComm"), a company which through a subsidiary, SkyPort Global
Communications, Inc. ("SkyPort"), operated a state-of-the-art, ultra-secure satellite
communications and network operations facility at Ellington Field in Houston, Texas.

3.      CenturyTel, Inc. ("CenturyTel"), one of the nation's 10 largest
telecommunications companies, gained control over SkyComm, and in violation of its fiduciary
duties operated SkyComm for its own benefit and to the detriment of SkyComm's shareholders.
CenturyTel exercised control over SkyComm, as holder of SkyComm's convertible debt and
through four of its senior managers that it appointed to SkyComm's Board.

4.      When CenturyTel was through with SkyComm, it delivered the "keys" to the
company on a silver platter to Robert Kubbernus ("Kubbernus"), despite the many red flags that
indicated that he was a stock fraudster and corporate looter. CenturyTel helped Kubbernus
obtain the necessary licenses to assume control of the SkyComm corporate vehicle and SkyPort
teleport by submitting false and misleading applications and other submissions to the Federal
Communications Commission ("FCC"), United States Department of Homeland Security,
Federal Bureau of Investigation ("FBI"), Department of Justice and Department of Homeland
Security.

5.      Kubbernus and various entities he controls, including Balaton Group Inc.
("Balaton"), Bankton Financial Corporation ("Bankton"), ClearSky Management, Inc.
("ClearSky Management") and Bankton Financial Corporation, LLC ("Bankton-Texas"),
defrauded over 100 investors in SkyComm. Kubbernus looted SkyComm, SkyPort, and a related
investment partnership, ClearSky Investments, LP ("ClearSky"), of millions of dollars.
Kubbernus then put SkyPort into Chapter 11, falsely claimed Balaton was a creditor of SkyPort

3

and obtained confirmation of a plan which gave Balaton most of the equity in SkyComm and wiped out the equity of all of its other shareholders.

6.    Throughout this time period, Kubbernus' long-time law firm, Wilson Vukelich, LLP ("Wilson Vukelich"), worked with him hand in glove, defrauding investors through the use of false and misleading offering materials and other documents, co-mingling and misappropriating investors' escrow funds, failing to protect the interests of its clients, ClearSky and the investors in ClearSky, charging excessive legal fees and collecting legal fees from SkyComm and ClearSky for services not rendered to those entities.

7.    All in all, Defendants violated and conspired to breach the fiduciary duties they owed to Plaintiffs, oppressed Plaintiffs, defrauded and conspired to defraud Plaintiffs, violated the Texas Securities Act, and made numerous false and misleading statements to the FCC, Department of Homeland Security, Federal Bureau of Investigation, Department of Justice and Department of Homeland Security in a scheme that resulted in the loss by Plaintiffs of the entire value of their interests in SkyComm.

8.    Given the pervasive violations, the catastrophic damages suffered by Plaintiffs, Defendants' utter contempt for United States laws designed to protect the United States' homeland, national defense and telecommunications infrastructure, and the actual and potential harm to the safety and security of the citizens of the United States, Plaintiffs should be awarded not just their compensatory and consequential, but also punitive damages to serve as a deterrent to Defendants and others from engaging in similar unlawful schemes.

9.    The allegations in this Petition, are except as noted as to a particular plaintiff, made upon information and belief. Plaintiffs do not have access to many of the documents relevant to this case.

4

Certified Document Number: 44550657 - Page 4 of 111

## PARTIES

10.      Plaintiff Joanne Schermerhorn is a resident of the State of Texas and is the successor to the interest of the Milan Trust, which has been the owner of 1,000,010 shares of common stock of SkyComm, a Delaware corporation with its principal office at 1140 Aerospace Avenue, Houston, Texas. SkyComm, through its wholly owned subsidiary, SkyPort, f/k/a SkyComm International, Inc., has at all relevant times owned and operated a satellite telecommunications facility and network operations center at Ellington Air Force Base in Houston, Texas. SkyPort is a Texas corporation with its principal office also at 1140 Aerospace Avenue, Houston, Texas.

11.      Plaintiff John K. Waymire is a resident of the State of Texas, and is the successor to the interest of NLMC, Inc., which is, and has been, the owner of 40,000 shares of common stock of SkyComm.

12.      Plaintiff Chet Gutowsky is a resident of the State of Texas and is, and has been, the owner of 1,000,000 shares of common stock of SkyComm.

13.      Plaintiff John Llewellyn is a resident of the State of Texas and is, and has been, the owner of 500,000 shares of common stock of SkyComm.

14.      Plaintiff Joseph A. Lopez is a resident of the State of New Jersey and is, and has been, the owner of 150,000 shares of common stock of SkyComm.

15.      Plaintiff Robert Foote is a resident of the State of Florida and is, and has been, the owner of 50,000 shares of common stock of SkyComm.

16.      Plaintiff BLF Partners, Ltd., is a corporation organized in the State of Texas and is, and has been, the owner of 115,500 shares of common stock of SkyComm.

5

Certified Document Number: 44550657 - Page 5 of 111

17.     Plaintiff ECAL Partners, Ltd., is a corporation organized in the State of Texas and is, and has been, the owner of 375,851 shares of common stock of SkyComm and the owner of 0.70% of ClearSky, which was purchased for $50,000 in 2006.

18.     Plaintiff Whizkid Venture, LLC, is a limited liability company organized in the State of Nevada and is, and has been, the owner of 1,000,000 shares of common stock of SkyComm.

19.     Plaintiff Bella Krieger is a resident of the State of Florida and is, and has been, the owner of 25,000 shares of common stock of SkyComm.

20.     Plaintiff Martin Pollak is a resident of the State of New York and is, and has been, the owner of 1,364,412 shares of common stock of SkyComm.

21.     Plaintiff Gloster Holdings, LLC, is a Limited Liability Company, organized in the State of Delaware and is, and has been, the owner of 1,163,91 shares of common stock of SkyComm.

22.     Plaintiff Melvyn Reiser is a resident of the State of New York and is, and has been, the owner of 105,000 shares of common stock of SkyComm.

23.     Plaintiff Barry Klein is a resident of the State of New York and is, and has been, the owner of 20,000 shares of common stock of SkyComm.

24.     Plaintiff Cheskel Kahan is a resident of the State of New York and is, and has been, the owner of 5,000 shares of common stock of SkyComm.

25.     Plaintiff John A. Rees is a resident of the State of Arkansas and is, and has been, the owner of 125,000 shares of common stock of SkyComm.

26.     Plaintiff Brian W. Harle is a resident of the State of Texas and is, and has been, the owner of 77,000 shares of common stock of SkyComm.

6

27. Plaintiff Michael Stein is a resident of the State of New York and is, and has been, the owner of 20,000 shares of common stock of SkyComm.

28. Plaintiff Lawrence Solomon is a resident of the State of Florida and is, and has been, the owner of 50,000 shares of common stock of SkyComm.

29. Plaintiffs Tracy Elstein and David Togut are residents of the State of New York and are, and have been, the owner of 50,000 shares of common stock of SkyComm.

30. Plaintiff Jason Charles Togut Trust is a trust formed in the State of New York and is, and has been, the owner of 25,000 shares of common stock of SkyComm.

31. Plaintiff BMT Grantor Trust is a trust formed in the State of New York and is, and has been, the owner of 25,000 shares of common stock of SkyComm.

32. Plaintiff Lynn Joyce Elstein Trust is a trust formed in the State of Florida and is, and has been, the owner of 200,000 shares of common stock of SkyComm.

33. Plaintiff Charles Stack is a resident of the State of Texas has been, the owner of 8,000,000 shares of common stock of SkyComm.

34. Plaintiff Joseph Baker is a resident of the State of Texas and is, and has been, the owner of 4,000,015 shares of common stock of SkyComm.

35. Plaintiff Movada, Ltd., is a limited company organized in the State of Texas and is, and has been, the owner of 6,584,972 shares of common stock of SkyComm.

36. Plaintiff Puddy, Ltd., is a limited company organized in the State of Texas and is, and been, the owner of 8,229,500 shares of common stock of SkyComm.

37. Plaintiff Draco Capital, Inc. is a corporation organized in Canada and is, and has been, the owner of 53.79% of ClearSky, which was purchased for $3,816,523 in 2006.

7

Certified Document Number: 44550657 - Page 7 of 111

38. Plaintiff Edward Pascal is a resident of Montreal, Quebec, Canada and is, and has been, the owner of 0.70% of ClearSky, which was purchased for $50,000 in March 2006.

39. Plaintiff Robert Mendel is a resident of Montreal, Quebec, Canada and is, and has been, the owner of 0.70% of ClearSky, which was purchased for $50,000 in March 2006.

40. Plaintiff Stanley Beraznik is a resident of the State of California and is, and has been the owner of 0.70 % of ClearSky, which was purchased for $50,000 in 2006.

41. Plaintiff Don Bui is a resident of Montreal, Quebec, Canada and is and has been, the owner of 0.15% of ClearSky, which was purchased for $10,682 in May 2006.

42. Plaintiff Ben Ariano is a resident of Montreal, Quebec, Canada and is and has been, the owner of 0.15% of ClearSky, which was purchased for $10,733 in June 2006.

43. Plaintiff 3791068 Canada, Inc. is a corporation organized in the Province of Quebec, Canada and is and has been the owner 0.70% of ClearSky, which was purchased for $50,000 in 2006.

44. Plaintiff Peter Taylor is a resident of Sutton West, Ontario, Canada and is, and has been, the owner of 14.09 % of ClearSky, which were purchased for $1,000,000 in 2006.

45. Plaintiff John E. Panneton is a resident of Toronto, Ontario, Canada and is, and has been, the owner of 4,337,500 shares of common stock in SkyComm.

46. Plaintiff Wayne C. Fox is a resident of Toronto, Ontario, Canada and is, and has been, the owner of 8,000,000 shares of common stock in SkyComm.

47. Plaintiff David Currie is a resident of Toronto, Ontario, Canada and is, and has been, the owner of 4,337,500 shares of common stock in SkyComm.

48. Plaintiff Byron Messier is a resident of Toronto, Ontario, Canada and is, and has been, the owner of 5,000,000 shares of common stock in SkyComm.

8

49.    Plaintiff Darshan Khurana is a resident of Montreal, Quebec, Canada and is, and has been, the owner of 801,430 shares of common stock of SkyComm.

50.    Plaintiff Mateo Novelli is a resident of France and is, and has been, the owner of 1,763,145 shares of common stock of SkyComm.

51.    Plaintiff Diya Al-Sarraj is a resident of the United Arab Emirates and is, and has been, the owner of 240,429 shares of common stock of SkyComm.

52.    Plaintiff Sequoia Aggressive Growth Fund, Ltd., is a limited company organized in the British Virgin Islands and managed by Nemo Asset Management in Abu Dhabi, UAE and is, and has been, the owner of 27,530,530,11 shares of common stock of SkyComm.

53.    Plaintiff Sequoia Diversified Growth Fund is an offshore fund managed by Nemo Asset Management in Abu Dhabi, UAE and is, and has been, the owner of 12,815,180 shares of common stock of SkyComm, and is, and has been the owner of 4.93% of ClearSky, which was purchased for $350,000 in 2006.

54.    Plaintiff Rig III, Ltd., is a limited company organized in the British Virgin Islands Fund and managed by Nemo Asset Management in Abu Dhabi, UAE and is, and has been, the owner of 12,822,874 shares of common stock of SkyComm.

55.    Plaintiff Aran Asset Management SA is a corporation formed in Switzerland and is, and has been, the owner of 7,926,280 shares of common stock of SkyComm.

56.    Plaintiff Semper Gestion SA is a corporation formed in Switzerland and is, and has been, the owner of 2.24% of ClearSky, which was purchased for $159,257 in 2006.

57.    Plaintiff Eosphoros Asset Management, Inc., is a corporation organized in Ontario, Canada and is, and has been, the owner of 2.82% of ClearSky, which was purchased for $200,000 in February 2006.

Certified Document Number: 44550657 - Page 9 of 111

58.     Plaintiffs Joanne Schermerhorn, John K. Waymire, Chet Gutowsky, John Llewellyn, Joseph A. Lopez, Robert Foote, BLF Partners Ltd., ECAL Partners, Ltd., Whizkid Venture, LLC, Bella Krieger, Martin Pollack, Melvyn Reiser, Barry Klein, Cheskel Kahan, John A. Rees, Brian W. Harle, Michael Stein, Lawrence Solomon, Tracy Elstein & David Togut, Jason Charles Togut Trust, BMT Grantor Trust, Lynn Joyce Elstein Trust, Charles Stack, Joseph Baker, Movada, Ltd, Puddy, Ltd, are "Original Shareholders" of SkyComm. The Original Shareholders held shares in SkyComm prior to CenturyTel acquiring any interest in SkyComm.

59.     Plaintiffs Gloster Holdings, LLC, and ECAL Partners, Ltd., are the "Non-CenturyTel Debenture Holders." The Non-CenturyTel Debenture Holders purchased debentures from SkyComm prior to May 2005 and converted them into SkyComm shares on November 2, 2006.

60.     Plaintiffs Draco Capital, Inc., Edward Pascal, Robert Mendel, Stanley Beraznik, Don Bui, Ben Ariano, Sequoia Diversified Growth Fund, 3791068 Canada, Inc., Peter Taylor, Semper Gestion SA, Sequoia Diversified Growth Fund, ECAL Partners, Ltd. and Eosphoros Asset Management, Inc. are "ClearSky Investors", having purchased membership interests in ClearSky.

61.     Plaintiffs John E. Panneton, Wayne C. Fox, David Currie, Byron Messier, Darshan Khurana, Mateo Novelli, Diya Al-Sarraj, Sequoia Aggressive Growth Fund, Ltd., Sequoia Diversified Growth Fund, Rig III Fund, Ltd., and Aran Asset Management SA, are "Additional Investors" in SkyComm, having purchased shares in SkyComm after November 2, 2006.

62.     Defendant CenturyTel, a/k/a CenturyLink, is a Delaware corporation with its headquarters located at 100 CenturyTel Drive Monroe, Louisiana 71203. CenturyTel does

10

business in the State of Texas systematically and regularly through agents and subsidiaries, some of which are wholly-owned Texas corporations, and CenturyTel has committed torts in the State of Texas as alleged herein. From December 2002 through approximately February 2006, CenturyTel, as lender to SkyComm and holder of SkyComm's convertible debentures, exercised complete control over the management and operations of SkyComm and SkyPort for the benefit of CenturyTel. On or about February 15, 2006, CenturyTel transferred operational control of SkyComm to Balaton and Kubbernus, while continuing to exercise control in working towards the transfer of formal control, which occurred on November 2, 2006, also for the benefit of CenturyTel. CenturyTel has not appointed a registered agent for service of process as required by State law and may be served by service upon the Texas Secretary of State with notice forwarded to CenturyTel's home office: 100 CenturyTel Drive, Monroe, Louisiana 71203.

63. Defendant Clarence Marshall ("Marshall") was Vice President – Corporate Technology Assessment and Strategic Planning of CenturyTel and from December 2002 until sometime in 2006, Chairman of the Board of Directors of SkyComm and SkyPort. Marshall resigned at some point in 2006 over concerns about conflict of interest issues, but continued to direct SkyComm's activities on behalf of CenturyTel. Marshall is a resident of the State of Oklahoma. Marshall committed torts in the State of Texas as alleged herein and is subject to personal jurisdiction in this state. Marshall may be served under the Texas Long Arm Statute by service upon the Secretary of State with notice forwarded to Marshall's home: 12701 S Harvard Ave, Jenks OK 74037.

64. Defendant R. Stewart Ewing, Jr. was an Executive Vice President and Chief Financial Officer of CenturyTel and at from December 2002 until sometime in 2006, a Director of SkyComm and SkyPort. Ewing is a resident of the State of Louisiana. Ewing committed torts

11

in the State of Texas as alleged herein and is subject to personal jurisdiction in this state. Ewing may be served under the Texas Long Arm Statute by service upon the Secretary of State with notice forwarded to Ewing's home: 1511 Frenchmans Bend Rd., Monroe, LA 71203.

65.     Defendant Michael E. Maslowski was a Vice President of CenturyTel and from December 2002 until sometime in 2006, a Director of SkyComm and SkyPort. Maslowski is a resident of the State of Louisiana. Maslowski committed torts in the State of Texas as alleged herein and is subject to personal jurisdiction in this state. Maslowski may be served under the Texas Long Arm Statute by service upon the Secretary of State with notice forwarded to Maslowski's home: 3431 Westminister Ave., Monroe, LA 71201.

66.     Defendant Harvey P. Perry was Executive Vice President, General Counsel and Chief Administrative Officer of CenturyTel and from December 2002 until sometime in 2006, a Director of SkyComm and SkyPort. Perry is a resident of the State of Louisiana. Perry committed torts in the State of Texas as alleged herein and is subject to personal jurisdiction in this state. Perry may be served under the Texas Long Arm Statute by service upon the Secretary of State with notice forwarded to Perry's home: 2778 Point Dr., Monroe, LA 71201.

67.     Defendants referenced in the preceding four paragraphs are collectively referred to as the "CenturyTel Directors." CenturyTel and the CenturyTel Directors are collectively referred to as the "CenturyTel Defendants." From approximately December 2002 through approximately February 15, 2006 the CenturyTel Directors, acting for the benefit of CenturyTel, exercised complete control over the management and operations of SkyComm and SkyPort. From approximately February 15, 2006 through November 2, 2006, the CenturyTel Directors transferred operational control of SkyComm to Balaton and Kubbernus, while continuing to work towards the transfer of formal control and maintaining *de jure* control over SkyComm.

12

68. Defendant Kubbernus is presently a resident of Galveston County, Texas and was at all relevant times a resident of Galveston County, Texas, and Ontario, Canada, as well as the President and party in control of the defendants Balaton, Bankton, Bankton-Texas, ClearSky, and ClearSky Management, as well as Lavell-Canada and Lavell-US, all described below. Kubbernus may be served at his place of employment: 11140 Aerospace Avenue, Houston, Texas 77034.

69. Defendant Balaton is an Ontario corporation with its headquarters located at 152 King Street East, Suite 400 Toronto, Ontario, M5A 1J3 Canada. Balaton does business in the State of Texas systematically and regularly through agents and subsidiaries, some of which are Texas corporations, and Balaton has committed torts in the State of Texas as alleged herein. Balaton has not appointed a registered agent for service of process as required by State law and may be served by service upon the Texas Secretary of State with notice forwarded to Balaton's home office: 152 King Street East, Suite 400 Toronto, Ontario, M5A 1J3 Canada.

70. Defendant Bankton is a Canadian Corporation with its headquarters located at 152 King Street East, Suite 400 Toronto, Ontario, M5A 1J3 Canada. Bankton does business in the State of Texas systematically and regularly through agents and subsidiaries, some of which are Texas corporations, and Bankton has committed torts in the State of Texas as alleged herein. Bankton has not appointed a registered agent for service of process as required by State law and may be served by service upon the Texas Secretary of State with notice forwarded to Bankton's home office: 152 King Street East, Suite 400 Toronto, Ontario, M5A 1J3 Canada.

71. Defendant Bankton-Texas is a Texas limited liability company, with offices in Harris County, Texas and 152 King Street East, Suite 400, Toronto, Ontario, M5A 1J3 Canada.

13

Bankton-Texas may be served through its registered agent: Robert Kubbernus, 319 Northcliff Ridge Lane, Friendswood, Texas 77546.

72. Defendant ClearSky Management is a Delaware corporation with its headquarters located at 152 King Street East, Suite 400 Toronto, Ontario M5A 1J3, Canada. ClearSky Management does business in the State of Texas systematically and regularly through agents and subsidiaries, some of which are Texas corporations, and ClearSky Management has committed torts in the State of Texas as alleged herein. ClearSky Management has not appointed a registered agent for service of process as required by State law and may be served by service upon the Texas Secretary of State with notice forwarded to ClearSky Management's home office: 152 King Street East, Suite 400 Toronto, Ontario, M5A 1J3 Canada.

73. Defendants Kubbernus, Balaton, Bankton, Bankton-Texas, and ClearSky Management are together referred to as the "Kubbernus Defendants."

74. Defendant Wilson Vukelich is a Canadian law firm with offices in Markham, Ontario. The Kubbernus Defendants, CenturyTel Defendants and Wilson Vukelich are together referred to as the "Defendants." Wilson Vukelich has committed torts in the State of Texas as alleged herein. Wilson Vukelich has no office or registered agent in the State and may be served by service upon the Texas Secretary of State with notice forwarded to Wilson Vukelich's home office: Valleywood Corporate Centre, 60 Columbia Way, Suite 710, Markham, Ontario, Canada L3R 0C9.

75. Defendant ClearSky is named as a nominal defendant in this action because of the derivative claims being asserted in its behalf by the ClearSky Investors.

14

## JURISDICTION AND VENUE

76.     The Court has jurisdiction to hear this case in that the damages are in excess of the minimum jurisdictional limits of the Court.

77.     All or a substantial part of the events and transactions giving rise to the causes of action stated herein occurred in Houston, Harris County, Texas, making venue proper in Harris County pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a)(1). Additionally, one or more defendants reside or maintain its principal office in Harris County.

78.     Venue is proper as to all the defendants in Harris County, pursuant to Tex. Civ. Prac. & Rem. Code § 15.005. Each defendant participated in the transactions which form the basis of this action and such transactions occurred in Harris County, Texas.

79.     All claims and causes of action are based solely on state law. While the factual allegations herein discuss many violations of federal statutes and misconduct in federal bankruptcy court, these allegations are factual only and will serve only as supporting evidence of conduct which violated state law. To the extent that any private cause of action may exist relating to any of the federal laws mentioned herein, Plaintiff's expressly limited their claims and causes of action to state law.

80.     This Petition does not allege a derivative action on behalf of SkyComm or SkyPort. Plaintiffs are asserting only direct claims for violations of duties owed directly to Plaintiffs. All pleading of conduct that violates duties to corporations is made solely to evidence conduct that also violates duties owed directly to Plaintiffs.

15

Certified Document Number: 44550657 - Page 15 of 111

## FACTUAL BACKGROUND

### A.    SkyPort's Founding

81.    SkyPort, then known as SkyComm International, Inc., was founded in the late 1990's by a group of Houston-based telecom executives and NASA telecommunications experts for the purpose of developing, owning and operating a satellite communications facility and network operations center at Ellington Air Force Base, adjacent to NASA headquarters in the Houston, Texas.

82.    This facility was to be the most advanced and secure satellite communications facility in the United States, and perhaps the world, and it was intended to provide highly secure telecommunications services to Federal and State agencies and service providers, as well as to various commercial customers.    The facility was also to include a Special Compartmented Intelligence Facility (known as a "SCIF") to support the needs of national security agencies for advanced physical and network communications security.

83.    In March 1999, SkyPort entered into a long-term lease at Ellington Air Force Base for approximately 7.5 acres, with an option for 11 acres more.

84.    From 1999 and 2002, SkyPort obtained the various licenses it would need from the FCC to operate the teleport, and it developed its plans for the design and development of the teleport.    SkyPort also obtained the backing of the local business community in Houston and of various potential users of the facility.

85.    During this period, SkyPort raised several million dollars from investors (the "Original Shareholders") to finance its activities.    SkyPort estimated that it would need approximately $14 million to develop, construct and equip the teleport.

16

Certified Document Number: 44550657 - Page 16 of 111

**B.    Regulatory, National Security and Homeland Security Requirements**

86.    Section 214 of the Communications Act of 1934, as amended (the "Communications Act") required SkyComm, as a prospective operator of an international telecommunications facility and satellite earth station, to obtain a certificate of public convenience and necessity from the FCC prior to construction of the teleport.

87.    Authorizations for operation of satellite earth stations require an application and approval process pursuant to 47 C.F.R. Part 25, similar to that in 47 C.F.R. Part 63 described above for international section 214 authorizations.

88.    Transfers of control of international telecommunications facilities and satellite earth stations, or of interests within controlling entities, require approvals from the FCC and transfers of control involving foreign ownership require additional approvals from the FCC and other United States governmental agencies.

89.    In accordance with Sections 63.12 and 63.18 and 63.24 and 25.119 of the FCC's Rules, any transfer of control of a United States based international telecommunications carrier and satellite earth station, or any change in a controlling interest in the ownership of a licensee, including changes in legal or equitable ownership, required application to and the prior approval of the FCC under 47 C.F.R. 63.24; 47 C.F.R. 63.12; 47 C.F.R. 63.18; 47 C.F.R. 25.119.

90.    Any transfer of control to a non-United States owned entity of 10% or more of a certain telecommunications facilities requires disclosure pursuant to 47 CFR § 1.2112 and 47 USC § 310 of the potential owner, and this information is to be used to evaluate whether the transfer should be approved (see FCC, International Bureau, Foreign Ownership Guidelines).

91.    In addition, the national and homeland security agencies that SkyComm was seeking to provide services to, required that their telecommunications vendors not be under

17

Certified Document Number: 44550657 - Page 17 of 111

foreign ownership, control or influence as a condition to being awarded a contract. See DoD 5220.22-R, Section C2.2 - "Industrial Security Regulation"; DoD 5220.22-M, Section 3 - National Industrial Security Program Operating Manuel; Directive-Type Memorandum (DTM) 09-019 - "Policy Guidance for Foreign Ownership, Control, or Influence (FOCI)."

92.     In 1999, SkyPort obtained an international section 214 license. In 2000 and 2002, SkyPort obtained fixed earth station licenses and in 2005, it obtained a VSAT license.

## C.  CenturyTel's Initial Involvement

93.     In 2002, CenturyTel was the eighth largest telecommunications company in the United States with operations in 22 States and around $2 billion in annual revenues.

94.     SkyPort was introduced to CenturyTel in 2002 by one of CenturyTel's directors, Ernie Butler, Jr.

95.     CenturyTel, which provided primarily land-based communications to customers in smaller metropolitan and rural areas, wanted to have access to satellite telecommunications capabilities to enhance its business.

96.     Among the applications that interested CenturyTel were the delivery of consumer television services via satellite, satellite distribution of video to its regional offices and delivery of billing and other data from its regional offices to its headquarters.

97.     In late 2002, CenturyTel agreed to provide SkyPort with the funds it needed to build the teleport in the form of debentures, convertible into shares of the company.

98.     As part of this transaction, SkyComm was created as a holding company for SkyPort, and it issued to CenturyTel its 8.5% cumulative preferred convertible debentures, carrying an 8% per annum interest rate.

99.     The proceeds of these debentures were to be used to construct the teleport.

18

Certified Document Number: 44550657 - Page 18 of 111

100.  The debentures were convertible into common shares, but even prior to conversion, the debentures granted CenturyTel the effective status of controlling shareholder. Under the terms of the debentures, CenturyTel had the right to elect four of the eight members of the Board of Directors of SkyComm and in the event of a deadlock, the Chairman appointed by CenturyTel, had the right to cast the deciding vote.

101.  CenturyTel exercised its rights by appointing the CenturyTel Directors, each of whom was a senior officer and/or director of CenturyTel, to the Boards of Directors of SkyComm and SkyPort. CenturyTel also appointed Marshall as Chairman of both Boards.

102.  The teleport was completed in the second half of 2003 and began providing services to customers in January 2004.

**D.    CenturyTel Manages SkyComm as if it were a Wholly-Owned Subsidiary**

103.  Although CenturyTel was never a shareholder in SkyComm or SkyPort, it exercised complete control over the management and operations of SkyComm and SkyPort -- directly and through the CenturyTel Directors.

104.  In their capacity as directors of SkyComm and SkyPort, the CenturyTel Directors exercised complete control over the management and operations of SkyComm and SkyPort on behalf of CenturyTel.

105.  CenturyTel caused SkyComm and SkyPort to hire a new CEO. The new CEO, Roger Klotz ("Klotz"), was informed by CenturyTel that he should report directly to CenturyTel and defendant Marshall, rather than the Boards of Directors of these companies.

106.  Klotz, as President and CEO of SkyComm and SkyPort, reported directly to and took his instructions from CenturyTel and Marshall, who was acting on behalf of CenturyTel.

19

Certified Document Number: 44550657 - Page 19 of 111

107.   CenturyTel and the CenturyTel Directors excluded the other directors of SkyComm and SkyPort (the "Non-CenturyTel Directors") from the decision making process of the two companies.

108.   The Non-CenturyTel Directors were given only intermittent and incomplete reports on what SkyComm and SkyPort were doing or were going to be doing, and were often kept unapprised of major decisions regarding SkyComm and SkyPort.

109.   The Non-CenturyTel Directors were often asked to vote on and approve courses of action that had already been determined and directed by CenturyTel, and without being given all of the particulars or final documentation relevant thereto.

110.   CenturyTel and the CenturyTel Directors managed and operated SkyComm and SkyPort for CenturyTel's benefit, as if SkyComm and SkyPort were its wholly owned subsidiaries, and they completely disregarded the interests of SkyComm's shareholders.

111.   CenturyTel and the CenturyTel Directors caused SkyPort to do significant work on a variety of projects for CenturyTel, including developing a consumer satellite television broadcast system and setting up a video distribution system. SkyPort engineers worked with CenturyTel personnel on these projects, developing systems meeting CenturyTel's requirements.

112.   SkyPort built and successfully tested prototype systems for CenturyTel, but in each instance, CenturyTel refused to proceed with the project with SkyPort, and selected another vendor instead.

113.   CenturyTel refused to pay SkyPort for its work or the other expenses incurred by SkyPort in setting up the systems for CenturyTel, asserting, through the CenturyTel Directors, that since it was providing all of SkyPort's funding anyway, it should not have to pay for its services.

20

Certified Document Number: 44550657 - Page 20 of 111

114. For example, CenturyTel promised SkyPort a $25 million contract to develop a satellite based communications system to backhaul its billing information from its regional offices to its headquarters. CenturyTel caused SkyPort to do significant work on setting up this system. SkyPort engineers worked with CenturyTel personnel teaching them the intricacies and operations of such a system and worked with them to develop a system to CenturyTel's requirements. SkyPort built and successfully tested this system. However, CenturyTel then informed SkyPort that it had decided not to proceed with this contract.

115. Marshall and the other CenturyTel Directors informed the Non-CenturyTel Directors that since the contract was not in writing, CenturyTel did not have to honor it.

116. CenturyTel, through the CenturyTel Directors, refused to pay SkyPort for the work it performed or expenses it incurred in setting up this system for CenturyTel, asserting that it was providing all of SkyPort's funding anyway.

117. The CenturyTel Directors did not represent the interests of SkyComm and its shareholders in connection with this project, but rather acted exclusively for the benefit of CenturyTel.

118. CenturyTel and the CenturyTel Directors exercised complete control over SkyComm's finances and managed them for the benefit of CenturyTel, and not SkyComm.

119. CenturyTel and the CenturyTel Directors promised SkyComm on numerous occasions that CenturyTel would provide for all of the Company's financial needs. CenturyTel and the CenturyTel Directors informed SkyComm and the Non-CenturyTel Directors, that SkyComm did not need any outside financing, that CenturyTel would be SkyComm's banker and that CenturyTel had all of the money SkyComm would ever need.

21

120. SkyComm, as an early stage company needed funds to be able to develop its business -- security deposits had to be made, obligations incurred and invoices paid.

121. To be competitive with its rivals in the satellite telecommunications industry, SkyComm had a critical need to be able to provide its customers with equipment lease financing.

122. CenturyTel and the CenturyTel Directors refused to permit SkyComm to obtain bank or other debt or equity financing from any source, other than through the issuance of more convertible debentures to CenturyTel.

123. CenturyTel and the CenturyTel Directors set the price, terms and timing of these debentures and their funding all to the benefit of CenturyTel.

124. CenturyTel and the CenturyTel Directors never permitted SkyComm to seek financing from third parties or to obtain price quotes for financing from third parties so that it could determine that the financing being offered to it by CenturyTel was at fair market rates.

125. Between 2002 and 2005, SkyComm issued approximately 8 rounds of debentures to CenturyTel, with the principle and accumulating interest of each round constantly increasing the percentage ownership of SkyComm that CenturyTel would receive upon conversion of the debentures.

126. However, CenturyTel repeatedly failed to provide timely financing to SkyComm so as to enable SkyComm to execute its business plan. It took CenturyTel as much as six months to provide financing to SkyComm after the funds were needed and had been requested.

127. CenturyTel's scheme of financing SkyComm exclusively through the issuance of convertible debentures was against the interests of SkyComm in that it resulted in SkyComm becoming a company overburdened by debt and an unsupportable debt to equity ratio.

22

128.    The CenturyTel Directors did not represent the interests of SkyComm and its shareholders in connection with obtaining the financing that SkyComm needed for its business but rather, acted exclusively for the interests of CenturyTel.

129.    CenturyTel and the CenturyTel Directors grossly mismanaged SkyComm and failed to exercise reasonable care in the performance of their duties. Their experience was in land-based telecommunications and they did not have the experience or know-how to operate a satellite based communications company or sell satellite communications services.

130.    CenturyTel and the CenturyTel Directors hired a sales staff for SkyComm that did not have experience in satellite telecommunications sales and this negatively impacted SkyComm's sales efforts.

131.    On a number of occasions, when the Non-CenturyTel Directors raised issues or concerns with the CenturyTel Directors, Marshall would state "Remember who you are working for – CenturyTel."

**E.    CenturyTel Decides to Sell its Controlling Interest in SkyComm**

132.    In May 2005, CenturyTel purchased additional debentures from SkyComm, which brought the total principal balance of its debentures to over $20 million ("CenturyTel Debentures").

133.    Shortly thereafter, after a change in the composition of CenturyTel's Board precipitated a change in business direction, CenturyTel abruptly decided to divest itself of its non-core business activities, including its interest in SkyComm.

134.    CenturyTel wrote off its investment in SkyComm and sought to end its involvement with SkyComm as quickly as possible.

23

Certified Document Number: 44550657 - Page 23 of 111

135.     At about that time, CenturyTel caused the preparation and distribution of a
prospectus, offering the sale of its convertible debentures and controlling interest in the
Company.

136.     CenturyTel and the CenturyTel Directors failed to inform the Non-CenturyTel
Directors of this decision.

137.     Word of CenturyTel's decision soon got out to SkyComm's competitors, who
used it against SkyComm in the competition to attract new customers.

138.     SkyComm lost customers to its competitors as a result of the acts of CenturyTel
and the CenturyTel Directors.

139.     The Non-CenturyTel Directors were not informed of this prospectus until after
they had already learned of its existence from prospective customers for SkyComm's services.

**F.     Kubbernus and Balaton Enter the Picture**

140.     At around this time, Kubbernus became aware that SkyComm was being shopped
by CenturyTel.

141.     Kubbernus was informed that CenturyTel needed to divest itself of its interest in
SkyComm in order to be able to proceed with a $10 billion merger with Alltel, another
telecommunications company.

142.     Kubbernus acting through Balaton, an investment banking firm he had recently
organized, started to shop SkyComm and put out offering materials for what he deemed a
"superb telecom opportunity."

143.     At the time, Kubbernus and Balaton had recently formed The Watershed Funds,
Ltd., a Cayman Islands corporation (the "Watershed Funds"), which he planned to organize as
an offshore investment fund.

24

144.    Kubbernus made an offer to CenturyTel to acquire the CenturyTel Debentures and controlling interest in SkyComm on behalf of the Watershed Funds, and began telling prospective investors that SkyComm would be the fund's first investment.

145.    Prior to the time that CenturyTel began negotiating with Kubbernus, Kubbernus had been involved in several shareholder disputes and had been accused of defrauding investors, abusing shareholders' rights and misappropriating and misusing company assets for his own benefit. These lawsuits included:

(a)    *Chamberlain and Rhea v. Optima International Trust, Robert Kubbernus et. al,* Civ. No. A-05-CA-394-LY (W. D. Tex 2005), in which Kubbernus was accused of, among other things, theft, breach of fiduciary duty, fraud/negligent misrepresentation, conspiracy, securities fraud and breach of contract;

(b)    *TrueStar Petroleum Corporation et al v. Optima Services International Ltd., Balaton Group, Inc., Robert J. Kubbernus, M. Carole Coale, John S. Burns, and Frederick Bryson Farrill vs. J.W. Rhea, IV and Robert Chamberlain vs. Thomas F. Cooke,* Cause No. 2005-54028, 157th Judicial District Court of Harris County, Texas, alleging breach of contract, business disparagement, breach of fiduciary duty and statutory fraud; and

(c)    *Bristol Asset Management v. JAWZ, Inc and Robert Kubbernus* (2000), alleging claims of fraud, breach of fiduciary duty and unfair business practices in connection with his failure to deliver shares to an investor.

All of these facts were available through an ordinary internet search regarding Mr. Kubbernus.

146.    Although Kubbernus fashioned himself as a "turnaround expert," the two companies in which his involvement could be verified on the internet had gone out of business after he became involved and resulted in shareholders' litigation.

25

147.   Kubbernus did not have any experience in satellite communications and his expertise was not in business operations or management did they have substantial experience in operating any business.

148.   Rather, Kubbernus' experience was in "financial engineering," and stock manipulation.

149.   Kubbernus proposed to take control of SkyComm utilizing not his own funds, but rather funds he would obtain from third party investors.

150.   Yet, CenturyTel and the CenturyTel Directors decided to enter into negotiations with him on an exclusive basis.

151.   In these negotiations, CenturyTel and the CenturyTel Directors pursued the interests of CenturyTel at the expense of the SkyComm shareholders and prospective investors.

152.   SkyComm's Non-CenturyTel Directors were not involved in or kept apprised of these negotiations.

153.   Kubbernus proposed to CenturyTel a multi-phased fundraising plan that they would execute for SkyComm, which would result in massive dilution for the SkyComm shareholders.

154.   At the time, various other parties were interested in negotiating with CenturyTel to acquire its debentures and controlling interest in SkyComm under terms that would have been much better for SkyComm's shareholders, but CenturyTel refused to entertain such offers and insisted on negotiating exclusively with Balaton.

**G.     CenturyTel Causes SkyPort to File for Chapter 11 Protection**

155.   On November 21, 2005, CenturyTel and the CenturyTel Directors caused SkyComm to file a voluntary petition under Chapter 11 of the Bankruptcy Act.

26

Certified Document Number: 44550657 - Page 26 of 111

156.    In connection to the Bankruptcy filing, CenturyTel and the CenturyTel Directors caused SkyComm's officers to file applications for authority to transfer SkyPort's FCC 312 authorizations and 214 licenses to SkyPort, as Debtor-in-Possession ("SkyPort DIP"). These applications were *pro forma* in that they did not involve an actual change in the ownership interests in SkyComm.

## H.    CenturyTel Signs an Agreement to Sell to the Watershed Funds and Causes SkyComm to sign Agreements for Balaton to Syndicate Interests in SkyComm

157.    On or about February 15, 2006, CenturyTel entered into a Debenture Purchase Agreement with the Watershed Funds for the CenturyTel Debentures. Under this agreement, the Watershed Funds was to acquire all of the CenturyTel Debentures for a purchase price of $3 million, plus an amount needed to reimburse CenturyTel for certain payments it made on behalf of SkyComm. The Watershed Funds was also given the right to purchase for $500,000, a restructured revolving $750,000 note from SkyPort to CenturyTel (the "Revolver Note"). The closing was scheduled for June 30, 2006. Balaton guaranteed the Watershed Funds obligations under the Debenture Purchase Agreement.

158.    Under the Debenture Purchase Agreement, CenturyTel and the Watershed Funds agreed to promptly make and prosecute all filings and submissions required by the FCC and obtaining FCC approval of the transfer of control **to the Watershed Funds**. Obtaining the FCC approvals was made a condition of closing.

159.    Also on February 15, 2006, Balaton agreed to provide SkyComm with a $1.5 million DIP Financing Facility. Balaton raised the funds it needed to advance the initial monies under this facility from several investors in Canada. These loans were to be convertible into equity in SkyComm.

27

Certified Document Number: 44550657 - Page 27 of 111

160.     On February 15, 2006, CenturyTel and the CenturyTel Directors caused SkyComm to enter into a $4 million Equity Placement Agreement with Balaton, under which Balaton was to be paid commissions for raising equity financing for SkyComm from third-party investors.

161.     Also on February 15, 2006, the CenturyTel Defendants caused SkyComm to enter into:

(a)     a $4 million Exit Credit Facility Agreement with Balaton (which was inclusive of the 1.5 million DIP Financing);

(b)     a Recapitalization Agreement;

(c)     a $4 million Securities Purchase Agreement with **Balaton and other purchasers** to be brought in by Balaton (the "SPA Purchasers"), under which SkyComm agreed to issue 133,333,333 at $0.03 per share to the SPA Purchasers, in exchange for a $4 million equity investment in SkyComm. The amounts advanced under the DIP Financing facility and Equity Credit Financing facility were to be converted into equity as part of the $4 million Securities Purchase Agreement; and

(d)     Warrants giving **Balaton** the right to purchase 133,333,335 shares of SkyComm stock at $0.10 per share.

162.     The obligations of the SPA Purchasers to proceed with these transactions were conditioned upon receipt of **all required** FCC consents and approvals.

163.     The Non-CenturyTel Directors were not provided with information on the proposed transaction or the proposed purchaser.

164.     When asked to vote in favor of the resolutions approving this transaction, the Non-CenturyTel Directors requested information about Kubbernus' background and financial

Certified Document Number: 44550657 - Page 28 of 111

capabilities, as well as the terms of the transaction, but the CenturyTel Directors ignored their requests.

165. The Non-CenturyTel Directors caused an internet search on Kubbernus to be performed and informed the CenturyTel Directors that they had uncovered litigation, including litigation in Harris County, Texas in which Kubbernus was being accused of abusing shareholders' rights and looting.

166. The Non-CenturyTel Directors raised with the CenturyTel Directors on several occasions the concern that Kubbernus did not have the financial resources to consummate the proposed transaction.

167. The Non-CenturyTel Directors informed the CenturyTel Directors that SkyComm's counsel had repeatedly taken the position that a transfer of even a 20% interest in SkyPort to foreign ownership would not be permitted by the FCC. The Non-CenturyTel Directors expressed concerns as to whether FCC approval of foreign ownership of a satellite telecommunications operator important to national security could be obtained.

168. The Non-CenturyTel Directors expressed concerns to the CenturyTel Directors that a transfer of SkyPort to foreign ownership would adversely impact SkyPort's ability to obtain national security related contracts and its ability to obtain common carrier licenses. Although SkyPort did not have a common carrier license at the time it was contemplated that SkyPort would seek such a license in order to extend its services. 47 U.S.C. 310 placed a 20% limit on foreign ownership of U.S. common carriers.

169. The CenturyTel Directors did not respond to these concerns and stated that they would be proceeding with the transaction anyway.

29

Certified Document Number: 44550657 - Page 29 of 111

170. The Non-CenturyTel Directors had no input regarding who the placement agent or SPA Purchasers would be, nor did they have any input on the terms of the transactions or the pricing for the new shares SkyComm was agreeing to issue.

171. The CenturyTel Defendants made no effort to assure that this price reflected fair market value for those shares.

172. The transaction was negotiated by the CenturyTel Defendants with only CenturyTel's interests in mind.

173. On or about February 15, 2006, SkyPort filed a motion in the Chapter 11 case seeking permission to accept up to $1.5 million in DIP financing from Balaton.

174. On March 15, 2006, CenturyTel and the CenturyTel Directors caused SkyComm to file a motion to dismiss the bankruptcy proceeding on the grounds that based upon the Balaton and/or Watershed Funds' financing commitment; it no longer needed the protection of the Bankruptcy Act. This motion was granted on March 30, 2006 and the case dismissed.

## I. Balaton and Kubbernus Form ClearSky and Begin to Syndicate Interests in SkyComm

175. The efforts of Balaton and Kubbernus to raise funds for the Watershed Funds, which was to have been a "blind pool" investment vehicle, were unsuccessful.

176. On or about February 15, 2006, Balaton and Kubbernus launched a separate effort to raise the funds needed for the SkyComm transaction. They formed an entity called ClearSky Investments, LP, a Delaware limited partnership, and began offering $10 million in limited partnership interests in ClearSky. ClearSky Management, a Delaware corporation and wholly-owned subsidiary of Balaton of which Kubbernus was a Director, was designated as the general partner of ClearSky.

30

177.    Wilson Vukelich represented ClearSky, ClearSky Management, Balaton and Kubbernus in this offering and also acted as escrow agent for investors' funds.

178.    According to the ClearSky Confidential Investment Memorandum dated February 2006 prepared in connection with the offering of interests in ClearSky (the "ClearSky IM") and the ClearSky Partnership Agreement ("ClearSky LPA") dated as of February 10, (a) ClearSky would provide $1.5 million in DIP financing to SkyComm, and an Exit Credit Facility of $4 million (inclusive of the $1.5 million DIP loan), (b) ClearSky would purchase 133,000,000 shares in SkyComm for $4 million, and receive warrants to purchase an additional 133,000,000 shares, (c) the $4 million would be used in part to repay the Exit Credit Facility, and the balance for SkyPort operations, (d) ClearSky would acquire all of the CenturyTel Debentures, then in the face amount of $20,596,000, and convertible into 108,000,000 shares of SkyComm, and (e) the equity investment and purchase of the CenturyTel Debentures would be deferred until receipt of FCC approval of the acquisition of control of SkyComm and SkyPort by ClearSky.

179.    The ClearSky IM and ClearSky LPA also provided that if the maximum proceeds of $10 million were raised, ClearSky would acquire a 76% interest in SkyComm, which would increase to 82% if the common stock purchase warrants were exercised. The offering document provided that if less than the maximum proceeds were raised, ClearSky's participation would be proportionately reduced and Balaton could retain any participation rights not assigned to the partnership.

180.    On or about February 15, 2006, Balaton and Kubbernus circulated to CenturyTel and the Non-CenturyTel Debenture Holders, a share restructuring plan for SkyComm, in which they showed that Watershed Funds would acquire the CenturyTel Debentures and convert them

31

into 108,000,000 shares of SkyComm, and thereafter, ClearSky would acquire Watershed Funds position in these shares and an additional 133,000,000 shares directly from SkyComm.

181. This restructuring plan also showed that ClearSky would acquire 15,567,080 shares from two of the original shareholders in SkyComm, Puddy, Ltd. and Charles K. Stack, Jr. Prior to receiving this plan, Puddy, Ltd. and Charles K. Stack, Jr. had not even been asked if they were interested in selling their shares.

182. At about this time, CenturyTel began to refer potential suitors and investors in SkyComm to Kubbernus and Balaton.

183. Kubbernus informed at least one such potential suitor that he was asking $30 million for the controlling interest in the company.

## J. CenturyTel Unlawfully Transfers Control to Balaton without FCC Approval

184. Even before dismissal of the Bankruptcy case, Balaton and Kubbernus assumed *de facto* control over SkyComm's management and operations. The management of SkyPort began to report to Balaton and Kubbernus on a regular basis. Kubbernus took control over personnel, terminating some employees and hiring others for key managerial positions. He put in place new business, accounting and sales systems and took control of SkyComm's sales efforts.

185. This transfer of control to Balaton and Kubbernus by CenturyTel and the CenturyTel Directors was without prior FCC approval and as such violated Section 214 of the Communications Act and FCC Rules 63.24 and 25.119. See 47 C.F.R. 63.24; 47 C.F.R. 25.119.

186. The Defendants knew that such a transfer was not permitted without prior FCC approval pursuant to Section 214 and Commission Rules 63.24 and 25.119, and knew that such a

Certified Document Number: 44550657 - Page 32 of 111

transfer of control could jeopardize SkyComm's licenses and business, as well as the equity interests of SkyComm's shareholders.

**K. Defendants Cause the Submission of Fraudulent "Pro Forma" Filings to the FCC**

187. Commencing in February 2006, the CenturyTel Defendants, in coordination with the Kubbernus Defendants, caused SkyPort to file a series of *pro forma* applications, pursuant to 47 C.F.R. 25.119, seeking permission to assign back to SkyPort the earth station licenses that had been assigned to SkyPort DIP.

188. On March 31, 2006, the CenturyTel Defendants, in coordination with the Kubbernus Defendants, caused SkyPort to file a notification pursuant to 47 C.F.R. 63.24, which they deemed *pro forma,* of SkyPort DIP assigning back to SkyPort its international 214 license (this notification and the applications described in the previous paragraph are collectively referred to as the"2006 Pro Forma Applications").

189. The 2006 Pro Forma Applications were in fact not "pro forma" as defined in 47 C.F.R. 25.119 and they were materially false and misleading by not disclosing that CenturyTel had already transferred *de facto* control to Balaton and Kubbernus, had entered into a contract to transfer actual control to the Watershed Funds and had repeated in various documents that control would transferred to ClearSky. The 2006 Pro Forma Applications did not disclose that the DIP financing was being provided by Canadian investors and that it was convertible into equity in SkyComm.

**L. Defendants Cause the Submission of Fraudulent Transfer Applications to the FCC the United States Department of Justice, Department of Homeland Security and Federal Bureau of Investigation**

190. On April 4, 2006, CenturyTel and the CenturyTel Directors, in conjunction with Balaton and Kubbernus, caused SkyPort's officers to file a series of applications on behalf of

33

SkyPort pursuant to 47 C.F.R. 63.24 and under 47 C.F.R. 25.119 seeking permission to transfer

control of SkyPort from CenturyTel **to Balaton** (the "2006 Transfer Applications").

191. Because the 2006 Transfer Applications involved a transfer of control of more

than a 10% equity interest to foreign ownership, they required the approval of an inter-

governmental agency group, consisting of the United States Department of Justice, Department

of Homeland Security and Federal Bureau of Investigation. This group is known as "Team

Telecom."

192. The 2006 Transfer Applications listed Balaton as the transferee and disclosed that

the equity in Balaton was owned by five Canadian citizens, one of whom was Kubbernus, who

owned a 30% equity interest in Balaton. The 2006 Transfer Applications represented that:

> The parties have entered into an agreement pursuant to which Balaton,
> through a series of transactions, will acquire approximately 84% of
> SkyComm's issued and outstanding stock.

and that

> Balaton has a proven track record of enabling companies in which it
> invests to maximize their potential through utilization of Balaton's
> business development and strategy, business operations, and financing
> experience

193. The 2006 Transfer Applications were materially false and misleading in that they

did not disclose that (a) the Watershed Funds was the contract vendee of the controlling

CenturyTel Debenture interests, (b) ClearSky was, according to documents prepared by

Kubbernus, the entity that was to acquire the controlling interest in SkyComm, (c) Balaton was

actually the equity placement agent for SkyComm, (d) Balaton and Kubbernus had already

assumed *de facto* control over SkyComm, (e) the ownership of SkyComm was at the time being

widely syndicated to foreign investors, (f) interim financing that was convertible into equity in

SkyComm had been and was continuing to be provided by Canadian investors, (g) Balaton did

Certified Document Number: 44550657 - Page 34 of 111

not have the track record or experience represented, and (h) Balaton and Kubbernus had been named defendants in several lawsuits within the prior year.

194. As would be revealed later, the 2006 Transfer Applications were also materially false and misleading in that they did not disclose that (a) Kubbernus was in the process of buying out his partners in Balaton, (b) Kubbernus' interest in Balaton was not even owned by him, but rather by Bankton, a company he controlled, and (c) Kubbernus' interest in Bankton was not even owned by him, but rather "ultimately" by a family trust.

195. Wilson Vukelich, as counsel to Watershed Funds, ClearSky, Balaton and Kubbernus, had negotiated all of the relevant documents for SkyComm transactions and was responsible for delivering the FCC approvals at the closing. Wilson Vukelich had also been Kubbernus' long-time counsel, and at the very least had an obligation to assure that the FCC licenses reflected ClearSky's controlling interest in SkyComm.

196. In the 2006 Transfer Application pursuant to 47 C.F.R. 63.24 (for international 214 license), the CenturyTel Defendants, in coordination with the Kubbernus Defendants, caused SkyPort to falsely make the certification that any transfer of control would not occur prior to the consent of the FCC.

197. The CenturyTel Defendants caused SkyPort to file the 2006 Transfer Applications, knowing that they were materially false and misleading and over the objections of the Non-CenturyTel Directors.

198. The CenturyTel Defendants attempted to force one of the Non-CenturyTel Directors to sign the 2006 Transfer Applications, but despite the intense pressure they placed on him, he refused to sign them. Finally, they caused Klotz to sign them.

35

199. The Defendants were aware that had the FCC been informed the Watershed Funds was the contract vendee of the controlling CenturyTel Debenture interests or that the real party in interest acquiring the CenturyTel Debentures and additional shares in SkyComm was to be ClearSky, the FCC would deny approval of the 2006 Transfer Applications, or at the least delay them until all of the investors in the Watershed Funds and ClearSky had been identified and granted clearance status by the FCC and Team Telecom. This would have resulted in the failure or substantial delay of the closing, and CenturyTel needed or desired to divest itself of SkyComm as quickly as possible.

200. The Defendants knowingly and willfully caused the filing of false and fraudulent applications with the FCC and Team Telecom agencies, with utter disregard for the rights of Plaintiffs, the laws of the United States and safety of its citizens.

**M.   The ClearSky Investors' Interests are Not Disclosed to the FCC and Team Telecom**

201. As the 2006 Transfer Applications were being filed and approvals being pursued by CenturyTel, Kubbernus and Balaton continued to sell interests in ClearSky to foreign investors being promised indirect ownership interests in SkyComm.

202. One of the investors who provided the DIP financing funds to Balaton was a Canadian, Adrian Pouliot ("Pouliot"). In or about April 2006, Balaton and Kubbernus reached an agreement with Pouliot, for him to invest over $3.0 million in ClearSky. Pouliot, through Draco Capital, Inc. ("Draco"), a Canadian corporation controlled by him, wound up investing over $3.5 million and in return was promised by Balaton and Kubbernus, an approximately 50% equity interest in ClearSky and 35% indirect interest in SkyComm. Pouliot, who had participated in meetings with CenturyTel in Houston, Texas, was also promised a seat on SkyComm's Board of Directors.

36

Certified Document Number: 44550657 - Page 36 of 111

203. Even though the 2006 Transfer Applications were then pending before the FCC

and Team Telecom, none of the facts alleged above were disclosed to these agencies.

## N. The Department of Homeland Security Inquiry

204. In May 2006, the United States Department of Homeland Security sent SkyPort a

document entitled Initial Questions for International 214 Applicants ("Initial Questions").

Among other things, the questionnaire required the disclosure of:

> every non-U.S. individual, government or other entity that
> (a) exercises or may exercise voting or other ownership rights of the Applicant,
> (b) makes or may make overall corporate policy decisions for Applicant, or
> (c) otherwise manages the Applicant.
>
> For each such individual or entity, explain clearly the nature and extent of that involvement AND, provide the name, citizenship (for individuals), county for any entity, type of entity for any entity, and, if applicable, date of birth, place of birth, social security number, U.S. alien number, all passport identifying information including the passport number and the issuing country, all residence address(es), all business address(es) and all phone numbers.

205. The CenturyTel Defendants, in coordination with the Kubbernus Defendants,

knowingly and willfully caused SkyPort not to respond truthfully to this request and not to reveal

the nature, extent and particulars of the foreign ownership of SkyPort.

## O. Kubbernus' Acquisition of 100% Ownership in Balaton is Not Disclosed to the FCC

206. On June 30, 2006, the four other shareholders in Balaton departed the firm,

leaving Kubbernus 100% in control of Balaton.

207. This transaction, which also would have required prior FCC and Team Telecom

approval, was not disclosed to the FCC or to Team Telecom.

208. The 2006 Transfer Applications were never amended to reflect that Kubbernus

had acquired 100% control of Balaton, thus making them additionally materially and knowingly

fraudulent and misleading.

37

Certified Document Number: 44550657 - Page 37 of 111

**P.     The July 31, 2006 Assurances Letter to the United States Department of Justice,
Department of Homeland Security and Federal Bureau of Investigation**

209.    The United States Department of Justice, Department of Homeland Security and

FBI responded to the Transfer Applications by requiring specific written assurances from

Balaton, SkyComm and SkyPort with respect to the proposed owners of SkyComm and SkyPort

before they would agree to a transfer of control to Balaton.

210.    Balaton, SkyComm and SkyPort executed and delivered a letter dated July 31,

2006, addressed to the United States Department of Justice, Department of Homeland Security

and Federal Bureau of Investigation (the "2006 Assurances Letter") agreeing to abide by the

various conditions mandated by the Team Telecom agencies. In this letter, they represented the

proposed transaction to which they were seeking consent, to be as follows:

> On February 15, 2006, Balaton and the current owners of SkyComm entered into
> several transaction agreements pursuant to which Balaton will obtain an
> approximately 83% equity interest in SkyComm (the "Proposed Transaction").
> Upon completion of the Proposed Transaction, the remaining 17% of SkyComm
> will be owned by certain of SkyComm's existing shareholders, whose individual
> ownership will be substantially diluted and range from approximately 0.002% to
> 2.738%. All of these remaining shareholders are U.S. citizens, with the exception
> of one individual, a French citizen that the Signatories have been unable to locate,
> who will own less than 0.5% of SkyComm. CenturyTel no longer will hold any
> interest in SkyComm.

Balaton, SkyComm and SkyPort agreed to notify the United States Department of Justice,

Department of Homeland Security and FBI "promptly if there are material changes in any of the

facts as represented in this letter."

211.    This 2006 Assurances Letter was materially false and misleading in that it failed

to disclose that (a) Balaton had already assumed control of SkyPort, (b) an offshore fund,

Watershed Funds, and not Balaton, was the contract vendee of the controlling interest in

SkyComm under the February 15, 2006 Debenture Purchase Agreement, (c) Balaton was acting

38

Certified Document Number: 44550657 - Page 38 of 111

as placement agent for SkyComm, (d) Balaton was selling interests in ClearSky to foreign investors, (e) Balaton had agreed to assign its interest in SkyComm to ClearSky and had represented to the ClearSky investors that ClearSky would be acquiring 76-82% ownership of SkyComm, (f) Pouliot had already provided substantial funds to ClearSky and had been promised a 35% ownership interest a director's seat in SkyComm, (g) Kubbernus had bought out his partners in Balaton, (h) Bankton owned 100% of Balaton, (i) the entities that owned the equity in Bankton had not been disclosed, and (j) Kubbernus owned indirectly less than 100% of Bankton. The facts regarding Balaton's true ownership structure are still not fully known to Plaintiffs.

212. CenturyTel and the CenturyTel Directors caused the 2006 Assurances Letter, which was materially and knowingly fraudulent and misleading, to be executed and delivered by SkyComm and SkyPort.

**Q.     The Transfer Approvals**

213. CenturyTel vigorously pursued obtaining the consent of the FCC and Team Telecom to the transfer to Balaton and used all means at its disposal, including mail, emails and telephonic communications in this pursuit. Throughout this process, the Defendants concealed the true facts from the FCC and Team Telecom.

214. Based upon the fraudulent applications and fraudulent letter of assurances to the United States Department of Justice, Department of Homeland Security and Federal Bureau of Investigation, the FCC and Team Telecom approved SkyPort's Section 214 and 312 applications on August 4, 2006.

Certified Document Number: 44550657 - Page 39 of 111

215.    Shortly thereafter, Defendants caused SkyComm to inform all shareholders that the transfer of control had been approved by the FCC and Team Telecom, and that the deal with Balaton could now proceed.

**R.    Defendants Cause the Non-CenturyTel Debenture Holders to Convert their Debentures**

216.    From time to time, CenturyTel had given SkyComm shareholders and others the right to purchase their pro-rata share of new debentures being offered to CenturyTel.

217.    As a result, at the time of the Watershed Funds transaction, three shareholders and two non-shareholders (John and Sue Graves) (together, the "Non-CenturyTel Debenture Holders") held debentures in the aggregate sum of $2,237,000 (the "Non-CenturyTel Debentures").

218.    The CenturyTel Defendants and the Kubbernus Defendants represented to the shareholders of SkyComm, including the Non-CenturyTel Debenture Holders, that the buyer of the CenturyTel Debentures had agreed to convert them all to shares, and that the Non-CenturyTel Debenture Holders would be required to do so, as well. This was presented as a major benefit to SkyComm, in that it would deleverage the company and make it free of long-term debt.

219.    The Non-CenturyTel Debenture Holders were initially asked to convert their debentures at their initial conversion price of around $0.20 per share, but after negotiation, the conversion price was improved to approximately $0.07 per share.

220.    The Non-CenturyTel Debenture Holders agreed to convert their debentures at $0.07 per share; and the obligation to close the conversion was made subject to obtaining FCC consent to the transfer of control.

Certified Document Number: 44550657 - Page 40 of 111

221. Together with the other shareholders, the Non-CenturyTel Debenture Holders were informed in August 2006 that the FCC and Team Telecom had approved the transfer of control to Balaton.

## S. CenturyTel Agrees to Become a Shareholder in SkyComm

222. Even with the FCC approval in hand, the closing of the transactions contemplated by the February 15, 2006 agreements was postponed several times over the next few months.

223. On September 15, 2006, the Non-CenturyTel Directors were informed that CenturyTel had agreed to convert the Revolver Note and certain other SkyComm debts which were to be paid off under the Debenture Purchase Agreement, into shares at $0.03 per share.

224. CenturyTel's decision to become a shareholder in SkyComm was presented by both Kubbernus and CenturyTel as a major benefit to SkyComm because it allowed SkyComm to replace debt with equity, helping it even more so to become debt free, and because having CenturyTel as a shareholder would assist Balaton in its capital raising activities for SkyComm.

## T. Balaton Becomes the Purchaser of the CenturyTel Debentures and CenturyTel receives Shares in SkyComm

225. With the closing imminent, on or about October 27, 2006, various draft closing documents were presented to the SkyComm Board for approval.

226. Among these drafts was an Amended and Restated Debenture Purchase Agreement in which Balaton was substituted for Watershed Funds, as the purchaser.

227. This Agreement provided that CenturyTel was owed $1,290,935 by SkyComm, which it could convert into SkyComm shares at the rate of $0.03 per share. Within the sum of $1,290,935 was (a) $117,390 in legal fees allegedly incurred by CenturyTel in securing approval of the transfer of control to Balaton from the FCC and Team Telecom, (b) approximately

41

Certified Document Number: 44550657 - Page 41 of 111

$300,000 that was to be paid by the Watershed Funds, as part of the purchase price, and (c) $873,025 in principal and interest under the $750,000 Revolver Loan.

228. The $117,390 in legal fees was properly an expense of CenturyTel or Watershed Funds/ClearSky/Balaton, but the CenturyTel Directors caused SkyComm to agree to issue shares to reimburse CenturyTel for such amount.

229. The $300,000 portion of the purchase price, referenced above was properly an obligation of Watershed Funds/ClearSky/Balaton, but the CenturyTel Directors caused SkyComm to issue shares to reimburse CenturyTel for such amount. In this manner, the consideration to be paid by Watershed Funds/ClearSky/Balaton for the CenturyTel Debentures was reduced by $300,000, and SkyComm agreed to issue $300,000 more in shares to CenturyTel at $0.03 per share.

230. Under the Debenture Purchase Agreement, the $873,025 in principal and interest owed to CenturyTel under the Revolver Loan would be acquired by Watershed Funds/ClearSky/Balaton for $500,000, but the CenturyTel Directors caused SkyComm to agree to issue 43,031,166 SkyComm shares for the Revolver Loan, even though CenturyTel had agreed that Balaton could purchase it for $500,000.

231. Thereby, the Defendants caused SkyComm to issue a total of 43,031,166 shares to CenturyTel that would not have been issued under the original Debenture Purchase Agreement and properly should have been paid by Balaton/Watershed Funds/ClearSky out of the shares they received.

232. None of these transactions were negotiated with the interests of SkyComm's shareholders in mind and the SkyComm shareholders were additionally diluted by these transactions without receiving adequate consideration therefore.

42

233.    Both CenturyTel and Balaton agreed to issue to themselves shares in SkyComm at $0.03 per share, when they had required $0.07 per share from the Non-CenturyTel Debenture Holders on conversion of their debentures.

**U.    Balaton and Kubbernus Acquire *De Jure* Control of SkyComm**

234.    On November 2, 2006, more than six months after Balaton and Kubbernus had acquired *de facto* control of SkyPort, they closed the acquisition of the CenturyTel Debentures.

235.    Prior to closing, Balaton and Kubbernus deliberately cut off its fundraising for ClearSky at $7 million and informed CenturyTel that they did not have the funds to pay for the CenturyTel Debentures at that time. Balaton and Kubbernus stated that they would pay for the CenturyTel Debentures out of the next round of funding.

236.    To permit the transaction to close, CenturyTel agreed to accept a $3 million promissory note of Balaton in lieu of cash for the CenturyTel Debentures.

237.    In effect, the CenturyTel Defendants gave Balaton and Kubbernus control of SkyComm for no money of their own, and caused SkyComm's shareholders to suffer massive dilution through the issuance of large quantities of shares without adequate consideration.

238.    According to the information disclosed to the SkyComm shareholders and the Non-CenturyTel SkyComm Board Members, at the closing (a) Balaton acquired the CenturyTel Debentures from CenturyTel, which they simultaneously converted into 108,000,000 shares of SkyComm; (b) Balaton issued a $3 million note to CenturyTel; (c) Balaton acquired the 133,000,000 shares and 133,000,000 warrants from SkyComm; (d) CenturyTel was issued 43,031,166 shares by SkyComm, representing conversion of the alleged SkyComm debt of $1,290,935 at the rate of $0.03 per share; and (e) SkyComm issued 30,134,798 shares to the

43

Certified Document Number: 44550657 - Page 43 of 111

Non-CenturyTel Debenture Holders representing conversion of their debentures at approximately $0.07 per share.

239. CenturyTel's acquisition of SkyComm shares was never disclosed to the FCC or Team Telecom, even though the acquisition applications had stated that CenturyTel would have no interest in SkyPort after the closing, and the parties had agreed to provide such notification in the 2006 Assurances Letter.

**V.     Balaton and Kubbernus Defraud the ClearSky Investors**

240. Balaton and Kubbernus raised approximately $7 million in ClearSky from 45 investors -- all or most of whom were non-U.S. citizens. These investors purchased interests in ClearSky on the false representation that ClearSky would acquire a controlling share ownership interest in SkyComm.

241. The information provided to the ClearSky Investors, including in the ClearSky IM and ClearSky LPA, was false and misleading in that they were not informed that (a) Balaton, and not ClearSky, was being represented to the FCC and Team Telecom as the acquirer of control to SkyPort, (b) the Kubbernus Defendants did not intend to acquire the SkyComm interests in ClearSky, and (c) there was a material risk that the FCC would cancel SkyPort's licenses if it discovered that SkyComm's ownership had been falsely represented to it.

242. The ClearSky IM and ClearSky LPA were false and misleading in that they did not disclose (a) Kubbernus' background, including that JAWZ, a corporation he was most recently president of, went bankrupt and resulted in shareholder lawsuits, and that Kubbernus was in protracted litigation with TrueStar Petroleum alleging fraud and other misdeeds or (b) Kubbernus' true intent regarding the use of the investors' funds.

44

243.    Balaton and Kubbernus used the funds raised in ClearSky to acquire shares in SkyComm, but in direct violation of their representations to the ClearSky Investors, acquired such shares in the name of Balaton, and not ClearSky.

244.    Wilson Vukelich represented its long-time client, Kubbernus, and Balaton at the closing on November 2, 2006 and closed the transaction in the name of Balaton, and not its client, ClearSky, which had supplied all of the funds for the transaction and which was entitled to that interest under the ClearSky IM and ClearSky LPA.

245.    At no point did Wilson Vukelich inform the ClearSky Investors that it was also acting for Balaton and Kubbernus, or that Wilson Vukelich would be representing Balaton at the closing of the acquisition of the CenturyTel Debentures and SkyComm shares promised to ClearSky. At no point did Wilson Vukelich inform the ClearSky Investors that it would be acting or did act contrary to the interests of ClearSky and contrary to the provisions of the ClearSky IM and ClearSky LPA.

246.    Although Wilson Vukelich had attempted to absolve itself in the ClearSky LPA, of liability with respect to its conflict of interest in representing both ClearSky and ClearSky Management, it did not reveal its conflict in also representing Kubbernus and Balaton or attempt to obtain such absolution with respect to a conflict of interest in representing both ClearSky and Balaton and Kubbernus.

247.    In violation of its professional obligations to ClearSky, Wilson Vukelich failed to document the interests of its client, ClearSky, in SkyComm.

248.    Over the next two years, Balaton and Kubbernus sent ClearSky's limited partners various materials confirming ClearSky's interest in SkyPort, while at the same time sending out other financial statements and documents claiming that such interest belonged to Balaton.

45

249.    Balaton and Kubbernus delivered to Pouliot draft financial statements for ClearSky for the year ended December 31, 2006 (the "2006 Draft ClearSky Financials"), which had a draft accountants' review letter attached, but without the accounting firm identified.

250.    The 2006 Draft ClearSky Financials provided that (a) on November 2, 2006, ClearSky had acquired the CenturyTel Debentures in the face amount of $20,596,000, convertible into 118,172,422 SkyComm Shares, (b) Balaton assigned its interest to ClearSky, (c) the purchase price for the debentures was satisfied by the issuance of a note payable to CenturyTel due December 2, 2006, (d) in September 2007, the note was renegotiated to $2.5 million repayable December 31, 2007, after payment by ClearSky of $500,000, (e) the note was not repaid as of February 29, 2008 and is in default.

251.    The 2006 Draft ClearSky Financials also provided that (a) on November 2, 2006, Balaton had, for $4 million, acquired 133,333,335 shares of SkyComm, plus warrants to purchase an identical number of shares, (b) Balaton had acquired 500,000 shares from a SkyComm founding shareholder for $25,000, (c) all of these shares were assigned to ClearSky, (d) as of December 31, 2006, ClearSky held 133,833,333 common shares of SkyComm, representing a 53.08% undiluted ownership interest, which if the warrants were exercised and debentures converted would yield a 83.14% ownership interest.   The 2006 Draft ClearSky Financials showed a note payable to CenturyTel of $3 million as of December 31, 2006.

252.    The 2006 Draft ClearSky Financials also provided:

### June 2007 Activity

In June 2007 ClearSky increased its equity stake in SkyComm, as permitted in the LP and debenture agreements. The increase provided additional shares of $29,499,667 with a conversion price of $0.03 per share.

46

Certified Document Number: 44550657 - Page 46 of 111

Also in June, ClearSky received 31,224,223 shares in settlement of various fees and expenses owed.

## September 2007 Activity

In September 2007 ClearSky converted part of the outstanding debenture for 112,093,328 in shares and also received an additional 53,073,849 in shares for the non-cash exercise of the 133,333,333 common share warrants which were exercisable at $0.10. The unconverted portion of the convertible debenture was replaced with a note for $2.5 million. The outstanding note is accruing interest at 8.25%.

253.     Kubbernus asked Pouliot to sign the 2006 Draft ClearSky Financials as a director of ClearSky so they could be delivered to the limited partners, but Pouliot refused because they were in draft form only and had neither been discussed at a board meeting of the General Partner of ClearSky nor with the auditors of ClearSky, and they had not been signed by any auditors. In addition, the mandate performed by the accountants on the 2006 Draft ClearSky Financials was not a full audit as required by the ClearSky LPA.

254.     On August 27, 2008, the Kubbernus Defendants sent unaudited financial statements dated December 31, 2006 to the ClearSky Investors, stating that they had been approved by the board of directors of the General Partner, ClearSky Management, and bearing the signature of Kubbernus ("2006 ClearSky Unaudited Financials"). The 2006 ClearSky Unaudited Financials were substantively identical to the 2006 Draft Clearly Financials.

255.     The cover letter sent to the ClearSky limited partners with the 2006 ClearSky Unaudited Financials, which was approved by the Kubbernus Defendants before being sent, stated clearly that the underlying investment of ClearSky was the shares of SkyComm.

## W.     Balaton and Kubbernus Defraud the Additional Investors

256.     In the fall of 2006, Balaton and Kubbernus began offering shares in SkyComm. They began to put out various offering documents seeking to raise between $7 million and $30

47

million for SkyComm and representing that $3 million of the proceeds would be used to pay off the CenturyTel note.

257.   In February 2007, Balaton and Kubbernus prepared and distributed a private placement memorandum for an offering of $30 million in shares in SkyComm (the "February 2007 Offering Memorandum"), in which Balaton and Kubbernus represented that SkyComm had no long-term debt.

258.   The February 2007 Offering Memorandum did not show that SkyComm had any debt outstanding to CenturyTel.

259.   The February 2007 Offering Memorandum represented that the "Majority Shareholder" owned 70.37% of SkyComm's shares, but failed to identify who that was. It also stated that the FCC had approved a transfer of ownership to the "new majority owner" without identifying who that was.

260.   The February 2007 Offering Memorandum contained materially false and misleading statements, in that it failed to disclose that (a) the FCC approvals had been obtained, with CenturyTel's assistance, through fraudulent applications and statements to the FCC and the Team Telecom agencies, (b) there was a material risk that the FCC licenses could be revoked at any time by the FCC or Team Telecom agencies, as a result of such licenses having been procured by fraud, and (c) that the "Majority Shareholder" and "new majority owner" was Balaton, and not ClearSky, as was being represented to the ClearSky Investors.

261.   The February 2007 Offering Memorandum was false and misleading in that it did not disclose (a) Kubbernus' background, including that JAWZ, a corporation he was most recently president of, went bankrupt and resulted in shareholder lawsuits, and that Kubbernus

48

was in protracted litigation with TrueStar Petroleum alleging fraud and other misdeeds or (b) Kubbernus' true intent regarding the use of the investors' funds.

262.    Over the next six months, Balaton raised not less than an additional $8,198,843 from foreign investors (the "Additional Investors") in these offerings of shares in SkyComm. As described below, the existence and identity of these investors did not become known to SkyComm's Original Shareholders until late 2008 when Balaton listed them as shareholders in a second SkyPort bankruptcy filing described below.

## X.    The November 2006 Confirmatory Letters

263.    On November 2, 2006, CenturyTel's counsel, Latham & Watkins sent a letter to the FCC confirming that the transfer to Balaton had occurred and on November 14, 2006, SkyPort sent a letter on behalf of itself and Balaton to the Team Telecom agencies confirming that the transfer to Balaton had occurred.

264.    These letters were also false and misleading in that they did not disclose the true foreign ownership interests in SkyPort or that CenturyTel itself had acquired shares in SkyComm.

## Y.    Balaton and Kubbernus Offer Shares in Lavell Systems

265.    In or about July, 2007, Balaton and Kubbernus formed an entity named Lavell Systems, Inc, a Canadian company ("Lavell-Canada"), into which they stated they were seeking to merge SkyComm and certain other companies in the satellite communications business, and then take it public and list it on the Toronto Stock Exchange. Balaton and Kubbernus planned to raise approximately $65-120 million Canadian for it in an initial public offering.

49

266.    In the Lavell-Canada Preliminary Prospectus (Draft: September 24, 2007), Balaton and Kubbernus revealed for the first time that Balaton's $3 million note to CenturyTel was secured by a pledge of certain of the debentures it purchased from CenturyTel.

267.    The financial statement contained in this prospectus showed that $22,945,135 of debentures was still outstanding as of June 30, 2007. This was the first indication that the CenturyTel Debentures had not been converted on November 2, 2006.

268.    Elsewhere, the financial statement stated that as of August 31, 2007, SkyComm had $25,490,416.47 in these debentures outstanding, including interest and that on September 26, 2007, $23,024,789 of such debt was converted into 12,093,328 shares of SkyComm, leaving $2.5 million in debentures outstanding. This was the first indication that some of the CenturyTel Debentures were still outstanding.

269.    Balaton and Kubbernus stated in the Prospectus that the $2.5 million of debentures would be retired out of the proceeds of the Lavell-Canada offering. These were the same debentures that they had raised money from the ClearSky Investors and Additional Investors to pay off.

270.    Balaton and Kubbernus hired a management team for Lavell-Canada, including Patrick Brant, a former President and CEO of Loral Skynet Corp. This Lavell-Canada management team, brought on in anticipation of the Lavell-Canada IPO, was very highly compensated and Kubbernus and Balaton caused their salaries and other expenses of Lavell-Canada to be paid by SkyComm.

271.    Balaton and Kubbernus began to offer convertible debentures in Lavell-Canada to finance the costs of taking Lavell-Canada public. In this manner, Balaton and Kubbernus raised approximately $2-3 million for Lavell-Canada.

50

272.    At the same time, Balaton and Kubbernus solicited the shareholders of SkyComm to sell their shares in SkyComm to Lavell-Canada in return for shares of Lavell-Canada.

273.    Many, if not all, of the SkyComm shareholders agreed to sell their shares to Lavell-Canada shares and sent their SkyComm shares to Balaton and Kubbernus.

274.    In around 2008, with the IPO difficult to consummate, Balaton and Kubbernus proposed to take Lavell-Canada public via a merger with a public shell company, Software Growth, and also proposed to raise equity for Lavell-Canada through a private offering. None of these efforts were successful and the investors in the Lavell-Canada debentures lost all of their money.

**AA.    Balaton and Kubbernus Violate their Fiduciary Duties to SkyComm's Shareholders**

275.    Beginning in February 2006, Balaton and Kubbernus exercised control over the management and operations of SkyComm. Even before they closed that acquisition of the CenturyTel Debentures in November 2006, they ran the company and made policy decisions from which they excluded the Non-CenturyTel Directors.

276.    From November 2, 2006, Kubbernus acted as Chairman of the Board of Directors of both SkyComm and SkyPort. Kubbernus and Balaton ran the company for their own benefit, and with complete disregard for the rights and interests of the other shareholders.

277.    Balaton and Kubbernus failed to provide SkyComm shareholders with financial reports or other information, except in the context of asking them for additional funds or asking them to sell their shares to Lavell-Canada.

278.    On September 25, 2007, Balaton and Kubbernus caused SkyComm to issue to Balaton, 130,926,766 shares of its common stock purportedly "as payment for restructuring fees

51

and other costs incurred relating to the anticipated acquisition of the company by Lavell." This issuance of shares was unjustified and further diluted the shareholders of SkyComm.

279. Balaton and Kubbernus paid themselves massive fees from SkyComm and placed on SkyComm's books massive debts to Balaton and other Kubbernus controlled entities that were improper and/or were not properly attributable to SkyComm and should properly have been borne by Balaton.

280. In 2006, Balaton and Kubbernus caused SkyPort to pay Balaton approximately $1 million, purportedly in consulting fees, employee cost allocations and expense reimbursements.

281. In 2007, Balaton and Kubbernus caused SkyPort to pay Balaton approximately $2.4 million, purportedly in consulting fees, employee cost allocations and expense reimbursements.

282. In addition, only $4.8 million of the $7 million raised from the ClearSky Investors ever made it into SkyComm's accounts. The rest went to Balaton or Bankton or to pay Balaton's expenses.

283. Balaton and Kubbernus paid $146,776.07 from ClearSky to Bankton.

284. Balaton and Kubbernus caused SkyComm to pay the expenses of Lavell and to issue additional SkyComm shares to Balaton in consideration of sums purportedly paid by Balaton on Lavell's account.

285. Altogether, of the more than $15 million that Balaton raised for SkyComm, only a small percentage actually went to pay legitimate operating expenses of SkyComm.

286. Balaton and Kubbernus failed on multiple occasions to comply with FCC rules and requirements and failed to disclose the true ownership of SkyComm to the FCC thereby jeopardizing SkyComm's license and the interests of SkyComm's shareholders.

52

Certified Document Number: 44550657 - Page 52 of 111

287.    Balaton and Kubbernus massively diluted the shareholders of SkyComm without proper consideration and without providing them any information on what was happening to their shareholdings.

288.    Balaton and Kubbernus offered for sale additional interests in SkyComm through numerous false, misleading and inconsistent statements.

289.    Balaton and Kubbernus failed to hold required annual shareholders meetings or provide shareholders with financial and other reports and information that they requested.

290.    Balaton and Kubbernus maintained at least two sets of books for SkyComm -- one showing ClearSky as owning a substantial interest in SkyComm and the other showing Balaton owning substantially the same interest.

291.    Balaton and Kubbernus grossly mismanaged SkyComm and SkyPort. Their principle focus was on bringing in more money from additional investors and not on managing the operations of SkyComm and SkyPort so they could achieve profitability. They depleted the companies' financial resources by paying themselves exorbitant fees and charging the companies for the expenses of new rounds of fundraising, with the funds raised employed for their own benefit.

292.    Such conduct constituted gross violations of Balaton's and Kubbernus' fiduciary duties to the SkyComm investors.

293.    At the same time that they were presenting a picture of boundless optimism and success to investors in a never-ending series of offerings, SkyComm was sinking under the weight of their mismanagement and misappropriation of funds.

53

**AB.  Wilson Vukelich Breaches its Fiduciary Duties to ClearSky and the ClearSky Investors**

294.  Wilson Vukelich represented Kubbernus, Balaton, ClearSky Management and ClearSky in connection with (a) the ClearSky offering, including the preparation of the ClearSky LPA, and acting as trustee for investors' funds in the offering, (b) the acquisition of the CenturyTel Debentures, and shares in SkyComm, (c) the SkyComm offerings, including the preparation of the 2007 Offering Memorandum.

295.  Wilson Vukelich did not exercise due care in the preparation of these offering documents and in the supervision of investors' funds entrusted to it and permitted Kubbernus to divert investors' funds contributed to one entity to pay expenses of other Kubbernus controlled entities and to divert such funds for his own and Wilson Vukelich's purposes.

296.  The ClearSky IM and the 2007 Offering Memorandum were false and misleading in that they did not disclose (a) Kubbernus' background, including that JAWS Technologies, a corporation he was most recently President of, went bankrupt and resulted in shareholder lawsuits, (b) Kubbernus was in protracted litigation with TrueStar Petroleum, (c) SkyComm was not in compliance with FCC, and Team Telecom Agency requirements, (d) there was a substantial risk that the FCC would terminate SkyPort's licenses if it determined that it had been gotten through false representations, (e) the April 2006 Transfer of Control Applications named Balaton as transferee rather than ClearSky, (f) ClearSky had not received its interest in SkyComm as the ClearSky Investors had been promised and as represented in the ClearSky LPA, and (g) Balaton's debt to CenturyTel had been shifted to SkyComm.

297.  Wilson Vukelich violated its professional obligations to ClearSky and the ClearSky Investors by (a) not causing their interests to be disclosed to the FCC in a transaction in

Certified Document Number: 44550657 - Page 54 of 111

which it represented them, (b) closing the acquisition of the interests in SkyComm in the name of Balaton, and not in the name of ClearSky, (c) failing to properly document the interests of the ClearSky Investors in SkyComm and (d) permitted the misapplication and comingling of investors' funds.

298.    Wilson Vukelich had a clear conflict of interest which it did not disclose to the ClearSky Investors.

299.    Between April 2006 and June 2007, Wilson Vukelich was paid $259,351.96 in legal fees by ClearSky. These fees were excessive and largely not attributable to work performed for ClearSky.

300.    These fees included charges for work performed for Balaton and Kubbernus on other projects and fees for work performed that was diametrically opposed to the interests of ClearSky.

**AC.    The 2007 FCC Applications**

301.    As alleged above, in June 2006, Kubbernus bought out the other four partners in Balaton. This transfer required prior FCC approval, but Balaton and Kubbernus did not disclose this change in ownership to the FCC, nor did they file an application seeking approval of such change.

302.    In September 2007, Balaton and Kubbernus caused SkyPort to make additional applications to the FCC in connection with the proposed transfer of control of SkyComm to Lavell-Canada (the "Lavell-Canada Applications").

303.    Only as part of the Lavell application process did Balaton inform the FCC of Kubbernus' acquisition of the interests of his four former partners in Balaton. On September 27, 2007, Balaton filed a notification with the FCC seeking retroactive approval of what it deemed

55

Certified Document Number: 44530657 - Page 55 of 111

was the *"pro forma"* transfer of 100% ownership in Balaton to Kubbernus **in April 2007** (the "Balaton Notification").

304. This transfer was not *pro forma* under FCC rules in that there was an actual transfer of ownership and Kubbernus misrepresented the transfer as taking place in April 2007, rather than June 2006 -- prior to when the transfer to Balaton had been approved on the representation that Balaton had five partners.

305. The Lavell-Canada Applications, as well as the Balaton Notification, were false and misleading in a much more serious manner in that they did not disclose the interests of the ClearSky Investors or the Additional Investors, the fact that all or most of the equity owners in SkyComm were non-U.S. citizens or, as was revealed later, the true equity ownership in Balaton.

**AD. The 2008 FCC Applications and Assurances Letter to the United States Department of Justice, Department of Homeland Security and Federal Bureau of Investigation**

306. Commencing in July 2008, Balaton and Kubbernus, caused SkyPort to file a series of applications pursuant to 47 C.F.R. 63.24 and under 47 C.F.R. 25.119 seeking permission to transfer control of SkyPort from Balaton to Lavell Systems, Inc. a Delaware corporation ("Lavell-US") and subsidiary of Lavell-Canada ("Lavell") (the "2008 Transfer Applications"). These applications were characterized by applicants as necessitated by the abandonment of plans to consummate a public offering of Lavell-Canada on the Toronto Stock Exchange.

307. On or about July 30, 2008, in connection with the proposed transfer of control of SkyComm to Lavell-US, Balaton, Lavell-US, Lavell-Canada, SkyComm and SkyPort executed and delivered another letter (the "2008 Assurances Letter") to the United States Department of

56

Justice, Department of Homeland Security and FBI confirming their agreement to abide by the terms of the July 31, 2006 Assurances Letter.

308. The 2008 Transfer Applications and the 2008 Assurances Letter were false and misleading in that, among other thing, they did not disclose the existence of dozens of investors in SkyComm -- most or all of them non-U.S. citizens -- or that these investors would continue to have interests in Lavell-US as part of the acquisition of SkyComm by Lavell-US.

309. During the second half of 2008, Kubbernus made several efforts to raise additional funds by offering interests in SkyComm, and he raised additional undetermined sums at that time.

## AF. Balaton and Kubbernus, with CenturyTel's Complicity, Wrongfully Eliminate All of the Shareholders in SkyComm other than Balaton

310. On October 24, 2008, after they had taken many millions of dollars out of SkyPort to pay themselves various improper fees and expenses, Balaton and Kubbernus caused SkyPort to file another petition for relief under Chapter 11 of the Bankruptcy Act. In this petition, Balaton represented itself as one of SkyPort's biggest creditors.

311. SkyComm did not file a Chapter 11 petition, but Balaton listed all of the shareholders of SkyComm in the schedule of equity security holders it filed with the Bankruptcy Court. This list of shareholders included investors from England, France, Switzerland, Canada, Kuwait, Abu Dhabi-United Arab Emirates. It included several investors whose addresses were listed as "n/a" (not available). None of these Additional Investors had been disclosed to the FCC or the Team Telecom agencies – or to any of the Original Investors.

57

312.     CenturyTel was listed as owning 49,161,318 SkyComm shares. Apparently, CenturyTel had exercised certain warrants for SkyComm shares and this resulted in an increase in CenturyTel's shares.

313.     CenturyTel was also listed in the Chapter 11 petition as a secured creditor of SkyPort in the amount of $2,700,832.45, a debt allegedly incurred on April 13, 2006, with a lien on inventory and accounts receivable. This "obligation" had not been disclosed to SkyComm Shareholders, and was inconsistent with the fundamental terms of the 2006 sale and conversion of the CenturyTel Debentures, which the shareholders had been told had been completed. It was inconsistent with financial statements prepared by Kubbernus after the closing. But, somehow, Kubbernus and CenturyTel had "revived" $2.55 million of cancelled CenturyTel Debentures and these were now listed as a secured debt of SkyPort.

314.     Balaton was listed as an unsecured creditor of SkyPort for $1,945,603.58, with this debt allegedly incurred on February 22, 2006 and April 14, 2006. This obligation was a fictitious creation of Balaton and Kubbernus and had not been disclosed previously in SkyComm's financial statements or otherwise to the SkyComm shareholders.

315.     Lavell was listed in the Chapter 11 petition as an unsecured creditor of SkyPort for $515,000, with this debt allegedly incurred for "advances." This obligation had not been in SkyComm's financial statements or otherwise disclosed to the SkyComm Shareholders.

316.     The debts of Lavell to SkyComm, which had been described in the Lavell offering documents, were not listed in the Chapter 11 petition schedules.

317.     In point of fact, substantial sums had been diverted from SkyComm to Balaton and Lavell and now Kubbernus was listing them as creditors of SkyComm.

Certified Document Number: 44550657 - Page 58 of 111

318.   John E. Panneton was listed as an unsecured creditor of SkyPort for $9,450.00, allegedly for giving SkyComm this sum to purchase 337,500 shares of SkyComm stock, for which he was never issued certificates.

319.   Balaton was listed as owning over 58% of the equity in SkyComm, and ClearSky not listed at all.

320.   Kubbernus sold a valuable piece of networking equipment belonging to SkyComm and took the proceeds -- several hundred thousand dollars -- for Balaton and subsequently used these funds as Balaton's contribution to funding their bankruptcy plan.

321.   In the 2008 Chapter 11 proceeding, Kubbernus and Balaton made numerous false and misleading statements to the Bankruptcy Court, including:

(a)   Balaton and Kubbernus deliberately mixed and mingled the shareholders and creditors of SkyPort, which was a bankruptcy debtor, with the shareholders and creditors of SkyComm, which was not;

(b)   Balaton and Kubbernus fraudulently represented that they owned a majority of the shares in SkyComm;

(c)   Balaton and Kubbernus misled the Court into assuming jurisdiction over and affecting the rights of the shareholders and creditors of SkyComm, even though it was not a debtor in bankruptcy;

(d)   Balaton and Kubbernus fraudulently claimed to be owed approximately $2,000,000 by SkyPort when no such debt had been previously disclosed or shown on SkyComm's consolidated financial statements;

(e)   Balaton and Kubbernus listed Lavell as a creditor of SkyComm for $515,000, even though their prior communications had indicated the debt ran from Lavell to SkyComm;

59

Certified Document Number: 44550657 - Page 59 of 111

(f)    Balaton and Kubbernus listed CenturyTel as a secured creditor for $2.7 million (presumably, principal plus interest), even though CenturyTel had made no loans, nor extended any credit to SkyComm after the sale of its interest to Balaton and even though all of the CenturyTel Debentures had, according to what Defendants had represented to the Original Investors and the Non-CenturyTel Debenture Holders, been converted into shares;

(g)    Balaton, Kubbernus and CenturyTel unlawfully "revived" $2.5 million of CenturyTel Debentures after they had been converted into SkyComm shares and listed them as a still outstanding obligation of SkyComm;

(h)    Balaton and Kubbernus did not list the ClearSky Investors on its schedule of SkyComm equity holders, and later represented to the Bankruptcy Court that the ClearSky Investors had no interest in SkyComm;

(i)    Balaton and Kubbernus falsely represented that under Delaware law, Balaton, as purportedly the majority owner of the equity in SkyComm, had the legal right to approve a merger of SkyComm into its subsidiary, SkyPort, without a shareholders' vote and without granting appraisal rights to the non-assenting shareholders;

(j)    Balaton and Kubbernus falsely represented that by consummating this merger, they could effectively wipe out the share interests of the other SkyComm shareholders, even though SkyComm was not a debtor in the bankruptcy case;

(k)    Balaton and Kubbernus wrongfully asserted that it had no fiduciary duties to the other SkyComm shareholders;

(l)    Kubbernus deceitfully and falsely testified that under the ClearSky IM, if ClearSky did not raise $10 million, Balaton had no obligation to turn over any interest in SkyComm to ClearSky;

Certified Document Number: 44550657 - Page 60 of 111

(m) Kubbernus failed to disclose that he was responsible for raising the funds in ClearSky and that he had deliberately decided not to raise more than $7 million, so that if there was a shortfall, he was the cause;

(n) Balaton and Kubbernus failed to disclose their wrongful conversion of assets of the debtor.

322. CenturyTel made numerous false representations in the Chapter 11 case, CenturyTel asserting that it held a secured claim of approximately $2,700,000 against SkyPort, alleging that $2,500,000 of the SkyComm debentures it had held had never been cancelled and that accumulated interest had brought this debt to $2,700,000.

323. SkyPort did not have a debt outstanding to CenturyTel; rather Balaton did.

324. SkyPort did not have any debts outstanding to Balaton; rather Balaton and Kubbernus had misappropriated millions of dollars of SkyComm and investor funds.

325. On May 22, 2009, Balaton and Kubbernus filed a proposed plan of reorganization pursuant to which SkyComm would be merged into SkyPort, Balaton would exchange its alleged secured and unsecured debts for 100% of the equity in the merged entity and all of the other shareholders in SkyComm would have their shares expunged. Balaton proposed to contribute approximately $200,000 in new funds, which it had obtained by converting and selling SkyPort equipment that did not belong to Balaton.

326. This plan was amended on July 8, 2009 to reflect settlements reached with secured creditors to obtain their support for the plan. One of these purported secured creditors was CenturyTel.

61

327. Pouliot and Draco sought to challenge this plan. In response, Kubbernus and

Balaton argued that they did not have standing to do so since they did not have an interest in

SkyPort.

328. Kubbernus testified in the hearing on Pouliot's efforts to oppose confirmation and

remarkably stated under oath that, in fact, he was not the controlling shareholder of Balaton:

> Q: Are you the controlling shareholder of Balaton?
> A: No.
> Q: No. You don't own the majority of the shares in Balaton?
> A: No.
> Q: How about you or affiliated family members or partnership or ventures
> that you control?
> A: Yes. There's a structure in place where a family trust owns Balaton
> ultimately.
> Q: Okay. So you or others affiliated with you control --
> A: Yes.
> Q: -- the majority of shares of Balaton.
> A: Yes.

329. This was contrary to what had been represented in every filing to the FCC and

Team Telecom agencies from 2006 through 2008, as well as to the shareholders of SkyComm.

330. Ultimately, however, Pouliot and Draco were denied standing, since neither they

nor ClearSky had been listed as shareholders and they did not timely file proofs of claim.

331. CenturyTel was well aware of Pouliot and Draco's interest in SkyComm, but

failed to speak up and inform the Court of this fact.

332. Balaton's plan was confirmed on August 12, 2009.

333. As a result of their blatantly false representations and unconscionable breach of

their fiduciary duties to the shareholders of SkyComm and ClearSky, Balaton and Kubbernus

were able to eliminate all other shareholders in SkyComm and secure 100% of the equity in

62

SkyComm and SkyPort for themselves in the Bankruptcy proceeding and CenturyTel was able to secure the survival of the debt Balaton owed it..

334.    CenturyTel acquiesced and cooperated with Balaton's and Kubbernus' plan, even though it knew that Kubbernus and Balaton were wrongfully and fraudulently using the plan to deprive the SkyComm shareholders of their interests in SkyComm.

**AF.    The FCC Sanctions SkyPort**

335.    In July 2009, Plaintiffs learned that the FCC had issued an Order of Forfeiture against SkyPort in March 2009, after finding that it and its affiliates had "willfully and repeatedly violated the Commission's rules by engaging in unauthorized transfers of control."

336.    The Forfeiture Order related to SkyComm's failure to disclose the transfer of ownership interests within Balaton from Kubbernus' four partners to Kubbernus. This violation had been characterized by Balaton and Kubbernus in the applications as a minor violation of *pro forma* filing requirements.

337.    The Forfeiture Order, coupled with Balaton's and Kubbernus' fraudulent statements and plan in the Chapter 11 case, caused Plaintiffs to begin to investigate the facts relating to the CenturyTel-Balaton relationship and their FCC filings. Virtually all of the facts relating to the Defendants' fraudulent scheme and fraudulent statements, cited in this Petition, were discovered by Plaintiffs subsequent to July 2009. Plaintiffs' knowledge of this scheme is still incomplete since they did not have access to many of the key relevant documents, which are in Defendants' exclusive possession.

Certified Document Number: 44550657 - Page 63 of 111

**AG.     The 2009 *Pro Forma* FCC Filings**

338.     On September 8, 2009, Balaton submitted a *pro forma* application to the FCC for approval of the transfer of control in connection with the restructuring of SkyPort in the Chapter 11 case.

339.     In this application, Kubbernus and Balaton represented that Kubbernus owned 100% of the shares in Balaton – the exact opposite of what they had told the bankruptcy judge just months earlier.

340.     Kubbernus also represented that under the new ownership structure for SkyPort, (a) Bankton-Texas, a newly created entity, would own 66.5% of SkyPort, (b) Bankton would own 100% of Bankton-Texas and (c) "Robert Kubbernus, via Irrevocable Trust (Canada)" would own 100% of Bankton.

341.     On October 6, 2009 the FCC granted approval of the transfer described in this application.

342.     On October 13, 2009, Kubbernus and Balaton caused SkyPort to be merged with SkyComm, with SkyPort -- a Texas corporation – as the survivor. All of the former shareholders in SkyComm, except Balaton, were eliminated.

## COUNT ONE

**(Breach of Fiduciary Duties -- Against the CenturyTel Defendants on behalf of the Original Shareholders and Non-CenturyTel Debenture Holders)**

343.     Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

344.     Each of the CenturyTel Directors, as directors of SkyComm and SkyPort through November 2006, owed fiduciary duties to the shareholders of these companies; these included a duty of due care and a duty of loyalty.

64

Certified Document Number: 44550657 - Page 64 of 111

345.    CenturyTel, as a party in control of SkyComm and SkyPort, owed fiduciary duties to the shareholders of these companies, including a duty of due care and a duty of loyalty.

346.    As outlined in this Petition, each of the CenturyTel Defendants breached their duties of loyalty and due care by not acting in the best interests of SkyComm, SkyPort and their shareholders, but rather acting in bad faith and for their own personal and corporate interests.

347.    CenturyTel and the CenturyTel Directors breached their duties of loyalty and due care and failed to act in good faith with respect to the shareholders of SkyComm by:

(a) causing the CEO of SkyComm to report directly to CenturyTel, thereby usurping the authority of the SkyComm Board of Directors;

(b) depriving the shareholders of their rights to participate in the management of SkyComm;

(c) depriving SkyComm of the ability to obtain arms-length financing on the best terms available to it;

(d) causing SkyPort to perform services for CenturyTel without paying for the same;

(e) causing CenturyTel to breach and SkyComm not to enforce agreements whereby SkyComm was to perform services for CenturyTel;

(f) managing SkyComm for the benefit of CenturyTel and to the detriment of its shareholders;

(g) grossly mismanaging SkyComm and SkyPort;

(h) not informing the Non-CenturyTel Directors that they were actively in the process of seeking to sell SkyComm;

(i) not conducting proper due diligence on Kubbernus in the sale of SkyComm;

65

Certified Document Number: 44550657 - Page 65 of 111

(j) not making reasonable efforts to assure that shareholders and investors in SkyComm would not be harmed as a result of CenturyTel's disposition of its controlling interest in SkyComm;

(k) selling control of SkyComm to Kubbernus despite clear warnings of the danger that he would loot SkyComm and defraud investors;

(l) making no effort to assure that SkyComm was obtaining the best price and terms for the sale of shares in SkyComm;

(m) keeping the Non-CenturyTel Directors in the dark regarding the sale of the CenturyTel Debentures and issuance of additional shares by SkyComm, and the negotiations leading up to it;

(n) disregarding the best interests of SkyComm and its shareholders in the negotiation of the sale of shares to Balaton and the SPA Purchasers;

(o) causing SkyPort to issue shares to CenturyTel and to Balaton for inadequate consideration and at below fair market value;

(p) actively colluding with Balaton and Kubbernus to cause SkyComm to file false and misleading applications and statements with the FCC and the Team Telecom agencies of the United States government, in an effort to cause the FCC to approve the transfer of control of SkyPort to Balaton;

(q).causing SkyComm to reimburse CenturyTel for its legal expenses in securing FCC and Team Telecom approval;

(r) causing SkyComm to agree that Balaton could pay the consideration for the CenturyTel Debentures with SkyComm funds;

66

Certified Document Number: 44550657 - Page 66 of 111

(s) permitting the conversion of Balaton indebtedness to CenturyTel into SkyComm indebtedness;

(t) failing to inform the Non-CenturyTel Directors, SkyComm shareholders and Non-CenturyTel Debenture Holders of the complete and the final terms of the transaction with Balaton;

(u) turning over control of SkyComm and SkyPort to Balaton and Kubbernus before obtaining the approval of the FCC and the Team Telecom agencies;

(v) conspiring with Kubbernus and Balaton to revive a portion of the CenturyTel Debentures after representing to the Non-CenturyTel Directors and SkyComm Shareholders that they would be and had been fully converted; and

(w) selling control of SkyComm and SkyPort to a looter and securities fraudster.

348.    CenturyTel and the CenturyTel Directors knew that the shareholders of SkyComm would be harmed as a result of the transfer of control to Balaton and Kubbernus.

349.    CenturyTel and the CenturyTel Directors acted recklessly and with utter disregard for the welfare of the SkyComm shareholders by causing SkyComm to make false and misleading statements to the FCC and Team Telecom.

350.    CenturyTel and the CenturyTel Directors breached their duties of loyalty and due care and failed to act in good faith with respect to the Non-CenturyTel Debenture Holders by causing them to pay a much higher price for SkyComm shares than CenturyTel paid for such shares and not disclosing to the Non-CenturyTel Debenture Holders the price which CenturyTel paid for such shares.

351.    CenturyTel and the CenturyTel Directors acted willfully, wantonly and outrageously in breaching their fiduciary duties to the shareholders of SkyComm.

67

Certified Document Number: 44550657 - Page 67 of 111

352. As a direct and proximate result of the CenturyTel Defendants' breach of the fiduciary duties owed to the Original Shareholders and the Non-CenturyTel Debenture Holders, they were personally injured and suffered the loss of the value of their investments in SkyComm believed to be in excess of $17 million.

353. As a result of their willful, wanton and outrageous conduct, the CenturyTel Defendants should be held liable for punitive damages.

**WHEREFORE**, the Original Shareholders and the Non-CenturyTel Debenture Holders pray that the Court enter an order, judgment and decree granting the following relief against the CenturyTel Defendants:

A. An Order requiring the CenturyTel Defendants to produce for inspection and copying all shareholder, financial and corporate books, records and documents of SkyComm and SkyPort;

B. An Order requiring the CenturyTel Defendants to produce for inspection and copying all documents and records relating to the offering or sale of investments in SkyComm or SkyPort, ClearSky, Watershed Funds, or Lavell;

C. Awarding the Original Shareholders and the Non-CenturyTel Debenture Holders compensatory and consequential damages against all Defendants, jointly and severally, in a sum of not less than $17 million, together with interest thereon;

D. Awarding the Original Shareholders and the Non-CenturyTel Debenture Holders equitable relief, including disgorgement of compensation, fees and benefits, restitution, forced buy-out of interest, or other relief as determined by the Court as necessary to do justice.

E. Awarding the Original Shareholders and the Non-CenturyTel Debenture Holders punitive damages against Defendants, jointly and severally;

Certified Document Number: 44550657 - Page 68 of 111

F. Directing the CenturyTel Defendants, jointly and severally, to pay the Original Shareholders' and the Non-CenturyTel Debenture Holders' costs of the action, including reasonable counsel fees; and

G. Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT TWO

### (Breach of Fiduciary Duties — Against the Kubbernus Defendants on behalf of all Plaintiffs)

354. Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

355. Kubbernus, as a director of SkyComm and SkyPort from November 2006 on, owed fiduciary duties to the shareholders of these companies, including Plaintiffs; these included a duty of due care and a duty of loyalty.

356. The Kubbernus Defendants, as parties in control of SkyComm and SkyPort, owed fiduciary duties to the shareholders of these companies, including Plaintiffs, including a duty of due care and a duty of loyalty.

357. As outlined in this Petition, the Kubbernus Defendants breached their duties of loyalty and due care by not acting in the best interests of SkyComm, SkyPort and their shareholders, but rather acting in bad faith and for their own personal and corporate interests.

358. The Kubbernus Defendants breached their duties of loyalty and due care and did not act in good faith with respect to the shareholders of SkyComm by:

(a) taking *de facto* control of SkyPort without FCC and Team Telecom approval, but with the active collusion and support of the CenturyTel Defendants;

69

Certified Document Number: 44550657 - Page 69 of 111

(b)     actively colluding with CenturyTel and the CenturyTel Directors to file false and misleading applications and statements with the FCC and the Team Telecom agencies of the United States government, in an effort to cause the FCC to approve the transfer of control of SkyPort to Kubbernus and Balaton;

(c)     repeatedly filing false and misleading applications and statements with the FCC and the Team Telecom agencies in an effort to cause the FCC to approve the transfer of control of SkyPort to Kubbernus and Balaton;

(d)     misrepresenting to the shareholders of SkyComm that the FCC and Team Telecom approvals had been duly and properly obtained;

(e)     fraudulently diverting ClearSky's interest in SkyComm to Balaton;

(f)     failing to issue share certificates to the Additional Investors despite repeated requests that they do so;

(g)     failing to properly record all of the shareholders of SkyComm on the books and records of the corporation;

(h)     diluting the SkyComm shareholders for inadequate and/or no consideration;

(i)     causing SkyComm to issue shares to Balaton and CenturyTel without adequate and/or no consideration;

(j)     falsely asserting that debts of Balaton and Kubbernus were debts of SkyComm;

(k)     diverting funds from SkyComm and SkyPort, and misappropriating and converting assets of those entities;

(l)     failing to account for the funds invested in SkyComm and SkyPort;

(m)     collecting unjustified and excessive fees from SkyComm;

70

Certified Document Number: 44550657 - Page 70 of 111

(n)     managing SkyComm and SkyPort for their own benefit and to the detriment of the
SkyComm shareholders;

(o)     grossly mismanaging SkyComm and SkyPort, with reckless disregard for the
interests of SkyComm and SkyPort;

(p)     conspiring with CenturyTel to "revive" $2.5 million of converted and cancelled
debentures;

(q)     not representing the interests of the shareholders to whom the owed fiduciary
duties, in the 2008 Chapter 11 Case;

(r)     acting to deprive the shareholders of their interests in SkyComm and taking 100%
of the equity in SkyComm for Balaton; and

(s)     falsely asserting that Balaton was a creditor of SkyComm;

(t)     falsely asserting that CenturyTel was a creditor of SkyComm; and

(u)     making numerous other false and misleading statements to the bankruptcy court
in order to acquire 100% ownership of SkyComm and SkyPort and to deprive the shareholders of
their interests in the corporations.

359.    The Kubbernus Defendants acted willfully, wantonly and outrageously in
breaching their fiduciary duties to the individual shareholders of SkyComm.

360.    As a direct and proximate result of the Kubbernus Defendants' breaches of the
fiduciary duties owed to all Plaintiffs, they were personally injured and suffered the loss of the
value of their investments in SkyComm believed to be in excess of $32 million.

361.    As a result of their willful, wanton and outrageous conduct, Defendants should be
held liable for punitive damages.

Certified Document Number: 44550657 - Page 71 of 111

**WHEREFORE**, all the Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against the Kubbernus Defendants:

A.      An Order requiring the Kubbernus Defendants to produce for inspection and copying all shareholder, financial and corporate books, records and documents of SkyComm and SkyPort;

B.      An Order requiring the Kubbernus Defendants to produce for inspection and copying all shareholder, financial and corporate books, records and documents of Balaton, Bankton, Bankton-Texas, Watershed Funds, ClearSky and ClearSky Management, and any other records relating to the offering or sale of investments in any of such entities;

C.      An Order for an accounting;

D.      An Order appointing a provisional director, trustee, managing agent, fiscal agent or other court appointed fiduciary for SkyComm and SkyPort;

E.      Awarding all Plaintiffs compensatory and consequential damages against the Kubbernus Defendants, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

F.      Awarding all Plaintiffs equitable relief, including disgorgement of compensation, fees and benefits, restitution, forced buy-out of interest, or other relief as determined by the Court as necessary to do justice.

G.      Awarding all Plaintiffs punitive damages against the Kubbernus Defendants, jointly and severally;

H.      Directing the Kubbernus Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

72

l.      Granting such other, further or different relief as to the Court shall seem fair and just.

### COUNT THREE

### (Breach of Fiduciary Duties — Against the Kubbernus Defendants and Wilson Vukelich on behalf of the ClearSky Investors)

362.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

363.    The Kubbernus Defendants as parties in control of ClearSky, owed fiduciary duties to the members of ClearSky, including a duty of due care and a duty of loyalty.

364.    Wilson Vukelich invited reliance on the part of the ClearSky Investors and therefore owed a duty of due care to the ClearSky Investors.

365.    As outlined in this Petition, the Kubbernus Defendants breached their duties of loyalty and due care by not acting in the best interests of ClearSky and its members, but rather acting in bad faith and for their own personal interests.

366.    The Kubbernus Defendants breached their duties of loyalty and due care and did not act in good faith with respect to the members of ClearSky by:

(a)     failing to obtain FCC and Team Telecom approvals of ClearSky's controlling interest in SkyComm;

(b)     closing the acquisition of control of SkyComm in Balaton and not ClearSky;

(c)     fraudulently diverting ClearSky's interest in SkyComm to Balaton;

(d)     making numerous false and misleading statements to the ClearSky Investors about the status of their investments and confirming their indirect ownership of control in SkyComm;

(e)     diverting funds from ClearSky;

(f)     collecting unjustified and excessive fees from ClearSky;

73

Certified Document Number: 44550657 - Page 73 of 111

(g)     not representing the interests of ClearSky and the ClearSky Investors in the 2008 Chapter 11 Case;

(h)     falsely asserting in the 2008 Chapter 11 case that ClearSky had no interest in SkyComm;

(i)     making numerous other false and misleading statements to the bankruptcy court in order to deprive the ClearSky Investors of the value of their investments;

(j)     acting to deprive the ClearSky Investors of their interests in SkyComm and taking 100% of the equity in SkyComm for Balaton;

(k)     acting exclusively in their own best interests, and not in the interests of ClearSky; and

(l)     grossly mismanaging ClearSky in reckless disregard for the interests of the ClearSky Investors.

367.    As outlined in this Petition, Wilson Vukelich breached their duties of due care by not acting in the best interests of ClearSky and its members, but rather acting in bad faith and for their own personal interests. Wilson Vukelich knowingly participated in the breaches of fiduciary duties committed by the Kubbernus Defendants.

368.    The Kubbernus Defendants and Wilson Vukelich acted willfully, wantonly and outrageously in breaching their fiduciary duties to the individual ClearSky Investors.

369.    As a direct and proximate result of the Kubbernus Defendants' and Wilson Vukelich's breaches of the fiduciary duties owed to Plaintiffs, Plaintiffs were personally injured and suffered the loss of the value of their investments in ClearSky believed to be in excess of $7 million.

Certified Document Number: 44550657 - Page 74 of 111

370. As a result of their willful, wanton and outrageous conduct, the Kubbernus Defendants and Wilson Vukelich should be held liable for punitive damages.

**WHEREFORE**, the ClearSky Investors pray that the Court enter an order, judgment and decree granting the following relief against the Kubbernus Defendants and Wilson Vukelich:

A. An Order for an accounting;

B. Awarding the ClearSky Investors compensatory and consequential damages against the Kubbernus Defendants and Wilson Vukelich, jointly and severally, in a sum of not less than $7 million, together with interest thereon;

C. Awarding the ClearSky Investors equitable relief, including disgorgement of compensation, fees and benefits, restitution, forced buy-out of interest, or other relief as determined by the Court as necessary to do justice.

D. Awarding the ClearSky Investors punitive damages against the Kubbernus Defendants and Wilson Vukelich, jointly and severally;

E. Directing Kubbernus Defendants and Wilson Vukelich, jointly and severally, to pay the ClearSky Investors' costs of the action, including reasonable counsel fees; and

F. Granting such other, further or different relief as to the Court shall seem fair and just.

**COUNT FOUR**

**(Breach of Fiduciary Duty – Against Wilson Vukelich on behalf of the ClearSky Investors)**

371. Wilson Vukelich acted as a trustee of the funds invested by the ClearSky Investors in ClearSky, and as such was in a fiduciary relationship with the ClearSky Investors and the Additional Investors.

75

Certified Document Number: 44550657 - Page 75 of 111

372.    Wilson Vukelich breached the fiduciary duties it owed to the ClearSky Investors by:

(a)    failing to assure that the ClearSky Investors funds were expended in accordance with the terms of the ClearSky LPA and ClearSky IM;

(b)    failing to assure that the ClearSky Investors' funds were used to acquire good title to the interests ClearSky was entitled to in SkyComm under the ClearSky IM and the ClearSky LPA;

(c)    failing to ensure that the ClearSky Investors' funds, which it held in escrow, were properly disbursed;

(d)    allowing Kubbernus to comingle and use ClearSky Investors' funds to pay expenses that were not obligations of ClearSky; and

(e)    billing ClearSky excessive legal fees and billing ClearSky for work that was not properly attributable to ClearSky and collecting the same out of the ClearSky Investor's funds;

373.    Wilson Vukelich acted willfully, wantonly and outrageously in breaching their fiduciary duties to the individual ClearSky Investors.

374.    As a direct and proximate result of Wilson Vukelich's breaches of the fiduciary duties owed to the ClearSky Investors, these Plaintiffs were personally injured and suffered the loss of the value of their investments in ClearSky and SkyComm believed to be in excess of $7 million.

375.    As a result of their willful, wanton and outrageous conduct, Defendants should be held liable for punitive damages.

**WHEREFORE**, the ClearSky Investors pray that the Court enter an order, judgment and decree granting the following relief against the Wilson Vukelich:

76

Certified Document Number: 44550657 - Page 76 of 111

A. An Order for an accounting;

B. Awarding the ClearSky Investors compensatory and consequential damages against Wilson Vukelich in a sum of not less than $7 million, together with interest thereon;

C. Awarding the ClearSky Investors punitive damages against Wilson Vukelich;

D. Directing Wilson Vukelich to pay the ClearSky Investors' costs of the action, including reasonable counsel fees; and

E. Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT FIVE

### (Oppression -- Against the CenturyTel Defendants on behalf of the Original Shareholders and the Non-CenturyTel Debenture Holders)

376. Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

377. Each of the Original Shareholders is and has been a shareholder indirectly in SkyPort, a closely-held Texas corporation.

378. Each of the Non-CenturyTel Debenture Holders had the right to convert their debentures into indirect share ownership in SkyComm.

379. Each of the CenturyTel Defendants exercised control over SkyPort from approximately the end of 2002 through November 2, 2006.

380. Each of the CenturyTel Defendants, as a party in control of SkyPort, was prohibited from acting oppressively towards the other sharcholders, substantially defeating their reasonable expectations, acting in a burdensome, harsh or wrongful manner acting with a lack of probity and fair dealing in the company's affairs to the prejudice of the other shareholders, or visibly departing from the standards of fair dealing on which every shareholder is entitled to rely.

77

Certified Document Number: 44550657 - Page 77 of 111

381.    As set forth in this Petition, each of the CenturyTel Defendants acted in an oppressive manner towards the Original Shareholders.

382.    Each of the CenturyTel Defendants acted to frustrate the reasonable expectations of the Original Shareholders.

383.    Each of the CenturyTel Defendants acted in a burdensome, harsh, and wrongful manner, characterized by a lack of probity and fair dealing in company's affairs to the prejudice of the Original Shareholders.

384.    Each of the CenturyTel Defendants acted in a manner that was a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

385.    The CenturyTel Defendants acted to deprive the Original Shareholders and Non-CenturyTel Debenture Holders of the benefits and rights associated with their stock ownership and entitlements in SkyPort and their participation in SkyPort's affairs, took benefits for CenturyTel to the exclusion of the other shareholders, wasted corporate assets and converted for their own benefit to the detriment of the other shareholders.

386.    As a direct result of CenturyTel Defendants' oppressive conduct, the Original Shareholders and Non-CenturyTel Debenture Holders have lost the full value of their interests in SkyPort.

387.    Plaintiffs have no adequate remedy at law.

**WHEREFORE,** the Original Shareholders and the Non-CenturyTel Debenture Holders pray that the Court enter an order, judgment and decree granting the following relief against the CenturyTel Defendants:

A.    An Order for an accounting;

78

Certified Document Number: 44550657 - Page 78 of 111

B.    Awarding Original Shareholders and the Non-CenturyTel Debenture Holders compensatory and consequential damages against the CenturyTel Defendants, jointly and severally, in a sum of not less than $17 million, together with interest thereon;

C.    Awarding the Original Shareholders and the Non-CenturyTel Debenture Holders equitable relief, including disgorgement of compensation, fees and benefits, restitution, forced buy-out of interest, or other relief as determined by the Court as necessary to do justice.

D.    Awarding the Original Shareholders and the Non-CenturyTel Debenture Holders punitive damages against the CenturyTel Defendants, jointly and severally;

E.    Directing the CenturyTel Defendants, jointly and severally, to pay the Original Shareholders' and Non-CenturyTel Debenture Holders' costs of the action, including reasonable counsel fees; and

F.    Granting such other, further or different relief as to the Court shall seem fair and just.

COUNT SIX

**(Oppression -- Against the Kubbernus Defendants on behalf of All Plaintiffs)**

388.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

389.    Each of the Plaintiffs is a holder of an equity interest indirectly in SkyPort, a closely-held Texas corporation.

390.    Each of the Kubbernus Defendants exercised control over SkyPort from approximately February 2006 through the date of this Petition.

391.    Each of the Kubbernus Defendants, as a party in control of SkyPort, was prohibited from acting oppressively towards the other shareholders, including Plaintiffs, substantially defeating their reasonable expectations, acting in a burdensome, harsh or wrongful

79

Certified Document Number: 44550657 - Page 79 of 111

manner acting with a lack of probity and fair dealing in the company's affairs to the prejudice of
the other shareholders, including Plaintiffs, or visibly departing from the standards of fair dealing
on which every shareholders is entitled to rely.

392. Each of the Kubbernus Defendants acted in an oppressive manner towards
Plaintiffs.

393. Each of the Kubbernus Defendants acted to frustrate the reasonable expectations
of Plaintiffs.

394. Each of the Kubbernus Defendants acted in a burdensome, harsh, and wrongful
manner, characterized by a lack of probity and fair dealing in company's affairs to the prejudice
of Plaintiffs.

395. Each of the Kubbernus Defendants acted in a manner that was a visible departure
from the standards of fair dealing and a violation of fair play on which each shareholder is
entitled to rely.

396. The Kubbernus Defendants acted to deprive Plaintiffs of the benefits and rights
associated with their stock ownership in SkyPort and their participation in SkyPort's affairs, took
benefits for Balaton and Kubbernus to the exclusion of the other shareholders, including
Plaintiffs, wasted corporate assets, and converted for their own benefit to the detriment of the
other shareholders, including Plaintiffs.

397. The Kubbernus Defendants used SkyPort as a vehicle to oppress Plaintiffs and
wrongfully deprive them of their interests in SkyComm and SkyPort in connection with the 2009
Chapter 11 plan.

398. As a direct result of the Kubbernus Defendants' oppressive conduct, Plaintiffs
have lost the full value of their interests in SkyPort.

80

399.   Plaintiffs have no adequate remedy at law.

**WHEREFORE,** all Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against the Kubbernus Defendants:

A.      An Order requiring the Kubbernus Defendants to produce for inspection and copying all shareholder, financial and corporate books, records and documents of SkyComm and SkyPort;

B.      An Order requiring the Kubbernus Defendants to produce for inspection and copying all shareholder, financial and corporate books, records and documents of Balaton, Bankton, Bankton-Texas, Watershed Funds, ClearSky and ClearSky Management, and any other records relating to the offering or sale of investments in any of such entities;

C.      An Order granting equitable relief, including disgorgement of compensation, fees and benefits, restitution, forced buy-out of interest, or other relief as determined by the Court as necessary to do justice.

D.      An Order for an accounting;

E.      An Order appointing a provisional director, trustee, managing agent, fiscal agent or other court appointed fiduciary for SkyComm and SkyPort;

F.      Awarding all Plaintiffs compensatory and consequential damages against the Kubbernus Defendants, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

G.      Awarding all Plaintiffs punitive damages against the Kubbernus Defendants, jointly and severally;

H.      Directing the Kubbernus Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

Certified Document Number: 44550657 - Page 81 of 111

I.      Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT SEVEN

### (Common Law Fraud – Against all Defendants on behalf of All Plaintiffs)

400.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

401.    As described herein, Defendants made and caused to be made numerous material misrepresentations which at the time they were made, they knew were false and/or were made recklessly without knowledge of the truth. Such statements were made with the intent that they be relied upon.

A.      **False and Misleading Statements re the FCC and Team Telecom Approvals**

402.    Such representations included numerous materially false and misleading statements to the FCC and Team Telecom agencies described above, made in order to induce their approval of the transfer of control of SkyComm to Balaton, knowing that such approvals would be relied upon by Plaintiffs in their decision to invest in and maintain their investments in SkyComm.

403.    Such representations included numerous false and misleading statements to the shareholders and investors in SkyComm and ClearSky, including without limitation that (a) SkyPort was in compliance with all FCC and other governmental requirements for the transfer of control to Balaton and Kubbernus, and (b) the FCC and Team Telecom approvals of such transfer of control to Balaton were obtained lawfully and in compliance with FCC and Team Telecom rules and regulations.

82

Certified Document Number: 44550657 - Page 82 of 111

404. Defendants had actual knowledge that the Original Shareholders, Non-CenturyTel Debenture Holders, ClearSky Investors and Additional Investors would rely on such false and misleading statements.

405. Defendants had actual knowledge that the transfer to Balaton could not have been completed without the FCC and Team Telecom duly and properly approving such transfer.

406. Defendants had actual knowledge that the Original Shareholders and Non-CenturyTel Debenture Holders would not have permitted the transfer to Balaton and Kubbernus without the transfer of control of the FCC licenses being duly and properly approved by the FCC and Team Telecom.

407. Defendants had actual knowledge that the Non-CenturyTel Debenture Holders would not have converted their debentures without the transfer of control of the FCC licenses being duly and properly approved by the FCC and Team Telecom and without the conversion of all of the CenturyTel Debentures.

408. Defendants had actual knowledge that the ClearSky Investors would not have invested their funds in ClearSky without the transfer of control of the FCC licenses being duly and properly approved by the FCC.

409. Defendants had actual knowledge that the Additional Investors would not have invested their funds in SkyComm without the transfer of control of the FCC licenses being duly and properly approved by the FCC.

410. The Original Shareholders justifiably relied on such statements to their detriment. Had the SkyComm shareholders known that the FCC and Team Telecom had been obtained through fraudulent misrepresentations, they would have exposed the same and thus, never have permitted such transfer to go through.

83

411.    The Non-CenturyTel Debenture Holders justifiably relied on such statements to their detriment. Had the Non-CenturyTel Debenture Holders known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentations, they never have permitted the conversion of their debentures to be consummated.

412.    The ClearSky Investors and the Additional Investors justifiably relied on such statements to their detriment. Had such investors known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentations, they would never have invested in ClearSky and SkyComm, respectively.

**B.    Misrepresentations to the ClearSky Investors**

413.    The Kubbernus Defendants, together with Wilson Vukelich, made numerous false and misleading representations and statements in the ClearSky IM and ClearSky LPA, including that:

(a)    ClearSky would acquire 133,000,000 shares in SkyComm, at a purchase price of $0.03 per share plus warrants and an additional 133,000,000 shares in SkyComm for a total investment of $4 million;

(b)    ClearSky would acquire the CenturyTel Debentures, then in the face amount of $20,596,000, for a purchase price of $3 million, and then convert them into 108,000,000 shares of SkyComm;

(c)    all told, ClearSky would, upon completion of these transactions, own 76% of SkyComm;

(d)    they would obtain approval from the FCC of ClearSky as the party in control of SkyPort; and

84

Certified Document Number: 44550657 - Page 84 of 111

(e)     the proceeds of the offering would be used only for ClearSky's purposes and benefit.

414.     All of these representations were knowingly false and misleading when made and were intended to induce the ClearSky Investors to invest in ClearSky.

415.     The Kubbernus Defendants and Wilson Vukclich failed to disclose numerous facts that were necessary to be disclosed to make the ClearSky IM and ClearSky LPA not misleading, including that:

(a)     the applications to the FCC and Team Telecom had been made in the name of Balaton;

(b)     Kubbernus was then involved in litigation with Truestar Petroleum alleging fraud; and

(c)     Kubbernus had recently been CEO of JAWS, a company that went out of business and resulted in shareholder litigation.

416.     This information was material to the ClearSky Investors' decisions and was required to be disclosed to make the offering documents truthful and not misleading.

417.     The ClearSky Investors justifiably relied on such statements to their detriment. Had the ClearSky Investors known the truth regarding such representation, they would never have invested in ClearSky.

C.     Misrepresentations to the Additional Investors

418.     The Kubbernus Defendants and Wilson Vukelich represented in the 2007 Offering Memorandum that:

(a)     FCC approval of the transfer of ownership to the "new majority owner" had been duly obtained; and

Certified Document Number: 44550657 - Page 85 of 111

(b)     the proceeds of the offering would be used only for SkyComm's purposes and benefit.

419.    All of these representations were knowingly false when made and were intended to induce the Additional Investors to invest in SkyComm.

420.    The Kubbernus Defendants and Wilson Vukelich failed to disclose numerous facts that were necessary to be disclosed to make the 2007 Offering Memorandum not misleading, including that:

(a)     ClearSky was the rightful owner of the majority of SkyComm's shares;

(b)     Balaton owed CenturyTel $3 million in payment for the CenturyTel Debentures;

(c)     Kubbernus had been sued for failing to deliver shares, fraud upon shareholders and looting;

(d)     the company Kubbernus had most recently been CEO of JAWS, had gone out of business and was the subject of shareholder litigation; and

(e)     Pouliot, who was listed as a director, actually owned more than 35% of the equity in SkyComm through his company, Draco.

This information was material to the Additional Investors' decisions and was required to be disclosed to make the offering documents truthful and not misleading.

421.    The Additional Investors justifiably relied on such statements to their detriment. Had the Additional Investors known the truth regarding such representation, they would never have invested in SkyComm.

86

Certified Document Number: 44550657 - Page 86 of 111

## D. The CenturyTel Defendants' Participation

422. The CenturyTel Defendants, with intent to deceive or defraud and with reckless disregard for the truth or the law worked jointly with, conspired with and assisted Kubbernus and Balaton in perpetrating their fraudulent scheme.

423. The CenturyTel Defendants worked jointly with, conspired with and assisted Kubbernus and Balaton in their fraudulent schemes and misrepresentations, including:

(a) filing fraudulent statements with the FCC and Team Telecom agencies;

(b) obtaining FCC and Team Telecom approvals of the transfer of control to Balaton based upon such false statements;

(c) informing Plaintiffs that the FCC and Team Telecom approvals had been duly and properly obtained;

(d) permitting SkyComm to operate with licenses that were improperly obtained and which were at a material risk of being terminated upon the FCC's and Team Telecom's learning of the falsity of the information supplied to them;

(e) accepting shares in SkyComm in return for debt that was not properly SkyComm's

(f) reviving $2.5 million of previously converted debentures;

(g) misrepresenting CenturyTel as being a secured creditor of SkyPort in the 2008 Chapter 11 case;

(h) not disclosing the interests of Pouliot and ClearSky in SkyComm in the 2008 Chapter 11 case; and

(i) permitting its participation as a shareholder in SkyComm to be used as an endorsement of Balaton and Kubbernus.

87

424.    The CenturyTel Defendants failed to inform that FCC or Team Telecom of the existence of the numerous non-U.S. investors shown on SkyPort's bankruptcy schedules and failed to inform investors in SkyComm that the FCC and Team Telecom Approvals had been obtained through false and misleading statements and were in danger of being revoked..

**E.    Reliance and Injury**

425.    Plaintiffs reasonably relied upon these representations to their detriment.

426.    As a result of such reliance, Plaintiffs suffered the loss of their entire investments in SkyComm and/or ClearSky.

427.    The Defendants acted willfully, wantonly and outrageously in breaching their fiduciary duties to the individual shareholders of SkyComm.

428.    Defendants' actions were taken jointly, severally, and in conspiracy with each other.

429.    As a direct and proximate result of the aforesaid fraudulent, malicious and oppressive conducts of the defendants, Plaintiffs lost the value of their investments in SkyComm believed to be in excess of $32 million.

430.    As a result of their willful, wanton and outrageous conduct, Defendants should be held liable for punitive damages.

**WHEREFORE**, all Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against all Defendants:

A.    Awarding all Plaintiffs compensatory and consequential damages against all Defendants, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

Certified Document Number: 44550657 - Page 88 of 111

B.   Awarding all Plaintiffs punitive damages against all Defendants, jointly and severally;

C.   Directing all Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

D.   Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT EIGHT

### (Breach of Duty of Care; Negligence — Against the CenturyTel Defendants on behalf of the ClearSky Investors and the Additional Investors)

431.   The CenturyTel Defendants owed a duty to those that might foreseeably be harmed by their actions to take such steps as a reasonably prudent person would take in similar circumstances to avoid such harm to others.

432.   As previously stated, the CenturyTel Defendants were under a heightened duty of care because of the many danger signs concerning Kubbernus, including that:

(a) Kubbernus had been accused on more than one occasion of being a stock fraudster and corporate looter;

(b) Kubbernus was not using his own funds to close the acquisition of control of SkyPort, but rather was relying exclusively on funds raised from investors;

(c) Kubbernus was not being truthful with the FCC and Team Telecom;

(d) Kubbernus was not being truthful with his own investors;

(e) Kubbernus was willing to issue SkyComm shares to pay obligations that were not SkyComm's, but rather CenturyTel's or Balaton's; and

Certified Document Number: 44550657 - Page 89 of 111

(f) Kubbernus was willing to "revive" debentures after they had been converted into shares.

433. The CenturyTel Defendants were obligated to take reasonable prudent steps to assure that control of SkyComm would not be delivered to a stock fraudster and looter.

434. The CenturyTel Defendants knew that Kubbernus and Balaton were actively selling direct and indirect ownership interests in SkyComm to the ClearSky Investors and the Additional Investors, and it was foreseeable that ClearSky Investors and the Additional Investors would be hurt by the sale of control of SkyComm to a stock fraudster and looter.

435. The CenturyTel Defendants failed to take any reasonably prudent steps to prevent harm to the ClearSky Investors and the Additional Investors in connection with the CenturyTel Defendants' sale of control of SkyComm to Balaton and Kubbernus.

436. The CenturyTel Defendants were guilty of gross negligence in that they acted with wanton disregard for the interests of the ClearSky Investors and the Additional Investors.

437. As a result of their willful, wanton and outrageous conduct, Defendants should be held liable for punitive damages.

438. The ClearSky Investors and the Additional Investors were in fact hurt by CenturyTel's acts and lost their entire investments in SkyComm thought to be in excess of $15 million.

**WHEREFORE**, the ClearSky Investors and the Additional Investors pray that the Court enter an order, judgment and decree granting the following relief against the CenturyTel Defendants:

90

A.    Awarding the ClearSky Investors and the Additional Investors compensatory and consequential damages against all the CenturyTel Defendants, jointly and severally, in a sum of not less than $15 million, together with interest thereon;

B.    Awarding the ClearSky Investors and the Additional Investors punitive damages against the CenturyTel Defendants, jointly and severally;

C.    Directing the CenturyTel Defendants, jointly and severally, to pay the ClearSky Investors' and the Additional Investors' costs of the action, including reasonable counsel fees; and

D.    Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT NINE

### (Negligent Misrepresentation – Against the CenturyTel Defendants on Behalf of All Plaintiffs)

439.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

440.    As described in this Petition, the CenturyTel Defendants made and caused to be made numerous material misrepresentations with the intent that they be relied upon.

441.    The CenturyTel Defendants did not exercise reasonable care or competence in obtaining or communicating this information to Plaintiffs.

442.    As set forth in this Petition, the CenturyTel Defendants had actual knowledge that the Original Shareholders, Non-CenturyTel Debenture Holders, ClearSky Investors and Additional Investors would rely on such false and misleading statements.

91

Certified Document Number: 44550657 - Page 91 of 111

443.    As set forth in this petition, the Original Shareholders, Non-CenturyTel Debenture Holders, ClearSky Investors and Additional Investors justifiably relied on such statements to their detriment.

444.    As a result of such reliance, Plaintiffs suffered the loss of their entire investments in SkyComm.

445.    The Defendants acted willfully, wantonly and outrageously in breaching their fiduciary duties to the individual shareholders of SkyComm.

446.    The Defendants' actions were taken jointly, severally, and in conspiracy with each other.

447.    As a direct and proximate result of the aforesaid misrepresentations and omissions, Plaintiffs suffered the loss of the value of their investments in SkyComm believed to be in excess of $32 million.

448.    As a result of their willful, wanton and outrageous conduct, the CenturyTel Defendants should be held liable for punitive damages.

**WHEREFORE,** all Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against the CenturyTel Defendants:

A.    Awarding all Plaintiffs compensatory and consequential damages against the CenturyTel Defendants, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

B.    Awarding all Plaintiffs punitive damages against the CenturyTel Defendants, jointly and severally;

C.    Directing the CenturyTel Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

Certified Document Number: 44550657 - Page 92 of 111

D.      Granting such other, further or different relief as to the Court shall seem fair and

just.

## COUNT TEN

### (Violations of the Texas Securities Act — Against all Defendants on Behalf of the Non-CenturyTel Debenture Holders, ClearSky Investors, and Additional Investors)

449.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

450.    SkyComm is an issuer of securities in the State of Texas.

451.    The Kubbernus Defendants offered for sale and sold securities from within the State of Texas.

452.    CenturyTel, the CenturyTel Directors and Wilson Vukelich aided and abetted the sale of securities of SkyComm and ClearSky from the State of Texas.

453.    As described herein, the Kubbernus Defendants violated the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-33A(2) and Tex. Rev. Civ. Stat. Ann. Art. 581-33F(2), by offering and selling securities in SkyComm, and as controlling persons of SkyComm, by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading,

454.    As described herein, the CenturyTel Defendants and Wilson Vukelich violated the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-33F(2), by directly or indirectly, with intent to deceive or defraud and with reckless disregard for the truth or the law aided and gave substantial assistance in the issuance of securities by SkyComm and sale of such securities by Balaton and Kubbernus in the State of Texas.

93

Certified Document Number: 44550657 - Page 93 of 111

455. As set forth in this Petition, the CenturyTel Defendants and Wilson Vukelich were fully aware of the Kubbernus Defendants' improper activities and of their role in the fraudulent scheme and acts.

456. The CenturyTel Defendants and Wilson Vukelich rendered assistance to Balaton and Kubbernus in the face of a perceived risk that its assistance would facilitate untruthfulness and illegal activity by the Kubbernus Defendants.

457. The CenturyTel Defendants and Wilson Vukelich intended to deceive the Non-CenturyTel Debenture Holders, ClearSky Investors, and Additional Investors and/or acted with reckless disregard for the truth of the Kubbernus Defendants' misrepresentations.

458. Defendants acted willfully, wantonly, recklessly and outrageously.

459. Defendants' actions were taken jointly, severally, and in conspiracy with each other.

460. As a direct and proximate result of the aforesaid violation of the Texas Securities Act, Plaintiffs lost the value of their investments in SkyComm believed to be in excess of $17 million.

461. As a result of their willful, wanton and outrageous conduct, all Defendants should be held liable for punitive damages.

**WHEREFORE,** the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors pray that the Court enter an order, judgment and decree granting the following relief against all Defendants:

A. Awarding the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors compensatory and consequential damages against all Defendants, jointly and severally, in a sum of not less than $17 million, together with interest thereon;

94

B.     Awarding the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors punitive damages against all Defendants, jointly and severally;

C.     Directing all Defendants, jointly and severally, to pay the Non-CenturyTel Debenture Holders', the ClearSky Investors' and the Additional Investors' costs of the action, including reasonable counsel fees; and

D.     Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT ELEVEN

### (Violations of Texas Business and Commerce Code 27.01 — Against all Defendants on Behalf of the Non-CenturyTel Debenture Holders, ClearSky Investors and Additional Investors)

462.     Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

463.     Defendants violated Texas Business and Commerce Code 27.01(b) by making and causing to be made, numerous false representations of material facts described above to the Non-CenturyTel Debenture Holders for the purpose of inducing them to convert their debentures into shares of SkyComm.

464.     Defendants violated Texas Business and Commerce Code 27.01(c) by having actual awareness of the falsity of such statements.

465.     The Kubbernus Defendants violated Texas Business and Commerce Code 27.01(b) by making and causing to be made, numerous false representations of material facts described above to the ClearSky Investors and the Additional Investors for the purpose of inducing them to purchase shares in ClearSky and SkyComm, respectively.

466.     The Kubbernus Defendants violated Texas Business and Commerce Code 27.01(c) by having actual awareness of the falsity of such statements.

95

Certified Document Number: 44550657 - Page 95 of 111

467. The CenturyTel Defendants and Wilson Vukelich violated Texas Business and Commerce Code 27.01(d) in that they had actual awareness of the falsity of the representations made or caused to be made by the Kubbernus Defendants and failed to disclose the falsity of such representations to the shareholders and investors in SkyComm.

468. The CenturyTel Defendants benefited from such false representations in that they were able to divest CenturyTel of its interest in SkyComm and to receive consideration therefore.

469. Wilson Vukelich benefited from such false representations as they were able to derive substantial fees from these transactions and were able to collect other fees that the Kubbernus Defendants owed them for work unrelated to these transactions.

470. Such misrepresentations included numerous materially false and misleading statements to the FCC and Team Telecom agencies described above, which were made in order to induce their approval of the transfer to Balaton, knowing and having reason to expect that such approvals would be relied upon by the shareholders and investors in SkyComm.

471. Such representations included numerous false and misleading statements to the shareholders and investors in SkyComm and ClearSky described above, including without limitation that (a) SkyPort was in compliance with all FCC and other governmental requirements for the transfer of control to Balaton and Kubbernus, (b) the FCC and Team Telecom approvals of such transfer of control to Balaton were obtained lawfully and in compliance with FCC and Team Telecom rules and regulations, (c) all of the CenturyTel Debentures would be converted into shares, and (d) all of the CenturyTel Debentures were in fact converted into shares.

472. The Non-CenturyTel Debenture Holders justifiably relied on such statements to their detriment. Had the Non-CenturyTel Debenture Holders known that the approval of the

96

transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentations, they never have converted their debentures to shares in SkyComm.

473.    The ClearSky Investors and the Additional Investors justifiably relied on such statements to their detriment. Had such investors known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentations, they would never have agreed to purchase shares in ClearSky and SkyComm, respectively.

474.    As a direct and proximate result of the aforesaid violation of Texas Business and Commerce Code 27.01, Plaintiffs lost the value of their investments in SkyComm believed to be in excess of $17 million.

475.    As a result of their willful, wanton and outrageous conduct, all Defendants should be held liable for punitive damages.

**WHEREFORE,** the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors pray that the Court enter an order, judgment and decree granting the following relief against all Defendants:

A.    Awarding the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors compensatory and consequential damages against all Defendants, jointly and severally, in a sum of not less than $17 million, together with interest thereon;

B.    Awarding the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors punitive damages against all Defendants, jointly and severally;

C.    Directing all Defendants, jointly and severally, to pay the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors costs of the action, including reasonable counsel fees; and

97

D.     Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT TWELVE

### (Civil Conspiracy -- Against all Defendants on Behalf of All Plaintiffs)

476.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

477.    Defendants conspired among themselves for CenturyTel, the CenturyTel Directors, Balaton and Kubbernus and Wilson Vukelich to defraud the SkyComm shareholders and investors, to breach their respective fiduciary duties to Plaintiffs and to oppress Plaintiffs and to deprive them of their ownership and participation in SkyComm.

478.    Defendants conspired among themselves to transfer control of SkyComm without prior notice to or approval of the FCC, to make false and misleading statements in applications and filings to the FCC and Team Telecom, and to operate the teleport without proper licenses and without required disclosures of transfers of ownership and control.

479.    As a direct and proximate result of such the above-mentioned conduct, Plaintiffs, as shareholders in SkyComm, suffered pecuniary loss believed to be in excess of $32 million.

WHEREFORE, all Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against all Defendants:

A.     Awarding all Plaintiffs compensatory and consequential damages against all Defendants, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

B.     Awarding all Plaintiffs punitive damages against all Defendants, jointly and severally;

98

C.     Directing all Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

D.     Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT THIRTEEN

### (Aiding and Abetting -- Against the CenturyTel Defendants on Behalf of All Plaintiffs)

480.     Plaintiffs reallege the above paragraphs as if fully set forth herein.

481.     The CenturyTel Defendants were aware of the fiduciary relationship of the Kubbernus Defendants to the shareholders of SkyComm after their transfer of control of SkyComm to Balaton and Kubbernus.

482.     The CenturyTel Defendants knew of the Kubbernus Defendants' breaches of their fiduciary duties to Plaintiff and knowingly participated in, aided and abetted such breaches by giving substantial assistance to the Kubbernus Defendants.

483.     Specifically, the CenturyTel Defendants participated in, aided and abetted the Kubbernus Defendants in their fraudulent activities, including (a) turning over control of SkyComm to Balaton for what appears to be no cash consideration put up by Balaton; (b) converting portions of the purchase price payable by Balaton for the CenturyTel Debentures into obligations of SkyComm; (c) assisting Balaton in obtaining FCC and Team Telecom approvals through fraudulent applications and statements; (d) depriving the ClearSky Investors of their interests in SkyComm; (e) transferring to SkyComm, Balaton's obligations to CenturyTel, (f) defrauding the ClearSky Investors and Additional Investors by permitting Kubbernus and Balaton to represent CenturyTel as endorsing their efforts, and (g) permitting Balaton and

99

Kubbernus to deprive all of the shareholders in SkyComm of their share interests in SkyComm in the Chapter 11 case.

484. As a proximate result of the assistance and support of the CenturyTel Defendants to the Kubbernus Defendants in the Kubbernus Defendants' breach of fiduciary duties and fraud, Plaintiffs suffered pecuniary loss believed to be in excess of $32 million.

**WHEREFORE,** all Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against the CenturyTel Defendants:

A. Awarding all Plaintiffs compensatory and consequential damages against the CenturyTel Defendants and Wilson Vukelich, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

B. Awarding all Plaintiffs punitive damages against the CenturyTel Defendants and Wilson Vukelich, jointly and severally;

C. Directing the CenturyTel Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

D. Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT FOURTEEN

### (Breach of Contract and Rescission – Against the Kubbernus Defendants on Behalf of the ClearSky Investors and the Additional Investors)

485. The Kubbernus Defendants had contractual obligations to the ClearSky Investors pursuant to the ClearSky LPA and ClearSky IM.

100

Certified Document Number: 44550657 - Page 100 of 111

486.    Kubbernus testified and maintained that these contractual obligations did not require that Balaton assign its interest in SkyComm to the ClearSky partnership in the event that it did not raise $10 million.

487.    In the event that Kubbernus is correct, then the Kubbernus Defendants are contractually obligated to return all of the proceeds of the offering to the ClearSky Investors and the contract between the Kubbernus Defendants and the ClearSky Investors should be rescinded.

488.    The Kubbernus Defendants failed to issue share certificates to the Additional Investors despite repeated demands therefore.

489.    Thus, the Kubbernus Defendants are obligated under implied contract and under law to return all of the proceeds of the offering to the Additional Investors, and the contract between the Kubbernus Defendants and the Additional Investors should be rescinded.

490.    Accordingly, the ClearSky Investors are entitled to the return of their capital contributions to ClearSky in the sum of approximately $7 million and the Additional Investors are entitled to the return of their capital contributions to SkyComm in the sum of approximately $8 million.

491.    As a result of their willful, wanton and outrageous conduct, the Kubbernus Defendants should be held liable for punitive damages.

**WHEREFORE**, the ClearSky Investors and the Additional Investors pray that the Court enter an order, judgment and decree granting the following relief against the Kubbernus Defendants:

A.    Awarding the ClearSky Investors and the Additional Investors compensatory and consequential damages against the Kubbernus Defendants, jointly and severally, in a sum of not less than $15 million, together with interest thereon;

101

B.    Awarding the ClearSky Investors and the Additional Investors punitive damages against the Kubbernus Defendants, jointly and severally;

C.    Directing the Kubbernus Defendants, jointly and severally, to pay the ClearSky Investors' and the Additional Investors' costs of the action, including reasonable counsel fees; and

D.    Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT FIFTEEN

### (Breach of Fiduciary Duty and Malpractice – Against Wilson Vukelich and the Kubbernus Defendants Brought by the ClearSky Investors Derivatively on Behalf of ClearSky)

492.    The ClearSky Investors owned interests in ClearSky at the time the wrongs complained of below occurred and continue to own interests in ClearSky as of the filing of this Petition. The ClearSky Investors will fairly and adequately represent the interests of ClearSky and its members in enforcing ClearSky's rights in this action.

493.    As alleged above, Wilson Vukelich violated its fiduciary and professional duties to ClearSky by charging excessive fees to ClearSky, charging ClearSky for work not performed for ClearSky, permitting the misapplication and comingling of ClearSky funds, failing to assure that ClearSky obtained title to the interests in SkyComm and representing Balaton in taking title to such interests.

494.    As alleged above, the Kubbernus Defendants violated their fiduciary and contractual duties to ClearSky by taking title to the interests in SkyComm to which ClearSky was entitled, and misapplying and misappropriating funds from ClearSky.

102

Certified Document Number: 44550657 - Page 102 of 111

495. As a direct and proximate result of the Wilson Vukelich's failure to perform its professional and fiduciary obligations and of the Kubbernus Defendants' violations of their fiduciary and contractual duties, ClearSky has sustained significant damages, for which such Defendants are liable.

496. The ClearSky Investors have not made demand on ClearSky Management, the general partner of ClearSky, to bring this claim against the Kubbernus Defendants and Wilson Vukelich. Such demand would be a futile because ClearSky Management is a wholly-owned subsidiary of Balaton and is managed by Kubbernus as its sole Director; Balaton and Kubbernus would not cause ClearSky to bring suit against themselves or against the law firm which allowed them to deprive ClearSky of its right to title of the shares in SkyComm it was lawfully entitled to receive.

**WHEREFORE**, the ClearSky Investors pray that the Court enter an order, judgment and decree granting the following relief against the Wilson Vukelich and the Kubbernus Defendants:

A. Awarding ClearSky compensatory and consequential damages against Wilson Vukelich and the Kubbernus Defendants, jointly and severally, in a sum of not less than $15 million, together with interest thereon;

B. Awarding ClearSky punitive damages against the Wilson Vukelich and the Kubbernus Defendants, jointly and severally;

C. Directing Wilson Vukelich. and the Kubbernus Defendants, jointly and severally, to pay ClearSky's costs of the action, including reasonable counsel fees; and

D. Granting such other, further or different relief as to the Court shall seem fair and just.

103

## JURY DEMAND

497.    As permitted by Rule 216 of the Texas Rules of Civil Procedure, Plaintiffs

demand trial by jury of all issues so triable. Plaintiffs have deposited with the District Clerk the

required jury fee.

## REQUEST FOR DISCLOSURE

498.    Pursuant to Rule 194, each Defendant served with this Petition is requested to

disclose, within 50 days of service, the information or material described in Rule 194.2.

## REQUEST FOR PRODUCTION OF DOCUMENTS

499.    Pursuant to Rule 196, each Defendant served with this Petition is requested to

produce documents within 50 days of service, as directed below:

### Definitions

As used in these interrogatories, the following terms have the following meanings:

1.    "Defendants" collectively means Clarence Marshall, R. Stewart Ewing, Jr.,
Michael E. Maslowski, Harvey P. Perry, CenturyTel, Inc. (a/k/a CenturyLink), Balaton Group,
Inc., Bankton Financial Corporation, Bankton Financial Corporation, LLC, ClearSky
Management, Inc., Robert Kubbernus and Wilson Vukelich, LLP.

2.    "Communication" means any oral or written communication of which the
Defendant has knowledge, information, or belief.

3.    "Document" or "documents" means " means any written, typed, printed, recorded
or graphic matter, however produced or reproduced, of any type or description, regardless of
origin or location, including without limitation all correspondence, records, tables, charts,
analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters
(sent or received), telegrams, telexes, messages (including, but not limited to reports of telephone
conversations and conferences), studies, books, periodicals, magazines, booklets, circulars,
bulletins, instructions, papers, files, minutes, other communications (including, but not limited
to, inter and intra office communications), questionnaires, contracts, memoranda or agreements,
assignments, licenses, ledgers, books of account, orders, invoices, statements, bills, checks,
vouchers, notebooks, receipts, acknowledgments, data processing cards, computer-generated
matter, photographs, photographic negatives, phonograph records, tape recordings, wire
recordings, other mechanical recordings, transcripts or logs of any such recordings, all other data
compilations from which information can be obtained, or translated if necessary, and any other
tangible thing of a similar nature.

Certified Document Number: 44550657 - Page 104 of 111

4.     "Refer or relate to" when used with respect to a given subject, means any document that constitutes, contains, evidences, identifies, refers to, deals with, communicates with, comments on, responds to, describes or is in any way pertinent to that subject, including, without limitation, documents concerning the presentation or existence of other documents.

5.     "Possession, custody or control" means documents within Defendant's possession, custody or control, including documents within the possession, custody and control of Defendant's agents, auditors, employees, representatives or attorneys; documents that Defendant has a legal right to obtain; and documents that Defendant has placed in the temporary possession, custody or control of any third party.

6.     Whenever a party is named in these document requests, the reference shall mean to include any and all officers, employees, agents, servants, attorneys, and representatives of such party. For example, a request for all documents relating to "SkyComm" shall mean all documents relating to "SkyComm, or any of its, officers, employees, agents, servants, attorneys, or representatives."

## Instructions

A.     This Request for Production is served on you pursuant to Texas Rule of Civil Procedure 196. You must respond to each request separately, fully and in writing and provide the responses to Plaintiffs' counsel within fifty (50) days after this Request for Production is served on you.

B.     You must state, with respect to each item or category of items in the request, any objection to the particular document or category of items, and either (1) that production, inspection, or other requested action will be permitted as requested; (2) that the requested items are being served with the response; (3) that production, inspection, or other requested action will take place at a specified time and place, if you are objecting to the time and place of production; or (4) that no items have been identified -- after a diligent search -- that are responsive to the request.

C.     You must produce the requested documents that are within your possession, custody and control for inspection and copying at the offices of Fryar Law Firm P.C., 1001 Texas Ave., Suite 1400, Houston, Texas 77002, no later than 5:00 p.m. on the first business day following the 50th day after service, unless otherwise agreed in writing.

D.     Your responses should be typed or handwritten in the space provided. If a response requires more space, please attach an additional page and identify that response by the request number.

E.     You are required to apply due diligence in seeking out the documents and things requested. The answer that you have no knowledge of the matter requested is only appropriate after reasonable efforts by you to obtain the requested information.

F.     Magnetically or electronically stored data must be produced in Microsoft Word or searchable PDF format.

G.     Each request to identify or produce a document or documents shall be deemed to call for the identification or production of the original document or documents to the extent that they are in or subject to, directly or indirectly, the control of the party to whom these interrogatories are addressed. In addition, each request should be considered as including a request for separate identification or production of all copies and, to the extent applicable,

105

Certified Document Number: 44550657 - Page 105 of 111

preliminary drafts of documents that differ in any respect from the original or final draft or from each other (e.g., by reason of differences in form or content or by reason of handwritten notes or comments having been added to one copy of a document but not on the original or other copies thereof).

### Request for Production

1.      Any and all documents of any of the Defendants or of SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada, or Lavell-US relating to the subject matter of this action, including with respect to SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US all (a) offering documents, (b) business analyses, (c) business plans, (d) financial reports, (e) projections, (f) valuation reports or appraisals, whether formal or informal, (g) documents which relate to or mention a value for SkyComm, SkyPort, Watershed Funds, ClearSky, Lavell-Canada or Lavell-US, or of any interest in any of the foregoing and (h) documents relating to or to or from equity owners, investors, lenders, placement agents, underwriters finders or other investment intermediaries, or prospective investors, lenders, placement agents, underwriters finders or other investment intermediaries, (i) payroll and other records regarding employees or consultants, (j) documents relating to transactions among SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, or (k) documents relating to the purchase or sale, or offer of purchase or sale, of any equipment or other assets by SkyComm or SkyPort.

RESPONSE:

2.      Any and all documents of any of the Defendants or of SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada, or Lavell-US relating to the subject matter of this action, including with respect to SkyComm or SkyPort, all documents relating to (a) licenses, approvals, authorizations from, applications to and communications with the FCC, United States Department of Homeland Security, FBI and United States Department of Justice, (b) CenturyTel's loans to or investment in SkyComm, including the CenturyTel Debentures and shares held by CenturyTel in SkyComm, (c) transactions between or among any of the CenturyTel Defendants, on the one hand, and any of the Kubbernus Defendants, on the other, (d) debts and obligations from any of the Defendants to any other Defendant, or to or from SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, (e) efforts by CenturyTel to sell the CenturyTel Debentures, SkyComm or any interest in SkyComm.

RESPONSE:

3.      Any and all documents between any of the Defendants and their agents, servants, employees, attorneys, and representatives on the one hand, and SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, and their respective agents, servants, employees, attorneys, and representatives on the other hand.

106

RESPONSE:

4.     Any and all documents between any of the CenturyTel Defendants and their
agents, servants, employees, attorneys, representatives on the one hand, and any of the
Kubbernus Defendants and their agents, servants, employees, attorneys, and representatives on
the other hand.
     RESPONSE:

5.     Any and all documents between any of the Defendants and their agents, servants,
employees, attorneys, and representatives on the one hand, and any third party relating to
SkyComm, SkyPort, Balaton, Bankton, ClearSky, Bankton-Texas, Lavell-Canada or Lavell-US
and any of their agents, servants, employees, attorneys, and representatives on the other hand
regarding the subject matter of this lawsuit.
     RESPONSE:

6.     Any and all minutes, consents, notices and other documents relating to meetings
or votes of the shareholders or Board of Directors of SkyComm or SkyPort from January 1, 2002
through the present.
     RESPONSE:

7.     Any and all minutes, consents, notices and other documents relating to meetings
or votes of the equity holders or Board of Directors of Balaton, Bankton, ClearSky, ClearSky
Management, Bankton-Texas, Lavell-Canada or Lavell-US from January 1, 2005 through the
present and any agreements among or between or relating to any of the equity holders of any of
the forgoing.
     RESPONSE:

8.     Any and all documents, including Board minutes, briefing papers and notes, of
the CenturyTel Defendants from January 1, 2002 through the present which mention or refer to
(a) SkyComm or SkyPort, (b) Kubbernus, Balaton, Bankton, Bankton-Texas, Watershed Funds,
ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, (c) any CenturyTel non-landline
business activity, (d) a possible merger with or sale to AllTel, (e) divestiture of assets by
CenturyTel, (f) any investor or prospective investor in or purchaser of any of SkyComm,
SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, (g)

107

the use of satellite services by CenturyTel for any purpose, including delivery of consumer television services, distribution of video, and backhaul of billing and other data from CenturyTel's regional offices.

RESPONSE:

9. Any and all documents of any of the Kubbernus Defendants from January 1, 2005 through the present which refer or relate to (a) any CenturyTel Defendant, (b) any CenturyTel non-landline business activity, (c) AllTel, (f) any investor or prospective investor in SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US or (d) any actual or contemplated public or private offering in any of SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US.

REPONSE:

10. Any and all tax returns with schedules and attachments, financial statements (certified and uncertified), balance sheets, and profit and loss statements for SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US from January 1, 2002 to the present time.

RESPONSE:

11. Any and all share or equity interest registries for SkyComm, SkyPort Balaton, Bankton, Bankton-Texas, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, and any other documents reflecting equity ownership, voting rights or capital contributions with respect to SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US from inception through the present time.

RESPONSE:

12. Any and all documents relating to any proposed, completed, contemplated, requested or discussed loan or advance to or investment in SkyComm or SkyPort by CenturyTel.

RESPONSE:

13. Any and all documents relating to proposed, completed, contemplated, requested or discussed sale of SkyComm, SkyPort, Balaton, Bankton, ClearSky, ClearSky Management, Bankton-Texas, Lavell-Canada or Lavell-US, or any interest therein or indebtedness thereof.

108

RESPONSE:

14.    Any and all documents relating to the CenturyTel Debentures or any proposed, completed, contemplated, requested or discussed sale of the CenturyTel Debentures or of CenturyTel's controlling interest in SkyComm or SkyPort.
RESPONSE:

15.    Any and all documents relating to any transaction between CenturyTel, SkyComm or SkyPort, on the one hand, and Balaton, Kubbernus, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, on the other, including (a) the sale of the CenturyTel Debentures, (b) the payment of the purchase price therefore, and (c) any promissory notes or collateral documents from Balaton, Kubbernus, SkyComm, SkyPort, ClearSky or Lavell-Canada or Lavell-US to CenturyTel.
RESPONSE:

16.    Any and all documents relating to the issuance of shares in SkyComm, SkyPort, ClearSky, ClearSky Management, Balaton, Watershed Funds, Bankton and Bankton-Texas.
RESPONSE:

17.    Any and all documents reflecting debts or obligations between or among Balaton, Bankton, SkyComm, SkyPort, ClearSky, ClearSky Management, Bankton-Texas, Lavell-Canada or Lavell-US.
RESPONSE:

18.    Any and all documents relating to Wilson Vukelich or Hodgson Russ LLP and any work that they performed for any of Kubbernus, Balaton, Bankton, SkyComm, SkyPort, ClearSky, ClearSky Management, Bankton-Texas, Lavell-Canada or Lavell-US.
RESPONSE:

Certified Document Number: 44550657 - Page 109 of 111

109

19. Any and all SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas ClearSky, ClearSky Management, Lavell-Canada and Lavell-US books of original entry including general ledgers, disbursements, receipts, sales, purchase, payroll journals, accounts payable, accounts receivable subsidiary ledgers, bank statements, cancelled checks, checkbook stubs, and deposit slips.

RESPONSE:

20. Any and all documents relating to the 2006 SkyPort Chapter 11 case.
RESPONSE:

21. Any and all documents relating to the 2008 SkyPort Chapter 11 case.
RESPONSE:

Respectfully Submitted,

Eric Fryar
SBN 07495770
1001 Texas Ave. Ste 1400
Houston, Texas 77002-3194
Tel.        888-481-9995
            281-715-6396
Main Fax:  281-715-6397
Direct Fax: 281-605-1888
Email: efryar@fryarlawfirm.com

Samuel Goldman
Samuel Goldman & Associates
100 Park Ave; 20th Floor
New York, New York 10017
Tel.        212-725-1400
Fax.        212-725-0805
Email: sg@sgalaw.com

Harold B. Obstfeld
Harold B. Obstfeld, P.C.
100 Park Ave; 20th Floor
New York, New York 10017
Tel.        212-696-1212
Fax.        212-867-7360
Email: hobsd@erols.com

ATTORNEYS FOR PLAINTIFFS

111



I, Loren Jackson, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date
Witness my official hand and seal of office
this _____ March 24, 2010 _____

Certified Document Number: ___44550657___ (Total Pages 111)

LOREN JACKSON, DISTRICT CLERK
HARRIS COUNTY, TEXAS

In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com