UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| JOANNE SCHERMERHORN, ET AL., | . | CASE NO. 10-3150-H4-ADV |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | THURSDAY, MAY 27, 2010 |
| CENTURYTEL, INC. ET AL, | . | 9:07 A.M. TO 9:19 P.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| SKYPORT GLOBAL COMMUNICATIONS, | . | CASE NO. 10-3225-H4-ADV |
| INC., ET AL. | . | |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | |
| | . | |
| JOANNE SCHERMERHORN, ET AL., | . | |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . .

**VARIOUS MOTION HEARING**

BEFORE THE HONORABLE JEFF BOHM
UNITED STATES BANKRUPTCY JUDGE

**Trinity Transcription Services**
**61 North Bay Boulevard**
**The Woodlands, TX 77380**
**281-296-2290**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| JOANNE SCHERMERHORN, ET AL., | . | CASE NO. 10-3150-H4-ADV |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | THURSDAY, MAY 27, 2010 |
| CENTURYTEL, INC. ET AL, | . | 9:07 A.M. TO 9:19 P.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . .

| | | |
|---|---|---|
| SKYPORT GLOBAL COMMUNICATIONS, | . | CASE NO. 10-3225-H4-ADV |
| INC., ET AL. | . | |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | |
| | . | |
| JOANNE SCHERMERHORN, ET AL., | . | |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . .

**VARIOUS MOTION HEARING**

BEFORE THE HONORABLE JEFF BOHM
UNITED STATES BANKRUPTCY JUDGE

Appearances:

| | |
|---|---|
| Shermerhorn, et al.: | Samuel Goldman, Esq. |
| | No Address Provided |
| | |
| Schermerhorn, et, al.: | Christopher  Grier, Esq. |
| | No Address Provided |
| | |
| Schermerhorn, et al.: | F. Eric Fryar, Esq. |
| | Fryar Law Firm PC |
| | 1001 Texas, Suite 1400 |
| | Houston, TX 77002-3194 |

Appearances (continued):


Centurytel, et al.:              Hugh M. Ray, III, Esq.
                                 Robert Manley, Esq.
                                 McKool Smith PC
                                 300 Crescent Court, Suite 1200
                                 Dallas, TX 75201


Janet Schermerhorn, et al.:   Steve Smith, Esq.
                              No Address Provided

Wilson Vukelich OCP:          David Jones, Esq.
                              No Address Provided

Wilson Vukelich:              Elizabeth Freeman, Esq.
                              Porter  & Hedges, L.L.P.
                              1000 Main Street, 36th Floor
                              Houston, TX 77002

SkyPort Global Comm.:         Ed Rothberg, Esq.
                              Hoover Slovacek, LLP
                              5847 San Felipe, Suite 2000
                              Houston, TX 77057

Case Manager:                 Not Identified

Official Interpreter:         None Present

Court Recorder:               Brent Laswell

Transcriber:                  Cheryl Battaglia
                              Trinity Transcription Services
                              61 North Bay Boulevard
                              The Woodlands, TX 77380
                              281-296-2290




Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

<u>INDEX</u>

<u>WITNESSES:</u>                           <u>Direct</u> <u>Cross</u> <u>Redirect</u> <u>Recross</u>

**Kathy Mayle**

   By Mr. Rothberg          89

   By Mr. Ray                       97

   By Mr. Goldman                   98

**Robert Kubbernus**

   By Mr. Rothberg          99

   By Mr. Jones                    111

   By Mr. Goldman                  117

**Bill McCrary**

   By Mr. Goldman          172

   By Mr. Rothberg                 181

   By Mr. Ray                      184

   By Mr. Jones                    195

   By Mr. Goldman                           212

**Brogan Taylor**

   By Mr. Goldman          216

   *Voir Dire* by Mr. Jones   225

   By Mr. Goldman          228

   By Mr. Ray                      244

   By Mr. Goldman                           248

**Closing Argument**

By Mr. Rothberg          252

By Mr. Ray               257

By Mr. Jones             264

By Mr. Smith             267

**Ruling**

The Court                268

**EXHIBITS:**                                    **Offered** **Received**

<u>For SkyPort</u>

S-1          Listing of Equity Security
                Holders                                    11

S-2          Creditor Mailing Matrix                       11

S-3 - S-4                                                  11

S-5          Certificate of Service for
                Plan Package                               11

S-6          Emergency Motion to approve
                Modifications to Chapter 11
                Plan with Certificate of
                Service                                    11

S-7          Order Confirming Plan of
                Reorganization (8/12/09)                   11

S-8 - S-9                                                  11

S-10         State Court Petition Removed
                To Bankruptcy Court                        11

<u>For Centurytel</u>

C-1 - C-14                                                 63

C-15 - C-26                                               251

1

1        **Houston, Texas; Thursday, May 27, 2010; 9:07 a.m.**

2            **THE COURT:**  Okay.  This is the nine o'clock docket.

3    And two adversary proceedings.  *Adversary 10-3150*, which is

4    *Joanne Schermerhorn, et al. versus Centurytel, Inc., et al.*

5    And then we've got *Adversary Proceeding 10-3225,* which is

6    *SkyPort Global Communications, Inc., versus -- et al. versus*

7    *Schermerhorn, et al.*

8            And we've got in the docket in *Adversary 10-3150,*

9    Docket Number 2, which is the Motion to Dismiss or

10   Alternatively, For Summary Judgment and for Sanctions filed by

11   the Defendants in this adversary, to which a response or an

12   objection has been filed, which is Docket 15.

13           Then we've got Docket 7, which is Defendant's Rule 42

14   Motion for Separate File.  And that's been posed by the

15   Plaintiffs in Docket 28.  And then we've got Docket 14, which

16   is a Plaintiff's Motion to Remand or Alternatively to Abstain

17   and For Sanctions.  And that's been responded to in Docket 33

18   by the Defendants.

19           And then in *Adversary 10-3225*, we've got a request

20   for an injunction.  That's Docket 1.  And we've got a request

21   for a Motion to Consolidate, which is Docket 2.  And we also

22   have a Motion to Consolidate in the 3150 Adversary, which is

23   Docket 44.

24           Let me go ahead and get appearances from all counsel.

25   And good morning.

1          **MR. RAY:**  Good morning, your Honor.  Hugh Ray, R-a-y,

2    the Third.  With me here is Mr. Manley, M-a-n-l-e-y, on behalf

3    of all Defendants in 3150, except for Wilson Vukelich

4    Defendants.

5          **THE COURT:**  I'm sorry.  Except for?

6          **MR. RAY:**  Except for the Wilson Vukelich Defendants.

7          **THE COURT:**  Thank you.

8          **MR. ROTHBERG:**  Good morning, your Honor, Ed Rothberg

9    for -- in *Adversary 3225*, for the Plaintiffs, SkyPort Global

10   Communications, Robert Kubbernus, and Balaton Group.

11         **MR. SMITH:**  Your Honor, Steve Smith with Sam Goldman

12   and Eric Fryar on behalf of the Schermerhorn Plaintiffs in 3150

13   and the Schermerhorn Defendants in 3225.

14         **THE COURT:**  Thank you.

15         Mr. Jones?

16         **MR. JONES:**  Good morning, Jones, J-o-n-e-s, and

17   Elizabeth Freeman, on behalf of the Wilson Vukelich Law Firm,

18   specially appearing today, and subject to the Motion to Dismiss

19   that has now been filed in 3150 at Docket Number 69.

20         **THE COURT:**  All right.  Thanks.

21         **MR. JONES:**  Thank you, Judge.

22         **THE COURT:**  Let me ask, on any of the pending matters

23   are there agreements in whole or in part?

24         **MR. JONES:**  No, your Honor.

25         **MR. ROTHBERG:**  Yeah, right.  I think we did have an

3

1    agreement on the Motions to Consolidate the adversary

2    proceedings.  Was that?

3           **MR. SMITH:**  Your Honor, we filed a Motion to

4    Consolidate and for continuance, which the Court denied.  We do

5    not oppose consolidation, but would like a chance to respond to

6    the 3225 complaint, which was filed last Friday.

7           **THE COURT:**  Okay.  Well bear with me.  Let me just

8    deal with any agreements.

9           Is there an agreement to consolidate?

10          **MR. JONES:**  There is not, Judge.

11          **THE COURT:**  Okay.  Then with no agreement to

12   consolidate, let me go back and looking at what is set, is

13   there any agreement as to which order you should go?

14          **MR. JONES:**  I don't think there's been any -- I

15   certainly have not been included in any discussions.  I

16   certainly have my own view.  But I've not been consulted or

17   asked to participate in any discussions.

18          **MR. RAY:**  No, your Honor.  There is no agreement.

19          **THE COURT:**  All right.  Well let go around the horn

20   and find out.

21          Mr. Jones, if you had your druthers, which do you

22   think we ought to take up first, second, third, fourth.

23   Mr. Smith, I'll ask you the same thing.  Mr. Ray and

24   Mr. Rothberg, I'll ask you the same thing.

25          **MR. JONES:**  Judge, I think before the Motion to

4

1  Disqualify was filed, I think that it made all the sense in the

2  world to take up the Motion to Dismiss.  And you could take up

3  the Motion to Dismiss in two parts.

4          You have the Clearsky claims which involve foreign

5  Plaintiffs, foreign Defendants and in, in my view, easy to take

6  up on the Motion to Dismiss that is pending for lack of

7  personal jurisdiction and/or improper venue.

8          The remaining issues in the case all deal with the

9  discharge injunction and whether or not there is contempt in

10  violation of 1141 and those sorts of issues, which I think are

11  far more serious than deal with Clearsky claims.

12          Also, so it's no big secret, Judge, it's my view that

13  if you dismiss the Clearsky claims, the Wilson Vukelich Law

14  Firm is gone, since all the claims are asserted derivatively

15  through Clearsky.  And that would also moot our Motion to

16  Dismiss.

17          Judge, having seen the Motion to Disqualify that has

18  been filed, I am extremely concerned that without dealing with

19  that, and I think you can deal with it on a summary basis,

20  because there is a clear lack of standing.  And there's just no

21  substance to the motion.  And I'm not a party to it, but I've

22  read it, and I'm officer of the Court.

23          Without it, you carry forward the proceedings with a

24  taint.  If you were to subsequently to determine that, in fact,

25  disqualification were proper on some basis, you're now going to

1   have to undo everything you've done up to that point.

2          So I think as a preliminary matter, you've got to

3   deal with that issue.  I wish you didn't have to.  I wish it

4   had been timely filed.  I wish it hadn't been done.

5          But with those things having occurred, I think you've

6   got to deal with that issue before we can proceed.  But in

7   terms of once you get past that issue, we think you ought to

8   take up the Motion to Dismiss first.  At least from my client's

9   point of view we think that will be dispositive as to the

10  Wilson Vukelich Law Firm.

11         And then with respect to the remaining violations  of

12  the discharge injunction, and contempt, and all those other

13  issues, those would continue on.

14         **THE COURT:**  All right.

15         **MR. JONES:**  Thank you, Judge.

16         **THE COURT:**  Mr. Ray?

17         **MR. RAY:**  Your Honor, unless you're will to address

18  the Motion to Disqualify me and my firm on a summary basis just

19  by reading the pleading, I am -- it's not on the docket.  We're

20  not here on that.  I'm not ready to argue that.

21         Having said that, here's how I think we should

22  proceed logically.  I think we should have on hearing.  I don't

23  think it should take too long.  I think the hearing should be

24  first, do you have jurisdiction.

25         We have alleged this Court does not have -- we've

6

1 allege this Court has jurisdiction.  The shareholders,

2 Schermerhorn Defendant, Schermerhorn Plaintiffs, Schermerhorn

3 Defendants, the shareholders, the other side, has alleged that

4 there is no jurisdiction of this Court.

5       And I think the first thing any Court has to do is

6 address whether or not it has jurisdiction.  Second, if this

7 Court has jurisdiction, the next question is, was the remand

8 procedurally -- removal procedurally proper?  Or is remand

9 appropriate?

10      If you have jurisdiction, you could send this back of

11 keep it.  We believe that this is the proper Court to enforce

12 its order.  But there is an argument that they have made that

13 this must be remanded.  So that needs to be addressed.

14      Assuming that this Court has jurisdiction, and that

15 the procedure for removal was correct, and that the Court

16 chooses not to remand, the next question is, is there

17 violation, any violation of this Court's discharge injunction,

18 or an attempt to subvert the plan, or intent to redivide the

19 pie, or a challenge to the Court's rulings of the Court's plan.

20      If that is the case, and once again, the shareholders

21 say there was no violation of the order at all in any one of

22 anything that they filed.  There's absolutely no violation.

23      The next thing you should address, the next to the

24 last thing is, do you enforce your order by saying there's a

25 penalty for violation.  Or do you render some kind of advisory

7

1   opinion.  Or take a red pen and strike out, as they've asked

2   the Court to do, those provisions that, as a matter of law,

3   violate the discharge injunction.

4           And then lastly, assuming your Honor enforces the

5   order, what is the enforcement going to be?  I presume it'll be

6   a dismissal of the entire case, which they can then refile,

7   perhaps with more consultation with counsel with how to file a

8   pleading that doesn't violate a discharge injunction.

9           Or if your Honor keeps some portion of it, because a

10  fact issue exists as to some -- whether or not something does

11  violate the discharge injunction, we should have a bifurcation.

12  And lastly, we should discuss Wilson Vukelich, because that is

13  a venue and -- issue and exclusively a venue issue.

14          And the injunction issue that Mr. Rothberg has

15  raised, I think is the last issue to raise, because I believe

16  that there's already an injunction.  If your Honor finds that

17  it has jurisdiction, that it's not remanding, that there is

18  no -- that there is a violation and that it's enforcing its

19  order, the injunction's already there.  The discharge

20  injunction's there.

21          And Mr. Rothberg doesn't need more of relief in terms

22  of a second injunction to not do something else.

23          **THE COURT:**  All right.

24          **MR. RAY:**  So that's the way I think it should

25  logically proceed.

8

1          **THE COURT:**  All right.

2          Mr. Smith?

3          **MR. SMITH:**  Your Honor, I think that we agree with

4   Mr. Ray that the first issue that has to be decided would be,

5   because -- because the disqualification is not ripe.

6          If the Court is going to go forward today before

7   determining that, I think the jurisdiction is the first -- the

8   first matter to be resolved.  I think that if you find that you

9   do not have jurisdiction, the matter's remanded, and all the

10  other issues are moot.

11         **THE COURT:**  Thanks, Mr. Smith.

12         Mr. Rothberg?

13         **MR. ROTHBERG:**  Thank you, your Honor.  We're

14  primarily here on the *Adversary 3225*.  And we filed the Motion

15  to Consolidate because it seemed like the issues were related.

16  But I have a post-effective date Debtor that's being damaged by

17  the prosecution of these cases.  And I need to go forward on my

18  preliminary injunction.  Obviously, they'll get to answer and

19  will have a final trial at some point.  And wherever you want

20  to stick me is fine.

21         **THE COURT:**  Okay.  Thanks.

22         All right.  Well the Motion to Disqualify is not on

23  the docket for today.  So I'm not going to hear it.  And if and

24  when I were to grant that motion, I still think that what goes

25  on today stands.  Until someone is removed as counsel as

1   record, my view is they're counsel of record.

2         So we won't deal with the Motion to Disqualify today.

3   I'm willing to -- to do what Mr. Ray and Mr. Smith are

4   suggesting, which is hear jurisdiction first.  I mean, I

5   suppose that's what they teach you in first year of law school.

6   You always have to ask the question, you know, does the Court

7   have jurisdiction.

8         And then even if the Court does, I suppose you always

9   ask is there a statute of limitations.  And does the party

10  having standing.  But assuming you hurdle over them, then and

11  only then you get to the merits.

12        So why don't we deal with the jurisdiction issues

13  first.  Let me ask whether this is strictly legal argument, or

14  whether anybody wants to introduce any evidence on that issue.

15        **(Pause)**

16        **MR. RAY:**  Your Honor, I'm going to start the

17  discussion of jurisdiction, because I think that that's

18  probably my job here today.

19        The only evidence I would ask the Court to take

20  judicial notice of is the State Court petition and the

21  confirmation order, which is -- which I think your Honor has

22  already taken judicial notice of, is capable of taking judicial

23  notice, and Docket Number 43 in the pleadings in this case

24  which have -- which have already been filed, the admissions of

25  counsel by -- in the pleadings that have been filed.

1          Those are the documents I'd like your Honor to take

2     judicial notice of.

3          **THE COURT:**  So taken.

4          **MR. SMITH:**  Can I ask what 43 is, your Honor?

5          **MR. RAY:**  Docket Number 43 in the main case was

6     attached to the -- I believe it was attached to the Notice of

7     Removal and to the -- or the Motion to Dismiss.

8          It is the list of equity security holders filed in

9     the main case that lists several of the -- its shareholders who

10    are here as Schermerhorn Plaintiffs.

11         **MR. ROTHBERG:**  Your Honor, if I might provide some

12    assistance on that.  In the exhibit notebook that we submitted

13    on behalf of SkyPort, a white exhibit notebook.  Exhibit Number

14    7 is the order confirming the plan.  And Exhibit Number 10 has

15    the State Court petition that was removed to the Bankruptcy

16    Court.

17         And I don't believe that there's any objection to

18    those.  So in case you need to refer to those, they're handy to

19    you.

20         **THE COURT:**  Thanks.  Mr. Smith do you see where

21    they're pointing to?

22         **MR. SMITH:**  Your Honor, I agree with that.  The list

23    of equity security holders we don't have objection to.  But I

24    wonder if there is in one of the books, I think it's in both

25    the books, frankly.

1           Did you give an exhibit number on that one?

2           **MR. ROTHBERG:**  Yes.  The list of equity security

3    holders is Exhibit Number 1.

4           **MR. RAY:**  Okay.  I have no opposition to that, your

5    Honor.

6           **THE COURT:**  Okay.  Why don't we do this.  Looking in

7    the white booklet, Mr. Smith, Mr. Ray, Mr. Jones, let's just go

8    through and do housekeeping.

9           Are there any objections to any of those exhibits

10   being admitted?

11          **MR. RAY:**  No, your Honor.

12          **MR. SMITH:**  Is that 1, 7, and 10?

13          **THE COURT:**  Why don't we just do them all.  And let's

14   which ones you object to and which you don't.

15          **MR. SMITH:**  In the white booklet we have no

16   objections.

17          **THE COURT:**  All right.  Mr. Jones.

18          **MR. JONES:**  Judge, no objections to Exhibit 1 through

19   10.

20          **THE COURT:**  All right.  Then for purposes of today's

21   hearing, we'll go ahead and admit Exhibits 1 through 10 of

22   SkyPort Global Communications, Inc., Robert Kubbernus, and

23   Balaton Group, Inc., which are in the white booklet that

24   Mr. Rothberg has submitted.

25          **(SkyPort Global Communication, Inc.'s Exhibit Numbers 1**

12

1 **through 10 were received into evidence)**

2       THE COURT:  Let's go to the other exhibits.  And see

3 if there is stipulation as to what's admitted and what needs to

4 be proved up.

5       Mr. Smith, on your booklet, it's look like I've got,

6 am I right in saying Exhibit 1 through 13?

7       MR. SMITH:  Yes, sir.

8       THE COURT:  Okay.  Let's see.  Mr. Ray, any

9 objections to my admitting Exhibits 1 through 13 of what we'll

10 call the Schermerhorn parties?

11       MR. RAY:  Yes, your Honor.  I object to Exhibit

12 Number 1.

13       THE COURT:  All right.

14       MR. RAY:  Exhibit Number 3.

15       THE COURT:  All right.

16       MR. RAY:  Exhibit Number 4.

17       THE COURT:  Okay.

18       MR. RAY:  Exhibit Number 5, Exhibit Number 6, and

19 Number -- Exhibit Number 7, Exhibit Number 8, Exhibit Number 9,

20 Exhibit Number 10, Exhibit Number 11, Exhibit Number 12.  And

21 Exhibit Number 13 I don't believe is being admitted for

22 evidentiary purposes.

23       So I object to Exhibit 13 as well.

24       THE COURT:  All right.  So you don't object to

25 Exhibit Number 2.

13

1          **MR. RAY:**  That's correct, your Honor.

2          **THE COURT:**  Okay.  So let me ask, let's see,

3   Mr. Rothberg.

4          **MR. ROTHBERG:**  Yes, sir.

5          **THE COURT:**  Same question.

6          **MR. ROTHBERG:**  Yes, sir.  We agree to the admission

7   of Exhibit 1, 2, and 3.

8          **THE COURT:**  All right.  Bear with me hear just a

9   minute.

10          All right.  Tell me which ones you object to.

11          **MR. ROTHBERG:**  Okay.

12          **THE COURT:**  Let's try that.

13          **MR. ROTHBERG:**  The objections are to Number 4 all the

14   way through 10.

15          **THE COURT:**  Okay.

16          **MR. ROTHBERG:**  And then, your Honor, as to 13, I

17   haven't seen that one.  This hearing's come up in a big rush.

18   So I'm not -- I don't want to make a stink about that it's just

19   being produced.  But I just would object and just have them

20   prove it up.

21          **THE COURT:**  Okay.  So you also object to 13.

22          Am I right in saying then you don't object to my

23   admitting Exhibits 1, 2, 3, 11, and 12.

24          **MR. ROTHBERG:**  That's correct.

25          **THE COURT:**  All right.  Thanks, Mr. Rothberg.

14

1   Mr. Jones?

2          **MR. JONES:**  Judge, I haven't been provided an exhibit

3   book or copies of the exhibits.  So I object to all of them.

4   And I move to strike on them when they come up.

5          **THE COURT:**  All right.

6       **(Pause)**

7          **THE COURT:**  Let's see here.

8       **(Pause)**

9          **THE COURT:**  Mr. Ray has got Exhibits on behalf of his

10  clients, Exhibits 1 through 14.  Am I right?

11         **MR. RAY:**  That's correct, your Honor.

12         **THE COURT:**  Okay.

13         **MR. RAY:**  And at this point, I will not offer at this

14  point Exhibits 1 or 2.  Because I believe that that is only

15  relative if  we get into a sanctions damages issue.

16         **THE COURT:**  All right.

17         **MR. RAY:**  And I would offer Exhibits 1 and 2 if we

18  have to have testimony as to the damages that have been

19  suffered.

20         **THE COURT:**  Okay.

21         **MR. RAY:**  The remaining exhibits I offer.

22         **THE COURT:**  Okay.  Then let's see, Mr. Rothberg, over

23  to you.  Any objections?

24         **MR. ROTHBERG:**  No objections, your Honor.

25         **THE COURT:**  All right.  Mr. Smith?

15

1            **MR. SMITH:**  No objections to the all but 1 and 2.

2            **THE COURT:**  Okay.  And Mr. Jones?

3            **MR. JONES:**  Judge, again I don't have copies.  So

4    until I see them, it's hard for me to take a position.

5            **THE COURT:**  All right.

6        **(Voices speaking off the record)**

7        **(Pause)**

8            **THE COURT:**  Then I won't admit any of them at the

9    moment, then, because Mr. Jones has objected.  I think when all

10   is said and done then we've at least got Mr. Rothberg's

11   exhibits admitted at this point.

12           Mr. Ray, do you want to continue on with your

13   jurisdictional argument?

14           **MR. RAY:**  Yes, your Honor.  Thank you.

15           **THE COURT:**  All right.

16           **MR. RAY:**  Your Honor, the issue in jurisdiction here

17   is that the shareholders have said there is absolutely no

18   jurisdiction here.  And they have argued several arguments as

19   to why the complaint on its face has no basis for bankruptcy

20   jurisdiction at all.

21           For instance, they say the claims alleging --

22   requesting a provisional Trustee or receiver of SkyPort, the

23   reorganized Debtor, are boilerplate.  They say that all of the

24   counts, so first issue is they claim boilerplate, when they

25   seek a provisional Trustee, director, Court-appointed fiduciary

1   or receiver of the reorganized Debtor, SkyPort, on account of

2   their claims in the -- in their State Court petition.

3          Second, they say all counts -- counts of their State

4   Court petition are not violative.  And in the most recent

5   proceeding they capitalized in all caps the words counts and

6   boldfaced it.  Because they believe that is important.

7          They have said that there is no bankruptcy issue, no

8   bankruptcy issue.  They have said derivative claims are not

9   discharged.  Derivative claims are not discharged.  They have

10  said that there is no attempt to redivide the pie or subvert

11  the plan.  That is the reason they say there is no jurisdiction

12  of this Court over this dispute.

13         Let me discuss boilerplate first.  The argument that

14  requesting a provisional Trustee, or fiduciary over the

15  reorganized Debtor is not a violation of a plan, even though

16  their claims stem from the loss of their shares in the

17  bankruptcy case, is something that is not boilerplate.

18         It is a non-monetary form of relief.  And our

19  response is that on its face, the petition seeks to challenge,

20  or violate, or undermine the confirmation order on its face.

21         Your Honor, I want you also to take judicial notice

22  of Rule 15 of the Federal Rules of Civil Procedure and Rule

23  7015 of the Bankruptcy Rules, which permit amendment to

24  pleadings.  Rather than amend their pleading and say that the

25  relief that they are seeking is not violative, they have said

17

1    the relief they are seeking can be amended.

2           Rather than do that, rather than try to amend and fix

3    this, what they have done is they have said there is no

4    violation.  That they may make that allegation, make it on its

5    face, and that that allegation does not confer jurisdiction.

6    It does.  It is a violation.  It is almost Orwellian to say

7    that I can seek control of a reorganized Debtor based on my

8    pre-bankruptcy equity interest.  And that does not violate the

9    discharge injunction.

10          Now let me tell you another thing, Judge.  I think

11   your Honor knows this.  Your Honor's been practicing in the

12   State Courts.  I'm concerned about the state procedural rules.

13   Because even if it were excised from this draft of this

14   complaint, if this case were remanded based on the facts that

15   are alleged, they could always add in new causes of action and

16   new forms of relief up to a few days before trial.

17          **(Pause)**

18          **MR. RAY:**  What is currently pled, your Honor, could

19   be changed for the worse.

20          **(Pause)**

21          **MR. RAY:**  What they have said means what it says.

22   And by saying that they want a provisional director, fiduciary

23   over SkyPort, and because the nature of their damages is that

24   they lost their shares in the Bankruptcy Court, on its face,

25   the complaint has conferred -- has raised an issue of a facial

1    discharge -- facial violation of the discharge injunction.

2            Your Honor, that's the first issue.  The second with

3    regard to boilerplate is, there are six pages, your Honor,

4    complaining about what happened in this Bankruptcy Court.  Out

5    of the 65 pages of fact allegations, 6 of them complain about

6    what happened in the Bankruptcy Court.

7            One could not reasonably read this pleading, the

8    complaint, and say it has nothing to do with bankruptcy.

9    Clearly, it is a challenge to the confirmation order.  It says

10   that the bankruptcy judge was duped.  It insinuates that the

11   jury and the judge in the State Court don't need to follow the

12   Bankruptcy Court, because he was duped.

13           It insinuates that there is -- that the confirmation

14   order shouldn't bind.  There are also, your Honor, 13 pages out

15   of the 65 pages of factual allegations, dealing with wrongs the

16   Debtor allegedly committed.  Allegedly, the Debtor lied to the

17   FCC, even though it got licenses, it has licenses, it has

18   always had licenses, and it only paid a $3,000 fine to deal

19   with any disclosure issues.

20           There's 13 pages where they -- they allege the Debtor

21   did this wrongdoing.  Thirteen pages of corporate harm.  And,

22   your Honor, they're seeking to pierce the veil of the Debtor

23   and say that Mr. Kubbernus, who acted as an officer of the

24   Debtor in doing this, is liable as an alter ego.  And that's

25   the piercing of the veil argument you can't make.

1          Your Honor, if I may?

2          **THE COURT:**  All right.

3       **(Pause)**

4          **MR. RAY:**  In the petition, they have clearly

5    retitled.

6          **THE COURT:**  Hold on one second.

7       **(Recess taken from 9:33 a.m. to 9:36 a.m.)**

8          **THE COURT:**  Okay.  We're now back on the record in

9    the *SkyPort Global Communications Adversaries*.  Specifically,

10   *Adversary 10-3150 and 10-3225.*

11          When we broke, Mr. Ray was arguing jurisdiction.  You

12   can continue.

13          **MR. RAY:**  Thank you, your Honor.

14          **MR. SMITH:**  Your Honor?

15          **THE COURT:**  Mr. Smith?

16          **MR. SMITH:**  Yes, sir.  My eyes are not what they used

17   to be.  Would the Court?

18          **THE COURT:**  If you want to come up and literally

19   stand there, you are welcome to do so.  I have to tell you, my

20   eyes aren't what they used to be.  And even with new glasses

21   and a magnifying glass, I'm going to have to squint as well.

22          **MR. GOLDMAN:**  Your Honor, may I take a quick --

23          **THE COURT:**  Yes.

24          **MR. GOLDMAN**  -- look as well?

25          **THE COURT:**  For sure.  For sure.

1         **MR. SMITH:**  May we come up?

2         **THE COURT:**  Yeah.  You can stand right there.

3         **MR. SMITH:**  That's a needed question, sir.

4         **THE COURT:**  You need to be able to see.  I think

5 Mr. Ray would want you to be able to understand his arguments

6 as well.

7         **MR. SMITH:**  Okay.

8         **THE COURT:**  So, it's no problem.

9         **MR. RAY:**  Thank you.

10         Your Honor, first of all, let's go back to the six

11 pages of allegations about wrongs in the Bankruptcy Court.  On

12 its face, that has to be.  There's one kind of claim that that

13 could be.  That has to be an 1144 claim. Fraud on the

14 Bankruptcy Court only exists under 11 U.S.C. §1144.  It doesn't

15 exist under state law.  It doesn't exist under any other law.

16         So that on its face confers bankruptcy jurisdiction.

17 There's six pages of allegation.

18         Now the interesting thing is, in those allegations,

19 they make allegations about the bankruptcy, but they use the

20 word SkyComm, even though SkyPort was the Debtor.  They SkyComm

21 has FCC licenses.  That's not true, because the Debtor had FCC

22 licenses.

23         And any jeopardizing of the Debtor's licenses is a

24 wrong involving the Debtor, principally alleging mismanagement

25 of the Debtor, injury to the Debtor, derivative claim of the

1   Debtor, it couldn't be a direct claim of anyone else.  It has

2   to be a claim against the Debtor.

3         SkyComm had sales and sales staff.  Remember SkyComm

4   was a holding company with no employees and no activities,

5   other than having shares and raising money giving it to

6   SkyComm -- SkyPort.  But they say in the petition, Centurytel

7   and Centurytel directors, hired a sales staff for SkyComm and

8   did not -- that did not have experience in satellite

9   communications.  And this negatively impacted SkyComm's sales

10  efforts.

11        So SkyPort, that was the Debtor.  That's the Debtor

12  we're talking about here.  It couldn't have been SkyComm.

13  Kubbernus put in place a business plan and took control of

14  SkyComm's sales efforts.

15        If the wrong alleged in the petition is that there

16  were bad sales efforts, that has to be SkyPort.  This has to be

17  a cleverly camouflage claim directly involving a derivative

18  claim of the Debtor, SkyPort.

19       **(Pause)**

20       **MR. RAY:**  There's an allegation that SkyComm had

21  competitors to which it lost customers.  That has to be

22  SkyPort.  SkyComm had no competitors.  SkyPort was doing

23  business.  SkyComm had bad operations and services.  Again,

24  that has to be SkyPort.  SkyComm had a bad business -- had a

25  business plan that wasn't executed properly.  Once again,

22

1   SkyComm didn't have a business plan.   SkyPort did.

2          This kind of confounding of the two concepts is how

3   they're hoping to say that this Court has no jurisdiction,

4   because this doesn't involve a Debtor.

5          **THE COURT:**  Mr. Ray, did the disclosure statement

6   that was approved reference SkyComm?

7          **MR. RAY:**  Of course.

8          **THE COURT:**  And what did it say?

9          **MR. RAY:**  It said SkyComm is going to cease to exist

10  and will be merged into SkyPort.  And at the conclusion of the

11  confirmation hearing, SkyPort and SkyComm will become SkyPort.

12         **THE COURT:**  And in the plan of reorganization that

13  was actually confirmed, was there a reference to SkyComm?

14         **MR. RAY:**  Yes, your Honor.  It specifically said that

15  SkyComm shares are cancelled and being -- and SkyPort's shares

16  are cancelled.  The two are being merged, and a new reorganized

17  Debtor named SkyPort will come out of it.

18         **THE COURT:**  All right.  Thanks.

19         **MR. RAY:**  Your Honor, another argument that is made,

20  I'm going to switch now to the issue of all counts.  The

21  arguments has been made that all counts pled are not involving

22  bankruptcy.  And this -- and that they're all solely state law

23  claims.  There's no -- nothing involving the Debtor, nothing

24  involving the -- I would remind the Court, obviously, of Rule

25  8.  We have notice pleading in the United States under 7008.

23

1          If I'm driving down -- if I write in a pleading I was

2    driving in my car, minding my own business, and Mr. Rothberg

3    wasn't watching what he was doing, and he hit me from behind,

4    and I have whiplash and I'm injured, and I want money for

5    quantum meruit, the Court can fashion that in any remedy it

6    wants.

7          Because the count that is pled is not the issue.  We

8    have notice pleading in the United States.  It is the facts

9    that matter.  And that's what happened in *Dexterity Surgical*,

10   your Honor.

11         In *Dexterity Surgical*, someone said I have a fraud

12   claim and a breach of contract claim.  They started off with a

13   derivative claim.  But they repled their complaint when they

14   realized the derivative claim violated the statute.  And then

15   Dexterity Surgical they said we have a fraud claim.  We have a

16   breach of contract claim.

17         Well what's the breach of contract?  Well I bought

18   shares.  And when I bought those shares, you told me that you'd

19   run the company well, and you ran the company in the ground,

20   and it hurt the company, and I hurt my share value.  And

21   therefore, I want money for breach of contract.

22         Well that's not a breach of contract claim.  That's

23   just a cleverly pled derivative claim.  And fraud is the same

24   thing.  What's the fraud?

25         Well the fraud is you ran the company into the

24

1   ground.  And but for you running the company into the ground, I

2   wouldn't have invested money in it.  And that's a derivative

3   claim, too.

4         Breach of duty under Delaware law is always

5   derivative.  And we've cited those cases in the -- in the

6   response to the Motion to Remand.  The counts, your Honor,

7   don't say dilution.  They don't say inequitable dilution of

8   shares.  That's not the words they use.  They say breach of

9   duty.  And if Delaware applies, that means it's a derivative

10  claim.  And not a direct and derivative claim.  It means it's

11  just derivative.

12        If there's a dilution claim, there's a subspecies of

13  dilution claim that's been raised recently in some of the

14  responses.  Instead of amending the pleading under Rule 15, the

15  response is every single count and every single fact in the

16  entire 111 page complaint has nothing to do with Bankruptcy

17  Court.

18        So nothing to do with -- in violation of discharge

19  injunction.  Nothing at all that would confirm jurisdiction in

20  this Court.  We would argue that the counts are not where your

21  Honor looks for jurisdiction.

22        Your Honor looks at the facts of the case, the

23  underlying facts pled in the complaint, and determines

24  jurisdiction based on that.

25      **(Pause)**

1      **MR. RAY:**  Your Honor, there is an argument that they

2  have made and that they make over and over again, that the

3  claims are derivative and direct.  They're derivative but not

4  discharged.  Not discharged because the Debtor continues to

5  possess the derivative claims.

6      Your Honor, it doesn't matter if they were discharged

7  or not.  It matters that the shares were cancelled, and that

8  the merger was effectuated by the plan.  And the point here is,

9  if it is property of the estate or the Debtor, the derivative

10  claims can't be pursued.

11      In the WorldCom case that we cited in our response to

12  the Motion to Remand.  And in that case, it's instructive,

13  because the facts are similar.

14      A person had a derivative suit against WorldCom.

15  WorldCom filed a bankruptcy and merged in the bankruptcy.  And

16  on the other end of the bankruptcy came MCI.  And the

17  shareholder wanted to pursue derivative claims against MCI.

18  Because he said MCI's not doing it, I should do it.

19      And the Bankruptcy Court said no.  Under the plan,

20  you are defeased of your shares, and if you had a problem with

21  that, with who was going to be able to pursue derivative

22  claims, you should have said so before the plan was confirmed.

23  You knew about the case and you didn't say anything about it.

24      Your Honor, derivative claims are not theirs, they're

25  SkyPort's, the reorganized SkyPort's, and your Honor, I'm not

1    even sure whether those derivative claims were preserved or

2    not.  I'm not going to get into that argument because I don't

3    think it matters whether they were preserved or not.  They are

4    simply not their to assert.

5            Your Honor, they say, I'm going to switch points.

6    Remember they said there's -- this is -- there's no attempt to

7    redivide the pie.  And I've cited cases in Delaware which say

8    if there's a confirmed plan and you have a direct claim that is

9    not discharged, even pursuing the direct claim that is not

10   discharged, cannot undermine the plan by redividing the

11   allocation of assets set forth in the plan.  Those are called

12   the redivide the pie arguments.

13           Now it applies only to non-monetary relief.  And the

14   response I hear from the shareholders is we're not seeking no-

15   monetary relief that would redivide the pie.  But wait a

16   minute, the complaint says that they want accounting from the

17   Debtor, from SkyPort, not from Mr. Kubbernus.

18           They want the books and records of the Debtor, that's

19   the reorganized Debtor turned over to them.  That they want a

20   provisional director in charge of the company.  And it seeks to

21   challenge the Centurytel debt, and seeks to challenge the debt

22   of Mr. Kubbernus and Balaton.

23           And I don't know that that would be seen as anything

24   other than an attempt to redivide the pie, since they were in

25   the bankruptcy case, they were listed as equity security

1  holders, they knew about the discharge.  They knew about the

2  bankruptcy.  They did not show up in the bankruptcy case.  They

3  received the disclosure statement.  The received the

4  confirmation order.  They filed nothing in this Court to set

5  aside the confirmation order.  I do not think that it is right

6  for them to go to State Court and attempt to redivide the pie.

7  And I think the redivide the pie argument gives your Honor

8  jurisdiction.

9          And if you remember, your Honor, any one

10 jurisdictional basis of the Bankruptcy Court, any one of any of

11 these things would create a jurisdiction.  If there is a

12 violation of the discharge injunction, if there's an attempt to

13 redivide the pie, if there is an attempt to assert control over

14 the Debtor post-confirmation, or to have a provisional Trustee

15 appointed, if there is an attempt to undermine the plan,

16 challenge the plan, have an 1144 action in State Court, or

17 otherwise have a State Court judge determine that the

18 Bankruptcy Court was duped and you should ignore the plan, if

19 any of those thing happen, this Court has jurisdiction.

20          And then the question becomes, what kind of

21 jurisdiction?  I think the answer as the Court said in the

22 confirmation order, exclusive.  The Supreme Court has said in

23 the cases that we cited in the Response to Motion to Remand,

24 that the Bankruptcy Court has exclusive jurisdiction to

25 determine its jurisdiction.  And that you cannot collaterally

1    attack a Bankruptcy Court jurisdiction.

2            And in that case that I cited, what we're dealing

3    with was an asbestos bankruptcy, I believe.  And someone went

4    to State Court and say that bankruptcy discharge doesn't affect

5    me and the judge didn't know what he was talking about.

6            He didn't have jurisdiction over it.  And that can't

7    be an argument that's raised, I don't think, in State Court to

8    say that the Bankruptcy Court doesn't have -- was wrongly found

9    it had jurisdiction.

10           If you contest, and the Bankruptcy Court did find it

11   had jurisdiction over anything to interpret the plan, anything

12   to enforce the plan, anything to force people to relinquish

13   property or claims in the plan, that's in the confirmation

14   order.  That was the finding.  No one appealed.  They got

15   notice, many, almost all of the Plaintiffs, and I believe all

16   of these, got notice of the confirmation order and of your

17   Court's determination.

18           Your Honor has exclusive jurisdiction over anything

19   relating to the plan of reorganization.  So it's wrong to have

20   anyone else decide that for you.

21           If this was a solely state law claim, and it's not,

22   if this was a claim that involved no bankruptcy, and it's not.

23   If this was a claim that did not collaterally attack the

24   Bankruptcy Court, there's still the problem, Judge, the fact

25   that the 9027(e) statement was struck, that objections can be

1  waived.

2          Now, your Honor, it isn't the only reason that you

3  have jurisdiction, or that you should not remand.  It is one of

4  them.  It is just one of them.  But certain rights are more

5  easily waived than others.

6          For instance, jury trial rights are very easily

7  waived.  Likewise, rights to have an Article III judge try your

8  case are very easily waived.

9          I will remind, your Honor, that the Fifth Circuit has

10  said that the Bankruptcy Court has core jurisdiction to enforce

11  its confirmation order.  I would say that to the extent that

12  there is any procedural issue that they don't like the way that

13  we have removed the case, Mr. Rothberg's case should be

14  consolidated with this one so that any procedural issue is

15  cured.

16          Certainly your Honor has jurisdiction, and I don't

17  think there's any contest with it.  Your Honor has jurisdiction

18  over the deck action filed by the Debtor to enforce the

19  confirmation order.

20          Now, your Honor, that's all I have to say about

21  jurisdiction.  I do have some words to say about remand and

22  removal.

23          **THE COURT:**  Well let's -- let's give everybody an

24  opportunity to deal with jurisdiction.

25          I think, Mr. Rothberg, why don't I ask you for any

30

1    additional jurisdictional arguments.

2         **MR. ROTHBERG:**  Certainly, your Honor.

3         I think the -- the seminal case that gives you

4    jurisdiction is the *Craig Stores Case*, that gives you

5    jurisdiction post-effective date over enforcement of the plan

6    and the order confirming the plan.

7         And obviously, in our petition, *Adversary 3225*, we

8    assert that the petition violates the plan injunction, against

9    not only SkyPort, but Mr. Kubbernus, and Balaton, who received

10   released in the -- in the Chapter 11 plan.

11        And to kind of underscore some of -- of Mr. Ray's

12   arguments, the six pages of allegations regarding the fraud

13   committed in the bankruptcy case, just for instance, page -- to

14   show that what they're really attacking is the plan itself, if

15   you look at that Exhibit 10 that we submitted that has the

16   petition in it, the six pages starts on -- on the bottom on

17   page 57.  The top shows 61 of 116.

18        **THE COURT:**  Right.

19        **MR. ROTHBERG:**  And all the way through 63 complains

20   of bad acts in the bankruptcy case.  And just to look at a

21   couple, if you look at -- turn the page and go to number 313,

22   it says,

23        "Centurytel was also listed in the Chapter 11

24        petition as a secured credited in the amount of 2.7

25        million.  The debt allegedly occurred on April 13.

1             This obligation had not been disclosed to SkyComm

2             shareholders."

3          Your Honor, our exhibits that we put in today showed

4     that SkyComm shareholders who are Plaintiffs in this case

5     received notice of this case, numerous notices of the Chapter

6     11.

7          So if they -- what they should have done, if that was

8     the case, was raise this issue during the bankruptcy.  They

9     could have objected to the Centurytel claim.  They could have

10    objected to the plan.

11         And so what they're seeking to do here, vis-à-vis

12    Centurytel, is to upset the plan treatment for Centurytel.  So

13    that's -- go down further, the next sentence, the next

14    paragraph 314.

15            "Balaton was listed as an unsecured creditor of

16            SkyPort for $1.9 million.  The debt allegedly

17            incurred on February 22, 2006.  The obligation was a

18            fictitious creation of Balaton and Kubbernus."

19         Okay.  Well again, they had notice of this.  Or plan

20    essentially swapped that debt, plus a DIP loan, to give stock

21    to Mr. -- to Balaton.  Well again, why didn't these

22    shareholders, who were noticed of the case, appear and object

23    to that?

24         So they're collaterally attacking in State Court

25    an -- a confirmation order that approves a provision of the

1   plan, which goes back to Mr. Ray's redivide the pie story and

2   issue.

3        **(Pause)**

4        **MR. ROTHBERG:**  In paragraph 321, it says,

5            "In the Chapter 11 proceeding, Kubbernus and Balaton

6            made numerous false and misleading statements to the

7            Bankruptcy Court."

8        Where were the shareholders?  They could have come in

9   and filed a Motion to Appoint a Trustee.

10       **(Pause)**

11       **MR. ROTHBERG:**  On paragraph 325 directly attacks the

12  plan.  And I can show you the provisions of the plans.

13           "On May 22nd, Balaton and Kubbernus filed a proposed

14           plan of reorganization, which pursuant to which

15           SkyComm would be merged into SkyPort.  And Balaton

16           would exchange its alleged secured and unsecured

17           debts for 100 percent of the equity."

18       Okay.  That's what the plan said.  And that's what

19  the -- and then when the plan was confirmed, that was

20  implemented.  The merger was implemented, pursuant to Delaware

21  law.

22       So what they're really trying to do in this case is

23  upset that entire transaction, which they had notice of, which

24  they should have appeared earlier.  And certainly, I have

25  Mr. Kubbernus here to testify, if they had appeared earlier,

1    this whole case might have turned out extremely differently.

2           All the parties that were in the case, Centurytel,

3    Balaton, and Kubbernus, the unsecured creditors, Aegis Venture,

4    which was another unsecured creditor, voted for this plan in

5    reliance on that the plan would be implemented.   And

6    Mr. Kubbernus is here today.   And he can testify that the

7    Debtor, that SkyPort, the reorganized Debtor is current on all

8    of its plan obligations, is paying its debts as reorganized.

9    So what they're trying to do is upset that entire issue.

10          So in conclusion, your Honor, in terms of the

11   jurisdiction issue, the Schermerhorn group might say well, wait

12   a second, all of our claims are direct claims.   So you don't

13   have jurisdiction.   And we dispute that.   We say these are

14   derivative claims.   We said we are attacking the confirmation

15   order.

16          Well you have jurisdiction to decide that.   It's that

17   simple.   And once that's decided, if it -- if you determine

18   that these are derivative claims that they're asserting.   They

19   belong to the reorganized Debtor.   They can only be asserted by

20   the reorganized Debtor, I can tell you the reorganized Debtor

21   believes these claims are nonsense and there's no intention

22   whatsoever in pursuing them.

23          And to the extent that -- that the -- you determine

24   that the -- some of the requests to seek a receiver, or appoint

25   a Trustee violates the discharge injunction, then, of course,

34

1  you have jurisdiction to enforce your discharge injunction

2  order by sanctions or additional injunctive relief.

3          So I don't see how you can't have jurisdiction over

4  this.

5          **THE COURT:**  Let me ask you.  Let's assume that

6  Schermerhorn Plaintiffs that I find that it's not -- their

7  claims are not derivative, that they're personal claims, does

8  the confirmed plan set forth that the Defendants, whom these

9  Schermerhorn Plaintiffs have sued, does the confirmed plan

10  release, or give a release, to those individual Defendants of

11  any and all causes of action, derivative or otherwise?

12          **MR. ROTHBERG:**  Okay.  If they're derivative, yes.

13          **THE COURT:**  Yeah.  Go ahead.

14          **MR. ROTHBERG:**  But if they're personal, direct

15  claims, no.  And, in fact, we carved out a specific, in the

16  confirmation order, a specific species of the claims, which was

17  related to the Clearsky Investment Partnership.

18          **THE COURT:**  Hence my question.  Carved out those

19  claims for Clearsky.

20          **MR. ROTHBERG:**  Correct.

21          **THE COURT:**  Does that mean inferentially or

22  expressly, that no other claims were carved out?

23          **MR. ROTHBERG:**  No.  No, your Honor.  I wouldn't even

24  argue that.

25          I think that if there is a direct claim to the extent

1   that, you know, Mr. Smith sold me the security, and he lied to

2   me, and he told me that it was X and it was really Y, I don't

3   think that's -- that is released by the plan.

4           THE COURT:  Okay.

5           MR. ROTHBERG:  Okay.  I don't think we can do that.

6           Thank you, your Honor.

7           THE COURT:  Thanks.  Let's see, Mr. Smith, before you

8   go, let me ask Mr. Jones --

9           MR. SMITH:  Okay.

10          THE COURT:  -- if he wants to make any arguments.

11          MR. JONES:  Very briefly, Judge.  And thank you on

12  behalf of the Wilson Vukelich Law Firm.  And again, specially

13  appearing subject to the Motion to Dismiss.

14          Judge, the issue that's being argued is not who's

15  right or wrong.  It's not who did what to whom to where.  The

16  issue is whether or not you have jurisdiction.  And by

17  jurisdiction, we all are assuming, but we should say it,

18  subject matter jurisdiction over the issue.

19          And, Judge, a Bankruptcy Court's jurisdiction is very

20  simply defined in 1334.  That's where you have to look to find

21  whether or not you have jurisdiction to hear a dispute.

22          Judge, as you listen to all of the argument that's

23  being made, and if you read the complain, if you've gone

24  through that.

25          THE COURT:  When you say complaint, just so that

36

1    we've got, if this matter is up on appeal, Mr. Jones, you mean

2    the Plaintiff's original petition --

3              **MR. JONES:**  I do, Judge and I --

4              **THE COURT:**  -- that was filed in Harris County.

5              **MR. JONES:**  -- apologize.

6              I do not spend enough time in State Court anymore.

7              **THE COURT:**  Thanks.

8              **MR. JONES:**  But you are correct.

9              Judge, if you look at that, there isn't any question,

10   whether you want to take one side of the argument or not, you

11   cannot dispute that the acts that form the basis of the claims

12   that are asserted all have to do with the bankruptcy process

13   what was said and done.

14             Judge, I would assert to you that by its very

15   definition, gives you both original and exclusive jurisdiction

16   under 1334(a).  At the very least, the claims that are being

17   asserted, and the effect upon the discharge injunction, and the

18   effect upon the plan, certainly give rise to original

19   jurisdiction under 1334(b).

20             Once you get to that conclusion, the answer is done.

21   You have jurisdiction to hear the dispute. Judge, I would also

22   assert to you  that give the issues that are being argued as to

23   whether or not the discharge injunction is being effected, it

24   is black letter law that only the issue in Court of an

25   injunction has the jurisdiction to enforce its injunction.

1          Again, not trying to decide who's right or wrong.

2     Not trying to argue who's trying to get one up on you by giving

3     you facts.  The issue is, is that there is an injunction.  No

4     one can dispute that there is an injunction.

5          You're being asked to enforce it.  By definition,

6     that gives you jurisdiction.  You are, by definition, dealing

7     with the plan process.  You even had asserted that a fraud was

8     committed upon you.  Again, black letter law.  Only a Court

9     upon whom a fraud has been committed, or alleged to have been

10    committed, can make that determination.

11         So again, not to decide who's right or wrong, not to

12    decide which fact is right, which fact is wrong.  Take either

13    set of facts that their party wants to argue, you have subject

14    matter jurisdiction over the issues.

15         **THE COURT:**  Thanks, Mr. Jones.

16         Mr. Smith, please.

17       **(Pause)**

18         **MR. SMITH:**  Your Honor, there have been strong

19    accusations by counsel that I hold in high regard, don't do

20    them justice probably.  But what they say in a less dramatic

21    tone is that my clients, by their petition, seek to take over

22    the Debtor, attack the confirmation order, and appropriate

23    property of the estate.

24         But I ask the Court to review the petition.  Nowhere

25    in there do we seek any of that.  SkyPort's not a Defendant.

1    There's not an attempt to take over the Debtor or the

2    reorganized Debtor.  There's no request to any change to the

3    confirmation order.

4            They point to the request for the appointment of a

5    receiver.  It's my understanding that that request if part of

6    the Delaware pleading under oppression.  But if you look at

7    that, it's under the Kubbernus -- Kubbernus, account.  There is

8    no account related to the Debtor at all.

9            If Kubbernus is found liable for his oppression or

10   stock fraud, we have, as part of this pleading under Delaware

11   law, sought the employment of a receiver over his assets, not

12   the assets of the reorganized Debtor.  It's akin to the Texas

13   remedies of -- once you establish liability, you seek a writ of

14   attachment, appointment of a receiver if certain conditions are

15   met.

16           Your Honor, if that truly caused concern, we have

17   offered, and we have stated, that we did not -- do  not intend

18   to seek control over SkyPort.  And we were prepared to delete

19   any reference to the appointment of a provisional director, et

20   cetera.

21           The petition asserts only direct claims supported by

22   current case law.  The petition clearly states that the

23   Plaintiffs are not asserting derivative claims on behalf of the

24   Debtor.  And they know how to assert derivative claims.  They

25   did so on behalf of Clearsky.  There are none on behalf of the

39

1    Debtor.

2            I understand that the claims are all based on

3    documents which came into the Plaintiff's possession post-

4    confirmation.  With the finality of the confirmation order, and

5    this Court's admonition to Draco (phonetic), the Plaintiffs

6    selected the route to pursue this in State Court.  And what I'm

7    referring to, your Honor, is that as part of the hearing on the

8    Draco matter, the Court states,

9            "If you're in some other Court, in some other state,

10           or at some other time, what I don't want to have

11           happen some other attorney, obviously, Mr. Rothberg,

12           it wouldn't be you, but it might be some attorney in

13           New York, or Delaware, or Canada saying here's a

14           transcript from Bohm's hearing, and this witness said

15           X and Bohm confirmed the plan.

16           I want to make sure we've got a clear a record as we

17           can so that no other, no other jury, is going down

18           that path."

19           What you were referring to is your statement at the

20   close of the hearing, okay, Mr. Mitchell, which was

21   representing Draco,

22           "Although I have ruled that your client does not have

23           standing, let me make sure I square the circle.

24           Based upon the testimony, I don't believe that we've

25           got anything in the record that puts your client in

40

1          harm's way with respect to the release e issue.  But

2          I want to make sure that agree with me."

3        So you were more or less advising him that if he had

4  a claim, go assert it in the proper court.

5     **(Pause)**

6     **MR. SMITH:**  The petition -- sorry.

7        The Defendants, except for Wilson Vukelich, removed

8  the entire case, the entire petition to this Court.  The party

9  removing has the burden of establishing the jurisdiction over

10  the removed parties.  And we cited cases, Fifth Circuit *Frank v*

11  *Bayer* (phonetic).

12        After the confirmation, the jurisdiction of this

13  Court is exceedingly limited, per Judge Lake in his bankruptcy

14  trading case, where the discussion -- where he discussed *Craig*

15  *Stores*, Fifth Circuit and *Brass*, *U.S. Brass*.

16          "The related-to test of 1334 is no longer

17          appropriate.  Jurisdiction ceases to exist, except

18          for matters pertaining to implementation or execution

19          of the plan."

20        The Defendants say there is jurisdiction and seek

21  dismissal of the entire case on the ground that the

22  petitions -- that the Plaintiffs asserted only derivative

23  claims against released insiders.

24        You look to the petition of -- there are 15 counts.

25  You have to look at each of the counts to see if the Defendants

1   have objectively and correctly set forth the basis for their

2   removal in this Court's jurisdiction.

3          That is set for in the *Educator's Case*, which is a

4   Fifth Circuit case, 25 F.3d 1281.  You evaluate each cause of

5   action to see if it is direct or if it belongs to the Debtor.

6          Nowhere do you find any allegations against the

7   Debtor or any that are derivative of the Debtor against the

8   released parties.

9          In the pleading, in the petition, there are four

10  groups of plaintiffs, the original stockholders in SkyComm, the

11  non-Centurytel debenture holders who converted to stock in

12  SkyComm, the members or interest owners in Clearsky, and then

13  an additional $8 million worth of investors who directed -- who

14  invested directly into SkyComm after Clearsky had been shut

15  out.

16         There are three groups of Defendants.  There's

17  Centurytel and it's four directors on the SkyComm board.

18  There's Kubbernus and Balaton, and then the other related

19  Kubbernus entities, and then the Wilson Vukelich.

20         First, all of the Defendants, except Balaton and

21  Kubbernus are not released parties.  And the confirmation order

22  releasing Balaton and Kubbernus was limited, not nearly as

23  broad as imagined by counsel today.

24         A careful review of the counts show that there are

25  direct claims against non-Debtors to recover damages, not

1   seeking anything else.  We're not trying to reconstrue the

2   plan, or effect implementation, or execution of the plan.

3          The Clearsky claims are set for in Counts Three,

4   Four, Eight, Fourteen, and Fifteen.  I think I heard again

5   today that there's no argument from the Defendants, that no

6   basis for removal was urged.  They just state that the

7   claims -- they're saying in their response in one of the

8   footnotes that the Clearsky Draco issue is not discharged and

9   may proceed.

10          The Plaintiff's securities fraud claims are set forth

11   in Counts Seven, Eight, Nine, Ten, Eleven, and Thirteen.  No

12   basis for removal was urged.  They just state that the claims

13   have not been properly pleaded.  That can be addressed in the

14   State Court upon remand.

15          The claims against Vukelich are Counts Four, and

16   against Vukelich and others, Counts Three, Seven, Ten, Eleven,

17   Twelve, and Fifteen.  No basis again for removal urged.

18          Claims against Centurytel, Marshal (phonetic), Ewing,

19   Maslowski, Perry, Bankton, Bankton, LLC, and Clearsky

20   Management, reason given, they were released by the plan.  They

21   were not.

22          That leaves Counts One, Two, Five, and Six.  Two

23   against Centurytel, Defendants, and two against the Kubbernus

24   Defendants.  *Seven Seas*, which is a Fifth Circuit case, and

25   *Gentile versus Rosette* (phonetic), which is a Delaware Supreme

1    Court case hold,

2            "Direct and derivative claims may be pled on the

3            facts.  And direct claims may proceed in State Court,

4            even if derivative claims could have been asserted on

5            the same facts."

6            We assert these are nothing more than direct claims.

7    Those two cases, plus some other ones that we've cited in our

8    briefs, state that,

9            "Where the controlling shareholder of a close

10           corporation impermissibly impacts the shareholders of

11           the minority, or dilutes the voting rights, or

12           deprives them of a voice in corporate governance,

13           that aggrieved party can bring direct claims."

14           The counts that we have in our petition seek that

15   relief.  Let's assume that even if they're derivative, the

16   Plaintiffs are shareholders of SkyComm, not SkyPort.  Any

17   derivative claims of SkyComm could not have been brought in the

18   Bankruptcy Court.  That's *Educator's* again.

19           **THE COURT:**  How do you respond to Mr. Ray's argument

20   that SkyComm, and its existence, and it shares, were all dealt

21   with in the disclosure statement in the confirmed plan.

22           **MR. SMITH:**  The only response I have to that, your

23   Honor, is the fact that the claims that were held by SkyComm,

24   were not property of the Debtor's estate at the commencement of

25   the case.

1         There is no way that the -- the Plaintiffs could have

2    come into this Court and pursued derivative claims of SkyComm.

3    The fact that it urged after, frankly, makes the claims that

4    Plaintiffs have now direct, instead of derivative, if ever they

5    were derivative.  Because there is no more corporate

6    corporation, SkyComm, to be derivative of.

7         **THE COURT:**  So your argument is, is that even though

8    your clients were given notice of a disclosure statement and

9    play, which said SkyComm is going to be merged with SkyPort,

10   and its shares were going to be extinguished, that your

11   client's going to sit by, watch that happen, and then

12   subsequently say we still have causes of action by virtue of

13   the fact that at one time we were shareholders.

14        **MR. SMITH:**  What I'm arguing is still that these are

15   direct claims that they are asserting.  But I'm arguing now

16   that even if they were derivative --

17        **THE COURT:**  Well but even -- if they're direct

18   claims, what you're telling me I want to make sure you're

19   telling me, that the oldest direct claim stems from the fact

20   that they were, at one time, shareholders of SkyComm.

21        **MR. SMITH:**  That is part of -- yes, sir.  That would

22   be part of it.

23        **THE COURT:**  Okay.

24        **MR. SMITH:**  Now as I stated before, at the

25   commencement, SkyPort could not have brought the claims on

1   behalf of SkyComm.   Therefore, the derivative claims on behalf

2   of SkyComm are not barred.

3         I believe that we have shown, if the Court will look

4   carefully at the petition, that they're only direct claims.

5   Much was made of the chart, your Honor --

6       **(Pause)**

7       **MR. SMITH:**  I mean, it's not art of the record today.

8   But I will state to the Court that as part of the offering

9   documents made to these investors, what we've alleged here is

10  what was in the offering documents.   SkyComm had the business

11  plan.   SkyComm had the licenses, et cetera, et cetera, et

12  cetera.   So that's why it was pled here.

13        But again, we are you not seeking anything against

14  SkyPort.   I want to make that as clear as I can.

15      **(Pause)**

16      **MR. SMITH:**   Finally, the Defendants argue that

17  there's jurisdiction because the Plaintiffs allege frauds by

18  Centurytel and Kubbernus during the Chapter 11 case.

19        Again, your Honor, this is part of the case that we

20  are building against Kubbernus and Centurytel.   We seek no

21  release that violates, modifies, vacates the confirmation

22  order.   We do not seek anything from anybody, no redivision of

23  the pie.   We seek damages period.

24        We are using the State Court.   As suggested by you,

25  we do seek the award of damages.   We are not seeking to strip

46

1    Balaton or Kubbernus of their distribution, or seek to reverse

2    the distribution rights of Centurytel.

3            Your Honor, there was some comments by Mr. Ray about

4    the matter 9027(e).  The statement in our brief we have set

5    forth the Courts in other jurisdictions have addressed this in

6    the failing to file have held that this was an insubstantial

7    violation, and declined to find that the failure was a waiver

8    of any argument.

9            Prejudice is the most important factor.  And in our

10   case, we pled in response to -- in our remand for the setting

11   forth there was jurisdiction.  Within two days, I think, two or

12   three days thereafter we had the 9027(e) on file.  No action

13   had been taken by the Defendants in that case.

14           I believe that -- oh, also I wanted to point out that

15   the Texas Business Corporation Act stated under 514(i) that,

16           "If justice requires the derivative actions that are

17           brought may be treated as direct actions by

18           shareholders by his own benefit, if justice

19           requires."

20           I believe that we have shown that these are direct

21   claims.  They are against non-Debtor third parties.  And the

22   allegations of the petition under each count do not relate in

23   any to matters pertaining to implementation or execution of the

24   plan.

25           We think the Court should remand for the absence of

1   jurisdiction.

2            **THE COURT:**  Thanks.

3            Mr. smith?

4            **MR. GOLDMAN:**  Your Honor?

5            **THE COURT:**  Yes.

6            **MR. GOLDMAN:**  May I address just one point if it

7   please the Court.

8            **THE COURT:**  All right.

9            **MR. JONES:**  Just for the record, Judge, I'm going

10  object.

11           Did this at the last hearing.  We let it go.  The one

12  lawyer, one client.

13           **THE COURT:**  I generally operate under a one ride, one

14  reinjure rule.  But go ahead.

15           **MR. GOLDMAN:**  I just wanted to clarify one point.

16  Okay?

17           The issue is the jurisdiction of the Court.  And I

18  wanted to clarify that point, 'cause I think it's very

19  important.

20           This Court has jurisdiction to decide whether the

21  claims that were brought in the State Court action are direct

22  or derivative.  We're not challenging that.

23           Our argument is they're all direct.  And therefore,

24  they should go back to the State Court, because this Court

25  doesn't have jurisdiction to hear direct claims.  That's issue

1  number one.

2           Issue number two, we're not arguing that this Court

3  doesn't have jurisdiction to enforce the confirmation order.

4  Absolutely this Court does.  And if, in fact, we were seeking a

5  receiver, and if we had pleaded a -- a cause of action saying

6  we are entitled to a receiver under this document, or under

7  this statute, or under this provision, had we sought a

8  receiver, absolutely this Court would have jurisdiction.

9           The issue is we really -- there is no claim there

10  pleading for a receiver to be appointed, except in the context

11  of a judgment execution.  And the case law is that that is --

12  is a very different thing.

13           If the Court finds that Kubbernus has been guilty of

14  oppre3ssion, then there, you know, then it should not be

15  offensive to this Court if they put a receiver in to try to

16  protect assets that now might be used to satisfy that judgment.

17           So I just want to be clear on the jurisdiction issue.

18  The Court absolutely has jurisdiction to make these decisions,

19  but we think the decision, if you look at the pleading, and the

20  pleading really does speak for itself, if you look at the

21  pleading.  There is no claim there.  If you took this case to a

22  State Court judge, he couldn't appoint a receiver.  Period.  He

23  couldn't appoint a Trustee.  Period.

24           Except in the context of it he found Kubbernus guilty

25  of fraud, oppression, et cetera, and he believes that there is

1    a danger that Kubbernus is going to divert assets, which is

2    part of what we're claiming here.  If he thinks Kubbernus is

3    going to divert assets, then he has the inherent authority to

4    appoint somebody to make sure that doesn't happen.

5            I can give you the reference, the only reference in

6    the pleading to the appointment of a receiver if I may, your

7    Honor.

8            **THE COURT:**  All right.

9            **MR. GOLDMAN:**  If your Honor will at the petition, at

10   the end of Count Two.  And the "Wherefore" cause at the very

11   top on page 72 of the petition.

12           **THE COURT:**  All right.

13           **MR. GOLDMAN:**  Okay. And that is a claim against

14   Kubbernus for breach of fiduciary duties.  And if you read the

15   claim, it is only for breach of his fiduciary duties directly

16   to the Plaintiffs.  Breach of fiduciary duties to the

17   Plaintiffs, we've breached it extensively that these are

18   different from breaches to the corporation, which would be

19   derivative.

20           So if you look at this, it says that on this the

21   Court enter a judgment and decree of relief against the

22   Kubbernus Defendants.  And then it's got the standard list of

23   relief that the Court can order on this type of claim.

24           And, in D, it says, "An order appointing a provisions

25   director, Trustee, managing agent," et cetera.  And that is as

50

1    part of relief against Kubbernus.  It has nothing to do with

2    the, you know, with seeking a Trustee against SkyPort via a

3    claim seeking a receiver.

4         Now, your Honor, I'm sorry.  I'll let you look at the

5    provision.

6         **THE COURT:**  It says,

7              "An order appointing a provisional director, Trustee,

8              managing agent, fiscal agent, or other Court-

9              appointed fiduciary for SkyComm and SkyPort."

10        **MR. GOLDMAN:**  Right.  But that is only in the context

11   of if it finds that Kubbernus is guilty of breach of fiduciary

12   duties that are direct to the Plaintiffs.

13        And so that is known as an enforcement appointment,

14   as opposed to looking for one as of right.  AS of right, if I

15   have a mortgage or deed of trust, there's a provision in there

16   that says I can appoint a Trustee.

17        And if I go into Court seeking a Trustee of a Debtor

18   under a provision entitling me to a Trustee, that I think would

19   be violative of the Court's, you know, of the Court's plan.

20        **THE COURT:**  Well the mere fact that you're asking for

21   an order to appoint a provisional director, Trustee, managing

22   agent, fiscal agent, or other Court-appointed fiduciary for

23   SkyComm, if I understand the argument from Mr. Ray, is that

24   SkyComm no longer exists because it was merged into SkyPort.

25        So my reading of this pleading is that the Plaintiffs

1   are taking a position that SkyComm does exist.

2          **MR. GOLDMAN:**  No.  Absolutely not, your Honor.

3   Absolutely not.

4          **THE COURT:**  Well if SkyComm does not exist, then why

5   is SkyComm -- why is relief being requested that a director,

6   Trustee, managing agent, or other Court-appointed fiduciary be

7   appointed for SkyComm?

8          **MR. GOLDMAN:**  Your Honor, we, the Plaintiffs, were

9   shareholders of SkyComm.  We were shareholders.  The petition

10  acknowledges that we are no longer shareholders.  We could not

11  seek a receiver of either SkyComm or SkyPort in the context of

12  being shareholders because we're not shareholders.

13         So what we're saying is whatever it is at the end of

14  the day, this is part of the authority the Court has.  I will

15  say that it -- it was probably looking at it now, since SkyComm

16  was merged into SkyPort, it really would be the same thing.

17         Yeah.  I think your Honor's point is very well taken.

18         **THE COURT:**  Okay.

19         **MR. GOLDMAN:**  It think it is.

20         **MR. ROTHBERG:**  Your Honor, if I could comment --

21         **THE COURT:**  Thank you.

22         **MR. ROTHBERG:**  -- on that point just for a moment.

23         **THE COURT:**  Sure.  I'll give everybody a chance for

24  rebuttal.

25         **MR. ROTHBERG:**  Just very briefly, your Honor.

52

1          This is the exact provision which troubled me so much

2   and why we filed the suit.  And I don't really care about

3   SkyComm, 'cause that doesn't exist.

4          But it says, "An order appointing a Trustee for

5   SkyPort."  So he's saying well, you only can do that if we get

6   a claim against Mr. Kubbernus.  Well here's the four

7   shareholders who had notice of the bankruptcy case, notice that

8   they were going to lose their shares, trying to come in through

9   the back door by alleging claims against Mr. Kubbernus, or to

10  take over the Debtor.

11         That's going to seriously impact the Debtor and the

12  Debtor's ability to make its plan payments to the real

13  creditors in the case.

14         And so to me that directly violates the Court's plan

15  injunction.  And the fact that he's trying to say it's -- it

16  makes a difference between whether it's in the count, or

17  whether it's in the prayer, or whether it's in the factual

18  allegations, is a distinction without a difference.

19         Because as your Honor knows, has tried many, many

20  cases.  The relief granted by a Court is generally based on the

21  facts.  If you have a count that maybe is not artfully pled, or

22  you have a count that's not pled at all, the rules provide for

23  even post-trial amendment of the pleadings.

24         And so we have these six pages worth of allegations

25  of fraud committed in the bankruptcy case.  And he says well,

53

1    we're not trying to do anything in the bankruptcy case.

2            When we go to State Court, and we have a jury, and

3    the jury believes all of this stuff about the fraud in the

4    bankruptcy case.  And they set aside the confirmation order.

5    We can't have that in Bankruptcy Court.  So I think it's a

6    false position to try to look at this and just say well let's

7    just look at the counts.  Let's just look at the prayer

8    separate and let's just look at the facts.  It has to be looked

9    at as a whole to see what relief they're really seeking.

10           I think Mr. Goldman indicated he doesn't dispute the

11   Court's jurisdiction to determine what's direct and what's

12   derivative.  So I think he's essentially admitted the Court has

13   jurisdiction over the claims that would be derivative.

14           He says he's not pursuing them.  We say he does.

15   That's a dispute which I think you can determine.

16           **THE COURT:**  Okay.  Thank you.

17           Mr. Ray, did you want to make any rebuttal?

18           **MR. RAY:**  Well, your Honor, I -- I did want to first

19   of all clarify something Mr. Rothberg said I disagree with.

20           There was a global release of Balaton and Kubbernus,

21   and the Debtor for the matter, for anything that happened in

22   the Bankruptcy Court in the discharge injunction.  And it does

23   apply to third parties.  So there is a third party release,

24   number one.

25           Number two, Mr. Mitchell mentioned that by giving the

54

1    kind of release we were giving, limited to officers and

2    directors of the Debtor, discharging certain kinds of

3    derivative claims, Mr. Mitchell who was Draco's counsel at the

4    confirmation hearing said this will affect a third party

5    release.  I'm concerned that it will.

6          And so I think we're probably -- I don't want

7    Mr. Rothberg's statement to be judicial admission that there is

8    no release, 'cause I disagree with it.  I think there is a --

9    there might be a release.  There certainly is a release of

10   anything that happened in the bankruptcy case, because there's

11   only one place to raise those issues and that's here.

12         Your Honor, the other thing is, it was said by

13   Mr. Smith, and I want this addressed very clearly, we are

14   seeking damages period.  Cash money.  That's it.  That's what

15   he said.  Now he even said damages period.

16         And if you read these counts, and I have boards and

17   boards of counts to show you, they're not seeking money

18   damages, just money damages.  They're seeking other relief.  In

19   addition to what appears in 72, your Honor, there's on page 82,

20   I'm sorry, 81, a request for an order -- an order again, on

21   page 81, subparagraph 3 of the petition or complaint, an order

22   appointing a provisional director, Trustee, managing agent,

23   fiscal agent, or other Court-appointed fiduciary of SkyComm or

24   SkyPort.  Also --

25         **THE COURT:**  By the way, can you show me where in the

55

1    plan, I know where it is in the disclosure statement, where it

2    is in the plan, or documents attached to the plan that SkyComm

3    and SkyPort were merged.

4            MR. RAY:  Yes, your Honor.  I'll walk you through

5    that very quickly.

6            Okay.  The disclosure -- would you want the

7    disclosure statements first and then the plan?

8            THE COURT:  No, the plan.

9            MR. RAY:  Okay.

10        **(Pause)**

11            MR. ROTHBERG:  Your Honor, I've got the page cite if

12   you want.

13            THE COURT:  Please.

14            MR. ROTHBERG:  It's our Exhibit 7.

15            THE COURT:  Yeah.

16            MR. ROTHBERG:  And it starts at the bottom of page

17   11.

18            THE COURT:  Well that's the disclosure statement.

19            MR. ROTHBERG:  No.  No.  This is the -- I'm sorry.

20   This is the order confirming the plan.  It attaches the plan.

21            THE COURT:  So that's -- are you on 11, Exhibit 11?

22            MR. ROTHBERG:  Exhibit 7.

23            THE COURT:  My Exhibit 7 --

24            MR. ROTHBERG:  Are you in the black book or the white

25   book.

56

1          **MR. RAY:**  White book.

2          **THE COURT:**  Do you want me in the white book?

3          **MR. ROTHBERG:**  In the white book.

4          **MR. RAY:**  White.

5          **THE COURT:**  All right.  Your Exhibit 7?

6          **MR. ROTHBERG:**  Correct.

7          **THE COURT:**  All right.  On page 11?

8          **MR. ROTHBERG:**  Correct.

9          **THE COURT:**  All right.

10         **MR. ROTHBERG:**  And that's the order confirming the

11  plan that attaches the --

12         **THE COURT:**  The plan.

13         **MR. ROTHBERG:**  -- plan itself.

14         **THE COURT:**  All right.

15         **MR. ROTHBERG:**  And if you go to page 11 of the plan.

16         **THE COURT:**  Okay.

17         **MR. ROTHBERG:**  Not the --

18         **THE COURT:**  All right.

19         **MR. ROTHBERG:**  Do you see where there's an Article

20  VI, Means of Execution?

21         **THE COURT:**  All right.  There we go.

22         **MR. ROTHBERG:**  It's paragraph 6.3.

23         **THE COURT:**  Bear with me.  Let me --

24         **MR. ROTHBERG:**  It's paragraph 6.3 merger.

25         **THE COURT:**  Yeah.  Let me read through this.

1      **(Pause)**

2            **THE COURT:**  Okay.  Thanks, Mr. Rothberg.

3            **MR. ROTHBERG:**  It's also approved specifically in the

4      confirmation order, which is just previous to that in -- on

5      page ten at the -- the first paragraph.  There's a sentence

6      that says, "Specifically the merger."

7            **THE COURT:**  Yeah.  Okay.  I'm with you.  Thanks.

8      Okay.

9            Mr. Ray.  You wanted to make any additional

10     arguments.

11           **MR. RAY:**  Yes.  Very briefly.

12           And it's asking for books and records of SkyPort, not

13     Mr. Kubbernus' books and records.  That's one of the relief

14     sought.

15           And for the -- just for the record so the record's

16     clear, paragraph 353, paragraph A and B of the complaint, the

17     petition says the books and records of SkyPort.  Paragraph 360,

18     subparagraphs A through D, 361 subparagraphs A through D.  And

19     we've addressed those.  That includes books and records of

20     SkyPort, accounting of SkyPort.  Paragraph 398, paragraphs A

21     through E, once again, accounting.

22           Those are not just damages.  Accounting is not a

23     monetary relief.  It's not monetary relief.  Turning over books

24     and records is not monetary relief.

25           Your Honor, with regard to the *Gatts Case* (phonetic).

58

1    First of all, your Honor, I'm not a Delaware.  I don't know

2    Delaware law as well as Mr. Fryar obviously does.

3            And for that reason Mr. Manley should we ever

4    generate this out of bankruptcy and into a Delaware legal issue

5    of what's direct and what's derivative.

6            We think that there's causes of action that violate

7    the plan injunction on its face.  And if that's sufficient

8    for -- and certainly for jurisdiction, I think that it all we

9    need for jurisdiction.  Thank you.

10           **THE COURT:**  All right.  Thanks.

11           Mr. Jones, you're next.  And Mr. Smith, you'll have

12   another crack, I believe, as well.

13           **(Pause)**

14           **MR. JONES:**  Judge, I will be very brief.

15           I'd like to take you in the white book to Exhibit 10.

16   And this is the petition that Mr. Goldman was reading from in

17   an attempt to convince you that, you know, whatever it was he

18   was trying to convince you of.

19           The concept of direct versus derivative claims.

20   Judge, as you know all ultimately revolves around the harm, the

21   type of harm, was it individualized was it not.

22           I'd like you to take -- I'd like to take you to page

23   59 of Exhibit 10.

24           **THE COURT:**  Sixty-nine?

25           **MR. JONES:**  Yes.  This is the Count Two that

1  Mr. Goldman made such a big deal about trying to lead out who

2  he was seeking a receiver of.  And I'd like to start with

3  paragraph 355.

4          **THE COURT:**  Okay.

5          **MR. JONES:**  I'd like to just go through a couple of

6  paragraphs.

7          **THE COURT:**  Mr. Kubbernus is a director of SkyComm.

8          **MR. JONES:**  "Kubbernus is a director of SkyComm and

9          SkyPort from November, 2006 on, owed fiduciary duties

10         to the shareholders of these companies, including the

11         Plaintiffs.  These included a duty of care and a duty

12         of loyalty.

13         The Kubbernus Defendants as parties in control of

14         SkyComm and SkyPort, owed fiduciary duties to the

15         shareholders of these companies, including

16         Plaintiffs, including a duty of care, and a duty of

17         loyalty."

18         As outlined in this petition,

19         "The Kubbernus Defendants breached their duties of

20         loyalty and due care by not acting in the best

21         interest of SkyComm, SkyPort, and their shareholders,

22         but rather acting in bad faith and for their own

23         personal and corporate interest."

24  Going on,

25         "The Kubbernus Defendants breached their duties of

1          loyalty and care, and did not act in good faith with

2          respect to the shareholders of SkyComm by"

3     And then you see a whole list of acts.

4          Judge, you go through that.  There's not an

5     allegation.  And perhaps it's just another drafting mistake,

6     but there's not a claim for a direct cause of action in that

7     entire count.  And they stood up here and told you it

8     absolutely is, just read it.  Okay.  We've read it.

9          And that is a derivative claim straight out of the

10    book.  Now maybe they didn't mean to do it.  But that's that

11    they wrote and that's what they're stuck with.

12          **THE COURT:**  Thanks, Mr. Jones.

13          Mr. Smith?

14     **(Voices whispering)**

15     **(Pause)**

16          **MR. SMITH:**  One second, your Honor.

17          **THE COURT:**  Sure.  Do you need a few minutes?  Do you

18    want to take a break?

19          **MR. SMITH:**  If I could, your Honor.

20          **THE COURT:**  All right.  It's 10:35 right now.  Let's

21    come back at 10:45, 10:45.  We'll be in recess for ten minutes.

22     **(Recess taken from 10:37 a.m. to 10:54 a.m.)**

23          **THE COURT:**  Okay.  We're back on the record in the

24    9:00 o'clock docket, the two adversary proceedings, *10-3150 and*

25    *10-3225*.

61

1          When we broke, Mr. Smith was about to make any

2     further arguments --

3          **MR. SMITH:**  Thank you, your Honor.

4          **THE COURT:**  -- on the jurisdictional issue.

5          **MR. SMITH:**  If I could just a few matters.

6          In our response, we have filed -- we have given the

7     cite to *Gaston* (phonetic), which is a Western District case.

8     Recently it's an acknowledgement there of the difference

9     between the appointment of a receiver.  And the Courts in that

10    instance recognized the difference between it being a remedy,

11    versus it being a claim for relief.

12         In *Michael v. Dyke* (phonetic), it was a recognition

13    of the distinction between virility and claim for relief in an

14    accounting situation.

15         Your Honor, the Supreme Court case of *Caterpillar*,

16    and we have that cite, again, in our -- I think we have that

17    cited.  If not, we'll provide it to the Court.  I'm sorry --

18         **THE COURT:**  Go ahead.

19         **MR. SMITH:**  All right.  The Plaintiffs have a right

20    to plead their claims as they want.  They're the master, if you

21    will, of their own pleading.

22         The petition to review that, we've pled everything as

23    directed.  And the Defendants do not have a right to come in

24    here and replead our claim saying that they are really

25    derivative.  In *Duncan v Lickenverter and Redmond* (phonetic),

1   those were cases where looting and improper conduct by the

2   controlling parties, it's a direct claim.

3        Granted, there may be some relief for the

4   corporation, but it is a direct claim.  They said we do not

5   have pleadings to support that in paragraphs 287 and 289.  We

6   have pleadings in the petition for dilution and loss of the

7   vote.  That makes it a direct claim.

8        In a recent case, memorandum and opinion and order

9   out of the Eastern District of Texas Bankruptcy Court to the

10  *Rosenbaum Case* (phonetic), *Adversary proceeding 09-4023*.  I

11  don't know if we had this in the brief.  But we can provide

12  that to the Court.  It's *Case Number 08-43029*.

13       In that case, the former shareholder was claiming

14  oppression.  In this case, the controlling shareholder stole

15  all the money.  Now the shareholder in that instance brought

16  suit for oppression.  And the Court recognized the distinction

17  there saying oppression is a direct cause of action.  You don't

18  get return of the money.  But you do get a return of your

19  investment.

20       He also pled other relief that the Court construed as

21  being on behalf of the company and said, no, you cannot bring

22  that.  But you do have your direct claim.

23       Your Honor, we have stipulated and we will stipulate

24  again, we do not intend to pursue, and we will not pursue

25  derivative claims, only directly claims.  And we do not want,

63

1   nor will we seek control over SkyPort.

2           We are seeking only direct claims against third-party

3   non-Debtors.   Thank you.

4           **THE COURT:**  Thank you.

5           Mr. Ray, I'll give you one minute.

6           **MR. RAY:**  Thank you, your Honor.  I don't have any

7   more on jurisdiction, except to say one little thing.  I

8   originally had offered my exhibits.  Mr. Jones has had

9   opportunity to review them.  I would now like to offer all of

10  my exhibits, except for 1 and 2 into evidence.

11          **THE COURT:**  All right.  Let's see.  Then what you're

12  offering are Exhibit 4 through 14, to which only Mr. Jones

13  objected.

14          **MR. RAY:**  Three through fourteen.

15          **THE COURT:**  Three through fourteen.

16          Mr. Jones, do you -- you initially had objected.  Do

17  you still so object?

18          **MR. JONES:**  At this time, I will withdraw the

19  objection.

20          **THE COURT:**  All right.  Then I'll go ahead and admit

21  the -- Mr. Ray's client's Exhibits 3, 4, 5, 6, 7, 8, 9, 10, 11,

22  12, 13, and 14.

23      **(Centurytel's Exhibit Numbers 3 through 14 were received**

24  **into evidence)**

25          **MR. RAY:**  Thank you, your Honor.  I think we're

64

1   concluded with jurisdiction.  I think that the jurisdiction

2   issue's over.  So remember the outline.  The first issue's

3   jurisdiction.  The second issue is do you remand, even though

4   you have jurisdiction.

5           The third issue, which people are jumping into and

6   out of, but I think we really should hold until after remand

7   is, is there a violation of the discharge injunction.  And then

8   the last is do you enforce your order.  And then perhaps after

9   that, there's a Wilson Vukelich issue.

10          But I think right now we should move to the issue of

11  whether the remand is appropriate, and whether the -- whether

12  the removal was -- was appropriate.  There's been an argument

13  made about removal being inappropriate because it was filed

14  with the wrong clerk or with the wrong court.  And I would like

15  to address that at this point.

16          **THE COURT:**  Go ahead.

17          **MR. RAY:**  Your Honor, the argument was made that the

18  removal by the -- by my clients was to the wrong court.  The

19  argument was made that under 9027, notwithstanding the text of

20  the Rule, my clients should have removed to the District Court,

21  not to the Bankruptcy Court.  And that I -- that the

22  pleading -- the removal was filed in the wrong Court.

23          Your Honor, our response to that issue, was that the

24  removal was procedural correct.  You do not remove to courts

25  you remove to clerks.  You file a notice of removal with a

65

1    clerk.  And the clerk in this case is one clerk.  It's a

2    district clerk and a bankruptcy clerk.

3          And just in case there was any confusion, the local

4    Rule 9027-1, requires removal with a caption that says in

5    the -- for bankruptcy-related matters, in the United States

6    Bankruptcy Court for the Southern District of Texas, blank

7    division.

8          So to file it with the clerk, who is both the

9    District and Bankruptcy clerk, with that caption, one may

10   presume that the removal was to the proper judicial officer.

11   The removal was filed timely.

12         Also the rules define the word clerk to mean -- the

13   bankruptcy rules, define the word clerk to mean bankruptcy

14   clerk if one has been appointed.  And finally, as was said at

15   great length in many other proceedings -- in many other cases,

16   and I'm not going to read them out.  They're all in the -- in

17   the response to the Motion to Remand.  And if you'd like, I can

18   read them into the record.  But it's not necessary.  There's

19   dozens and dozens of cases that say the correct place to remove

20   a bankruptcy-related matter to remove a proceeding under the

21   bankruptcy -- under 1452 is this jurisdiction, is the

22   Bankruptcy Court, not the District Court.

23         Having said that, your Honor, there's another

24   argument made, I mean, I don't think there's -- I don't see how

25   you could argue that we were -- that the case was removed to

66

1    the wrong court.  I just think that has any base.  It makes no

2    sense to me.

3              The second argument made is that we shouldn't have

4    removed the direct claims.  We have admitted, unlike the

5    shareholders who have asserted, we admit, at least the Clearsky

6    claims are direct claims.  They are not discharged.  They may

7    bring them.  We have never said that they may not bring them.

8    We've been honest about that.  We have never said that every

9    single thing in here is derivative.  Some things are

10   derivative, most of them are derivative.  Eighty percent of

11   them are derivative.  But there's things in here -- in the

12   complaint specifically, the Clearsky claims that we acknowledge

13   that could be brought.  We just don't think that they --

14   unfortunately they're in one big pleading that alleges a bunch

15   of other things.  And Clearsky is one of the Plaintiffs that

16   has alleged wrongdoing in the Bankruptcy Court and has sought

17   the relief under all -- there's some counts that have relief

18   sought as to all Plaintiffs, including Chris Dye, that we would

19   consider derivative.

20             So having said that, an argument was made that we

21   should have removed only the claims that we disagree with.  I

22   don't know how you do that.  No one I know knows how you do

23   that.  I've asked around.  And I've never heard of anyone

24   removing only part of a lawsuit.  I don't know how that would

25   happen.

67

1          But that's an argument that they make that the

2    removal was improper, because it was not a removal of only

3    certain things.  I really don't have much of a response other

4    than to say that's not how removal works.  You remove the case.

5    You file a Notice of Removal and it comes up.

6          There is a issue again on remand -- on the remand

7    motion with whether or not they have waived their remand, the

8    shareholders have waived their remand by failing to file a

9    timely 9027(e) statement.

10         Now where I said in jurisdiction I -- it's

11   questionable as to whether or not it's the only thing you can

12   rely on, there's other things to rely on.  In the case of

13   9027(e), the remand deadlines are pretty strict.  They're kind

14   of like jury trial -- jury demand deadlines.

15         And under this case, failure to file a timely 9027(e)

16   statement, taken in the totality of the circumstances, along

17   with the fact that there was no response to the Motion to

18   Strike filed on time, per month, should constitute a waiver of

19   the jury trial issue and the Motion to Remand.  I think that

20   that is easily waived.

21         Now with regard to mandatory abstention, the argument

22   for mandatory abstention is the same argument for jurisdiction.

23   This has nothing to do with bankruptcy.  And I hope we're over

24   that hurdle.

25         And with the argument of permissive abstention, I

1    think that that argument is wholly inapplicable to a judge

2    enforcing his own confirmation order.  I cannot imagine that

3    this Court would think it is a good idea to have this case

4    decided anywhere but here.

5            I will also point out --you know, your Honor, I'm not

6    going to talk about what violates your Honor's injunction at

7    this point.  The only issue I wanted to raise on the remand is

8    whether or not it made more sense for this case to be here or

9    it be in a State Court.

10           I think the things that have been alleged in the

11   petition of which your Honor's already taken cognizance,

12   sufficiently state this requires your Honor's attention.

13   Certainly six pages of complaining about bankruptcy fraud mean

14   that this is ill-sited to a State Court deciding whether it was

15   correct or incorrect.

16           That's all I have, your Honor.

17           **THE COURT:**  All right.

18           Mr. Rothberg, do you have any comments?

19           **MR. ROTHBERG:**  No.  No comments, your Honor.

20           **THE COURT:**  Mr. Jones?

21           **MR. JONES:**  No, Judge.

22           **THE COURT:**  Mr. Smith, over to you.

23        **(Pause)**

24           **MR. SMITH:**  In response to the removal, the

25   inappropriateness of the removal, all we can say to that is

69

1   it's pretty strict.  It says to the District Court.  It's a

2   technical violation.

3          As to the remand, is it being appropriate?  Under the

4   circumstances of --

5          **THE COURT:**  Let me just ask you about that since we

6   have, you know, one clerk here in this courthouse.  What, in

7   your judgment, should have been done.

8          **MR. SMITH:**  To file it with the District Clerk.  It's

9   a technical matter, but I agree with the arguments that have

10  been made, frankly your Honor, that I think it's a matter that

11  could have been cured.  But it was raised.  It's probably on

12  the same level as the 9027(e) matter.  I think there was a

13  technical violation there.

14         But we will argue again no harm, no foul in that

15  instance.

16         **THE COURT:**  Okay.

17         **MR. SMITH:**  I remand appropriate?  I think with the

18  limited jurisdiction of this Court after the confirmation, we

19  need to have those that are not covered in any way, that are

20  not derivative.  And frankly, that's about 11 out of the 15

21  counts that were not objected to.  There was no basis given for

22  removal of those.

23         Those should be sent back.  Fourteen fifty-two does

24  say that a claim or cause of action can be removed.  All of

25  them were removed.  Those that the Court does not have

1  jurisdiction over should be remanded.

2         THE COURT:  Let me ask you, Mr. Smith, it's been a

3  while since I've looked at this, but if I've got jurisdiction

4  over some of the claims, do I then have what I learned was

5  pendant jurisdiction, what the law school these days are

6  teaching is supplemental jurisdiction, over the remaining

7  claims?

8         MR. SMITH:  I don't think so, your Honor.  The case

9  that I cited you, the Fifth Circuit one, said you have to look

10  at these on a case-by-case basis.  And --

11         THE COURT:  You mean on a --

12         MR. SMITH:  And a claim or cause of action.

13         THE COURT:  Cause of action, both cause of action

14  basis.

15         MR. SMITH:  Right, sir.

16         As to those that you do not have jurisdiction over, I

17  just don't think it's appropriate for you to address some of

18  the other matters that have been raised in this Court, like the

19  Motions to Dismiss, the venue first motions for a more definite

20  statement.  Those are more appropriately raised in the State

21  Court.

22         Again, we would urge, your Honor, that we can find

23  nothing that says that the 9027(e) late filing remand is

24  waived.  That's -- I just don't -- I haven't found a case that

25  says that at all, except in an instance where it was just so

1    abusive.

2              Here is was two days later.  There was a hearing

3    after that.  The explanation that I have ready by counsel is

4    that everybody thought that it was all resolved at the hearing

5    that was held shortly after this -- this matter was filed.

6              And, your Honor, again, I want to make clear, we

7    agree about the, you know, this Court has jurisdiction to

8    enforce its confirmation order.  We are not attacking the

9    confirmation order nowhere.  And if it's unclear before, we're

10   saying now again that we will stipulate as to those matters

11   that we said -- we're not trying to take control of the

12   reorganized Debtor.  We are not trying to pursue derivative

13   claims.

14             Thank you.

15             **THE COURT:**  Thank you.

16         **(Pause)**

17             **THE COURT:**  Mr. Ray.

18             **MR. RAY:**  Just only a brief comment.

19             First of all, I disagree that this Court does not

20   have jurisdiction over the matters.  They're all arising from

21   the same core of operative facts.  And the core of operative

22   facts are set forth in the complaint.  And the core of

23   operative facts include things that are alleged to be frauds in

24   the Bankruptcy Court.

25             If there was some way of divvying them up, Rule 15

1   was the response.  Rule 15 was the option.  But unfortunately,

2   the way they are now, everything's part of the same issue.

3          Also, your Honor, with regard to the stipulation of

4   counsel that they aren't doing this.  That it doesn't mean what

5   it says, that the words don't count.  Rule 15 is their -- is

6   their solution.  It's their salvation.

7          When this -- on March 26th when the shareholders

8   received, or the next day, when they received  a Motion to

9   Dismiss and a Motion for Sanctions, those shareholders could

10  have said we're going to amend our petition under Rule 15.

11  We're going to file a pleading with Judge Bohm.  And we're

12  going to say we're sorry, let's clarify this.  Let's fix it.

13         But we're here.  We're not here on something that

14  they're saying on the record.  We're here on what was written

15  down.  And what was written down is the basis of your

16  jurisdiction, and it's the basis of what we think should be

17  refusal to remand on everything at this point.

18         At some point later, it may become clear that some

19  things don't require your supervision.  But at this point,

20  everything appears to come out of the same core of operative

21  facts.

22         **THE COURT:**  All right.  Thanks.

23     **(Pause)**

24     **MR. SMITH:**  Your Honor, may I give the Court one

25  cite?

1          **THE COURT:**  Please.

2          **MR. SMITH:**  _Matter of Walker_ 51 F.3d 562.  It says

3     that, the Fifth Circuit there held,

4               "The Bankruptcy Court does not have supplemental

5               jurisdiction over unrelated claims, even when one

6               claim in a lawsuit is related to the bankruptcy

7               proceeding."

8          And, your Honor, I would also like to address the

9     Court on an exhibit to our Motion to Remand included our very

10    first, but not our last, promise to withdraw anything that was

11    offensive in the way of this remedy that we were seeking.  We

12    simply remove it, your Honor.

13         **MR. RAY:**  Your Honor, I don't wear the black robe.

14    And I don't rewrite the -- I don't authorize amendments to

15    pleadings, so I disagree that any of that's relevant.

16         Your Honor, if we could, I would like to move on from

17    the remand issue, which I think has been discussed fully at

18    this point, to the question assuming you have jurisdiction,

19    assuming remand is not proper, is there a violation.  And then

20    if there is a violation, are you going to enforce your order.

21         So the next issue I think I should talk about is our

22    position on violations.  Our position is if there is a single

23    violation of the discharge injunction, a single violation of

24    the confirmation order, one solely derivative claim pled, one

25    attempt to assert control of the reorganized Debtor, based on a

74

1   pre-bankruptcy equity interest, an attempt to enforce dead

2   shareholder rights that were terminated by the discharge

3   injunction, or by the plan, or by the merger that was

4   effectuated in the plan, one attempt to recover money based on

5   dead shares that were extinguished in the plan, or one attempt

6   at veil piercing, to pierce the corporate veil of the

7   reorganized Debtor.

8          Any one, any single violation anywhere in the entire

9   petition justifies a remedy from the Court to enforce its

10  discharge injunction.  Rather than amend their pleading and say

11  we're sorry.  Here's what we're going to say.  This is what we

12  meant.  We meant to say dilution.  We said breach of fiduciary

13  duty.  Or we didn't mean -- we meant to ask for our own

14  monetary relief, we didn't mean to ask for all this non-

15  monetary relief.

16         Your Honor, instead of doing that, we're stuck with

17  what they filed.  And the position of our side is that the

18  violations are manifest on the face of the petition.

19         Now there are -- your Honor, question has come up,

20  what happens if there's some things that there's a fact issue

21  on.  This is after all a Motion for Summary Judgment.  It is

22  potentially the case that some things there might be a fact

23  issue on whether or not they're violating the discharge

24  injunction.

25         Well in that case, we just continue on with those.

75

1    And whether we penalize based on those or not, we'll have to

2    have some discovery on it.  That's where the bifurcation

3    motions comes in.

4             But as for certain things on the face of the

5    complaint, on the face of the petition, one could not

6    reasonably read them to be anything other than derivative only

7    claims alleging injuries to the corporation.

8             Mr. Jones started the conversation.  Let me direct

9    your attention to a board I have up there called Mismanagement.

10   Now unfortunately, the size of the board limits the size of the

11   text that can go on it.  And it's a little harder to read than

12   the previous one.

13            But the complaint is replete with allegations of

14   mismanagement by SkyPort.

15            **THE COURT:**  By who?

16            **MR. RAY:**  SkyPort.  That SkyPort -- may I, your

17   Honor?

18            **THE COURT:**  Please.

19            **MR. RAY:**  Thank you.

20        **(Pause)**

21            **MR. RAY:**  That Centurytel exercised control of the

22   management and operations of SkyComm and SkyPort, that the

23   directors exercised control over the management and operations.

24   That Centurytel managed SkyPort.  That Centurytel, I'm sorry,

25   was never a shareholder of SkyComm, in SkyComm, or SkyPort, but

76

1    it exercised complete control or management.

2            That Centurytel directors were in control of

3    management SkyPort.  That they managed SkyPort, they say

4    SkyComm's finances, but they mean SkyPort.  It doesn't matter,

5    because they merged.  In paragraph 118.

6            "Centurytel and the Centurytel directors exercised

7            complete control over SkyComm's finances and managed

8            them for the benefit of Centurytel and not SkyComm.

9            They grossly mismanaged SkyComm."

10   Paragraph 129.  They did not have the experience to operate a

11   satellite -- that satellite based communications company or

12   sell satellite communication services.

13           It is one -- and this -- I'm not going to waste your

14   Honor's time reading from every example.  But it's Horn Book

15   law that when someone is violating their duties as a director

16   by mismanaging a corporation, that's just derivative.

17           The allegations have been made that you can have

18   derivative and direct claims in a unique subspecies, and

19   let's -- and by the way, let me digress here.

20           Once again, I'm not the Delaware person.  Mr. Manly

21   will address it if your Honor has any detailed questions about

22   Delaware law.  But, your Honor, in a unique subspecies of

23   shareholder -- of shareholder oppression or -- they don't have

24   that in Delaware -- in dilution claims in Delaware.  There can

25   be in a closely-help corporation a time when a majority

1   shareholder will issue more shares to itself or require the

2   minority shareholders to overpay or underpay for shares.  That

3   equivalent to an unequal dividend where on person gets more of

4   a dividend than another one.

5           And that's been held in some instances in Delaware to

6   constitute a direct claim.  That is also potentially a derivate

7   claim.  That's their argument.

8           So their argument is, this entire petition, all 111

9   pages of it, are really just this one subspecies of dilution

10  claim, because there are three paragraphs that say the work

11  dilution.  Your Honor, I can't believe that that's the case.

12          We have injuries to the Debtor alleged.  We have

13  derivative claims alleged on most of the counts.  There are 13

14  pages of FCC -- allegations about the FCC and lies that SkyPort

15  allegedly told the FCC.  Although it apparently didn't matter,

16  because the FCC gave them licenses.  The FCC still gave --

17  still has licenses with them.  They haven't lost the licenses.

18          During the bankruptcy, the FCC changed the licenses

19  to say Debtor-in-possession.  And lawyers have signed off on

20  all this.  and the Debtor did pay a $3,000 fee for apparently

21  for failing to file its paperwork properly.  But on the other

22  hand, those 13 pages of allegations have to be just derivative.

23          The Plaintiffs, the shareholders say that that's not

24  derivative, that that's a direct claim because of fraud.

25  That's a fraud claim.

1          Now they didn't know about those FCC licenses.

2    They're not alleged to have known about those FCC licenses.

3    They weren't told about the FCC licenses.  And the reason they

4    say it's a fraud is, well if I had know, I wouldn't have

5    invested in the company.  And so it's -- so you should have

6    told me that you have -- that you had an FCC issue.

7          And, of course -- I'm not talking about the company

8    they actually invested with, 'cause they invested with SkyPort.

9    They're arguing that -- they invested with SkyComm.  They're

10   saying the subsidiary, the company we invested with, said

11   something wrong to the FCC that we never knew about.  And

12   that's our fraud claim.  No it's not.  It's a derivative claim.

13   That's what happened in *Dexterity Surgical.*

14         In *Dexterity Surgical* someone said I have a fraud

15   claim, Judge, and what's the fraud.  Well they defrauded me

16   because I was investing in the company and they just -- the

17   mismanaged the company, and I wouldn't have invested if I'd

18   known they're mismanaging it.  That's just a derivative claim.

19         We're not given leave of our common sense here.

20   There are six pages of bankruptcy-related issues in the

21   complaint.  Once again, if that could be exercised, excised,

22   removed, deleted, redacted, taken out of the complaint, Rule 15

23   gave the Plaintiffs that option.  They could have filed that

24   motion in the Bankruptcy Court, rather than admit that that is

25   a violation of the confirmation order.  It's an attempt to

79

1    challenge the confirmation order.  It's seeking to -- to

2    undermine the confirmation order, rather than admit any of

3    that, or even not admit it, just ask to remove it.

4         Their position is that has nothing to do with

5    bankruptcy.  It is not a violation of the confirmation order.

6    It has nothing to do with any attempt to challenge this Court's

7    jurisdiction.  Is it simply relevant factual background for our

8    direct claim for fraud.

9         Okay.  They seek control of SkyPort.  That's what the

10   words say.  I know that there's a lot of argument that those

11   words don't mean what they say.  But they're there.  They say

12   what they say.  And they violate the discharge injunction

13   saying I want control of the Debtor because of the injury.

14        And what's your injury?  Well let's go through the

15   counts and see what the injury is, if I may, your Honor.

16        **THE COURT:**  Please.

17   **(Pause)**

18   **(Voices whispering)**

19        **MR. RAY:**  Here is Count Two, your Honor.

20   **(Pause)**

21        **MR. RAY:**  Count Two, paragraph 360.

22        **THE COURT:**  Hold on one second.

23        Mr. Smith?

24        **MR. SMITH:**  Yes, sir.

25        **THE COURT:**  Could you move the microphone up so that

80

1   we don't pick --

2          **MR. SMITH:**  I'm sorry, your Honor.

3          **THE COURT:**  -- Mr. Goldman and you up on the mic.

4          **MR. SMITH:**  I am so sorry.

5          **THE COURT:**  That's okay.  Thanks.

6       **(Pause)**

7          **MR. RAY:**  Your Honor, the loss is the loss of their

8    investment in SkyComm because of the bankruptcy, because of the

9    merger, because of the discharge.  The damages are the loss of

10   their money from their equity interest.

11          They're no longer shareholders.  They can't assert a

12   derivative claim.  They're no longer shareholders who could

13   assert a direct claim that shareholders have to operate.

14   They're former shareholders whose loss and injury is that they

15   lost money in a bankruptcy case.  But they didn't show up here.

16          And their loss was because the bankruptcy should

17   never have entered the merger, should never have done the

18   confirmation, and the Bankruptcy Judge was duped.

19          Your Honor, veil piercing, your Honor's aware, as

20   acquisition, and Mr. Smith's certainly aware, you can't pierce

21   the corporate veil of a Debtor.  It's property of the estate.

22   There's an argument that they've made that it wasn't property

23   of the estate, 'cause it wasn't property of the estate as of

24   the petition date.  That's not what 541 says.

25          Section 541 says that the estate is comprised of all

1   property that the Debtor possessed on the petition day and, I'm

2   think (a)(7), I think it says anything that's acquired

3   afterwards.

4        So if the shares of SkyComm, and the entity in

5   existence of SkyComm, are put in afterwards, let me make sure

6   I've got the copy right here.  Yes.  That's right.  Section

7   541(a)(7), includes any interest in property that the estate

8   acquires after commencement of the case.

9        So if the derivative claims of SkyPort were

10  contributed in, there's something that were property of the

11  estate, they can't exercise control over those.  They lost

12  their value in the bankruptcy case.

13       Here we go.  I've got another count.  This is Count

14  1, your Honor.  I've put a little orange mark next to paragraph

15  342, "Caused a loss of their investment."

16       **(Pause)**

17       **MR. RAY:**  Doubling up, your Honor, Count 7, paragraph

18  426, "Plaintiffs suffered a loss of their entire investment."

19       They're computing damages based on a wrong that

20  happened here.  There's Paragraph 474, your Honor.

21       And, your Honor, these are summaries.  I need to say

22  I'm not admitting these documents.  I'd like to have them here

23  in the courtroom and use them as demonstrative.  Obviously, the

24  paragraphs say what they say.

25       **THE COURT:**  Sure.

82

1        **MR. RAY:**  But paragraph 474, the damages again, loss

2   of the investment, the wrongdoing in the Bankruptcy Court

3   caused me to lose my investment in this Debtor.  That's the

4   argument.  That's got to invoke a violation of the

5   confirmation, because only this Court issues claims to equity

6   interest holders.  And only this Court authorizes the

7   prosecution of claims that are the estate's property.  And this

8   Court dealt with that.

9        Your Honor, going back to --

10       **(Pause)**

11       **(Voices whispering)**

12       **MR. RAY:**  Going back to the issue of mismanagement.

13   I don't want to get into a paragraph-by-paragraph argument.

14   Because we don't need that today.  All we need in this summary

15   judgment motion is to find if there's a violation.  That's all.

16       If there's one violation, then as a matter of law,

17   based on the face of the complaint that your Honor can just

18   read the complaint and say that's a violation, then we are

19   entitled to a remedy.  And we ask you to enforce your order.

20       What we don't want is an advisory opinion.  And

21   that's what they're asking for.  They're going to say, your

22   Honor, why don't you take a pencil or a Marks A Lot and strike

23   out the provisions that violate as a matter of law, the

24   confirmation order.  Or better yet, give us your opinion on

25   what we should write.

83

1          And we don't do that.  That's not how this Court

2    works.  That's now how any judge works.  What we do is

3    determine if there's a person here who sought a remedy and is

4    entitled to it.  And that's what we are.

5          We are here saying that as a matter of law, some of

6    the claims, and not all of them, and I want to be clear.  Not

7    all of the claims that they said in their complaint are -- are

8    violative.

9          For instance, the Clearsky Draco issue doesn't

10   violate the confirmation order.  I don't want anyone thinking

11   it does.  But some of these as a matter of law violate the

12   confirmation order.  Some of them may require factual

13   investigation.

14         And then the question is well for those that violated

15   the confirmation order as a matter of law, what the remedy

16   should be.  And we are asking for a monetary sanction.  And

17   maybe that's something we could have an evidentiary hearing on

18   on a different day or today.  But that is -- that's where we

19   are.

20         We believe that your Honor can read the petition.

21   I'm not going to read it to you.  I expect the Court has read

22   it.  I know you have.  I know the Court's read it.

23         So assuming the Court has read the petition, your

24   Honor can determine on the face of it whether there's a

25   violation or not.  We have pointed out several.  And if there

84

1    is one violation, we ask for you to enforce your order.

2         That's all I have, your Honor.

3         **THE COURT:** Mr. Rothberg?

4         **MR. ROTHBERG:** Your Honor, this part of the, I'm

5    sorry, this part of the argument kind of flushes over to the

6    *Adversary 3225*, the same issues. And I agree with what Mr. Ray

7    said. I have two witnesses that I can put on that would

8    establish that the Debtor is incurring harm, the reorganized

9    Debtor by the filing of this suit, and by some of the relief

10   that's been requested in this suit, how it would severely harm

11   the Debtor.

12        And so I would ask the Court after everybody's made

13   their opening comments if I could put on my evidence.

14        **THE COURT:** Let me ask you something.

15        **MR. ROTHBERG:** Certainly.

16        **THE COURT:** Is here any dispute among the parties

17   that these shareholders, that the Debtor when it was leading up

18   to the confirmation hearing did, in fact, send plan packets for

19   these shareholders?

20        **MR. ROTHBERG:** Your Honor, I had evidence on that

21   that I was going to present. I didn't know if the other side

22   is stipulating to that.

23        **THE COURT:** Mr. Smith, do you stipulate that the

24   shareholders got the plan packets?

25        **MR. SMITH:** May I confer with counsel?

85

1           **THE COURT:**  Sure.

2           **MR. SMITH:**  I don't know the answer.

3           **THE COURT:**  Sure.

4      **(Pause)**

5      **(Counsel confers with co-counsel)**

6           **MR. SMITH:**  I'm told, your Honor, that most of the

7      Plaintiffs in our case did have those packets.  But at the

8      time, we did not have the information and had not even begun to

9      know the depths of what had gone in this case.

10          And it wasn't until, I think, that the FCC censured

11     the SkyPort that we began to look into it more deeply and to

12     come up with what we're now pleading.

13          **THE COURT:**  Okay.  Thanks.

14          I am going to want you to adduce testimony from these

15     two witnesses.  I need to hear testimony on notice.  So I'm

16     going to give you that opportunity.

17          **MR. SMITH:**  Okay.

18          **THE COURT:**  And I'll give you that opportunity in a

19     minute or two.  So that you know, I think we're going to break

20     at 12:30 so that you all can go have lunch and I can hold my

21     next hearing.  And I have two o'clock final arguments from a

22     hearing yesterday.

23          So I will get you back this afternoon if we don't

24     complete by 12:30.

25          **MR. ROTHBERG:**  Thank you, your Honor.

1        **THE COURT:**  Mr. Jones, do you have any comment on the

2   particular issues that Mr. Ray addressed?

3      **(Pause)**

4       **MR. JONES:**  Judge, I agree with Mr. Rothberg that we

5   moved beyond the he said, she said oral argument.  It is time

6   for the evidentiary presentation where each of the parties has

7   to bear their burden.

8        I'm assuming what we're taking up is the Motion to

9   dismiss and/or for sanctions.  So long as I'm correct about

10  that, I don't have any other comment.  I will welcome the

11  evidentiary presentation.

12       **THE COURT:**  Thanks.

13      Mr. Smith?

14       **MR. SMITH:**  Yes, sir.

15     **(Pause)**

16       **MR. SMITH:**  Your Honor, we think Mr. Ray is still

17  trying to replead our petition.  We don't want him to do it.

18  And we clearly are not asking you to replead for us.  We pled

19  direct claims.  The allegations that have been pointed out by

20  Mr. Ray are proof of the control which is oppressive, looting,

21  improper conduct.  We've given you the *Rosenbaum Case*

22  (phonetic), the *Redman* (phonetic), and *Duncan Case*, *Tri-State*,

23  *Odyssey*, *Silk Road*.  *Silk Road* was unlawful or wrongful pattern

24  of activities.  All of these impressive looting, improper

25  conduct, patter. of wrongful activities, Texas defraud,

1    illegality, or oppression are direct claims.

2           For some of these may give rise to derivative claims.

3    We have not pled derivative claims.  But for Mr. Ray to

4    successfully replead for us, he would have to establish that it

5    is legally impossible for a minority shareholder to bring a

6    shareholder oppression claim based on this conduct.

7           We have numerous cases that I've just cited to the

8    contrary.  The difference between the two claims is that a

9    derivative claim awards damages to the corporation that were

10   proximately caused by the mismanagement.  We're not seeking

11   that.

12          Shareholder oppression awards to the shareholder, the

13   value of his ownership as a result of the pattern of conduct

14   that grossly disregards shareholder rights and welfare.  It

15   provides a remedy when there's a squeeze out, successful

16   squeeze out, or when there's not.

17          Mr. Ray also points to *Dexterity Security*.  I think

18   was a -- Judge -- I'm sorry what?

19          **MR. RAY:**  Surgical.

20          **MR. SMITH:**  *Dexterity* --

21          **MR. RAY:**  Surgical.

22          **MR. SMITH:**  -- *Surgical*.  Sorry.  I think that was a

23   Judge Isgur decision.  But a big different there, that's a

24   public company.  One claim of theft from the Debtor.  Ours is a

25   private company.

88

1            And there, the controlling shareholders have a

2    fiduciary duty to -- to the minority shareholders, the breach

3    of which is a direct claim.  That's all we've urged, your

4    Honor, direct claims.  We do not think that there has been

5    anything that would warrant any kind of damages or sanctions.

6            **THE COURT:**  Thanks.

7            Mr. Rothberg, I think I'd like to hear testimony.

8       **(Voices speaking off the record)**

9       **(Pause)**

10           **MR. ROTHBERG:**  Your Honor, I would like to call Miss

11   Kathy Mayle to the stand.

12           **THE COURT:**  All right.  Come on forward.  Miss

13   Attaway here will swear you in.

14           **MR. JONES:**  And Judge, so that I'm clear, we're

15   taking up the entire Motion to Dismiss and --

16           **ELECTRONIC RECORDING OPERATOR:**  Mr. Jones, please get

17   closer to the --

18           **THE COURT:**  Mr. Jones, let me get you up to the

19   podium because the electronic recording officer can't hear you.

20           **MR. JONES:**  My apologies, Judge.

21           I just want to make sure we're taking up the entire

22   Motion to Dismiss and Request for Sanctions filed by Mr. Ray's

23   clients, correct?

24           **THE COURT:**  We are.

25           **MR. JONES:**  All right.  Thank you, Judge.

MALEY - DIRECT                                               89

1            **THE CLERK:**  Please raise your right hand.

2       **(Witness sworn)**

3            **THE CLERK:**  Thank you.

4            **THE COURT:**  Once you get situated.  If you'd state

5  your full name for the record and spell your last name.  And if

6  you could move that microphone over where I pick it up and just

7  move it just right on over towards you.  And if you could twist

8  that mic like this so it comes forward.  And move the mic

9  towards you.  And you can actually pull it towards you.  There

10  you go.

11            Thanks.  Mr. Rothberg, please.

12            **MR. ROTHBERG:**  May I hand the witness an exhibit

13  book.

14            **THE COURT:**  You may.

15                    **DIRECT EXAMINATION**

16  BY MR. ROTHBERG:

17  Q    Please state your name and spell it for the record.

18  A    Kathy Mayle, M-a-y-l-e.

19  Q    And where are you employed?

20  A    Cooper (phonetic) Slovicek (phonetic).

21  Q    And --

22            **ELECTRONIC RECORDING OPERATOR:**  I'm sorry.  Is it

23  Kathy with a K?

24            **THE WITNESS:**  Oh, I'm sorry.  Yes.  K-a-t-h-y.

25  //

MALEY - DIRECT                                    90

1   **BY MR. ROTHBERG:**

2   Q    And what is your position?

3   A    I'm a business bankruptcy paralegal.

4   Q    Okay.  And at the time of the SkyPort bankruptcy, were you

5   employed by a different firm?

6   A    Yes.  Weycer Kaplan Pulaski and Zuber.

7   Q    Okay.  And what was our position at Weycer Kaplan Pulaski

8   and Zuber?

9   A    Chapter 11 bankruptcy paralegal.

10  Q    Okay.  And did you work on the SkyPort case while you were

11  at Weycer Kaplan?

12  A    Yes, I did.

13  Q    Okay.  And tell the Court just very briefly what your

14  responsibilities are at the beginning of a Chapter 11 case.

15  A    After the attorney meets with the client, then I work with

16  the -- I work with the client on preparing schedules,

17  statements, petition, creditors, making sure that we notice all

18  parties in the case, any potential parties with claims, and on

19  the service, master and full.

20  Q    Okay.  And take a look in the exhibit book, Exhibit Number

21  2.  That's already been admitted.  Is that the mailing matrix?

22  A    Yes.

23  Q    Okay.  And did you prepare the mailing matrix?

24  A    yes.  I prepared the creditor matrix.

25  Q    Okay.  Now take a look at Exhibit Number 1.

MALEY - DIRECT                                         91

1        **(Pause)**

2     **BY MR. ROTHBERG:**

3     Q    Okay.  Is that the list of equity security holders?

4     A    Yes.

5     Q    And does that list of equity security holders say if

6     they're the equity security holders of SkyComm Technologies as

7     opposed to SkyPort?

8     A    Yes.

9     Q    Was this a document that was filed in the SkyPort

10    bankruptcy case?

11    A    Yes.

12    Q    And why were the SkyComm shareholders listed in the

13    SkyPort bankruptcy case?

14    A    Because SkyComm owned SkyPort, or was the major

15    shareholder.  And then we wanted to make sure that all parties

16    got notices.

17    Q    So you wanted to make sure that the shareholders of

18    SkyComm, the parent --

19    A    Yes.

20    Q    -- received notice of the bankruptcy leadings.

21    A    Of the subsidiary.  Yes.

22    Q    So are all of the equity security holders on Exhibit

23    Number 1 reflected in the creditor matrix on Exhibit Number 2.

24    A    Yes.  Unless, you know, there were -- maybe there was a

25    problem address or we -- sometimes people move.  We're not

MALEY - DIRECT                                            92

1   given current addresses, the client isn't.  And so we -- or

2   there are bad addresses.

3           But otherwise, at the beginning of the case we supply

4   all known addresses of the creditors and shareholders, any

5   parties could be parties to the bankruptcy.

6   Q    Okay.  So unless on Exhibit 1 we didn't have an address,

7   they would be shown on the matrix on Exhibit 2; is that --

8   A    Yes.

9   Q    Okay.  Okay.  Now I think you also mentioned that you

10  prepared the master service list and full service list,

11  correct?

12  A    Yes.

13  Q    Okay.  Can you take a look at -- oh, let me ask this

14  question first.

15          Did you do a comparison of the equity holders listed

16  on Exhibit 1 and compare those to the Plaintiffs in *Adversary*

17  *10-3150*?

18  A    Yes, I did.

19  Q    Okay.  And so can you tell the Court, describe for the

20  Court if the people shown on the equity security holders in the

21  mailing matrix are also the Plaintiffs in *10-3150*.

22  A    Most of them.  I served out -- there was a total of 49, I

23  think, Plaintiffs.  And of those, I served 38 of the -- or of

24  our Defendants are in the Plaintiffs in *3150*, who were also

25  equity.  So they were not only on the creditor matrix, but they

MALEY - DIRECT                                    93

1   were served pleadings.

2   Q    Okay.  And you said --

3   A    That would have been gone to the full service list.

4   Q    Okay.  Now you said you had 38 of 49.

5   A    Yes.

6   Q    Okay.  So what about the 11 that are missing?  Who are

7   they?

8   A    Nine of the eleven were Clearsky Investments investors.

9   And one was an investor of SkyComm, but we did not have a

10  current address on record.  And we could not find him.  We do

11  try and find creditors or parties.

12       But if they have multiple addresses, we would now

13  know who to serve.  And the other gentlemen, I did not -- was

14  not served.  And I don't -- he wasn't served.  And he was an

15  investor of SkyComm.  So I show only one or two was not.

16  Q    Okay.  And do you know who it was that was not served?

17  A    Yes.  Charles Stack and Robert Foot (phonetic).

18       **(Pause)**

19  BY MR. ROTHBERG:

20  Q    So the other nine people that weren't served that are

21  Plaintiffs, those are investors of Clearsky, correct?

22  A    Yes.

23  Q    Okay.  So did you have any charge to serve Clearsky

24  investors in the SkyPort case?

25  A    No.

MALEY - DIRECT                              94

1   Q    Okay.

2        **(Pause)**

3   **BY MR. ROTHBERG:**

4   Q    Okay.  Now turn to Exhibit 5.

5        **(Pause)**

6   **BY MR. ROTHBERG:**

7   Q    And tell the Court what that is.

8   A    That is a certificate of service.  When we send out plan

9   packages, I compile everything to make sure of that.  And we

10  review to make sure that we have all the parties.  And we

11  compare with proof of claims, many schedules to make sure we

12  have good addresses.  And it's all parties in the case,

13  including any shareholders.

14  Q    Okay.  And have -- did you -- in preparation for today,

15  did you review this certificate of service?

16  A    Yes.

17  Q    And were the 38 equity holders of SkyComm served with the

18  plan package?

19  A    Yes.  I showed that they were.

20  Q    Okay.

21  A    I did not -- I'm unaware of any address changes for any of

22  those.

23       Now I would like to say that there were two; one was

24  Milam Trust I served.  And according to the complaint, Joanne

25  Schermerhorn is the successor-in-interest.  And the other is I

MALEY - DIRECT                                    95

1   served NLMC with the plan package, and the successor-in-

2   interest to NLMC, Inc. was John Waymire.

3   Q    And it's Joanne Schermerhorn and Waymire are Plaintiffs in

4   the *10-3150* --

5   A    Yes.

6   Q    -- adversary.

7         So they were served, the predecessors, essentially,

8   were served.

9   A    Yes, were served --

10  Q    Okay.

11  A    -- the plan.

12  Q    Would you have had the address of Schermerhorn or Waymire

13  at the time of the bankruptcy?

14  A    No, I'm not.  No.  I've not seen those names.

15  Q    Okay.  Turn to Exhibit 6, please.

16       **(Pause)**

17  **BY MR. ROTHBERG:**

18  Q    And identify that for the Court.

19  A    It's our Emergency motion to approve the modifications to

20  the -- our Chapter 11 plan and our request for an expedited

21  hearing.

22  Q    Okay.  And does that have a certificate of service

23  attached to that?

24  A    Yes, it does.

25  Q    Okay.  And was that document served on the 38 Plaintiffs

MALEY - DIRECT                                        96

1   who are in *Adversary 10-3150*, who were shareholders of SkyComm?

2   A    I believe so.  I don't remember making any changes to the

3   full service after we'd mailed the plan.

4         I did not review this.  I reviewed the one for

5   mailing of the plan package, but --

6   Q   Why don't you take a look at it right now and just -- and

7   see if those are the same service lists that you used for the

8   plan package.

9         **(Pause)**

10  A   Yes.  I saw like one change, but it did not pertain to the

11  Plaintiffs.

12  Q    Okay.

13  A    As I glanced through.  It did not pertain to this -- to

14  any of the Plaintiffs in these cases.

15  Q   So is it fair to say that the 38 Plaintiffs who are -- who

16  were SkyComm shareholders received that motion as well?

17  A    Yes.

18  Q   Okay.  Now as part of your duties as paralegal, do you

19  also receive all of the pleadings in the Chapter 11 case?

20  A   Yes, I do.

21  Q    Okay.  Do you recall ever seeing any objections or any

22  pleadings filed by any of the 38 Plaintiffs in the Chapter 11

23  case?

24  A    I think if memory serves on Draco, Draco Capital.  I don't

25  remember anything else.

MALEY - CROSS                                            97

1          **MR. ROTHBERG:**  I have not further questions, your

2    Honor, as for the witness.

3          **THE COURT:**  Mr. Ray, any questions?

4      **(Pause)**

5                      **CROSS EXAMINATION**

6    BY MR. RAY:

7    Q    Miss Mayle, did you try to give the best -- did we -- did

8    your firm try to give the best notice possible to all parties-

9    in-interest in the case?

10   A    Always.  We consider notice the most important aspect

11   of --

12   Q    Thank you.

13   A    -- a bankruptcy case.

14          **THE COURT:**  Mr. Jones, any questions?

15          **MR. JONES:**  No questions, Judge.

16          **THE COURT:**  Mr. Smith, any questions or Mr. Goldman.

17          **MR. SMITH:**  Thank you, your Honor.

18          **MR. GOLDMAN:**  Thank you, your Honor.

19                      **CROSS EXAMINATION**

20   BY MR. GOLDMAN:

21   Q    Just a couple of questions.

22          When did you start preparing for this -- your

23   testimony here?

24   A    Probably about three o'clock.  I also had to prepare for

25   the injunction.  And I read through the pleadings that I would

MALEY - CROSS                                    98

1    be asked questions upon.

2    Q    I'm sorry.  Three o'clock?

3    A    Probably.  I had another case that I had to prepare.

4    Q    I see.  So you put that together.

5    A    I put together a list -- I work with spreadsheets all the

6    time.  So I went through all the Plaintiffs.  And then I

7    compared it with my matrix and also with my certificate of

8    service for the plan.  And also there were names that I had

9    never seen before.  And when I looked at the complaint, it said

10   they were investors of Clearsky.

11   Q    When were you first told that you might have to testify in

12   this case?

13   A    Yesterday.  Yesterday morning probably 10, 11 when I went

14   and asked my -- I saw my name on the exhibit list.

15   Q    Thank you.

16   A    You're welcome.

17            **THE COURT:**  Mr. Rothberg, any redirect?

18            **MR. ROTHBERG:**  No, your Honor.

19            **THE COURT:**  You can step down.  Thank you.

20       **(Witness steps down)**

21            **THE COURT:**  Mr. Rothberg, your second witness.

22            **MR. ROTHBERG:**  Your Honor, that's my witness on

23   notice.  I would like to call Mr. Kubbernus to -- for him to

24   provide testimony about how the filing of the suit is impacting

25   and -- the reorganized Debtor.

KUBBERNUS - DIRECT                              99

1          THE COURT:  Mr. Kubbernus, would you come forward,

2   please?

3          Raise your right hand.

4      **(Witness sworn)**

5          THE COURT:  Take a seat.  Once you get settled in,

6   you need to state your full name for the record and spell your

7   last name, please.

8          THE WITNESS:  Name is Robert Kubbernus.  Spelling is

9   K-u-b-b-e-r-n-u-s.

10         THE COURT:  Thank you.

11         Mr. Rothberg?

12                    **DIRECT EXAMINATION**

13  **BY MR. ROTHBERG:**

14  Q    Mr. Kubbernus, tell the Court your relationship to SkyPort

15  Global Communication.

16  A    I am the Chief Executive Officer of the company and the

17  chairman of the current board.

18  Q    Okay.  And --

19  A    And President.

20  Q    Okay.  And --

21         THE COURT:  Go ahead.

22         MR. ROTHBERG:  Okay.

23  **BY MR. ROTHBERG:**

24  Q    In that role could you please briefly explain the duties

25  that you performed for SkyPort Global Communication?

KUBBERNUS - DIRECT                    100

1    A    At this stage, it is a small enterprise.  It's a small

2    company staffed with approximately 14 people.  So you -- I am

3    involved in all aspects of the company from managing over our

4    CFO, and working with our CFO, working with our Chief Operating

5    Officer.  I'm involved in the strategy of the company.  I'm

6    involved in the customer negotiations.  I'm involved with our

7    sales force.  I'm involved with a lot of the travel to

8    different symposiums and conferences that go on.  And I also

9    deal with the regulators.

10   Q    Okay.  Did you consider that a full time job?

11   A    Yes.

12   Q    Before the bankruptcy, where did you reside?

13   A    Before the bankruptcy, I was residing in Toronto Canada.

14   I'm a Canadian citizen.

15   Q    Okay.  Did you move to Texas?

16   A    Yes.

17   Q    And why did you move to Texas?

18   A    The company needed full time attention.  It could not be

19   managed by a hired executive.  We had learned that in the past

20   that the company was failing because of that.  So it was

21   important that it had a hands on approach to operating the

22   company.

23          And with it only having -- at one point it was 35

24   people.  And in order for it to be financially sound, it had to

25   get itself down to, you know, approximately 15 people.  So

1   there wasn't a lot of room for external management, other types

2   of management.  We had to manage it hands on.

3   Q    Tell the Court what some of the current customers are of

4   SkyPort?

5   A    Yeah.  It's a very interesting company in that it is

6   heavily involved in emergency management, Department of Defense

7   communications, those type of objectives.

8            So we provide voice, data, and video services by

9   satellite to a number of organizations, the National Guard,

10  FEMA, Red Cross.  We manage communications for offshore

11  platforms, oil and gas, onshore as well.

12           Just recently we've been awarded the opportunity to

13  work with XBand frequency, which is the exclusive domain of the

14  Department of Defense.  They've delivered to us highly

15  sensitive equipment to manage those communications for them.

16  And security protocols are involved in that for the people, the

17  staff of the company, the organization itself.  We're located

18  on an air force base.

19           So our organization lends itself nicely to those

20  types of activities, which involves communication for UAV

21  (phonetic) activities, the unmanned vehicles, some of the

22  missions over in the Middle East, some of the border control

23  issues that are going on now.

24           So we're providing -- those are some of the customers

25  that we service today.

KUBBERNUS - DIRECT                         102

1  Q    Okay.  Now are you familiar with, in the white book there,

2  Exhibit 7, the order confirming plan of reorganization?

3       **(Pause)**

4  A    Yes, I am.

5  Q    And is it fair to say that you would be the main person

6  responsible to see to it that the Debtor's complying with the

7  plan?

8  A    Yes, I am.

9  Q    Okay.  And since the plan was confirmed, has SkyPort

10 Global Communications complied with all of the terms of the

11 plan?

12 A    Yes, we have.

13 Q    And is SkyPort paying its creditors pursuant to the terms

14 of the plan?

15 A    Yes, we are.

16 Q    Okay.  Now you've been in the courtroom listening to the

17 testimony about the -- the lawsuit and the -- in particular,

18 regarding the --

19          **THE COURT:**  Let me stop for a minute.

20          **MR. ROTHBERG:**  Sure.

21          **THE COURT:**  So the record's clear, there's been no

22 testify about the lawsuit.  There has been statements --

23          **MR. ROTHBERG:**  Statements.

24          **THE COURT:**  -- made by attorneys at the podium, but

25 that's not testimony.

KUBBERNUS - DIRECT                              103

1          **MR. ROTHBERG:**  Correct.  I --

2          **THE COURT:**  All right.

3          **MR. ROTHBERG:**  -- stand corrected, your Honor.

4    BY MR. ROTHBERG:

5    Q    You're aware that the petition, Exhibit Number 10, by the

6    Plaintiffs, asserts causes of action regarding the FCC license.

7    A    Yes.

8    Q    Okay.  How important is it for SkyPort to have an FCC

9    license?

10   A    The company cannot function without FCC at all.

11   Q    Okay.

12   A    All of our licensing, all of our capacity, XBand, even

13   though it's Department of Defense, the FCC operates with NTIA

14   in approval of those -- those licenses.  All of our customers

15   require us to be licensed.  We can't just operate without it.

16   Q    Okay.  And has the SkyPort always had that license?

17   A    Yes, it has.

18   Q    Okay.  It's never been lost.

19   A    Never been lost.

20   Q    Okay.  Now explain to the Court why it's important for you

21   to be -- continue your involvement in SkyPort relative to the

22   FCC license.

23   Q    The FCC approves, not just the organization, but the

24   people.  So that the antenna are approved to be compliant.  The

25   spread spectrum.  You don't want to knock out any other

KUBBERNUS - DIRECT                          104

1   satellite.  There's a bunch of technical things that FCC

2   manages over.

3            They manage over the people that are running the

4   organizations as well.  FCC is responsible for foreign

5   ownership and control situations.  That's a individual

6   situation, not a corporate situation.  Whenever applying for a

7   license, they do pass through corporate entities to get down to

8   the natural person who's actually going to manage and control

9   the license.

10            It's that natural person that goes, and is

11  investigated by, the different team telecom, if you want to

12  call them that, which is the Department of Justice, the FCC, of

13  course, Homeland Security, and the FBI.  They're always

14  involved in approving the people behind the license.

15  Q    Okay.  So are you one of the people the FCC has approved

16  for -- on behalf of SkyPort to have the license?

17  A    Yes.

18  Q    Okay.  So what happens to SkyPort if the Plaintiffs are

19  successful in appointing a receiver, a fiduciary, and a Trustee

20  removing you as a principal of SkyPort?

21  A    Well on the FCC front, you cannot have an -- the people

22  that are approved are the people that hold the license,

23  although it's in SkyPort's name.  And I think your license

24  evaporates.  And every license has a different characteristic.

25            For example, the XBand license is mission oriented.

KUBBERNUS - DIRECT                                      105

1   When you're mission for the Department of Defense, and so does

2   your license.  However, your other licenses do not expire based

3   on a mission expiring.  They stay in place based on the people

4   in place.

5           So, you know, glove in hand, if -- if certain

6   individuals who are managing certain projects for the

7   Department of Defense disappear, or under a cloud of

8   allegations, or a number of things happen, then those missions

9   disappear and so does your license.

10  Q    And so what happens to SkyPort and its ability to pay its

11  creditors if the license is withdrawn because the people aren't

12  there.

13  A    Yeah.  If you recall during the bankruptcy proceedings as

14  we moved into the confirmation period, how important it was for

15  SkyPort to get through the confirmation process, because of

16  hurricane season, because of the types of clients that we had,

17  because there were only prepared to give us so much time to

18  cure the problems and to come out of bankruptcy.

19          To have this all brought up again, and to be

20  memorialized in, you know, the digital world for -- for all the

21  customers and our customers to see again, is a blow for us.

22  And, you know, we're right back to, does that give them cause

23  to move off to somebody else.  We just can't risk.  And we're

24  in the middle of hurricane season again in three days.  It

25  kicks off June 1st.

KUBBERNUS - DIRECT                          106

1            We're got Florida National Guard.  We're got Texas

2    National Guard.  We're just awarded the Texas Department of

3    Emergency Management after a lot of work and a lot of

4    convincing that we were on solid grounds.  And that was a half

5    a million dollar award starts June 1st, and now this has all

6    flared up.

7            And so it's very awkward for the company.

8    Q    So is it fair to say that if the Plaintiffs are successful

9    in getting a receiver appointed, then all those agencies that

10   are relying on SkyPort to provide communications will be left

11   without service because the FCC license will be withdrawn.

12   A    We moved ahead with exactly what we said we were going to

13   do on plan confirmation, that was rebuild customer confidence.

14   That was to get in additional customers.  And we won the Harris

15   County Emergency 9-1-1 call centers, all of their vehicles that

16   roll when an emergency happens, stand up a satellite link are

17   connected to us.

18           So the risk is do they have service at that.  If

19   somebody else is appointed, if the company shut down.  If a

20   receiver goes in the in the, you know, we haven't been asked to

21   go up and poll all of our customers saying if it goes into

22   receivership again, would you stick with the company?

23   Q    So there would be an alternative provider is what you're

24   saying.

25   A    There would be?

KUBBERNUS - DIRECT                          107

1   Q    Is that was that your testimony?

2   A    Yeah.  They'd have to move somebody else.

3   Q    Okay.

4   A    They should be notified.

5   Q    Right.

6   A    For sure.  They should be allowed to make the decision as

7   to whether they go to, you know, another provider.

8   Q    And then SkyPort would lose the revenue from those

9   customers if that occurred.

10  A    Yes.

11  Q    And then SkyPort could not make its plan payments.

12  A    No.

13  Q    Okay.  Had the Plaintiffs or the representatives contacted

14  any customers, vendors, or employees of SkyPort?

15  A    Yes, they have.

16  Q    And who have they contacted?

17  A    They've made a number of inquiries.  For example, Roger

18  Klotz (phonetic).  He used to be an employee of SkyPort.  He's

19  moved on, started his own company.  He offers telematic

20  services that require satellite links as well.

21       So what used to be a former employee is now, you

22  know, a company owner of who we are promoting to see satellite

23  services to.  An employee of SkyPort, up to about two weeks

24  ago, Dawn Cole (phonetic), they've tried to contact her.  She's

25  moved on and started her own consulting practice in Department

1   of Defense telecommunication services.

2           And so going forward, we hope to gain her type of

3   business as well if she's not poisoned by this whole thing.

4           And individual called Mike Rambo (phonetic) used to

5   be an employee of SkyPort, and has moved on to start his own

6   consulting firm as of two years ago, and is awarded -- has been

7   awarded some contracts that we're trying to provide satellite

8   services to.  He came back to us and was hopeful we were out of

9   bankruptcy, we proved that we were out of bankruptcy.  He

10  brought us the business.  We started servicing him just a short

11  while ago.  But he's now been contacted as well.

12          In a lot of cases, some of our regulators are also

13  our customers.  The FCC is or customer and our regulator.  The

14  FCC is in charge of a massive amount of budget for emergency

15  response, first responders, and they're coming out with their

16  new ten year game plan.

17          You know, and so to be in a could of, you know,

18  what's going on here, I don't know.  And I'm afraid to ask a

19  regulator like the FCC, you know, how they view stuff like

20  this.

21  Q   Okay.  So those contacts have had -- had those contacts

22  had a negative impact on the operation of the business?

23  A   I believe so, yes.

24  Q   Okay.

25      **(Pause)**

KUBBERNUS - DIRECT                                    109

1   BY MR. ROTHBERG:

2   Q    Now in -- I believe you heard testimony from Miss Maley

3   that the shareholders had received notice of the -- of the

4   bankruptcy.  Did you recall that?

5   A    Yes.

6   Q    Okay.  If the shareholders had intervened in the

7   bankruptcy, might that have made a difference to you and how

8   you'd conducted yourself in the case?

9   A    Yes.  Absolutely.  You know, there's a lot of choices that

10  are made along the way from further making a further investment

11  into the company, putting up personal guarantees, moving from

12  Toronto, taking my kids out of school up there, registering

13  down here, making application for immigration to the U.S. you

14  know, putting security protocol in place so that I am ring

15  fenced inside the organization so it can get a Mach II

16  (phonetic) Light clearances and top secret ratings.

17          All that stuff, had this emerged back then, had this

18  become a contentious issue back then, many, many plans, other

19  plans, alternate plans would have been made.

20  Q    Now are you familiar with the -- you're read the lawsuit

21  that's Exhibit Number 10 in the book that the Plaintiffs have

22  filed?

23  A    Yes.

24  Q    And does SkyPort believe that any of the claims that would

25  be against Centurytel or the other Defendants that could be

1    considered a derivative claim, should be pursued?

2    A    No.

3    Q    And why not.

4    A    You know, so many of these things, and being involved in

5    the history, and reading through those, is absurd.  You know,

6    the -- back to the point of, you know, was I aware of all these

7    shareholders getting notification and all the rest of it, it

8    wasn't just a single notice.  I know I received all the

9    documents as well in parallel with everybody else getting

10   notice.  It was reams and reams, volumes of notices that were

11   going out once and twice a week.

12            There was no not seeing this thing.  And we

13   painstakingly at the beginning made sure that we captured as

14   many people as possible.  And if there's going to be an issue,

15   come forward.  Because lots of plans, lots of changes are being

16   made.

17            And I'm reading these allegations.  I was involved

18   with Centurytel.  I listened to a lot of stories and complaints

19   by people in the past about Centurytel, you know.  They were

20   slow in giving us money, then they gave us too much, and on and

21   on.  And I'm just -- I'm just -- I'm not a lawyer, but I'm

22   flabbergasted by the allegations.  I --

23   Q    Did the plan incorporate a settlement with Centurytel?

24   A    Yes.

25   Q    And what was that settlement?

KUBBERNUS - DIRECT/CROSS                          111

1    A    The settlement was $1 ½ million, amortized over 15 years,

2    6 percent interest rate, and a balloon payment and an

3    opportunity to renegotiate in it's either, I didn't read it

4    before I came today, it's either 4 years or 5 years.

5    Q    And was that the full amount owed to Centurytel?

6    A    No.  They were owed 2.7, I believe.

7         **MR. ROTHBERG:**  I'll pass the witness, your Honor.

8         **THE COURT:**  Mr. Ray, any questions?

9         **MR. RAY:**  No questions, your Honor.

10        **THE COURT:**  Mr. Jones.

11        **MR. JONES:**  Yes.

12        **(Pause)**

13                         **CROSS EXAMINATION**

14   **BY MR. JONES:**

15   Q    Good morning, Mr. Kubbernus.

16   A    Good morning.

17   Q    Am I pronouncing that right?

18   A    Close enough.  I get it both ways, Kubbernus and

19   Kubbernus.

20   Q    I gotcha.  Which do you prefer?

21   A    Kubbernus.

22   Q    Kubbernus.  I will try to get that right.

23   A    Okay.

24   Q    You and I have never met before, correct?

25   A    No.

KUBBERNUS - CROSS                             112

1   Q    All right.  Mr. Kubbernus, were you the guy who was

2   dealing with the plan during the bankruptcy case?  Were you the

3   one who was organizing with the lawyer, giving instructions,

4   and making sure the process was followed?

5   A    Yes.

6   Q    All right.  I'd like for you to look at the white book in

7   front of you.  Let's turn to Exhibit 7.

8        **(Pause)**

9   **BY MR. JONES:**

10  Q    That's already been admitted.  It's the confirmation

11  order, correct?

12  A    Correct.

13  Q    All right.  Now under the plan, SkyComm was merged into

14  SkyPort as I understand it, correct?

15  A    Correct.

16  Q    All right.  And what happened to all of the equity holders

17  of SkyComm?

18  A    Eliminated.

19  Q    All right.

20  A    If that's the right --

21  Q    Go on.

22  A    If that's right legal move.

23  Q    Terminated, poof, gone, right?

24  A    Yes.

25  Q    All right.  And what was the date of the confirmation

1   order?  Just look at the first page.

2   A     August 12th, 2009.

3   Q     Okay.  All right.  Let's turn over to Exhibit 10.

4         **(Pause)**

5   **BY MR. JONES:**

6   Q     This is a copy of the lawsuit.  I think Mr. Rothberg asked

7   you about that, correct?

8   A     Correct.

9   Q     All right.  Let's turn over to page five.

10        **(Pause)**

11  **BY MR. JONES:**

12  Q     Actually, I'm sorry for moving you around a little bit.

13  When was this lawsuit filed?

14  A     I'm assuming -- is that on page five?  Where am I going to

15  find that?

16          This is, I see a March 24th date, 2010.

17  Q     Right.  Works for me.

18          Now I'd like for you to turn over to where we were

19  going, back over to page five.  It says Parties at the top,

20  right?

21  A     Yes.

22  Q     All right.  Let's just pick a couple of those paragraphs,

23  and I want you to read along with me and make sure I read it

24  correctly.

25          Paragraph 11 says,

1            "Plaintiff John K. Waymire is a resident of the state

2            of Texas and is the successor to the interest of

3            NLMC, Inc. which is and has been the owner of 40,000

4            shares of common stock of SkyComm."

5    Did I read that correctly?

6    A    Yes.

7    Q    Is that true?

8    A    I don't have the shareholder register at the time of this.

9    Q    Well this is 2010, right?

10   A    Yeah.

11   Q    Are there any other shareholders of SkyComm?

12   A    No, there's not.

13   Q    All right.  So is this a true statement?

14   A    No.

15   Q    All right.  Let's look at the next page, or the next

16   paragraph.  Read along with me.  It says,

17            "Plaintiff Chet Kudiwiski is a resident of the state

18            of Texas and is, and has been, the owner of a million

19            shares of the common stock of SkyComm."

20   Is that a true statement?

21   A    No.

22   Q    Are there any shareholders of SkyComm?

23   A    No.

24   Q    They were all terminated under the plan, correct?

25   A    Correct.

KUBBERNUS - CROSS                        115

1   Q    And if we go to the next paragraph.  And it says,

2            "Plaintiff John Luland is a resident of the state of

3            Texas, and is, and has been, the owner of 500,000

4            shares of common stock of SkyComm."

5   Is that a true statement?

6   A    No.

7   Q    If there is one of those allegations for every single one

8   of the Plaintiffs, can they be as of March, 2010, a shareholder

9   of common stock of SkyComm?

10  A    No.

11  Q    Now I'd like for you to go over to page seven, beginning

12  in -- at the bottom at paragraph 37.  Do you see that?

13  A    Yes.

14  Q    All right.  if you'd read along with me.  It says,

15            "Plaintiff, Draco Capital, Inc. is a corporation

16            organized in Canada and, is, and has been, the owner

17            of 53.79 percent of Clearsky, which was purchased for

18            $3,816,000, I'm sorry, $3,816,523 in 2006."

19  Correct?

20  A    Correct.

21  Q    So Plaintiff, Draco Capital, is a Canadian corporation,

22  correct?

23  A    Correct.

24  Q    Based upon this.

25  A    Based upon this.

KUBBERNUS - CROSS                                        116

1   Q    All right.  Let's flip the page.

2         Paragraph 38 is a statement on behalf of Edward

3   Paskal, who is also an owner of Clearsky, correct?

4   A    Correct.

5   Q    And where is he a resident?

6   A    Montreal, Quebec.

7   Q    Okay.  Let's move on to Robert Mandel.  Where is he a

8   resident of?

9   A    Montreal, Quebec.

10  Q    How about Stanley Beraznik.

11  A    Beraznik.  State of California.

12  Q    All right.  Plaintiff Don Bois?

13  A    Montreal, Quebec.

14  Q    All right.  Plaintiff, Ben Ariano?

15  A    Montreal, Quebec.

16  Q    All right.  Canada, Inc.  Where are they organized?

17  A    I believe Quebec.

18  Q    All right.  Plaintiff Peter Teller -- Taylor.  Where is he

19  a resident?

20  A    Ontario.

21  Q    All right.

22  A    Canada.

23  Q    Plaintiff John Panneton?

24  A    Ontario, Canada.

25  Q    Wayne Fox.

KUBBERNUS - CROSS                           117

1   A    Ontario, Canada.

2   Q    Now Mr. Kubbernus, are you familiar with the Wilson

3   Vukelich Law Firm?

4   A    Yes, I am.

5   Q    Where are they located?

6   A    Toronto, Canada.

7   Q    Do they have any offices in Texas?

8   A    No.

9   Q    Do they have offices in the United States?

10  A    No.

11       **MR. JONES:**  Judge, nothing further.

12       **THE COURT:**  All right.  Mr. Smith or Mr. Goldman?

13       **MR. GOLDMAN:**  Thank you, your Honor.

14       **(Pause)**

15                   **CROSS EXAMINATION**

16  BY MR. GOLDMAN:

17  Q    Mr. Kubbernus, you testified that -- about your concern

18  that the company's being damaged for the existence of this

19  lawsuit.

20       First of all, isn't it true that any lawsuit against

21  you personally would -- alleging that you defrauded dozens of

22  investors, breached fiduciary duties, wouldn't that, no matter

23  how it's pleaded, have potentially an adverse impact, even if

24  it had nothing to do with the Debtor?

25       **MR. JONES:**  Judge, objection to form.

KUBBERNUS - CROSS                              118

1          **THE COURT:**  Response to the objection.

2       **(Pause)**

3          **MR. GOLDMAN:**  Let me withdraw the questions, your

4    Honor.

5          **THE COURT:**  All right.

6    **BY MR. GOLDMAN:**

7    Q    Mr. Kubbernus, you're a Defendant in this lawsuit,

8    correct?

9    A    Correct.

10   Q    And SkyPort is not a defendant in this lawsuit, correct?

11   A    I believe it is a Defendant, is it not?

12   Q    You believe it is.

13   A    I believe it is.

14   Q    When you take a look at the complaint, I believe you have

15   it in front of you, and show me where you see that SkyPort is a

16   Defendant in this lawsuit.

17   A    Well the title of SkyPort has been attacked in this, the

18   ownership and the title.

19   Q    Where's that?  I'm sorry?

20   A    The title is clouded and is being attacked by this

21   lawsuit.

22   Q    The title is clouded.

23          **MR. JONES:**  Judge, objection to form.  There's no

24   question.  He doesn't get to just talk and make comments.  He

25   needs to ask questions.

KUBBERNUS - CROSS                              119

1           **MR. GOLDMAN:**  No.  No.  I'm trying to understand.

2           **THE COURT:**  Okay.

3           **MR. JONES:**  Now I want to go talk to you at the

4     sidebar.

5           **THE COURT:**  Hold on.  It's a sustainable objection.

6     You need to ask a question.

7           **MR. GOLDMAN:**  Fine.

8        **(Pause)**

9     BY MR. GOLDMAN:

10    Q    I'm waiting for an answer.  Is SkyPort a Defendant in this

11    lawsuit?

12    A    I believe it is.

13    Q    Are they named as a party in the lawsuit?

14    A    I believe they are.

15    Q    How about SkyComm, are they named as a party in the

16    lawsuit?

17    A    I believe they are.

18    Q    Could you show me where that is by looking at the

19    petition?

20       **(Pause)**

21           A     "This case in which Plaintiff seeks redress in

22           amounts of fraud, oppression, breach of fiduciary

23           duties, and other violations of their legal rights

24           that were perpetrated by Defendants and resulted in a

25           loss by them of their entire investment in SkyComm

KUBBERNUS - CROSS                          120

1          Technologies, Inc."

2   Q    Where are you reading?

3          A    "A company in which through its subsidiary,

4          SkyPort Global Communications, Inc., SkyPort,

5          operated state of the art, ultra secure satellite

6          communication, and network operating facility at

7          Ellington Field in Houston, Texas."

8          So that'd be paragraph under the introduction and

9   summary of the case under paragraph two.

10         **(Pause)**

11  A    SkyComm, SkyPort is mentioned again in three.  SkyComm is

12  and SkyPort are mentioned in four, along with the FCC, FBI,

13  Homeland Security, all of which are customers of SkyPort.

14  Homeland Security is.  FBI, we're bidding on projects for them

15  right now.

16         There was other mention there in paragraph four,

17  SkyPort, SkyComm, are mentioned in paragraph five.

18  Q    What's -- SkyPort is not a party that is being sued.

19  You're the party that's being sued.  Correct?

20  A    And subject to the ownership of SkyPort and SkyComm, I

21  believe what you're asked, and I'm layman.  I believe what

22  you've asked is you would like control of SkyPort, SkyComm, and

23  operate it through a receiver.

24         So it is subject, to me, as a layman, you've attacked

25  the asset.  You've attacked the customer base.  You're attacked

1   the business itself.

2   Q   Can you tell me where it says that we, and by that I

3   believe you're referring to the Plaintiffs, are seeking control

4   of SkyComm, SkyPort, anything like that.

5           Is that a relief that we have, is that one of our

6   counts in the case?  Or is the case about allegations of fraud,

7   beach of fiduciary duty, misconduct, illegality by you,

8   companies affiliated with you, Centurytel, and Wilson Vukelich,

9   your law firm.

10          **MR. JONES:**  Judge, objection.

11          **MR. RAY:**  Objections.

12          **THE COURT:**  All right.  All right.  Mr. Jones, you

13  stood first, what's your objection?

14          **MR. JONES:**  Judge, object to for.  Compound question.

15          **THE COURT:**  All right.  Mr. Ray, your objection?

16          **MR. RAY:**  Same question.  And to the extent he's

17  asking a layman for legal questions of what the counts states,

18  he can read what it says.  The document speaks for itself.

19          **THE COURT:**  Okay.

20          **MR. GOLDMAN:**  The layman has a base --

21          **THE COURT:**  All right.  Hold on.  You don't address

22  Mr. Ray.

23          **MR. GOLDMAN:**  Sorry.

24          **THE COURT:**  You get to address me.

25          **MR. GOLDMAN:**  Sorry, your Honor.

1          **THE COURT:**  The objection has been lodged as to form

2     by Mr. Jones, and as to form by Mr. Ray.  As well as Mr. Ray

3     has objected on the grounds you're asking a legal question.

4     Please respond to the objections.

5          **MR. GOLDMAN:**  I'm not asking the legal question.

6          The gentleman is here testifying that there is a

7     lawsuit directed to SkyPort.  And I am trying to at least

8     clarify that he understands the allegations as being that he

9     and others defrauded numerous investors, breached fiduciary

10    duties, acted illegally vis-à-vis, the FCC, the Department of

11    Homeland Security, and the FBI, and Department of Justice, that

12    that's what the lawsuit is about.  It's not about anything

13    else.

14         There's no attack on SkyPort.  SkyPort can continue

15    to operate whether or not Mr. Kubbernus is there.  There are

16    solutions if somebody like Mr. Kubbernus suffers a monetary

17    judgment that is substantial.

18         **MR. JONES:**  Judge, objection.  Non-responsive.

19         **MR. GOLDMAN:**  That is responsive.

20         **THE COURT:**  I agree.  I don't think it is responsive.

21         The objections have been launched as to form, that

22    is, you've asked too many compound questions.  And then the

23    second question is that you're asking him a question of law.

24         So I'll sustain the objection, because I think what

25    you did do is asked him a compound question, which renders moot

KUBBERNUS - CROSS                       123

1    the objection about whether you ask him a question of law.

2    I'll ask you to start over again.

3              MR. GOLDMAN:  I will, your Honor.

4    BY MR. GOLDMAN:

5    Q    Do you understand that the allegations in this complaint

6    assert that you defrauded investors, not that --

7              THE COURT:  All right.  Stop right there.

8              MR. GOLDMAN:  Stop right there.

9              THE COURT:  Do you understand the question posed to

10   you?  Do you understand the question that's posed to you?

11             THE WITNESS:  Yes, I do.

12             THE COURT:  That's my question.

13             All right.  Go ahead and answer it, please.

14             THE WITNESS:  Okay.  Can you repeat the question

15   again?

16   BY MR. GOLDMAN:

17   Q    Do you understand that the complaint asserts that you

18   defrauded investors?

19   A    Yes, I understand that.

20   Q    Do you understand that the complaint asserts that you

21   breached your direct fiduciary duties as an individual in

22   control of SkyComm and SkyPort to the minority shareholders of

23   those companies.

24             MR. JONES:  Objection.

25             THE COURT:  Go ahead.  State your objection.

KUBBERNUS - CROSS                    124

1          **MR. JONES:**  Judge, objection.  Calls for a legal

2    conclusion.  Objection.  Misstates the complaint.  Nowhere in

3    there has there ever been any assertion that there is the

4    phrase direct fiduciary duty.  It's not in there.

5          **THE COURT:**  Mr. Ray, your objection?

6          **MR. RAY:**  That was my objection, your Honor.

7          **THE COURT:**  All right.  I'll sustain the objection.

8          **MR. GOLDMAN:**  Okay.  I will rephrase the question,

9    your Honor.

10   **BY MR. GOLDMAN:**

11   Q    Do you understand that the complaint asserts breach of

12   fiduciary duties by you, duties that you owed to the other

13   shareholders of the company.

14         **MR. RAY:**  Your Honor --

15         **THE COURT:**  What's your objection, Mr. Ray.

16         **MR. RAY:**  Again, he's saying that the duties are owed

17   to the shareholders.

18         Your Honor, I'm sorry.  I'll withdraw my objection at

19   this time.

20         **THE COURT:**  All right.  Mr. Kubbernus, do you

21   understand the question that been posed to you?

22         **THE WITNESS:**  Yes, I do.

23         **THE COURT:**  All right.  Go ahead and answer.

24         **THE WITNESS:**  I understand that that's what you're

25   alleging, this complaint is alleging that.

KUBBERNUS - CROSS                              125

1   **BY MR. GOLDMAN:**

2   Q    Do you understand that the complaint alleges that you

3   engaged in fraudulent, oppressive, and illegal conduct?

4   A    I understand that's what the complaint has alleged.

5   Q    Do you contend that the SkyPort business could not

6   continue without you?

7   A    Yes.  I contend that.

8   Q    Do you contend that if you were to suffer a judgment in

9   this case, that if the Plaintiffs won the case, and won their

10  judgment, that you somehow could not continue to run the

11  company.

12          **MR. JONES:**  Judge, objection.  Relevance.

13          **THE COURT:**  What's the relevance?  That's the

14  objection that's been launched.

15          **MR. GOLDMAN:**  The relevance, your Honor, is he's

16  claiming that somehow the fact that he has a license from the

17  FCC means that we're attacking the company here.  Because as he

18  testified, the company cannot continue without him.

19          And so I'm asking him if, you know, that is correct,

20  if, you know --

21          **THE COURT:**  I'll overrule the objection.

22          Go ahead.  Do you understand the question that's

23  asked?

24          **THE WITNESS:**  I understand the question.  And I truly

25  believe the company would fail without my operating the

KUBBERNUS - CROSS                          126

1   company.

2   **BY MR. GOLDMAN:**

3   Q    Well it is possible for someone else to assume the license

4   and take over operations here.

5   A    With approval eventually, right dollars posted, a number

6   of things that have to happen.  I believe somebody could --

7   Q    Okay.

8   A    -- start a new company, and get FCC licensing, I imagine.

9   It's a hypothetical.

10  Q    Now do you have any facts that support your assertion that

11  any of the Plaintiffs have contacted the vendors to the

12  company?

13  A    Yes.  I've spoken to them.

14  Q    Which vendors, please?

15  A    One of them is SWS, owned by Mike Rambo.  He is also a

16  vendor.  He is also a customer and a vendor.

17       **(Pause)**

18  **BY MR. GOLDMAN:**

19  Q    What does SWS do?

20  A    What do they do?

21  Q    Yeah.  What do they do?

22  A    Their primary business is they support and provide

23  satellite solutions and services, also Wifi radio operability

24  to first responders in the state of Texas.

25       They're located out of Dallas, Fort Worth.  They're

KUBBERNUS - CROSS                                127

1    heavily involved in the Texas Department of Emergency

2    Management, FEMA, FEMA licensed.

3    Q    Do you know what the substance of the conversations

4    between Mr. Rambo and the whoever it was that contacted him?

5    A    It was somebody from you office.  I believe it was

6    actually you that contacted him.  I immediately got a phone

7    call from him saying what's going on.  Why are they trying to

8    inquire into things that happened with Centurytel?  What's with

9    the investigation?  What's going on.

10         I'd have to look back at my notes as to whether we

11   were even out of bankruptcy.  I don't believe we were out of

12   bankruptcy.  It was prior to having the discharge that you

13   contacted them, I believe.

14         I'd have to look back at my notes.  I don't have

15   them.  I didn't bring them with me and I don't have it.  I

16   didn't refresh myself.

17   Q    So the contact with Mr. Rambo, and this was prior to

18   February of 2010, correct?

19         **(Pause)**

20   A    I think it was the summary.  I think it was prior to

21   August of -- I think it was prior to the discharge.

22   Q    And that was about Centurytel.

23         **THE COURT:**  Bear with me for a minute.

24         Prior to August of what year?

25         **THE WITNESS:**  If I, and my memory is vague on this.

KUBBERNUS - CROSS                                    128

1   I'd have to look back at the notes.  But it was at the time

2   that we were trying to get our confirmation order that you were

3   contacting and talking to Mike Rambo.  And that would have been

4   August of 2009.

5   **BY MR. GOLDMAN:**

6   Q    Do you have your notes with you?

7   A    No, I don't.  I didn't bring my notes with me.

8   Q    Is it possible that that conversation took after the

9   confirmation?

10  A    It's possible.

11  Q    Okay.  And Mr. Rambo was an employee of SkyComm or SkyPort

12  at the time that Centurytel was in control of the company?

13  A    And I believe it continued on after Balaton took control

14  of it.

15          Mike remained with the company until, I believe 2007.

16  And again, I didn't bring his employment file with me.  So he

17  remained with the company, and then he went on -- on his own.

18  Q    And have there been any contacts with Mr. Rambo since the

19  one conversation that you have testified to?

20  A    I have not asked him that question directly.

21  Q    Thank you.  Now are there any other vendors that you

22  believe have been contacted by any of the Plaintiffs?

23  A    Again, that would Roger Klotz, who also provides certain

24  solutions for Telematrix tracking devices.

25  Q    Has the company earned any revenues based on whatever

1    Mr. Klaus is currently doing?

2    A     He has referred customers in the past, for which we've

3    been grateful for, and that we've actually won.  So he has --

4    Q     So he's referred customers.

5    A     He has referred customers to us in the past.

6    Q     Mr. Klaus, was he an employee of SkyComm or SkyPort?

7    A     Yes, he was.

8    Q     Can you describe what his capacity was?

9    A     He was CEO of the company until, I believe, again, I don't

10   have his employment file, 2006, 2007, where Pat Brandt took

11   over his position.

12   Q     So do you recall when that was?

13   A     No, I don't -- I didn't bring his employment.

14   Q     So he was CEO of the company.

15   A     Correct.

16   Q     And he was CEO of the company while Centurytel was in

17   charge of the company.

18   A     Yes.  I believe so.

19   Q     And so you have any knowledge of what the conversations

20   with Mr. Klaus were?

21   A     Again, it was -- it was what was the relationship between

22   Centurytel, SkyPort, or sorry, Centurytel, Balaton.  He felt,

23   and his comments were, it was a bit of a fishing expectation in

24   looking for details on the relationship between the two

25   organizations.

KUBBERNUS - CROSS                          130

1           And I haven't examined it further.  We haven't done

2     any --

3     Q     You recall --

4     A     -- depositions or --

5     Q     Right.  Do you recall when that conversation was?

6     A     When you had a your conversation with him?

7     Q     Yes.

8     A     No.  I didn't bring my notes.

9     Q     You don't recall.

10    A     It was before today.

11    Q     Before today.

12    A     Yeah.

13    Q     Was it before February of 2010?

14    A     I don't recall.

15          **THE COURT:**  it's now 12:30.  So we're going to take a

16    break.  You all should come back at three o'clock.  I can't

17    guarantee I'll get you back up to the podium at three.  I'll do

18    the best I can.

19          You should take your books and notes with you, or at

20    least put them on to the side.

21          We're going to take a five minute break.  And well

22    then I'm going to go to the *May International Case*.  So we'll

23    be in recess for five minutes.

24          Thanks.

25          **(Recess taken from 12:29 p.m. to 4:54 p.m.)**

KUBBERNUS - CROSS                              131

1          **THE COURT:**  Okay.  We're back on the record in the

2   adversary proceedings from this morning.  Specifically,

3   *Adversary 10-3150 and Adversary 10-3225*.  And when we broke,

4   Mr. Kubbernus was on the stand.  Mr. Goldman was conducting

5   cross.  And you can proceed if you like, please.

6          **MR. GOLDMAN:**  Thank you, your Honor.

7               **CROSS EXAMINATION (CONTINUED)**

8   BY MR. GOLDMAN:

9   Q    When we left off, Mr. Kubbernus, we were trying to get

10  into a little more detail on customers and suppliers where you

11  said there were communications that, you know, were harming

12  the -- the Debtor.

13          Now we just -- you've already told us about the

14  communications with Mr. Rambo.  And you said Mr. Rambo was with

15  a company called SWS, correct?

16  A    Correct.

17  Q    And you told us about Mr. Klaus.  And he's with a company

18  called?

19  A    I didn't mention the name.  I don't have the name of the

20  company.  Another one of our account executives handles it.

21  Q    And you -- I think indicated that they're not really a

22  customer.

23  A    We're vying for their business.  We're trying to get his

24  business.

25  Q    But they're not a customer, correct?

1    A    Correct.

2    Q    Okay.  They're not a supplier.

3    A    could be if we wanted his type of product, yes.

4    Q    Okay.  The third person you mentioned where you're

5    claiming that, you know, where you testified that

6    communications were hurting.  The company was going Dawn Cole,

7    correct?

8    A    I mentioned Dawn Cole, yes.

9    Q    Yes.  Now isn't it true that Dawn Cole currently has a

10   lawsuit against you?

11   A    No.

12   Q    Is it true that she has a lawsuit against Balaton?

13   A    Dawn Cole against Balaton?

14   Q    Yeah.

15   A    No.

16   Q    Is there a lawsuit in the Superior Court of Justice in

17   Ontario entitled *Lode Star Management Corp. and Myra Dawn Cole*

18   *against Balaton Group*?

19   A    I think it's Lode Star.  I didn't know of Dawn's on there.

20   But yes, that is in the Court.

21   Q    I see.  So it's -- you knew that Lode Star was suing

22   Balaton.

23   A    Yes.

24   Q    And you didn't know Dawn was suing Balaton.

25   A    I didn't believe that she's on that lawsuit.

KUBBERNUS - CROSS                                    133

1  Q    I see.  Now who is Lode Star?

2  A    Lode Star is a consulting company out of the U.S., which

3  Dawn Cole, I believe she's a shareholder.  I've never checked

4  whether she's the shareholder or not.  But I believe that's her

5  consulting firm.

6  Q    That's her consulting firm.

7  A    Yes.

8  Q    Do you know of any other shareholders of Lode Star?

9  A    I've never investigated it.

10 Q    Have you ever dealt with anybody else on behalf of Lode

11 Star, aside from Dawn Cole?

12 A    There's been a couple of people I've talked to in the

13 past.

14       **THE COURT:**  Hold on a minute, Mr. Jones?

15       **MR. JONES:**  Objection.  Beyond the scope.  Objection

16 to relevance to the issues before the Court.

17       **THE COURT:**  Respond, Mr. Goldman.

18       **MR. GOLDMAN:**  Your Honor, the relevance is that

19 Mr. Kubbernus testified that his reputation was being hurt with

20 Dawn Cole.  What I'm trying to bring out, and I believe I have

21 brought out, is that Dawn Cole is currently a Plaintiff in a

22 lawsuit against Mr. Kubbernus, his company Balaton in which he

23 owns I think a hundred percent of, And I certainly think that

24 it's relevant to what his reputation is with Dawn Cole.

25       It's hard to believe that the fact that somebody

1   might have spoken to Dawn Cole would hurt Mr. Kubbernus'

2   reputation with Dawn Cole, since he is a Defendant in a lawsuit

3   with Dawn Cole.

4           **THE COURT:**  All right.  I'll overrule the objection.

5   You could proceed.

6   **BY MR. GOLDMAN:**

7   Q    Now can you tell us what that lawsuit is about?

8   A    Lode Star is suing Balaton for some expense reimbursement.

9   And I think there's some other fees as well.

10  Q    What's the amount of the lawsuit?

11  A    I don't have a record on that.

12          **MR. JONES:**  Judge, again.  Objection.  Relevance.

13  Objection.  Beyond the scope.  This cannot possibly pertain to

14  that petition.

15          **THE COURT:**  I'll overrule.  But I don't want you to

16  spend too much more time on this.

17          **(Pause)**

18  **BY MR. GOLDMAN:**

19  Q    Let's move on.  Okay?

20          Is Lode Star, to your recollection, is Lode Star

21  suing Balaton for fraud?

22  A    I don't know.  I haven't looked at that case in a long

23  time.  I don't believe so.

24  Q    Is the --

25  A    I don't know.  I don't -- I didn't review it before coming

KUBBERNUS - CROSS                                    135

1   here today.

2   Q    Is the case active?

3   A    I don't believe so.  There's a settlement.  We've

4   negotiated a settlement.

5   Q    Are you in default on various deposition notices?

6   A    With?

7   Q    Lode Star?

8   A    I don't believe so.  There's an attorney that's been

9   retained in Canada and deals with the case.  So I don't believe

10  so.  I --

11       **(Pause)**

12  **BY MR. GOLDMAN:**

13  Q    All right.  Now next, and correct me if I have your

14  testimony wrong, you're saying that the existence of this

15  lawsuit is -- creates a could on your reputation with the FCC.

16  A    I believe so, yes.

17  Q    And it could cost you business with the FCC.

18  A    I believe so, yes.

19  Q    Okay.  Now isn't it true that the FCC has already

20  determined that you filed a false and misleading application

21  with the FCC?

22  A    I don't believe so.  I don't believe that was the case.

23  Q    Is it true that the FCC issued an order of forfeiture

24  against you?

25  A    I didn't review that case.  I don't think that was the

KUBBERNUS - CROSS                    136

1   case.

2   Q    Now what was the $3,000 forfeiture order for?

3   A    The -- when Balaton purchased SkyPort from Centurytel,

4   there was an ownership change to Balaton back in 2006.  At that

5   time in 2006, 2007, Balaton was owned by a number of

6   individuals.

7          And in 2000, I believe it was 2008, I bought out the

8   other partners in Balaton.  And my holding company became the

9   hundred percent owner in Balaton, as opposed to the other

10  shareholders.

11         We weren't aware that changes of ownership at the

12  Balaton level, not the SkyPort level, but changes of ownership

13  at the Balaton level, had to be reported to the FCC.  The FCC

14  told us about this.  And we were sanctioned $3,000 of which we

15  paid right away.

16  Q    Isn't it true that the forfeiture order included

17  statements that said that you had commenced the buy out of your

18  four partners prior to getting the FCC's approval, and that you

19  didn't disclose that to the FCC?

20         **MR. JONES:**  Judge, objection.  Hearsay.  He's now

21  asking him what the content of the document that's not in

22  evidence says for the truth of the matter asserted.

23         **THE COURT:**  Do you have the document?

24         **MR. GOLDMAN:**  I'm asking him if he remembers.

25         **THE COURT:**  Do you have the document with you?

KUBBERNUS - CROSS                    137

1          **MR. GOLDMAN:**  Your Honor, the forfeiture order is a

2    matter of public record.

3          **THE COURT:**  Do you have the document?

4          **MR. GOLDMAN:**  I do not have it with me.  We just

5    found out that this hearing was proceeding yesterday.  I wish I

6    had it.  I didn't expect --

7          **THE COURT:**  All right.

8          **MR. GOLDMAN:**  -- this to be an issue.

9          **THE COURT:**  You're answered my question.  I'll

10   overrule the objection.  It is an expedited hearing.  You can

11   go ahead and ask the question again.

12       **(Pause)**

13   **BY MR. GOLDMAN:**

14   Q    Do you recall the question?

15   A    No, I don't.

16          **MR. GOLDMAN:**  Could we have it read back?

17          **THE COURT:**  No.

18          **MR. GOLDMAN:**  No?  I'll ask it again then.

19   **BY MR. GOLDMAN:**

20   Q    Isn't it true that the FCC found that you had started the

21   process of buying out your four partners in Balaton before you

22   had the FCC approval of the transfer, and that you didn't

23   disclose it to them then in 2006?

24   A    I don't remember the dates.  I haven't reviewed that file

25   in months.  So I can't give you a exact answer.  I'm sorry.

KUBBERNUS - CROSS                          138

1    Q    When was the forfeiture order issued?  Do you recall that?

2    A    No.

3    Q    And you can't recall any of the details about the FCC

4    forfeiture order events.

5    A    No.

6    Q    Okay.  And would you say that might have clouded your

7    reputation with the FCC?

8    A    Not according to our attorneys in D.C.

9    Q    I see.  Okay.  Now let me ask you this.  I'm going to ask

10   you to turn to an Exhibit in the white book, which is a list of

11   equity security owners.

12        And these were equity security owners of SkyComm,

13   correct?

14   A    What section?  Where are you?

15   A    I'm looking at Document Number 1.  If you take a look

16   at -- starting on the second page.  It lists equity security

17   holders.

18        **(Pause)**

19   A    As Exhibit A?

20        **THE COURT:**  Go ahead and approach and show him what

21   page you want him to be on.

22   **BY MR. GOLDMAN:**

23   Q    As Exhibit A, yes.  Yes.  Right there.  That's the page.

24   A    Okay.  Okay.

25   Q    How many equity security holders were there in SkyComm?

KUBBERNUS - CROSS                                    139

1  A    I don't recall like exact numbers?

2  Q    No.  Just a round number.

3  A    I don't recall.  Do you want me to count these off the

4  list?

5  Q    No.  Just give a ballpark.  How many equity security

6  owners?  You're the area company.

7           MR. JONES:  I object, your Honor.  He's already

8  answered the question.

9           THE COURT:  I'll sustained.

10          MR. JONES:  He said I don't know.  Guessing is not --

11          THE COURT:  I'll sustain.  He says he doesn't know.

12          MR. GOLDMAN:  Okay.

13      (Pause)

14  BY MR. GOLDMAN:

15  Q    Is it fair to say that most of the equity security holders

16  of -- that came into this company after you acquired control

17  were non-U.S. individuals?

18      (Pause)

19  A    Repeat the question again.

20  Q    Is it fair to say that most of the people who came into

21  this company as shareholders, after you acquired control, were

22  non-U.S. individuals?

23          MR. RAY:  Your Honor, I object.  The testimony he's

24  eliciting was not solicited on direct examination.  And it's

25  trying the facts of the underlying matter.  I don't think it

1   has anything to do with the issues that have been presented by

2   Mr. Rothberg on direct.

3            **THE COURT:**  Mr. Jones, you're standing.  Do you have

4   an objection?

5            **MR. JONES:**  I do, Judge.  Objection.  Beyond the

6   scope.  Objection.  Relevance.  It doesn't really matter

7   because there are no shareholders of SkyComm.  It existed at

8   one point in time.  It makes absolutely no difference until

9   such time as your confirmation order is set aside.

10           **THE COURT:**  Response to the objection.

11           **MR. GOLDMAN:**  Response to the objection is this is

12   directly relevant to Mr. Kubbernus' suggestion regarding

13   clouding his reputation with the FCC.  And I believe we are

14   entitled to delve into his standing with the FCC, his filings

15   with the FCC, and that's the purpose of it.

16           **THE COURT:**  I don't see the connection with the

17   question that you've asked him about --

18           **MR. GOLDMAN:**  I'm going to continue --

19           **THE COURT:**  -- his standing with the FCC.

20           **MR. GOLDMAN:**  I'm going to connect it in a moment,

21   your Honor.

22           **THE COURT:**  All right.  I'll carry the objection.

23           **MR. RAY:**  Your Honor, one --

24           **THE COURT:**  Sit, Mr. Ray.  I'll carry the objection.

25   //

KUBBERNUS - CROSS                                    141

1   **BY MR. GOLDMAN:**

2   Q     Yeah.  And --

3               **MR. GOLDMAN:**  I'll connect it --

4               **THE COURT:**  Go ahead.  I've carried the objection.

5   You've --

6   **BY MR. GOLDMAN:**

7   Q     When Mr. Jones asked you a question and he asked you to

8   read off where a number of the Plaintiffs were from, do you

9   recall a few hours ago where all of those parties were from?

10  Were they U.S. residents, or non-U.S. residents?

11  A     Most of -- I was asked what their address was on the

12  sheet.  And what their residence is, I can't opine to that.

13  But the address on the sheets, most of them were Quebec or

14  Ontario, Canada.

15  Q     Okay.

16  A     Canada.  Foreign.

17  Q     Foreign.  Okay.  Now isn't it true that at the time that

18  you told the FCC about these four other individuals who were

19  shareholders in Balaton, okay, and at that very moment that you

20  did not tell the FCC about all of the other foreign

21  shareholders being SkyComm.

22       **(Pause)**

23  A     No, I don't believe they were shareholders in SkyComm.

24  I'd have to look at the records, the filing with the FCC.  I

25  don't have the filing with the FCC.

KUBBERNUS - CROSS                              142

1   Q    Do you know what Document Number 1 is here?  What is this

2   document?  What does it say?

3        You testified as to this document just a few hours

4   ago.

5   A    List of equity shareholders is what the front page says,

6   Exhibit 1, list of equity shareholders, SkyComm.

7        **(Pause)**

8   **BY MR. GOLDMAN:**

9   Q    Do you recall what -- when this document was filed?  When

10  was this document file and where was it filed?

11  A    The front page should tell me that, correct?

12       **THE COURT:**  Just answer the question.  You don't get

13  to ask him questions.  Okay?

14       **THE WITNESS:**  Okay.

15       **THE COURT:**  If you could answer the question, do so.

16  If you can't --

17       **THE WITNESS:**  Yeah.  I don't --

18       **THE COURT:**  -- tell him you can't.

19       **THE WITNESS:**  I don't know.

20       **(Pause)**

21       **THE WITNESS:**  It looks like Patrick Brandt filed this

22  on November the 20th, 2008.

23  **BY MR. GOLDMAN:**

24  Q    Was this filed under your direction?

25  A    I don't recall.

KUBBERNUS - CROSS                           143

1   Q    Do you recall testifying a few hours ago that all of the

2   schedules in this case were filed under your direction?

3   A    Yes, I do recall that.

4   Q    But you don't remember whether this one was filed under

5   your direction.

6   A    Well I imagine it was if -- if Pat filed it.  He was the

7   CEO --

8   Q    So you do remember.

9   A    -- of the company.

10        **THE COURT:**  Hold on a minute.  Let him finish --

11        **MR. GOLDMAN:**  Sorry.

12        **THE COURT:**  -- answering the question.

13        **MR. GOLDMAN:**  Sorry.

14        **THE WITNESS:**  Yeah.  He was the CEO of the company.

15        **THE COURT:**  Let him finish.

16        **THE WITNESS:**  He was the CEO of the company at that

17   time.  And he would have sought instruction from my office.

18        **(Pause)**

19   BY MR. GOLDMAN:

20   Q    And let me ask you to take a look at Document Number 8 in

21   the -- in the black binder, not in the white binder, but in the

22   white binder.  Do you have that?

23   A    Yes.

24        **(Pause)**

25        **(Voices whispering)**

KUBBERNUS - CROSS                      144

1          **MR. RAY:**  Your Honor, this is a -- just for the

2     record, Exhibit 8 of the -- of the shareholders exhibits has

3     not been admitted yet.

4          **MR. GOLDMAN:**  I'm about to ask him if he can identify

5     this document.

6          **THE COURT:**  All right.  Go ahead.

7          **MR. JONES:**  And Judge, before we do, I'm going to

8     object again.  I did it a nine o'clock this morning.  I would

9     think common courtesy would have said get Jones a copy of these

10    exhibits.  I still don't have them.

11         **THE COURT:**  Normally, I would agree with you.  It's

12    an expedited hearing.  So --

13         **MR. GOLDMAN:**  Your Honor --

14         **THE COURT:**  -- I'll overrule the objection.

15         **MR. GOLDMAN:**  Thank you.

16         **THE COURT:**  All right.  Go ahead, please.

17         **MR. JONES:**  Can I at least see it?

18       **(Pause)**

19         **MR. JONES:**  I'd just like the record to reflect,

20    after six hours I've now been handed a complete set of

21    exhibits.  Expedited hearing or not, that's ridiculous.

22         **THE COURT:**  Fair point.  But I'm still going to

23    overrule the objection.  I'll let him go ahead and try to prove

24    it up.  Go ahead.

25    //

KUBBERNUS - CROSS                               145

1   **BY MR. GOLDMAN:**

2   Q    Can you identify this document?

3   A    There's a number of pages to it.

4   Q    We're talking about Section 8, is that correct?

5   A    Section 8.  And let's start on page four.

6        **(Pause)**

7   A    The page that is marked at four, or pages into --

8   **BY MR. GOLDMAN:**

9   Q    The page that has the number four on the bottom o fit.

10  A    Okay.  Thank you.

11  Q    I could approach and show you which one.

12       **(Counsel approaches the witness)**

13       **(Pause)**

14          **THE COURT:**  Go ahead.  You can ask him a question.

15  **BY MR. GOLDMAN:**

16  Q    Do you recognize this document?

17  A    It looks part of a document that went to the FCC.

18  Q    Was this prepared under your direction?

19  A    I don't recall.

20       **(Pause)**

21          **MR. GOLDMAN:**  Your Honor, I'd like to move this

22  Document Number 8 into evidence, at least the pages that are

23  marked four, five, six, and seven.

24          **THE COURT:**  All right.  Any objection?

25          **MR. JONES:**  Absolutely, Judge.  It's not

KUBBERNUS - CROSS                              146

1   authenticated.  It can't be identified.  It's a hearsay

2   statement.  There's been no foundation at all.

3          **THE COURT:**  Mr. Ray?

4          **MR. RAY:**  Objection.  Authentication.  Foundation.

5   Hearsay.  And relevance.

6          **THE COURT:**  Mr. Rothberg?

7          **MR. ROTHBERG:**  Same objection.

8          **THE COURT:**  Do you want to respond?

9          **MR. GOLDMAN:**  Yes, I will.

10          **THE COURT:**  Please.

11          **MR. GOLDMAN:**  Your Honor, he's identified the

12   document, although somewhat tentatively as the response of

13   SkyPort to the FCC.  I mean, that is what the document says

14   he's identified it.

15          And I believe it is admissible as that.  Now he

16   answered the subsequent question that he doesn't recall whether

17   this was prepared under his instruction.  But I believe the

18   document itself he's identified.

19          **THE COURT:**  Disagree.  Based upon what I've heard so

20   far, I don't think a sufficient foundation has been laid.  So

21   I'll sustain the objection.

22          **MR. GOLDMAN:**  Your Honor, the document is also a

23   public record.

24          **THE COURT:**  That doesn't mean squat to me.

25          **MR. GOLDMAN:**  Okay.

KUBBERNUS - CROSS                          147

1          **THE COURT:**  You've got to get it into evidence

2    properly under the Rules of Evidence.

3          **(Pause)**

4    **BY MR. GOLDMAN:**

5    Q    Let me ask you a question then.  Who is Martin Doan?

6    A    Martin Doan, Marty Doan --

7          **MR. RAY:**  Your Honor, I'm going to object.  This is

8    beyond the scope of direct.  Mr. Doan was not the subject of

9    any testimony in the original direct examination.  And if we're

10   trying to collaterally attack the witness by trying the merits

11   of the case, it's not an appropriate time to do so.

12         **THE COURT:**  Response, please.

13         **MR. GOLDMAN:**  Your Honor, I'm trying to obtain from

14   the witness confirmation of the fact that he did not provide

15   the FCC with the names of all of the foreign investors in -- in

16   SkyComm.  And that I think is material to the gentleman's

17   reputation at the FCC.

18         That's one of the claims that this lawsuit is about.

19   It's a direct claim, this is directly relevant to what we're

20   talking about today.  It's a direct claim against

21   Mr. Kubbernus.  It's not a claim that SkyPort did something

22   wrong.  It's a claim against Mr. Kubbernus, it's a claim

23   against Centurytel that those two did something wrong by not

24   disclosing the names of all these other individuals that then

25   later appear in this schedule as equity holders in the company.

1          **THE COURT:** All right. I'll overrule the objection.

2    I agree, Mr. Ray, it's not the subject of direct. But it's an

3    expedited hearing. And so I'm going to be a bit more flexible

4    with what Mr. Goldman asks on cross. Objection's overruled.

5    You can go ahead.

6          **(Pause)**

7    **BY MR. GOLDMAN:**

8    Q    Who is Mr. Doan?

9    A    Mr. Doan is a -- was a shareholder. Well his holding

10   company was a shareholder in Balaton Group before being bought

11   out. He was also an attorney, and also represented some

12   interests of mine in Ontario.

13   Q    And you said he was a person that had a -- an interest in

14   SkyComm by having an interest in Balaton, correct?

15   A    I didn't say that. He had an interest Balaton, which had

16   an interest in SkyComm.

17   A    No.

18   Q    Which was acquiring a controlling interest in SkyComm,

19   which was acquiring --

20   A    Balaton had an interest in -- yes.

21   Q    And the same for Mr. Kallsbec, Mr. Heeney and Mr. Farrell,

22   correct?

23   A    Correct.

24         **(Pause)**

25   //

KUBBERNUS - CROSS                            149

1   **BY MR. GOLDMAN:**

2   Q     Now what about Sequoia Aggressive Growth Fund when they

3   acquired an interest in SkyComm?  Did you disclose that to the

4   FCC?

5   A     The company and I have FCC counsel.  In this particular

6   case,  --

7              **MR. GOLDMAN:**  Strike as non-responsive, your Honor.

8              **MR. JONES:**  Judge how about letting him finish.

9              **THE COURT:**  Let him finish his answer.  And then you

10  can move to strike if you believe he hasn't answered you.

11             Finish answering the question.

12             **THE WITNESS:**  It appears that Jeffrey Marks of Latham

13  Watkins was the FCC attorney, according to this document that's

14  in here.  We use another firm out of D.C.

15             I'm not that familiar with the FCC rules.  But I

16  believe that it is -- you don't need to disclose anybody under

17  ten percent, or five percent, or -- I forget what the ratios

18  are and where those thresholds are.  So I'm unable to give you

19  a full answer on whether it was reported to the FCC or not as

20  to whether it was onsite or offsite with the rules, and whether

21  counsel did what they said they were supposed -- what they do

22  for us as counsel for FCC, the government.

23  **BY MR. GOLDMAN:**

24  Q     Did you report that Sequoia Aggressive Growth Fund had

25  acquired an interest in SkyComm to your counsel?

KUBBERNUS - CROSS                          150

1  A    Oh, I don't recall.

2  Q    How about Credito Aggrico (phonetic).

3           **MR. ROTHBERG:**  Your Honor, I'm going to make an

4  objection again on relevance, your Honor.  The connection that

5  Mr. Goldman is saying is that this has some impact on

6  Mr. Kubbernus' reputation with the FCC.  Okay.

7           Mr. Kubbernus' already testified that SkyPort has an

8  FCC license, it's current, it's never been terminated.  They're

9  operating under it right now.

10          This is from 2006.  I don't see how this could

11 possibly be relevant to now, which is where we're here today to

12 deal with.

13          **MR. RAY:**  And, your Honor, a reminder.  Earlier you

14 carried an objection based on a representation of counsel that

15 he would tie in the relevance of our prior relevance

16 objections.  At this point, I would suggest that the tie in has

17 not been made.

18          **MR. GOLDMAN:**  May I --

19          **THE COURT:**  Response?

20          **MR. GOLDMAN:**  Yes.  If the FCC license was obtained

21 or maintained through false, misleading, or incomplete

22 disclosure, okay.  That is a very serious violation of the U.S.

23 laws.  Now I have not yet gotten to the Department of Homeland

24 Security, I'm sorry.  I have no yet gotten to the Department of

25 Homeland Security --

KUBBERNUS - CROSS                     151

1          **ELECTRONIC RECORDING OPERATOR:**  Mr. Goldman, can you

2    move back just a little bit.

3          **MR. GOLDMAN:**  I'm sorry.  I've not yet gotten to the

4    Department of Homeland Security, FBI, and the Department of

5    Justice.

6          And my point is, that if the licenses that

7    Mr. Kubbernus is talking about were obtained via a false or

8    incomplete information to the FCC and these other agencies,

9    then those licenses are really subject to -- or Mr. Kubbernus'

10   position is subject to defeasance, no because of this lawsuit,

11   but because of his failure to comply with the requirements of

12   those government agencies, that's part of our lawsuit.  But it

13   also relates to the issue of have we done anything to hurt

14   Mr. Kubbernus' situation with his licenses with the FCC.

15         **THE COURT:**  How much time are you going to spend

16   examining him?

17         **MR. GOLDMAN:**  I would like to move much faster

18   than --

19         **THE COURT:**  Well that's not my question.  How much

20   time do you anticipate examining him on -- on what you believe

21   is his failure to adequately apprise the FCC of these issues?

22         **MR. GOLDMAN:**  I've got about a half a dozen

23   questions.  And if I get a half a dozen, you know, direct

24   answers, I'm finished.

25         **THE COURT:**  I want to give you the opportunity.  Go

KUBBERNUS - CROSS                     152

1    ahead.

2           **MR. GOLDMAN:**  Thank you, your Honor.

3           **THE COURT:**  Mr. Ray, I'm going to overrule the

4    objection that I carried.  All of his testimony stands.  I

5    think it does have some relevance.

6           So Mr. Goldman, you can go ahead.

7    **BY MR. GOLDMAN:**

8    Q    Now I believe you mentioned before that Clearsky has no

9    interest in SkyComm, correct?

10          **(Pause)**

11   A    Correct.  Well there is no SkyComm, but -- you mean, today

12   or --

13   Q    Or that they never had an interest.

14   A    That's been our position.

15   Q    Okay.  Now how much money did you raise in the Clearsky

16   syndication?

17          **THE COURT:**  Go ahead, Mr. Ray.  If you're standing

18   you must have an objection.

19          **MR. RAY:**  I object.  This is irrelevant.

20          **THE COURT:**  What's the relevance on this one?

21          **MR. GOLDMAN:**  The relevance, your Honor is that he,

22   you know, they've been taking a complaint that alleged fraud by

23   Mr. Kubbernus in trying to convert it into a claim that somehow

24   we're harming the company.  And it is certainly relevant, you

25   know, as to what our claims are, and as to whether those claim,

1   in fact, are alleging violations by Mr. Kubbernus or by the

2   company.

3           Again, I can connect it if I get another question or

4   two.

5           **THE COURT:**  All right.  Go ahead, Mr. Jones, you're

6   standing.

7           **MR. JONES:**  Judge, and I'm going to make an objection

8   that the pleading is in evidence.  It speaks for itself.  Any

9   testimony regarding what the claims are or are not is

10  irrelevant to the issues before the Court.

11          **(Pause)**

12          **MR. GOLDMAN:**  Your Honor, if I may?

13          **THE COURT:**  Go ahead.

14          **MR. GOLDMAN:**  Both of these two distinguished counsel

15  asked Mr. Kubbernus paragraph by paragraph to read from the

16  complaint.  And to say, you know, where is this guy from, and

17  does this say he is and was a shareholder, or whatever.  And

18  now I'm finding every single I ask to try to counter their

19  testimony, they have an objection.

20          I don't know why there are so intent on objecting to

21  every single question I ask.

22          **MR. JONES:**  Judge, it's very simple.  Lawyers are

23  required to follow the Rules of Evidence.

24          If you want to get into an issue that a document

25  that's been admitted, you have the witness read.  You don't ask

KUBBERNUS - CROSS                          154

1   somebody what they think it means.  Distinguished counsel ought

2   to know that.  Federal Rules are the same in New York as they

3   are in Texas.

4          **THE COURT:**  All right.  I'm going to overrule the

5   objection.  As I said, it's an emergency hearing.  And I'll

6   allow you to go ahead and ask the question.

7   **BY MR. GOLDMAN:**

8   Q   Mr. Kubbernus how much money did you raise in the Clearsky

9   syndication?

10  A   I believe there's $7 million plus or minus raised in the

11  partnership.

12  Q   And where did the $7 million that was raised in the

13  Clearsky partnership go?

14  A   Where did it go?

15  Q   Yes.

16  A   I don't have the books and records with -- I did not bring

17  the books and records with me today to deal with that.

18  Q   Is it fair to say that some of that money went to SkyComm?

19         **MR. RAY:**  Your Honor, if I may, the position of

20  everyone in this room is that Clearsky has been cut out in the

21  discharge injunction.  And the Clearsky suit is not going to be

22  tried here.  And so I object on the basis of relevancy to try

23  the Clearsky case right here right now.

24         **THE COURT:**  Thank you.  Didn't you stipulate earlier

25  today that Clearsky is not a derivative suit?

1          **MR. RAY:**  Well Clearsky is -- it says it's a

2    derivative suit in the petition.  What I said is, is that the

3    Draco Clearsky matter, it was clearly excluded from the

4    discharge injunction.

5          **THE COURT:**  So your contention is that cause of

6    action could be prosecuted in State Court.

7          **MR. RAY:**  Assuming it's a State Court proper venue,

8    yes.

9          **MR. GOLDMAN:**  Your Honor, you --

10         **MR. RAY:**  That's been our position in every pleading

11   we filed.

12         **THE COURT:**  I'll sustain the objection on that one.

13   I don't think you need to go down that road.

14         **MR. GOLDMAN:**  Your Honor, then the question is, why

15   if it's a State Court action, did they remove it here and ask

16   your Honor, as they are asking today, to take the case and

17   dismiss it.  If it's a State Court action --

18         **THE COURT:**  I'll let you argue the law.  I think

19   Mr. Ray was arguing you got to remove the whole thing or

20   nothing.  You can't remove it bits and pieces.

21         So in terms of asking him questions about that

22   particular transaction --

23         **MR. GOLDMAN:**  I'm not going to argue the law right

24   now.

25         **THE COURT:**  What I'm telling you I sustain his

KUBBERNUS - CROSS                          156

1    objection.  You don't get to ask him questions about that

2    transaction.

3              **MR. GOLDMAN:**  Then I am moving on.

4              **THE COURT:**  All right.

5         **(Pause)**

6    **BY MR. GOLDMAN:**

7    Q    You testified earlier today that Balaton was a creditor

8    for $2 million and SkyComm was a creditor for $2 ½ million,

9    correct?

10   A    Repeat that?

11   Q    You testified -- I'll break it into two questions.  You

12   testified earlier today that Balaton was a creditor for $2

13   million, correct?

14   A    I didn't testify to that.  I don't believe I was asked

15   that or testified that.

16   Q    Did you testify that Centurytel was a creditor for $2 ½

17   million.

18   A    Approximately 2 ½, 2.7 is what I had said.

19   Q    You did said that.

20   A    Yes.

21        **(Pause)**

22   **BY MR. GOLDMAN:**

23   Q    Let me ask you to turn to -- let me ask you to turn to

24   document Number 3 in the black binder.

25        **(Pause)**

1  BY MR. GOLDMAN:

2  Q    Do you have that document?

3  A    Yes, I do.

4  Q    Can you identify it?

5  A    It appears to be a -- it's titled SkyComm Technologies

6  Corp December 31st, 2007 audit report.  And it looks like it

7  was produced by Deloitte as the auditor.

8  Q    And you retained Deloitte to prepare this report?

9  A    I personally, or did the company retain -- SkyComm retain

10  them.

11  Q    SkyComm retain them.

12  A    Yeah.  SkyComm, SkyPort.

13  Q    Under your instructions.

14  A    Under the board of directors' instructions.

15  Q    Was there a board meeting on that?

16  A    As there is every year, yes.

17  Q    And who are the board members?

18  A    Who were the board members at that time?

19  Q    Yes.

20  A    Myself, Adrian Pouliot of Draco, 2006.  I believe

21  Mr. Ewing had resigned from the board.  Mr. Joe Long was a

22  board member.  And I believe -- I'd have to go back to the

23  minutes.  I believe a David Stone was a board member at that

24  time, General Stone.  And a Bill or William Hutchinson.

25  Q    So the board approved retaining Touche and Ross --

KUBBERNUS - CROSS                              158

1   A     I believe so, yes.

2   Q     -- to do this --

3   A     Yeah.

4   Q     -- audit.  I see.

5   A     That's the typical scenario is the board.

6   Q     You don't have any specific memory of who retained Touche

7   and Ross to do this audit.

8   A     No, I don't.

9   Q     Okay.  Let me ask you to turn to page 19 of this document.

10        **MR. RAY:**  Your Honor, I object.  This document is not

11   in evidence.

12        **THE COURT:**  I was just trying to refresh the witness'

13   recollection regarding the transaction since, you know, he has

14   having a hard time remembering.

15        **MR. JONES:**  Judge, then I object.  Because that's not

16   the way you refresh, recollect.

17        **THE COURT:**  I'll sustain the objection.

18        **(Pause)**

19   BY MR. GOLDMAN:

20   Q     Do you recall a closing on November 2nd, 2006?

21        **(Pause)**

22   A     Do I recall a closing?

23   Q     Right.

24   A     A closing of what?

25   Q     A closing by Balaton of the acquisition of control of

KUBBERNUS - CROSS                     159

1   SkyComm.

2           **MR. RAY:**  Your Honor, I hate to object again.  But

3   this is absolutely irrelevant to the damage this is currently

4   causing SkyPort.  This is the underlying case he's trying.

5   This is not about the damage SkyPort undergoing currently.

6           **THE COURT:**  Your response, please?

7           **MR. GOLDMAN:**  My response is the witness testified

8   that part of the damages that he's got Centurytel, you know,

9   and such.  You know, he testified earlier that Centurytel had a

10  claim for 2 ½ million, they reduced it in the bankruptcy.  And

11  so what, I have a right to ask him about a claim that he

12  testified on.  And it may not relate to Mr. Ray's narrow view

13  of what the issue here is. But the issue here is, and I may be

14  missing it, but is the -- is this lawsuit somehow hurting the

15  Debtor or the confirmed Debtor, post-confirmation Debtor, more

16  than would any lawsuit, private lawsuit, against an individual

17  who just so happens to be in control of the Debtor.  That's my

18  question.

19          **THE COURT:**  I'll overrule the objection.

20      **(Pause)**

21          **THE COURT:**  Go ahead and ask the question again,

22  please, Mr. Goldman.

23  **BY MR. GOLDMAN:**

24  Q    Yes.  Do you recall the closing on November 2nd, 2006,

25  whereby Balaton took control of SkyComm?

KUBBERNUS - CROSS                                    160

1  A     I don't recall the closing in what is defined as a

2  closing.

3  Q     Do you recall which law firm represented you in connection

4  with the transaction relating to the acquisition of Balaton on

5  control of SkyComm?

6  A     There's a number of law firms involved.  I'd have to go

7  back to the records and have a look at which law firms were

8  involved.

9  Q     Okay.  So as you're sitting here at this moment, you don'

10 recall if Wilson Vukelich was your counsel on that transaction.

11 A     On the closing part of it, they could have been part of

12 the Canadian closing, and not necessarily part of the U.S.

13 closing.  But there was Latham Watkins involved.  There is also

14 Julienne (phonetic), what the name of that firm, here in

15 Houston.

16 Q     Do you remember who represented Clearsky on this

17 transaction?

18 A     On SkyPort transaction, or on Clearsky, what part of

19 Clearsky?

20 A     Those are two questions.  Thank you.

21 Q     Who represented Clearsky on the SkyPort transaction?

22 A     Who represented Clearsky on the SkyPort.  I don't recall.

23 Q     You don't recall.

24       Who represented Clearsky on the Clearsky transaction.

25 A     Who represented Clearsky on the Clearsky transaction.

1    Q     That was my question.

2    A     Yeah.  I'm confused.

3    Q     Which came from your question.

4          Your question was did they represent Clearsky or

5    SkyComm.  And my question is I broke it into two.

6          MR. RAY:  Objection.

7          THE COURT:  All right.  Hold on a minute.  Go ahead

8    Mr. Jones and then Mr. Jones.  What's your objection?

9          MR. RAY:  Objection.  Form.

10         THE COURT:  Mr. Jones?

11         MR. JONES:  Same objection, Judge.

12         THE COURT:  I'll sustain.  Start over.

13         MR. GOLDMAN:  Thank you, your Honor.  I'm sorry about

14   that.

15   BY MR. GOLDMAN:

16   Q   Which law firm represented Clearsky on the Clearsky

17   transaction.

18         MR. RAY:  Your Honor, I'm going to object again.  I

19   don't know what he, and I've consulted with my co-counsel, I

20   don't know what he Clearsky transaction he's referring to is.

21   Maybe we -- I object to the basis of form --

22         MR. GOLDMAN:  All right.

23         MR. RAY:  -- and that it's vague.

24         MR. GOLDMAN:  Let's clarify what the transaction was.

25         THE COURT:  All right.

KUBBERNUS - CROSS                              162

1   BY MR. GOLDMAN:

2   Q    Mr. Kubbernus, can you tell us what the Clearsky

3   transaction was?

4        **(Pause)**

5   A    A private placement.  A raising of capital.  A --

6   Q    You testified five minutes ago that you raised $7 million

7   in Clearsky.

8   A    Correct.

9   Q    Okay.

10  A    Correct.

11  Q    Was that the Clearsky transaction.

12  A    That is.

13  Q    Or was there anything else.

14  A    That is a transaction.  But Clearsky was organized in such

15  a way that if you're asking who were the law firms involved in

16  Clearsky, there was Walker's (phonetic) of the Cayman Islands.

17  There was a firm, I don't have the file with me.  There was a

18  firm out of Buffalo that was involved for a tax opinion.  There

19  was Wilson's in Canada, Wilson Vukelich in Canada who was

20  involved.

21       So there was a number of firms that were involved in

22  the construction of Clearsky, if that helpful.

23  Q    And in the Clearsky syndication.

24       Do you recall which firm acted as escrow agent for

25  the $7 million that you raised in Clearsky?

1   A    Escrow or collection of the funds?  That would have

2   been --

3   Q    Collection of the funds.

4   A    That would have been Wilson's.

5   Q    I can't hear.

6   A    Wilson's.

7   Q    Wilson is Wilson Vukelich.

8   A    Correct.

9   Q    Okay.  And who wound up authorizing the disbursement of

10  funds from that Wilson Vukelich account?

11  A    Probably myself, but there was other staff.

12  Q    Right.  And is it fair to say that a lot of the money from

13  that Wilson Vukelich account went into SkyComm?

14  A    I don't have the records.  I can't tell you exactly what

15  happened.

16  Q    Do you remember --

17  A    I didn't bring --

18  Q    -- where any of the $7 million went?

19  A    Per the limited partnership, the funds were allowed to be

20  used for diligence, for paying lawyers, for any number of

21  things, including investment into assets, such as SkyPort or

22  SkyComm.

23  Q    So you raised $7 million in Clearsky.  And you have no

24  idea where any of the money went, correct?

25           **MR. RAY:**  Your Honor, I'm going to object now.  We've

KUBBERNUS - CROSS                        164

1  had more than six questions.  This is not relevant, because

2  we've already ruled that the Clearsky issue is cut out.  And

3  they're trying the Clearsky case again in this proceeding.  And

4  I think that that's not proper.

5           **THE COURT:**  Okay.  Response to the objection.

6           **MR. GOLDMAN:**  Your Honor, it's the same trend of --

7  I've had more than six questions, but not the six questions I

8  wanted to ask him, that's because I haven't had six straight

9  answers.

10          The question is directly relevant to what Mr. Jones

11 said.  Mr. Jones said, look everything was in Canada.  It's got

12 nothing to do with this case.  I just filed papers in the case

13 this morning.  But I'm here.

14          And I want your Honor to dismiss this case because it

15 has nothing to do with Texas.  And what I will -- am trying to

16 demonstrate with the witness is that the Clearsky money, a lot

17 of it, in fact, was used to -- did go into SkyComm.

18          Now that I thin is very material to whether this case

19 belongs in Texas.  Now that may not be the issue before your

20 Court if the Clearsky cases get sent back to State Court, which

21 is what I think these gentlemen say.  But they're not asking

22 that it be sent back to State Court.  They're asking that your

23 Honor rule that it can't go to State Court.  But it needs to go

24 to Canada or Delaware.

25          That's what their papers say.

KUBBERNUS - CROSS                        165

1              THE COURT:  I'll overrule the objection.  You can

2   proceed.

3              MR. GOLDMAN:  Thank you, your Honor.

4              THE COURT:  I'm going to give you, as I have been, a

5   lot of latitude with this witness.

6         **(Pause)**

7   BY MR. GOLDMAN:

8   Q    So you don't recall where any of the $7 million that you

9   raised in Clearsky went.

10  A    No.  I said it was used for, and it can be sued for --

11  Q    I don't --

12  A    -- diligence, legal fees --

13  Q    I'm not asking you --

14             THE COURT:  All right.  Hold on a minute.

15             MR. GOLDMAN:  I'm sorry.

16             THE COURT:  Let him finish answering the question --

17             MR. GOLDMAN:  Sorry.

18             THE COURT:  -- if you don't think it's responsive,

19  you can most to strike.

20             MR. GOLDMAN:  I'm sorry, your Honor.

21             THE COURT:  Mr. Kubbernus, go ahead.  Start over.

22  Please answer the question.

23             THE WITNESS:  Diligence, legal fees, acquisition of

24  assets, investment in SkyComm and SkyPort, any number of those

25  things, according to the limited partnership.  It can go to

KUBBERNUS - CROSS                    166

1   paying fees.  It can go to paying wages for the general

2   partner.

3         It can be used for -- like every limited partnership,

4   it can be used for evaluation purposes, for appraisals, legal

5   fees, like I said, accounting, any number of things.

6         **MR. GOLDMAN:**  I move to strike the answer, your

7   Honor.  My question was not what can it be used for, my

8   question is, does Mr. Kubbernus recall where any of the $7

9   million that he raised for Clearsky.

10  **BY MR. GOLDMAN:**

11  Q    You were the person who was in control of Clearsky, no?

12  A    I was one of them, yes.

13  Q    You were the general partner of Clearsky.

14  A    Correct.

15  Q    Thank you.  And you don't recall where any of the $7

16  million went.

17  A    Funds were used for, if that helps.  Funds were used for

18  due diligence, paying law -- legal fees.  Paying accounting

19  fees.  All of the business of Clearsky including making

20  investments.  How much it invested in SkyComm, SkyPort, I don't

21  have the records with me.  I haven't reviewed those.  How much

22  went to -- direct to legal fees, to diligence fees, to the

23  auditors, diligence professionals.  I haven't gone over the

24  records.  I didn't do that before coming today.

25  Q    Were any of the Clearsky fees paid to you or any entities

KUBBERNUS - CROSS                        167

1    controlled by you, if you recall.

2    A    Fees were paid according to the limited partnership.  Fees

3    were paid to Clearsky management.  So the construct is like

4    with any limited partnership, you have a limited partnership,

5    and LP.  LP is managed by a GP.  And the GP draws upon funds in

6    the LP.

7             And the GP is entitled to, according to the charger,

8    and live within the charger, of the LP, use the funds

9    accordingly.

10            So the GP was controlled by m and there was board

11   members.  But the GP was also paying fees to staff at Balaton

12   and other organizations we well, that perform due diligence,

13   including, I believe it paid funds to Adrian Poulot as a

14   director, which is one of the Plaintiffs as well.

15            Paid his firm for some of the due diligence he did.

16   Paid his travel expenses.  There's a lot -- there's a number of

17   places that the funds at Clearsky went.

18   Q    Now that, you know, that was not my question.  So I would

19   like to --

20   A    Sorry.

21   Q    -- ask my question again.

22   A    Okay.

23   Q    My question is, do you recall that any of the $7 million

24   went to you, or entities that you controlled.

25   A    I controlled --

KUBBERNUS - CROSS                         168

1   Q    It's a yes or no question.  You give me long answers.  Yes

2   or no?  Did it go to you or any entity you controlled?

3   A    That's a two part question.  Yes and no is the answer.

4   Q    Okay.  Let me ask you if you can identify.

5         MR. RAY:  Excuse me, your Honor.  He's approaching

6   the witness.  He's handing him something.

7         MR. GOLDMAN:  I'm sorry.

8         MR. RAY:  Can I see what he's handing the witness?

9         MR. GOLDMAN:  Sure.  Sorry.

10        MR. RAY:  Your Honor, this is an exhibit I have no

11  seen before.

12        THE COURT:  All right.  Is this in the exhibit

13  booklet?

14        MR. GOLDMAN:  It's not, your Honor.

15        THE COURT:  All right.

16        MR. GOLDMAN:  It's for cross examination purposes.

17  And it is to try to refresh the witness' memory as to where the

18  Clearsky money went to.

19        THE COURT:  Okay.  My policy is if you want --

20  anything that you want to show a witness has got to be in an

21  exhibit booklet.  Okay?  It's not in this exhibit booklet.  I'm

22  not going to let you examine him on that.

23        MR. GOLDMAN:  Even for cross examination.

24        THE COURT:  Yes, sir.

25        MR. GOLDMAN:  Your Honor, we had no idea what his

1   direct testimony was going to be.  And we had no idea that the

2   witness couldn't remember where, you know, the $7 million --

3             **THE COURT:**  I will say this.  You seem to know

4   exactly where you want to go with this witness and what

5   document you want to show this witness, so I'm not buying that

6   argument.  It should have been in the exhibit booklet.  It's

7   not.  So you're not going to be allowed to examine him about

8   it.

9             **MR. GOLDMAN:**  I will take it back then.

10      **(Pause)**

11            **MR. JONES:**  Judge, I don't intend to give it back.

12   I've been tendered the document, I'm going to keep it, and I'm

13   going to look at it.

14            **THE COURT:**  That's fine.

15            **MR. GOLDMAN:**  I think that's fine.

16            And do you have a copy of this?

17            **MR. RAY:**  No.  I'd like to see it.  I've never seen

18   it before.

19            **MR. GOLDMAN:**  You've never seen this.

20      **(Pause)**

21   **BY MR. GOLDMAN:**

22   Q    Do you know if any of the money from the $7 million that

23   you raised in Clearsky went to Balaton?

24   A    Yes, it did.

25   Q    Did any of the money of the $7 million that you raised go

1  to Bankton?

2  A    It may have.  I don't have the records.  But it was

3  allowable under the charter.

4  Q    It was allowable under the charter.

5  A    Yes.  It may have, but I don't have --

6  Q    Was Balaton the manager of Clearsky?

7  A    No.  Clearsky, LP was managed by Clearsky Management, two

8  separate structure.  Clearsky Management and Clearsky, LP are

9  two separate entities.

10      **(Pause)**

11  **BY MR. GOLDMAN:**

12  Q    Okay.  That doesn't answer my question.

13          My question was, was there -- did Balaton have a

14  relationship where it was supposed to receive fees from

15  Clearsky?

16  A    From Clearsky Management, yes.

17  Q    Did it receive fees from Clearsky, the partnership, or

18  Clearsky Management?

19  A    Directly or indirectly, I believe Balaton received funds,

20  yes.

21  Q    From Clearsky.

22  A    From Clearsky.

23  Q    Right.  Thank you for that answer.  Now how about Bankton.

24  Did Bankton receive funds from Clearsky?

25  A    I don't recall.  I don't know.  I don't have the records.

1   I don't --

2   Q    But if Bankton did receive funds from Clearsky, that would

3   not be pursuant to the partnership agreement.

4   A    I don't know.  I didn't review the partnership agreement.

5   Q    You never reviewed it.

6   A    No, I haven't for today's purposes, I haven't --

7   Q    I see.  Sorry.

8        **(Pause)**

9        **MR. GOLDMAN:**  Your Honor, I have no more questions

10  for this witness.

11       **THE COURT:**  All right.  Any redirect?

12       **MR. ROTHBERG:**  No redirect, y.

13       **THE COURT:**  All right.

14       **MR. ROTHBERG:**  And --

15       **THE COURT:**  You can step down.  You step down,

16  Mr. Kubbernus.

17       **THE WITNESS:**  Thank you.

18       **(Witness steps down)**

19       **THE COURT:**  Any other witnesses you want?

20       **MR. ROTHBERG:**  No, your Honor.

21       **THE COURT:**  All right.  Let's go over here.  Any

22  witnesses you want to call?

23       **MR. GOLDMAN:**  Yes, I have two witnesses, your Honor.

24       **THE COURT:**  All right.  Please.

25       **MR. GOLDMAN:**  one of our witnesses, your Honor, is on

MCCRARY - DIRECT                    172

1   the witness schedule.  The other one is a gentleman who is up in

2   Montreal, and he was unable to make it down here in time to be

3   here.

4           I have Bill McCrary who is a local resident and who

5   is a former Chairman, CEO of the company, and one of the, you

6   know, principal behind one of the Plaintiffs.  And I would ask

7   the Court's indulgence to have Mr. McCrary testify instead.  He

8   was able to make it to the courthouse.

9           **THE COURT:**  Fair enough.

10          **MR. GOLDMAN:**  Thank you, your Honor.

11          **THE COURT:**  Come on forward, please.

12          Would you raise your right hand?

13      **(Witness sworn)**

14          **THE COURT:**  Please take a seat in the witness box.

15          Once you get settled in, sir, if I could ask you to

16  stay your full name for the record and to spell your last name.

17          **THE WITNESS:**  Bill B. McCrary, M-c-C-r-a-r-y.

18          **THE COURT:**  Thank you, Mr. McCrary.

19          Mr. Goldman, please.  You may proceed.

20                          **DIRECT EXAMINATION**

21  BY **MR. GOLDMAN:**

22  Q    Mr. McCrary, you're a resident of the Houston area?

23  A    Yes.

24  Q    And what was your relationship to SkyComm and SkyPort.

25  A    Founder, and President, and CEO.

MCCRARY - DIRECT                          173

1  Q     And can you tell me during what period of time that was?

2  A     In the late '90's and I retired in October of 2003.

3  Q     And you retired when Centurytel got involved with the

4  company?

5  A     Yes.

6  Q     And do you and members of your family, they had

7  significant share holdings in the company?

8  A     Absolutely.

9  Q     Do you recall how many shares?

10 A     My wife and I had about 33 percent at one time.

11 Q     Thirty-three percent?

12 A     Yes.  That was when Centurytel, let's see, there were --

13 yeah, that's about right 33 percent I think that was.

14 Q     And that was in 2003?

15 A     Yeah.

16 Q     And do you recall how many shares were outstanding at that

17 time?

18 A     As I recall, Centurytel was not a shareholder.  So when

19 they came in they came in with debentures, voting debentures.

20 It was a hybrid situation.  There were a total of 49 million

21 some odd shares as I recall correctly.  And my wife and I

22 together owned about -- I guess we owned better than 33 percent

23 then.

24 Q     Okay.  Thank you.  And at the time that the company,

25 SkyPort went into bankruptcy, 2008, do you recall what

1    percentage of the company you and your wife owned?

2    A    The dilution factor was -- we were down to less than three

3    percent.

4    Q    Less than?

5    A    Less than three percent.

6    Q    Three percent.

7              Do you recall how many shares were outstanding at

8    that point in time?

9    A    I do not.  It was sizeable.

10   Q    Now let me direct your attention to the FCC license.

11   SkyPort was licensed by the FCC?

12   A    Absolutely.

13   Q    And the FCC is pretty strict about it's licensing

14   procedures?

15   A    Yes.  It's quite a process to go through in acquiring

16   those licenses.

17   Q    It took you a while to get the licenses.

18   A    Absolutely.

19   Q    And did there come a time when you became aware of an FCC

20   forfeiture order?

21   A    Yes.  That did come to my attention.  And I believe I

22   brought it to the attention of yourself and some others within

23   the company because it -- this was a very serious matter as far

24   as we were concerned.  Because there had to be something wrong.

25             They don't just do that without real reasons for

MCCRARY - DIRECT                          175

1   doing it.  So either they were improperly using the licenses or

2   the paperwork was not in order.

3              **MR. JONES:**  Judge --

4              **THE WITNESS:**  One or the other, both of them.

5              **MR. JONES:**  Objection.  Speculation.  He wasn't

6   there.  He's guessing.

7              **THE COURT:**  I'll sustain.

8   **BY MR. GOLDMAN:**

9   Q    Did you have occasion to read the FCC forfeiture order?

10  A    I believe that I did, yes.  Uh-huh.

11  Q    And do you recall what the forfeiture order pertained to.

12             **MR. ROTHBERG:**  Objection, your Honor.  Hearsay.

13             **MR. GOLDMAN:**  Public record.

14             **MR. ROTHBERG:**  He's testifying about an order that's

15  not in evidence.

16             **THE COURT:**  I understand.  I'll sustain it.

17             **MR. GOLDMAN:**  Okay.

18  **BY MR. GOLDMAN:**

19  Q    And you say you mentioned it to me and to several others.

20  Do you recall who some of the others were?

21  A    Yeah.  Mr. Joe Baker, Mr. Charles Stack, persons that had

22  been very much involved in the formation of the company and

23  bringing it forward, and its existence.

24       **(Pause)**

25  //

MCCRARY - DIRECT                    176

1   **BY MR. GOLDMAN:**

2   Q    And did you start to investigate the circumstances

3   relating to the forfeiture order at that time?

4   A    We were trying to do that.  That's not an easy thing to

5   do, to investigate on an FCC forfeiture.  It says what it says.

6        **(Pause)**

7   **BY MR. GOLDMAN:**

8   Q    Did you start investigating the company's filings with the

9   FCC?

10       **(Pause)**

11  A    There was -- I'm not sure I quite understand that

12  particular question.  But ask me that again, please.

13  Q    Did you start looking at the FCC filings that were made in

14  relation to SkyPort?

15  A    As far as we cold tell, there was a change of control

16  without -- before there was an FCC approval --

17           **MR. JONES:**  Objection.

18           **THE WITNESS:**  -- for change in control.

19           **MR. JONES:**  Non-responsive.  It was a yes or know

20  question, did you know.

21           **THE COURT:**  Sustained.

22  **BY MR. GOLDMAN:**

23  Q    Let me ask a slightly different question.

24           The FCC requirements, you're required to get FCC

25  approval before there is a change of control.

MCCRARY - DIRECT                          177

1  A    Yes.

2  Q    And you said there was a change of control without the

3  change of approval.

4  A    Yes.

5  Q    Can you elaborate on that?

6  A    I challenged the point that Balaton was taking control of

7  the company, SkyPort, SkyComm, before the FCC had made a change

8  of control order.

9         This was all started back in, I guess, November of

10 that year, following the -- and I challenged the Chairman of

11 the Board, who was a Centurytel person, as to how this could

12 be.  How could we -- how could this be allowed.  And that we

13 had an attorney firm, Bracewell Patterson, here in Houston that

14 represented SkyComm, SkyPort.  And Margaret Simons, one of

15 their attorneys had cautioned on many occasions for moving

16 ahead on --

17         **MR. ROTHBERG:**  Your Honor, I'm going to object.  He's

18 testifying to hearsay statements of third parties who aren't

19 here.

20         **THE WITNESS:**  I've got a document to that effect.

21         **THE COURT:**  Hold on a minute, I'll sustain the

22 objection, based upon the hearsay objection.  It's a hearsay

23 objection.

24 **BY MR. GOLDMAN:**

25 Q    Now I'd like you to tell us what you know and not what

MCCRARY - DIRECT                                    178

1  other people told you.  If you can testify as to what you know

2  from your own knowledge, I would appreciate it, regarding the

3  issue that you were trying to explain, which is that there was

4  a change in control without FCC approval.

5           And that was a change in control from whom to whom?

6  A    From SkyPort to Balaton.

7  Q    From SkyPort or from Centurytel?

8           **MR. JONES:**  Judge --

9  A    Well Centurytel --

10          **THE COURT:**  Hold on a minute.

11          **THE WITNESS:**  Sorry.

12          **THE COURT:**  Go ahead, Mr. Jones, you have an

13  objection.

14          **MR. JONES:**  Objection.  Leading.

15          **THE COURT:**  Sustained.

16          **MR. GOLDMAN:**  Sorry.

17  **BY MR. GOLDMAN:**

18  Q    Do you recall, you said there was an illegal change in

19  control.  Do you recall who the control was transferred from

20  to?

21       **(Pause)**

22  A    The licenses were held by SkyPort, the operating company

23  of SkyComm.  And when Balaton came in, they took control

24  before, long before, the application was approved by the FCC

25  for change of control.  That is a fact.

MCCRARY - DIRECT                              179

1   Q    I see.  And who had control of SkyComm before Balaton?

2   A    Centurytel.

3   Q    Thank you.  Now just to try to move along, is that initial

4   forfeiture order that's what started the chain of events that

5   ultimately led to this lawsuit?

6   A    That is correct.

7   Q    And in this lawsuit, you're a plaintiff, correct?

8   A    Yes.

9   Q    And you're a founder of the company.  You've testified to

10  that.

11        And you spoke to many of the other shareholders at

12  the time, you know, the original shareholders in the company?

13  A    Yes.

14  Q    And let me ask you this, was there ever a discussion about

15  possibly taking control of SkyPort?

16  A    No.

17  Q    Never came up.

18  A    No.

19  Q    Was there ever a discussion about taking any steps to

20  injure SkyPort?

21  A    No.

22  Q    Did you ever take any steps to take control of SkyPort?

23  A    No.

24  Q    Did you ever take any steps to have -- to injure SkyPort?

25  A    no.

MCCRARY - DIRECT                              180

1   Q    You were the head of the company for a number of years.

2   You are familiar with their customers are, their vendors, and

3   so on.

4   A    A large number of them.

5            MR. JONES:  Judge, objection to form.  Objection to

6   leading.  There wasn't even a question.

7            MR. GOLDMAN:  Sorry.

8            THE COURT:  Sustained.

9            MR. GOLDMAN:  Sorry.

10  BY MR. GOLDMAN:

11  Q    Are you familiar with the company's customers and vendors?

12  A    A large number of the, yes.

13  Q    Did you call any of them?

14  A    No.

15       (Pause)

16  BY MR. GOLDMAN:

17  Q    Did you attend any shareholders meetings of SkyComm during

18  the entire period from 2003 through 2008 when this petition was

19  filed?

20  A    No.

21  Q    Did you receive any financial statements from the company

22  during this period of time, 2003 to 2008?

23  A    No.

24  Q    Did you receive any financial statements from the company

25  during this period of time, 2003 to 2008?

1        **(Pause)**

2    A    Yes, I'm sure we -- I've received some statements.

3    Q    Do you have specific recollection.  And if not, I'm not

4    asking you to speculate.

5            **MR. JONES:**  Judge, objection.  He gave his answer.

6    Now he's trying to get him to change it.

7            **THE COURT:**  Sustained.  He did answer the question.

8        **(Pause)**

9    **BY MR. GOLDMAN:**

10   Q    What was our answer, I'm sorry.  Strike that.  Strike

11   that.

12           **MR. GOLDMAN:**  I have no more questions for the

13   witness, your Honor.

14           **THE COURT:**  All right.  Mr. Rothberg, any questions?

15           **MR. ROTHBERG:**  Just a few, your Honor.

16           **THE COURT:**  All right.

17       **(Pause)**

18                      **CROSS EXAMINATION**

19   **BY MR. ROTHBERG:**

20   Q    Mr. McCrary, you said something during Mr. Goldman's cross

21   exam -- examination, which peaked my interest.

22           Yu said that when you discovered this problem with

23   the FCC, you contacted Mr. Goldman.

24   A    Mr. Goldman was an attorney for our firm for way back.

25   Q    Okay.

1  A    And one of the --

2  Q    Oh, I'm sorry.

3  A    I'm sorry.  Go ahead.

4         THE COURT:  Go ahead and finish your answer, please.

5         THE WITNESS:  He was very close to the company in its

6  original state in its inception.

7  BY MR. ROTHBERG:

8  Q    Okay.  Was he an investor in the company?

9  A    An investor by virtue of his talent, yes.

10 Q    His talent.  So I think you testified that you discovered

11 this problem with the FCC in November of 2006; is that correct?

12 A    I'm not sure when I exactly discovered that.  I'm sorry.

13 I don't remember.

14        MR. GOLDMAN:  Objection, your Honor.

15        THE COURT:  I need you to stand when you address the

16 Court, please.

17        MR. GOLDMAN:  Sorry, your Honor.

18        Objection.  The witness did not testify to that,

19 November of 2006.  He didn't testify to that.

20        THE COURT:  So your objection is that Mr. Rothberg is

21 mischaracterizing his prior testimony.

22        MR. GOLDMAN:  He's misstating what the witness said.

23        THE COURT:  Mr. Rothberg?

24        MR. ROTHBERG:  I'll withdraw the question and

25 rephrase.

1    **THE COURT:** All right.  Thank you.

2    BY MR. ROTHBERG:

3    Q    When did you discover that the FCC entered that order?

4    A    I don't recall.  I don't have the records in front of me.

5    Q    Okay.  Do you recall receiving notice of the bankruptcy

6    fling in 2008?

7    A    Yes, I did.

8    Q    And did you attend the creditors meeting?

9    A    No.

10   Q    Do you remember receiving mailings from  - relative the

11   bankruptcy case?

12   A    I think we're -- I need to answer that, but I can't answer

13   it just the way you're asking it.

14   Q    Do you recall receiving a copy of the plan, and disclosure

15   statement, and the ballot to vote yes or not on the plan?

16   A    Yes.

17   Q    Now did the -- your knowledge of the FCC forfeiture occur,

18   I understand you don't remember when, but was it before the

19   bankruptcy case?

20   A    No.  I think it was after the bankruptcy case.

21   Q    Okay.  So would it have been before you received the plan

22   and disclosure statement?

23   A    I think it was after receiving the plan.

24   Q    After receiving the plan and disclosure statement.

25   A    And the reason I voted for the plan was I really had no

1   choice in that matter.  We were not --

2           **MR. ROTHBERG:**  I have no question, your Honor.

3           **THE COURT:**  Okay.

4           **MR. ROTHBERG:**  And I think I pass the witness.

5           **THE COURT:**  All right.  Mr. Ray, do you have any

6   questions for Mr. McCrary.

7           **MR. RAY:**  Yeah.  Yes.

8                         **CROSS EXAMINATION**

9   **BY MR. RAY:**

10  Q    Mr. McCrary, you've never seen me before and I've never

11  seen you before today, right?

12  A    That's correct.

13  Q    Okay.  You had 33 percent of this company; is that

14  correct?

15  A    I'm trying to calculate that.  Together we had about 17

16  million shares of about 50 million.  So whatever that is.

17  Q    And when did the change of control, you said change of

18  control went from Centurytel to Balaton.  When did that happen?

19  A    You have more records of that than I do.

20  Q    I'm asking you if you remember.

21  A    The change of control was happening during -- I think it

22  started prior to the bankruptcy filing -- the bankruptcy,

23  excuse me, the actual rendition of the bankruptcy, yes.  The

24  change of control, Dobson (phonetic) started taking control of

25  the company before --

MCCRARY - CROSS                                    185

1   Q     I --

2   A     -- there was a FCC approval.

3   Q     I was wondering about how we got that confusion.

4         You heard about the change of control before the FCC

5   approval, correct?  Right?

6   A     Let me think about that.  What did you say?

7   Q     You heard about the change of control before the FCC

8   approval, right?  That there was a change of control.

9   A     The FCC did not approve it.  So they didn't give change of

10  control.

11  Q     Well prior to the FCC giving approval, there was a change

12  of control, that's your -- that's your --

13  A     That's my statement.

14  Q     Okay.  Good.  And how did you become aware of the change

15  of control?

16  A     It was obvious the change of control.  That's why I

17  challenged the chairman of the board.

18  Q     Okay.  And you did that at the time.

19  A     I did that at the time.

20  Q     And that was in 2006.

21  A     I don't recall exactly.  I can pull out my -- I gave an

22  email to my attorney --

23  Q     Okay.

24  A     -- which clearly depicts the fact that I challenged.  And

25  that was absolutely admonished by Margaret Simons of Bracewell

MCCRARY - CROSS                              186

1   and Patterson for moving ahead without consulting the board.

2   Q     Okay.  Now --

3   A     They were not consulted.

4   Q     Okay.  Now the other thing is, you said we've had some

5   confusion about the bankruptcy.  Now I just realized what that

6   was.

7            There were two bankruptcies here.  I'd forgotten

8   about that.  In 2005 the Debtor filed bankruptcy and then

9   dismissed the bankruptcy, didn't it?

10           **MR. GOLDMAN:**  Objection, your Honor.

11           **THE COURT:**  I need to have you -- the local rules

12  require that you stand when you address the Court.  This is not

13  an ego thing, but I am going to enforce the rules.  Please.

14  Your objection is?

15           **MR. GOLDMAN:**  I will try very hard not to ever let

16  that happen.

17           **THE COURT:**  Fair enough.

18           **MR. GOLDMAN:**  I apologize to the Court.

19           **THE COURT:**  Fair enough.

20           **MR. GOLDMAN:**  I really do.

21           **THE COURT:**  Your objection is what?

22           **MR. GOLDMAN:**  Okay.  My objection is he said the 2005

23  filing was by the Debtor.  And I just -- I think that's

24  confusing by the witness, because there's SkyComm and there's

25  SkyPort, and SkyComm was merged into SkyPort.  I'd like him to

MCCRARY - CROSS                              187

1   be clear as to who the filing was by.

2           **THE COURT:**  Okay.  Mr. Ray, could you go ahead and

3   restate the question.  And instead of using the word Debtor,

4   could you put the specific name to --

5           **MR. RAY:**  Yes, your Honor.

6   **BY MR. RAY:**

7   A    SkyComm Global communications filed bankruptcy in 2005,

8   right?

9   A    Yes.

10  Q    Okay.  And then SkyPort Global Communications dismissed

11  that bankruptcy and that's when Balaton took over, right?

12          **(Pause)**

13  A    In March of 2006, I believe it was.

14  Q    Yes.  And you challenged the board at the time.

15  A    I challenged the board beginning, I believe, in November.

16  But the date is on that email.

17  Q    Okay.

18  A    You can certainly look into it.

19  Q    So that's where the November, 2006 date came from.  That's

20  why we were asking that question.

21          In November, 2006 you challenged the board about the

22  change of control, right?

23  A    I'm not sure of that date.  You keep asking me the same

24  question, and I keep telling you I don't know.  But it's on

25  that email.  He's got it right there in his hand.

1    Q    All right.

2    A    Turn around and ask him.

3    Q    Okay.  Another issue that you just raised was there were

4    no -- you're -- you were in charge of SkyPort as a CEO.  I

5    assume you have background in finance or have a financial

6    understanding, right?

7    A    No.

8    Q    Okay.  So when were CEO, did you look at balance sheets

9    and income statements?  Do you usually look at balance sheets

10   and income statements?

11   A    Yes.  But I had a CFO that took care of that sort of

12   thing --

13   Q    Okay.

14   A    -- and made representations to the board.

15   Q    Okay.  So your experience with accounting is relatively

16   minimal.  But when you were in SkyPort, did you expect

17   financial statements to be issued to you?

18   A    Certainly.

19   Q    Okay.  And when you were a shareholder, did you expect

20   financial statements to be sent to you?

21   A    Yes.

22   Q    Okay.  That was between 2003 and the bankruptcy.  That was

23   prior to the bankruptcy that you didn't receive financial

24   statements, correct?

25        **(Pause)**

MCCRARY - CROSS                     189

1  A    We received financial statements to the board.  You're

2  asking me between 2003 and 206, or some period of time.

3  Q    Two thousand and eight.

4  A    Two thousand and eight.

5  Q    Yes.

6  A    I was not associated with the company in a formal

7  position, other than a board member.

8  Q    Okay.  So my question again, between 2003, 2008 you did or

9  did not receive financial statements.

10  A    The board received financial statements.

11  Q    I'm asking --

12  A    I personally have not --

13  Q    Did you eyes perceive a financial statement?

14  A    The CFO presented them to the board.

15  Q    So you saw them.

16  A    Yes.  I saw them.  Yes.

17  Q    Okay.  You just previously testified you didn't get them.

18  But you're telling me you did get them as a human being in

19  capacity as a board member, right?

20  A    In capacity as a board member.

21  Q    Okay.  But you did get financial statements.

22  A    Yes.

23  Q    Okay.  I'm sorry.

24  A    Yes.

25  Q    And did you attend shareholder meeting by phone?

MCCRARY - CROSS                              190

1   A    No.  Most of them ere held in person.

2   Q    Did you attend financial -- any of the board meetings or

3   any of the shareholder meetings by phone?

4           **MR. GOLDMAN:**  Your Honor --

5           **THE COURT:**  You were standing.  Do you have an

6   objection?

7           **MR. GOLDMAN:**  I have an objection.

8           I think we need to clarify the time period that these

9   things were taken place.  Now it's getting confusing in terms

10  of he was a board member, and he got statements not as a board

11  member, but as a shareholder.

12          I think it's appropriate to find out when he was a

13  board member and when he was not a board member, so we an be

14  clear on when he got the financial statements and when he did

15  not.

16          I don't think the questions can just lump the entire

17  time period together.

18          **THE COURT:**  Mr. Ray, Mr. Goldman is asking if you can

19  put the timeframes on your questions.

20          **MR. RAY:**  I can, your Honor.

21          **THE COURT:**  Please.

22  **BY MR. RAY:**

23  Q    Now, Mr. Goldman, you were on the board and you received

24  financial --

25          **THE COURT:**  Wait a minute.  He's no Mr. Goldman.

1          **MR. RAY:**  Oh, I'm sorry.

2          **THE COURT:**  He's Mr. McCrary.

3          **MR. RAY:**  I'm so sorry.  I'm so sorry, Mr. McCrary.

4     **BY MR. RAY:**

5     Q    By the way, you did contact Mr. Goldman about these

6     issues, right?

7     A    About, say again?

8     Q    About the issues that you have talked about earlier in

9     your testimony, the lack of shareholder meetings, the lack of

10    financial statements, the improper change of control, the FCC

11    issue.  You have contacted Mr. Goldman.

12    A    I have contacted Mr. Goldman regarding a number of issues

13    that are relative to Centurytel and Balaton.

14    Q    And you hadn't talked to him about these issues before,

15    let's say, August of 2009?  Or had you talked to him before

16    August, 2009 about these very issues?

17    A    I probably did.

18    Q    Okay.

19    A    Before 2009.

20    Q    So you and Mr. Goldman were both aware, prior to the

21    confirmation of this plan, of these issues.  Right?

22    A    I might have been aware.  But there was no issue here as

23    far as we could bring together in terms of a lawsuit.  We

24    needed a lot of fact finding, and a lot of material.

25         I wrote a two page document as to my findings and my

1    feeling about all that had transpired over those years.  And I

2    published tat to Mr. Goldman.  And that's -- was the beginning

3    of a number of things that caused him to start looking into all

4    of the situations.

5           But it took a lot of fact finding.

6    Q    Those two pages weren't filed with the Bankruptcy Court?

7    A    Why should the be?  They were my personal thoughts and

8    feelings.

9    Q    Okay.  Now --

10   A    Were they requested by the Bankruptcy Court?

11   Q    I --

12          **THE COURT:**  Hold on a minute.  Mr. McCrary, you don't

13   get to ask questions.

14          **THE WITNESS:**  I'm sorry.

15          **THE COURT:**  You only get to answer.

16          **THE WITNESS:**  My apology.

17          **THE COURT:**  All right.  Mr. Ray, please.

18          **MR. RAY:**  Thank you.

19   **BY MR. RAY:**

20   Q    Let's talk about that.

21          There's a period your saying that as a shareholder,

22   you didn't get financial statements from SkyPort Global

23   Communications or SkyComm, either one, right?

24   A    I'm confused.  Ask him that again.

25   Q    Was there a period that you did not perceive with your

MCCRARY - CROSS                                    193

1    eyes financial statements that were regular that you would have

2    expected from SkyPort Global Communications of SkyComm

3    International.

4    Q     From the time that Balaton got involved, we didn't get any

5    information.

6    Q     Okay.

7    A     Period.

8    Q     And you knew that prior to the bankruptcy, didn't you?

9           **THE COURT:**  Which bankruptcy are you referring to?

10          **MR. RAY:**  Sorry.  I'm sorry.

11   **BY MR. RAY:**

12   Q     You knew about that prior to the most recent 2007, 2008

13   bankruptcy, 2008, 2009 bankruptcy.

14   A     That Balaton started -- they started taking control before

15   the bankruptcy.

16   Q     Okay.

17   A     I said that before.

18   Q     I'm sorry.  This second bankruptcy, the most recent one,

19   the one last year, you knew that prior to the confirmation of

20   the order last year, didn't you, sir.

21   A     I knew it -- yeah.

22   Q     Okay.

23   A     Yes, I knew it.

24          **(Pause)**

25   //

MCCRARY - CROSS                                    194

1   **BY MR. RAY:**

2   Q    Who is Bradford DeWitt McCrary?

3   A    My son.

4        **(Pause)**

5   **BY MR. RAY:**

6   Q    He is on the mail matrix, correct?

7   A    Yes.

8   Q    He received all of the pleadings that were sent out in

9   mailing matrix to the bankruptcy -- from the Bankruptcy Court;

10  is that correct?

11  A    I'm sure he did.

12  Q    And you received some of these pleadings from our son, and

13  you were aware of bankruptcy, correct?

14  A    I'm sorry.

15  Q    Your son gave you the pleadings that he received, or he

16  would forward them to you, right?

17       Did you --

18       **THE COURT:**  Hold on a minute.  Let him answer the

19  question.

20       **(Pause)**

21       **THE WITNESS:**  You're asking me did my son give me the

22  pleadings?

23  **BY MR. RAY:**

24  Q    Yes.

25  A    If he got his own pleadings, why would he give them to me?

1   Q    Okay.  And you --

2   A    Sorry to ask a question.

3   Q    Okay.  And you got your own pleadings, right?

4   A    I did.

5   Q    Okay.

6        **MR. RAY:**  That's all I have, your Honor.

7        **THE COURT:**  All right.  Mr. Jones, any questions for

8   Mr. McCrary?

9        **MR. JONES:**  Thank you, Judge.

10       **(Pause)**

11                       **CROSS EXAMINATION**

12  **BY MR. JONES:**

13  Q    Good afternoon, Mr. McCrary.

14  A    Good afternoon.

15  Q    You all right?

16  A    You know.  We've talked about it. And I think you for the

17  chair your brought me.

18  Q    Sure.  Do you need some water, you know --

19  A    I'm okay.

20  Q    You're okay?

21  A    Yeah.

22  Q    All right.  Now I want to ask you just a couple of

23  questions.

24       Do you see the white book in front of you?

25  A    Yes.

MCCRARY - CROSS                              196

1   Q    Can you take that down?

2           **THE COURT:**  Why don't you approach and help him,

3   Mr. Jones, and get him where you want him to be.

4       **(Counsel approaches the witness)**

5       **(Pause)**

6   BY MR. JONES:

7   Q    All right.  Now Mr. McCrary, I want you to look at what's

8   marked as Exhibit Number 10.  And I want you to turn over to

9   the third page.

10          **MR. JONES:**  Judge, can I approach just one more time.

11          **THE COURT:**  You may, please.

12      **(Counsel approaches the witness)**

13      **(Pause)**

14  BY MR. JONES:

15  Q    All right.  Do you have that in front of you, Mr. McCrary?

16  A    Yes, sir.  Page five.

17  Q    All right.  I'm sorry?

18  A    Page five?

19  Q    It says page 5 of 116 up at the top.

20  A    Yes.

21  Q    All right.  Gotcha.

22          Have you seen that before?

23  A    Yes.  This is the petition.

24  Q    The petition.  And I think you testified you said I am the

25  Plaintiff, right?

MCCRARY - CROSS                                    197

1   A      Yes.

2   Q      Help find your name on here.

3   A      Oh, I'm sorry.  I'm --

4          **(Pause)**

5   A      My name doesn't appear as my personal name, because it's

6   in a limited family partnership.

7   Q      Okay.  And what's --

8   A      Shares are held by family -- limited family partnership.

9   Q      Okay.  What's the name of that partnership.

10  A      My wife's is by the name of Puddy, P-u-d-d-y, Limited.

11  Mine is called Movada, M-o-v-a-d-a, Limited.

12  Q      Okay.  If we'll look up at the -- looking at the upper

13  right-hand corner again where we were just looking.  You ere

14  looking at 5 of 116.

15  A      Yes.

16  Q      If you'll turn over where it says page 11 of 116.

17         **(Pause)**

18  A      Okay.

19  Q      All right.  Now before I ask you a question, you can look

20  at me.

21  A      I'm sorry?

22  Q      You can look at me.  I'm not going to ask you a question

23  yet.

24  A      All right.

25  Q      What is your background?  Are you an engineer or what's

MCCRARY - CROSS                          198

1    your background?

2    A    Background of -- I have degree from Baylor University and

3    two degrees from Southern Baptist Theological Seminary in

4    Louisville, Kentucky.  And --

5    Q    Okay.  And I don't know anything about you.  So what was

6    your degree in from Baylor?

7    A    Double major of history and religion.

8    Q    Okay.  And then you went to seminary?

9    A    Went to seminary.

10   Q    Okay.

11   A    For two degrees and four extra years.

12   Q    Okay.  Any other formal education.

13   A    Okay.

14   Q    How did you end up the CEO for a technology company, if

15   you don't mind me asking.

16   A    We were, this goes back a long way, but I -- you got two

17   seconds, I'll try to fill you in.

18   Q    Please.

19   A    We had a number, my wife and I, a number of DBA's, and had

20   a number of different businesses, one of which was

21   coincidentally a group of sun tanning salons.  And a group of

22   guys came down from east Texas and said if you will teach my

23   technicians how to repair and sell tanning equipment, I will

24   teach your technicians how to sell and install satellite

25   systems.

1          I said well that's a fair trade.  Move your trailer

2    to the rear of the building and we'll get started.

3    Q    And that started it all.

4    A    So that's where it kind of got started.  And I kind of

5    like the satellite business.  And as a result, we had contracts

6    with Hughes Network Systems, Direct TV.  I was on the advisory

7    counsel of Hughes Network Systems for release of direct PC and

8    direct TV.

9    Q    Okay.

10   A    So I helped release those products before these ever hit

11   the market.

12   Q    Fair to say you kind of learned your trade on the job?

13   A    Pretty much on the job.  And then we dealt with Dish

14   Systems.  But prior to that we did Prime Star and -- but prior

15   to that we sold the big large dishes before the little --

16   Q    Okay.

17   A    -- pizza side came out.

18   Q    All right.

19   A    Yes.

20   Q    Now let's go back to page 11 of 116.  Okay?

21   A    Okay.

22   Q    And let's go down to paragraph 35.  Do you see that?

23   A    All right.

24   Q    I'd like for you to read along with me.  It says,

25          "Plaintiff, Movada, Limited, is a limited company

1          organized in the state of Texas."

2          Do you know what a limited company is?

3  A    Limited family partnership is what they -- what it is.

4  Q    So it's a partnership, not a company.

5  A    Limited family partnership.  In this particular one, I am

6  the general partner.  My wife is the limited partner.

7  Q    Okay.  Now did you read this before it was filed?

8  A    Yes.  And this was not the total shares that we owned.

9  Q    Just wanted to know if you read it.

10 A    Yes, I read it.

11 Q    Okay.  All right.  Let's go on.  It says,

12          "Plaintiff, Movada Limited, is a limited company

13          organized in the state of Texas and is, and has been,

14          the owner of 6,584,972 shares of common stock of

15          SkyComm."

16 Did I read that right?

17 A    Yes, you did.

18 Q    And that isn't right, is it.

19 A    Yes, it is right.

20 Q    So it's your testimony that when this law suit was filed,

21 you owned, through your family partnership, 6,584,972 shares of

22 stock.

23          **MR. GOLDMAN:**  Objection, your Honor.

24          **THE COURT:**  What's your objection?

25          **MR. GOLDMAN:**  My objection is that these pleadings

1   are prepared by counsel.  And the pleadings speak for

2   themselves.  It's a legal document.

3           **THE COURT:**  No, sir.

4           **MR. GOLDMAN:**  He's asking the witness

5           **THE COURT:**  No, sir.  Your objection's overruled.

6           You're the attorney.  He's the client.  He's

7   responsible ultimately for this pleading.  Fair game to ask him

8   about it.  Objection's overruled.  You can go ahead, Mr. Jones.

9           **MR. JONES:**  Thank you, Judge.

10  **BY MR. JONES:**

11  Q   Mr. McCrary is it your testimony that the day that this

12  lawsuit was filed Movada Limited owned 6,584,972 shares of

13  common stock of SkyComm.

14      **(Pause)**

15  A   My testimony is, the best of my knowledge, that was the

16  exact number that I sent to Canada.  So did own those under

17  that name of limited family partnership.

18  Q   Did you understand that in the bankruptcy, all of your

19  shares had been terminated?

20  A   No, I did not understand that that we had no position.

21  Because I'm looking back at how --

22          **MR. JONES:**  Judge, objection.  Non-responsive.

23          **THE WITNESS:**  I'm sorry.

24          **MR. JONES:**  It's a very simple question.

25          **THE COURT:**  Let him finish answering, and then I'll

1   let you object.  You can go ahead and finish your answer,

2   please.

3          **THE WITNESS:**  Well you're asking me to answer one

4   simple question when there's a lot of history that goes into

5   why.

6   **BY MR. JONES:**

7   Q    Don't want the history, I want the answer.

8   A    The answer is, in my mind that's a correct answer.

9   Q    In your mind, that's a correct answer.

10  A    In my mind, that's a correct answer.

11  Q    Do you own six million through your family limited

12  company?  Do you own 6,584,972 shares of common stock of

13  SkyComm today?

14  A    In m mind that's what I should own, because I sent that to

15  Canada.  They asked for it.

16  Q    I'm asking you, do you own it today?

17  A    In my mind, I own it.  Yes.

18  Q    Okay.  Fair enough.

19         **(Pause)**

20  **BY MR. JONES:**

21  Q    Let's go to the next paragraph, if you'd read along with

22  me.  It says,

23         Plaintiff, Puddy, Limited is a limited company

24         organized in the state of Texas, and is and has been,

25         the owner of 8,229,500 shares of common stock of

1           SkyComm."

2   Did I read that correct?

3   A    You did.

4   Q    Does Puddy, Limited today own 8,229,500 shares of common

5   stock of SkyComm?

6   A    The answer is the same as I gave you for the last

7   paragraph.

8   Q    I want you to answer it, sir.

9   A    In my mind, that is correct.

10  Q    Are you of sound mind?

11  A    Last I looked, yes.

12  Q    Okay.  And you understand you're under oath --

13  A    Is that a --

14  Q    -- here today, correct?

15  A    Is that a fair question.

16          THE COURT:  All right.  Now wait a minute.  You don't

17  get to ask questions, Mr. McCrary.

18          THE WITNESS:  I don't get to ask questions.

19          THE COURT:  All you et to do is answer.

20          MR. JONES:  You can corner me out in the hall.

21          THE COURT:  Mr. Jones, go ahead and ask your question

22  again.

23          THE WITNESS:  Yes.

24  BY MR. JONES:

25  Q    And I'm not trying to make fun of you.

MCCRARY - CROSS                          204

1  A    I understand.

2  Q    You said that in your mind, and so I've not got to

3  understand your mind.

4  A    Right.

5  Q    Are you on any medication today?

6  A    No.  I took my last one this morning.

7  Q    Okay.  And I don't want to know about your medical

8  history.

9        But do the drugs that you take affect your ability to

10 think?

11 A    No.

12 Q    Okay.  And so you understand where you are today, correct?

13 A    I do.  I know where I am.

14 Q    You understood you took an oath to tell the truth, the

15 whole truth, and nothing but the trust.

16 A    I do.

17 Q    Do you understand that if you were to not do that, you

18 could get some very serious trouble, correct?

19 A    I understand.

20 Q    All right.  And it is your testimony sitting here today

21 that you and your wife's family partnerships today own

22 8,229,500 shares of common stock of SkyComm, that Puddy, and

23 6,584,972 -- 6,584,972 shares of SkyComm in Movada.  Is that

24 your testimony?

25 A    May I answer why I think that?

MCCRARY - CROSS                                    205

1  Q    No, sir.  Just yes or no.

2  A    Yes.

3  Q    Okay.  Do you believe that SkyComm today has offices?

4  A    I don't know what SkyComm is today.

5  Q    Then how do you know you own it if you don't know what it

6  is.

7  A    I know that I had it.  I have copies of it.

8  Q    No, sir.  The question is, you said your answer was I own

9  it today.  What is it that you own today?

10     **(Pause)**

11 A    I don't have a good answer for you, do I?

12 Q    I didn't think you did.  All right.

13 A    'Cause you want to hear one thing, and I'm trying t tell

14 you something totally different.

15 Q    I'm after the truth, Mr. McCrary, that's all.

16 A    Well the truth is, there's a history, and you're not

17 letting me tell it.

18         **MR. JONES:**  Judge, objection.  There's no question.

19         **THE COURT:**  I'll sustain.  There's no question on the

20 table.

21 **BY MR. JONES:**

22 Q    Mr. McCrary, do you own any interest in SkyComm today?

23 A    Did I what?

24 Q    Do you own any interest in Clearsky?

25 A    I have no idea what to do with my shares.

MCCRARY - CROSS                                     206

1   Q    Do you own an interest in Clearsky?

2   A    I don't know.  I don't know what they did with my shares.

3   So if they --

4   Q    Shares of what?

5   A    SkyComm.

6   Q    All right.  So it's your position that because of your

7   interest in SkyComm, you might own an interest in Clearsky?

8   A    I doubt that I own any interest in Clearsky.

9   Q    All right.  So yes or no.

10  A    No.

11  Q    All right.

12       **(Pause)**

13  **BY MR. JONES:**

14  Q    Do you know what Clearsky is?

15  A    I don't know the history of Clearsky.

16  Q    It's a yes or no question.

17  A    No.

18  Q    Okay.

19       **(Pause)**

20  **BY MR. JONES:**

21  Q    Have you ever had any experience with the Wilson Vukelich

22  Law Firm?

23  A    Ask me that again.

24  Q    Have you ever had any experience with the Wilson Vukelich

25  Law Firm?

1   A    We're not talking about Wilkinson Cunard (phonetic).

2   Q    No, sir.

3   A    Okay.  No.  Sorry.

4   Q    Do you know that your companies sued Wilson Vukelich?  Do

5   you know that?

6   A    No.

7   Q    Okay.  But you read this petition, correct?

8   A    I've glanced through it.  I can't say that I read every

9   line on it.

10  Q    Now you told me earlier you read it.

11  A    Well --

12  Q    Now we're after the truth here.

13  A    I read --

14  Q    Yes or no.

15  A    I read it in the sense I'm aware of the petition.

16  Q    So you read it or you didn't read it?

17  A    I read most of it.

18  Q    How much?

19  A    I don't know.  What are you trying to get to?  Ask me the

20  question.

21  Q    Did you read it?

22  A    I read most of it.

23  Q    How much?

24  A    I don't know.  How much is relative.

25  Q    Relative to what?

1   A    Relative to how much I read it for.

2   Q    Well how much of it did you read?

3   A    It's relative.

4   Q    What?

5   A    Two-thirds, one-third, three-fourths?  Are you badgering

6   me?

7            **MR. GOLDMAN:**  Your Honor, objection.

8            **THE WITNESS:**  What's the deal.

9            **THE COURT:**  Okay.

10           **MR. GOLDMAN:**  He's badgering the witness.

11           **THE COURT:**  I'll sustain.  I think it's clear,

12  Mr. Jones he has testified that he did not read the entire

13  document.  And so I think you've adduced the testimony.

14  **BY MR. JONES:**

15  Q    Mr. McCrary, you testified that you wrote down your

16  private thoughts on two sheets of paper, and those two sheets

17  of paper form the basis of where we are today.  Did I

18  understand that correctly?

19  A    That could very well be true.

20  Q    All right.  Did anyone ask you to write down your thoughts

21  on those two sheets of paper?

22  A    No.  I just really got to thinking about this whole --

23  since I formed the company, it was my baby, and it more or less

24  died on me.

25  Q    Understood.

1   A    For various reasons, which I could explain.  But I haven't

2   been asked that.

3   Q    Right.

4   A    Then ask me the question again.

5   Q    Fair enough.  All right.  We'll start again.

6           The two pages that you wrote down your thoughts.

7   A    The two pages I wrote because they had -- it was welled up

8   within me that these thoughts needed to be put on paper.

9   Q    Okay.  And no one asked you to do it.  It was your way of

10  getting it out.  Fair enough?

11  A    Right.

12  Q    Getting it out of your system.

13  A    Right.

14  Q    All right.  And at the point in time where you wrote those

15  two pages, there was no lawyer that had asked you to do that,

16  correct?

17  A    No.

18  Q    All right.  And you took that two sheets of paper, who'd

19  you give it to?

20  A    There was a thought.

21  Q    There was a what?

22  A    There was a thought that if I put these thoughts on paper,

23  there might be an attorney who would take a look at this.

24  Q    That was your --

25  A    And that was my purpose.

MCCRARY - CROSS                           210

1   Q    Okay.  But you didn't have an attorney.

2   A    I didn't have an attorney, no.

3   Q    Fair enough.  Who did you give it to was my question.

4   A    Eventually, I gave it to Mr. Goldman.

5   Q    Who else did you give it to?

6   A    Mr. Charles Stack, Mr. Joe Baker, some others that were

7   involved directly in the company, maybe -- I don't recall

8   exactly.  Those were the primary ones that I knew would

9   understand what I was writing --

10  Q    Did you keep a copy.

11  A    -- 'cause they were there.

12        Oh, yeah.

13  Q    Okay.  And you got a copy now?  Not with you, just do you

14  have a copy?

15  A    Sure.

16  Q    Okay.  And you know where that copy is today.

17  A    It's on my computer.

18  Q    On your computer.  Gotcha.

19  A    I could use some water now since you asked me before.

20  Q    Sure.

21        THE COURT:  Let's do this.  why don't we come back at

22  quarter of seven.  Let's take a roughly an eight minute break.

23  Let's let Mr. McCrary get a glass of water.  And everyone can

24  use the restroom.  We'll be back at quarter of seven.  Thanks.

25        (Recess taken from 6:38 p.m. to 6:55 p.m.)

1      **THE COURT:**  Proceedings that we began this morning.

2    *Adversary 10-3150 and 10-3225.*  When we broke Mr. Jones was

3    cross examining Mr. McCrary.  And you may proceed.

4      **MR. JONES:**  Thank you, Judge.  Just a couple more

5    questions.

6    **BY MR. JONES:**

7    Q    Mr. McCrary, you ready to go?

8    A    You bet.

9    Q    All right.  Now you made the statement that Mr. Goldman

10   was an investor based on his talent.  I couldn't really hear.

11   I just -- was I close.

12   A    Close, yes.

13   Q    Did he actually own shares?

14   A    Yes.

15   Q    All right.  Did he own them individually or through an

16   entity?

17   A    Entity.

18   Q    What was the name of the entity?

19   A    I'd have to look at the --

20   Q    Does Gloster ring a bell?

21   A    That seems to ring a bell.  Yes, thank you.

22   Q    And is that a Plaintiff?  Are they a Plaintiff in this

23   case?

24   A    Yes.

25   Q    Thank you, sir.  Good luck to you.

1              **THE COURT:**  All right.  Let's see, Mr. Goldman, any

2    redirect?

3              **MR. GOLDMAN:**  Yes, your Honor.

4         **(Pause)**

5                        **REDIRECT EXAMINATION**

6    **BY MR. GOLDMAN:**

7    Q    Mr. McCrary, I'd like to give you the opportunity to

8    complete an answer that you were trying to provide for the

9    Court's benefit before.

10             And you made a statement that, this was in connection

11   with your discussion where you were saying you think you're

12   still a shareholder.  You said something about sending your

13   shares to Canada.  Could you elaborate on that?

14             **MR. JONES:**  Judge, I'm going to object --

15             **THE WITNESS:**  Sure.

16             **MR. JONES:**  -- as being beyond the scope.

17             I asked him a yes or no question.  Didn't want the

18   answer.

19             **THE COURT:**  I'll overrule.  I'm going to overrule.

20   You can answer the question, please.

21   **BY MR. GOLDMAN:**

22   Q    Let me rephrase that.

23   A    Okay.

24   Q    Who did you send the shares to in Canada?

25   A    Let me give you a little bit of background.  I just --

MCCRARY - REDIRECT                        213

1            **MR. JONES:**  No, Judge.

2            **MR. GOLDMAN:**  I want to answer the question first who

3    you sent them to if you don't mind.

4            **THE COURT:**  Mr. McCrary, listen to the question

5    that's posed to you and answer only --

6            **MR. GOLDMAN:**  I'll --

7            **THE COURT:**  -- the question.  Okay?

8    **BY MR. GOLDMAN:**

9    Q    I'll get to the other question, I just want Mr. Jones to

10   understand the relevance of the question.

11           Who did you send the shares to?

12   A    Under the direction of Mr. Kubbernus, we sent them to

13   Canada.

14   Q    To recall to who it went in Canada?

15   A    I believe to the first.

16   Q    Was it Wilson Vukelich?

17   A    I believe so.

18   Q    Thank you.

19           Now why did you send your shares to Wilson Vukelich

20   under Mr. Kubbernus' direction?

21   A    Mr. Kubbernus was creating a company off the shelf that

22   was called LaVelle (phonetic).  And there was to be an exchange

23   of shares.  And then there was to be a roll up.  And many good

24   things were going to happen.

25           Consequently, we Fedex'd our shares and kept copies

MCCRARY - REDIRECT                                214

1    of them.

2    Q    Did Mr. Kubbernus ask you to send your shares to Wilson

3    Vukelich in Canada?

4              **MR. JONES:**  Objection.  It's leading.

5              **THE COURT:**  Sustained

6              **MR. GOLDMAN:**  Sorry.  I'm just trying to lay the

7    foundation for the next question.

8              **THE COURT:**  Can't lead your witness.

9              **MR. GOLDMAN:**  Sorry.  Okay.

10   **BY MR. GOLDMAN:**

11   Q    What was the reason given by Mr. Kubbernus for why you

12   should send your shares to Canada?

13   A    'Cause there would be an exchange with the LaVelle of

14   shares.  And we were going to be given three cents a share, I

15   believe it was, for our --

16   Q    In --

17   A    But it was exchange of shares.  No money exchanged.

18   Q    Did you ever receive your LaVelle shares?

19   A    No.

20   Q    Did you ever receive your SkyComm shares back?

21   A    No.

22   Q    To our knowledge, to this day, where are your SkyComm

23   shares?

24   A    With the law firm in Canada that I sent them to.

25   Q    Wilson Vukelich.

MCCRARY - REDIRECT                          215

1   A     Exactly.

2   Q     And is that what you mean when you say that in your mind

3   you still own the shares?

4   A     Absolutely.

5   Q     Thank you, Mr. McCrary.

6          **MR. GOLDMAN:**  I have no more questions.

7          **THE COURT:**  All right.  You can step down.  Thanks,

8   Mr. McCrary.

9          **THE WITNESS:**  Thank you.

10         **THE COURT:**  You can leave that booklet right there.

11  Thanks.

12     **(Witness steps down)**

13         **THE COURT:**  Let's see --

14         **MR. JONES:**  Judge?

15         **THE COURT:**  Yes.

16         **MR. JONES:**  In fairness to Mr. McCrary, 'cause he's

17  had a hard day.  And I understand he's got some health

18  problems, he probably doesn't understand that he can leave.

19         And so if you could -- I didn't make it clear.

20         **THE COURT:**  Okay.  Mr. McCrary, if you want, you're

21  entitled to leave.

22         **THE WITNESS:**  Okay.  Thank you, your Honor.  I'll

23  probably stay a little bit longer.

24         **THE COURT:**  Thanks.

25         Let's see.  Mr. Goldman, Mr. Smith, do you have any

1    other witnesses you want to call?

2              **MR. GOLDMAN:**  Yes.  We have one more witness.  I'd

3    like to call Brogan Taylor to the stand.

4              **THE COURT:**  All right.  Please come forward.  Miss

5    Attaway will swear you in.

6         **(Pause)**

7              **THE CLERK:**  Please raise your right hand.

8              **THE COURT:**  Once you get situated in the witness box,

9    if you would kindly state your full name an spell your last

10   name, please.

11             **THE WITNESS:**  My full name is Peter Brogan Taylor.  I

12   go by my middle name, Brogan.  Last name is spelled

13   T-a-y-l-o-r.

14             **THE COURT:**  Thanks.  Please, Mr. Goldman.

15                      **DIRECT EXAMINATION**

16   BY MR. GOLDMAN:

17   Q    Mr. Taylor, where do you live?

18   A    I live in Toronto, Ontario.

19   Q    And can you give us your educational background?

20   A    Yes.  I went to undergrad at Bishop's University in

21   Quebec, Canada.  And did a BBA degree, Bachelor of Business

22   Administration, major in finance.

23   Q    And when did you graduated?

24   A    Graduated in 2005.

25   Q    And can you give me your employment history?

TAYLOR - DIRECT                                    217

1   A    I had a short stint with Scotia Bank in Toronto in the

2   institutional equity trading floor, just filling in on a mat

3   leave position.  So it was a couple of months after my

4   graduation.  And I joined the firm Balaton, in September of

5   2005.

6   Q    You joined Balaton?

7   A    Yes.

8           **MR. JONES:**  Judge, could I ask the witness to pull

9   the microphone closer.  I'm having trouble hearing.

10          **THE COURT:**  Yeah.  Can you move the mic closer to

11  you.  There was go.  Thanks.

12          **MR. JONES:**  Thank you, Judge.

13  **BY MR. GOLDMAN:**

14  Q    And who was the head of Balaton at the time you joined?

15  A    Mr. Kubbernus was.

16  Q    And do you recall when you joined Balaton?

17  A    September of 2005.

18  Q    And so this was before Balaton got involved in the SkyComm

19  transaction?

20  A    That's correct.

21  Q    And how long were you employed by Balaton?

22  A    Well I resigned in, I guess, March of 2009.  So a little

23  over four years, I guess.

24  Q    And can you explain why you resigned in March of 2009?

25  A    Well there's a number of reasons, some of which included,

TAYLOR - DIRECT                                    218

1   I guess, at the time --

2   Q    Could you speak into the mic?

3   A    At the time I was Vice President Asset Manager.  And I was

4   primarily responsible for the latter half of my employment

5   to -- involved in the SkyComm and SkyPort projects, which

6   included Clearsky Limited Partnership.

7   Q    You were the asset manager for SkyComm.

8   A    Yes.  I was directly involved with the ongoings of Balaton

9   around those projects.  But at the -- around, I guess, December

10  of 2008, I guess it was, Mr. Kubbernus was taking amore direct

11  role at SkyPort in Houston.  So he was taking over that

12  project.  And I kind of morphed into more of the Balaton guy in

13  Toronto.

14          And so I took a further look into the Balaton kind of

15  books and figured out where Balaton was at.  And I realized

16  that we hadn't paid a lot of our rent, we hadn't paid a lot of

17  our suppliers, or legal counsel.  We were way behind.  Cash

18  flow was really low.  We hadn't paid a lot of our employees.

19  We were way behind.  I was included in that.  I was owed wages

20  at the time.

21          And also I noticed that we had been -- or Balaton had

22  been taking loans from some of its consultants or people it's

23  done business with, with promises to pay them back.  But when

24  these -- those came due, I couldn't get any response from

25  Mr. Kubbernus.  So I explained that to him a letter of

TAYLOR - DIRECT                          219

1    resignation that I gave him on, I think it was March 9th, 2009.

2    Q    Do you believe Mr. Kubbernus had an intent of paying them

3    back when he took their money?

4         **MR. ROTHBERG:**  Your Honor, objection.  He's

5    speculating about someone else's --

6         **MR. GOLDMAN:**  I'm going to ask him if he has a basis

7    for that.

8         **THE COURT:**  All right.  Hold on a minute.  I'll

9    sustain the objection.  You can't speak about what was going

10   through Mr. Kubbernus' mind.  The way the question has been

11   asked, it's a sustainable objection.

12   **BY MR. GOLDMAN:**

13   Q    Let me ask a different question then.

14        **(Pause)**

15   **BY MR. GOLDMAN:**

16   Q    Now you were, during this period of time, the asset

17   manager for SkyComm, SkyPort?

18   A    That's correct.

19   Q    Now did SkyPort and SkyComm have separate bank accounts?

20   A    Sorry.  What do you mean by that?

21   Q    Was here a SkyComm bank account?

22   A    SkyComm bank account?  Not that I was aware of, no.

23   Q    Was there a SkyPort bank account?

24   A    At the company itself there was. Yes.

25   Q    Were there separate financial statements for SkyComm and

TAYLOR - DIRECT                           220

1   SkyPort?

2   A    They reported on a consolidated basis.

3   Q    Do you know if the financials were kept independently for

4   each company?

5   A    That's kind of hard for me to recall.  I don't really

6   recall.

7   Q    Let me ask you this.  Were you familiar with the Wilson

8   Vukelich Trust Account?

9   A    Yes, I am.

10  Q    Can you describe that trust account?

11  A    Well there's various trust accounts.  One in particular

12  was set up for the Clearsky Limited Partnership.  And then

13  there was various others for other projects that Balaton was

14  involved with.

15  Q    Who controlled those accounts?

16  A    Any inflow or outflow, mostly outflow of funds, were under

17  the direction of Mr. Kubbernus.

18  Q    And did you make an effort to reconcile the Wilson

19  Vukelich accounts?

20  A    Once I, I guess I did, in kind of December, 2008, when

21  Mr. Kubbernus took a more direct role with SkyPort.  And I

22  turned my attention to Balaton.

23       I took a look and the books and started to try to

24  reconcile some of those trust accounts, but couldn't make too

25  much sense of it.

TAYLOR - DIRECT                                221

1  Q    When you say it didn't make too much sense, were you able

2  to reconcile the accounts?

3  A    No.

4  Q    Did Balaton have financial officers during the period that

5  you were with the company?

6  A    There were various controllers that worked at Balaton

7  while I worked there.

8  Q    What was the tenure, if you recall, names and tenures of

9  these controllers?

10  A    Names.  I remember that was a Ross Harrison and a David, I

11  can't recall his last name.  I feel terrible, because I knew

12  him quite well.  But I haven't been there in a while.

13          There was definitely two.  And then there was a woman

14  that kind of came in on a few days a week basis when I first

15  started.  So we cycled through a few -- a number of controllers

16  when I was there.

17  Q    This is in a couple of year period, '05 to'09?

18  A    September, '05 till my resignation in March.

19  Q    Now did you know a woman by the name of Dawn Cole?

20  A    Yes.  Very well.

21  Q    Was she employed by Balaton?

22  A    Yes, she was.  She was a -- well she was -- I'm not sully

23  aware of how her employment was structured.  But I think she

24  was an independent contractor because she was an American.  And

25  she had that consulting firm Lode Star.

TAYLOR - DIRECT                                      222

1  Q     Lode Star.

2  A     But she carried a Balaton card.  And was a VP and asset

3  manager just like myself.

4  Q     And she was full time?

5  A     Yeah.

6  Q     And what were her responsibilities?

7  A     Pretty much the same as mine, but for other projects,

8  other than SkyPort and SkyComm.  She was heavily involved with

9  those projects.  We did quite a big of cross, I guess cross

10 work.  We helped each other out.  But --

11 Q     Which projects or project was she responsible for I

12 particular?

13 A     On the latter part of my employment, she was primarily

14 responsible for a project called Victoria Gray, which was a

15 real estate investment project in Detroit.

16 Q     And were there any communications you had with her

17 regarding Victoria Gray that influenced your decision?

18      **MR. ROTHBERG:**  Your Honor, I guess I would object to

19 the relevance of this.

20      **MR. GOLDMAN:**  Sorry.

21      **MR. ROTHBERG:** Victor Gray had -- is nowhere even

22 mentioned in the 111 pages.  It's ridiculous.

23      **THE COURT:**  it's a fair objection.  I'll sustain.

24   **(Pause)**

25 //

TAYLOR - DIRECT                                            223

1    **BY MR. GOLDMAN:**

2    Q    Let me ask you this, you did have an opportunity to

3    examine the Wilson Vukelich Trust Account?

4    A    Yes.

5    Q    And were you able to analyze where the funds that went

6    into that -- first of all, where did the funds that went into

7    that account come from?

8    A    Well I guess you'd need to specify which account, which

9    trust account.

10   Q    The Wilson Vukelich Trust Account for Clearsky.

11   A    Clearsky, I certainly did take quite a detailed look at

12   that trust account.  So I could see the funds coming in from

13   investors, or the unit holders of Clearsky.  And then the funds

14   be disbursed to legal firms.

15        **MR. ROTHBERG:**  Objection, your Honor.  He's

16   testifying from hearsay documents that are not in evidence.

17        **THE COURT:**  I'll sustain.

18   **BY MR. GOLDMAN:**

19   Q    To your knowledge, without reverting to the document, do

20   you knew where the money that was in the Clearsky Trust Account

21   at Wilson Vukelich that was controlled by Mr. Kubbernus went?

22   A    Yes.

23   Q    And to your knowledge, approximately how much of that

24   money went into SkyComm?

25   A    Approximately 4.8 million.

TAYLOR - DIRECT                              224

1        **MR. ROTHBERG:**  Your Honor, It's the same objection.

2   I don't know how he could possibly know a number without having

3   to refer to the document.

4        **THE COURT:**  I'll sustain the objection.

5        **MR. ROTHBERG:**  It's no in evidence.

6        **MR. GOLDMAN:**  Your Honor, he --

7        **THE COURT:**  I'll sustain  the objection.  I've got to

8   see the document in evidence.

9        **MR. GOLDMAN:**  Your Honor, may I speak on that for a

10  moment?

11       If the witness has an independent recollection of how

12  much money went in, then he's not testifying about a document

13  that's no in evidence.  He's testifying about his knowledge as

14  to where the money went.

15       **THE COURT:**  I'm going to sustain the objection.  I

16  need to see a document to testify about.

17       **(Pause)**

18  BY MR. GOLDMAN:

19  Q    Do you know how much money Balaton, your employer,

20  invested into SkyComm, which was the company that you were

21  responsible for asset managing?

22  A    Directly?

23  Q    Directly or indirectly.

24  A    I know that there's -- there's a few ways that Balaton

25  accumulated, I guess, its equity interest in SkyComm.

1    Q    Not my question.  How much cash did Balaton invest to your

2    knowledge?

3              **MR. ROTHBERG:**  Again, the same objection.  It has to

4    be -- get that knowledge from a document that's no in evidence.

5              **MR. GOLDMAN:**  He could have --

6              **MR. ROTHBERG:**  Or maybe somebody could have told it

7    to him  But it would be, again, a hearsay statement.

8              **MR. GOLDMAN:**  He was the person who was in charge --

9         **MR. JONES:**  Judge?

10             **MR. GOLDMAN:**  -- of this.  If he can't testify and he

11   doesn't know --

12             **MR. JONES:**  I object to the lawyer talking to a

13   lawyer.  And I would ask a brief *voir dire* of the witness.

14             **MR. GOLDMAN:**  Very good.

15             **THE COURT:**  All right.  Come on forward, Mr. Jones.

16   *Voir dire* the witness.

17        **(Pause)**

18                          ***VOIR DIRE***

19   **BY MR. JONES:**

20   Q    Mr. Taylor, good evening.

21             I'm going to ask you -- you heard a question that was

22   asked of you by Mr. Goldman, correct?

23   A    Yeah.  If I recall correctly, it was how much money did

24   Balaton put into --

25   Q    Right.

TAYLOR - *VOIR DIRE*                                226

1   A     -- SkyComm directly.

2   Q     In order for you to learn that information, did you look

3   at documents?

4   A     Well I was intimately involved with the whole project --

5   Q     Yes or no.

6   A     -- from the beginning, so yes.

7   Q     Did you look at documents?

8   A     Through my employment?

9   Q     Just did you look at documents to learn what the numbers

10  were?

11  A     Yes.

12  Q     Did you talk to people?

13  A     No.

14  Q     So you learned -- you came up with a number that's in your

15  head solely by looking at a document or a number of documents.

16  A     And being intimately involved with the project from start

17  to finish.  So I had --

18  Q     Okay.

19  A     -- a pretty good handle on it.

20  Q     Did you make the decision when to make an investment or

21  how much to make the investment?

22  A     No.  But I was intimately involved with that process.

23  Q     I want you to listen to me, sir.  When I ask you a

24  question, I want the answer.  This is not an opportunity for

25  you to talk.  All right?

TAYLOR - *VOIR DIRE*                    227

1  A    Understood.

2  Q    Then follow the instructions.

3           In order for you to understand how much an investment

4  was made, did you have to look at a document?

5       **(Pause)**

6  A    I'm not sure exactly how to answer that, because --

7  Q    Fair enough.  I'll ask you some addition questions.

8           Did anybody tell you how much had been invested?

9  A    No.

10 Q    Did you make the decision yourself of how much to invest?

11 A    No.  I was not solely responsible, no.

12 Q    Did you make any of the decisions?

13 A    No.

14 Q    Did you participate in discussions to make the decision?

15 A    Yes.

16 Q    All right.  So you did have conversations with other

17 people about how much money would be invested, correct?

18 A    Correct.

19 Q    And you looked at documents, correct?  Did you look at

20 wire transfers, bank statement.

21 A    Correct.

22 Q    Cash flow statements.

23 A    Yes.

24 Q    So you looked at documents.

25 A    Yes.

1  Q    And you don't have those documents here today do you?

2  A    I don't have anything with me.  No.  I was told to come

3  here last night.

4           **MR. JONES:**  Judge, his entire foundation is based

5  upon documents that are not here.  It's all hearsay.

6           **THE COURT:**  I'm going to sustain the objection.

7                 **DIRECT EXAMINATION (CONTINUED)**

8  **BY MR. GOLDMAN:**

9  Q    Mr. Taylor, did your duties at the company include

10 preparing cap tables listing who the investors in the company

11 were?

12 A    Yes.  Excuse me, yes.

13 Q    Did your duties at the company include preparing financial

14 information?

15 A    In what context?

16 Q    Financial information in the context of communications to

17 prospective investors and the like.

18 A    Yes.

19 Q    In the course of preparing those statements, did you have

20 communication with Mr. Kubbernus?

21 A    Yes.

22 Q    Did Mr. Kubbernus, at any point, tell you how much money

23 Balaton had invested in SkyComm?

24 A    Yes.

25 Q    Can you tell me what Mr. Kubbernus told you?

1   A    Well that we had -- Balaton had 120,000 invested in

2   Clearsky, which was an indirect investment in SkyComm.

3   Q    That was an indirect investment in SkyComm.

4   A    Yes.

5   Q    Did he tell you of any other funds that Balaton had

6   invested in SkyComm?

7   A    Dollars, no.  But --

8   Q    Did Mr. Kubbernus tell you, and you spoke to Mr. Kubbernus

9   frequently?

10  A    Pretty much every day.  He was my direct boss.

11  Q    Did he tell you at any time in your employment at Balaton,

12  that Clearsky was not a shareholder in SkyComm?

13  A    Never once.

14  Q    Did he ever tell you that Clearsky was a shareholder in

15  SkyComm?

16  A    Yes.

17  Q    Did you ever prepare documents that reflected the fact

18  that Clearsky was a shareholder in SkyComm?

19       **MR. RAY:**  Your Honor, I have objected in earlier

20  testimony to testimony about hearsay.  I'm going to renew my

21  objection.

22       In every pleading that our clients have filed, we

23  have said the Clearsky issue was reserved and is not part of

24  the discharge injunction.  I just don't see the relevance to

25  this motion.

TAYLOR - DIRECT                                    230

1          **THE COURT:**  Relevance?

2          **MR. GOLDMAN:**  The relevance is that the witness has

3    testified as to Balaton's interest and control of Clearsky.

4    And I'm trying to get to the bottom of where that came from,

5    which is an essential part of our complaint, not just on behalf

6    of the Clearsky shareholders, but on behalf of all of the

7    shareholders.

8          And I can clear this up very quickly, your Honor,

9    with one or two additional questions.

10         **THE COURT:**  You've got two questions.  I'll carry the

11   objection.

12         **MR. GOLDMAN:**  Thank you, your Honor.

13   **BY MR. GOLDMAN:**

14   Q    In the course of preparing the financial, the cap tables,

15   listing the shareholders of the company.  Towards the end of

16   your tenure, how many shares in SkyComm did Balaton have?

17   A    I do not recall.  I'd have to --

18   Q    Do you recall approximately.

19   A    Approximately?

20         **MR. JONES:**  Objection.  Calls for speculation.

21         **THE COURT:**  I'll sustain.

22         **MR. JONES:**  It also assumes facts not in evidence.

23         **THE COURT:**  I'll sustain.

24   **BY MR. GOLDMAN:**

25   Q    Do you recall if it was more or less than 500 million?

TAYLOR - DIRECT                      231

1          **MR. JONES:**  Judge, objection.  Calls for speculation.

2    Assumes facts not in evidence.

3          **THE COURT:**  I'm going to sustain the objection.

4      **(Pause)**

5    **BY MR. GOLDMAN:**

6    Q    Were the Clearsky investors, to your knowledge, told that

7    they controlled the majority interest in SkyComm?

8          **MR. RAY:**  Your Honor --

9          **MR. GOLDMAN:**  By Mr. Kubbernus?

10         **THE COURT:**  Okay.  Hold on a minute.  Let's see.  Go

11   ahead and state your question.  And let's see if it draws an

12   objection.  Go ahead and state your question again, please.

13   **BY MR. GOLDMAN:**

14   Q    To your knowledge, did Mr. Kubbernus represent to the

15   Clearsky investors that they owned the majority of SkyComm?

16   A    Yes.

17         **MR. RAY:**  Your Honor, at this point, I move to strike

18   that answer.  Because we had a representation from counsel that

19   he would tie this up in two questions.  It's been three.  I

20   don't see any tie in to the prior objection that we raised,

21   that this entire Clearsky issues has nothing to with the

22   violation of the discharge.

23         **MR. GOLDMAN:**  May I respond a, your Honor?

24         **THE COURT:**  Hold on a minute, Mr. Jones is standing.

25   So we'll let him make his objection.  And I'll give you a

TAYLOR - DIRECT                          232

1   chance to response.

2          **MR. JONES:**  Objection.  Hearsay.  Objection.  Lack of

3   foundation.

4          Though he says he was there when he told him, by

5   definition it has to be hearsay.

6          **THE COURT:**  Your response to the objections that have

7   been lodged.

8          **MR. GOLDMAN:**  My response to the objections, first.

9          Okay.  Your Honor, the case is about fraud on

10  investors by Mr. Kubbernus.  The fraud is demonstrated by

11  numerous acts.  And that -- those acts together, the acts of

12  fraudulent, oppressive, and illegal conduct constitute

13  oppression as well.  So we have pleaded these -- that's the

14  legal formula for it, fraudulent, oppressive, and illegal

15  conduct.

16         And what I'm trying to do is through this witness,

17  you know, obtain testimony, if possible, regarding the

18  fraudulent, oppressive, and illegal conduct by Mr. Kubbernus

19  which it is our position is all direct, you know, those are all

20  direct claims.

21         Now they're claiming there was injury by us bringing

22  direct claims against the company.  And I'm trying to address

23  that.  I have a second purposes here, which is that

24  Mr. Kubbernus has testified before this Court, and has

25  testified not just this time, but testified last time in front

TAYLOR - DIRECT                                    233

1   of this Court.  We did not come to this Court to say that we

2   are going to challenge Mr. Kubbernus' testimony.

3           We did not challenge the confirmation plan.  We

4   didn't challenge any aspect of it.  We sued him for monetary

5   damages.  That's what our lawsuit is about.

6           We're here in this Court because these gentlemen

7   dragged us into this Court saying the claims are, you know,

8   they're not fraud claims against Mr. Kubbernus.  They're

9   derivative claims which belong to the company.

10          And I'm trying to illustrate, number one, that that

11  is not the case.  And number two, and that there's very strong

12  basis for fraud claims for Mr. Kubbernus in relation to

13  SkyComm, SkyPort.

14          And number two, we believe it goes to the witness'

15  credibility.  The witness got up and testified that his company

16  has been damaged.  And he made various statements about being

17  the controlling shareholder of SkyComm today.

18          And it turns out that, in fact, this witness has just

19  testified that he's not or he wasn't.

20          **MR. JONES:**  Judge, after about six minute legal

21  argument, he didn't answer the objections.  We've ask that they

22  be sustained.

23          **MR. GOLDMAN:**  Your Honor, I believe my answer to the

24  objections are it goes to credibility and it goes to the

25  merits.

TAYLOR - DIRECT                                    234

1          It goes to the credibility of Mr. Kubbernus.  And it

2   goes to the merits as to whether or complain is somehow putting

3   the could of SkyPort on Mr. Kubbernus.  Now we are allowed to

4   put a cloud on Mr. Kubbernus, because we're suing

5   Mr. Kubbernus.  But that's doesn't pt a cloud on the company

6   per se.

7          **MR. JONES:**  Judge, the objection is to hearsay and

8   lack of foundation.

9          **THE COURT:**  I'm going to sustain the objection,

10  because I -- Mr. Goldman, I don't think you've addressed the

11  issue of hearsay.

12         **MR. GOLDMAN:**  Let me rephrase my question.

13         **THE COURT:**  All right.

14  **BY MR. GOLDMAN:**

15  Q   Did Mr. Kubbernus make a statement to you personally that

16  Clearsky controlled a majority interest in SkyComm?

17  A   Yes.

18  Q   To your knowledge, did he make that statement in your

19  presence to --

20         **MR. RAY:**  Your Honor?  I'm sorry.

21         **THE COURT:**  Hold on.

22         **MR. RAY:**  I'm sorry.

23         **THE COURT:**  Let him finish asking the question,

24  please.

25  //

TAYLOR - DIRECT                                    235

1    **BY MR. GOLDMAN:**

2    Q    Did he make that statement in your presence to any

3    investors?

4    A    Yes.

5         **(Pause)**

6         **MR. RAY:**  And, your Honor, I'm going to renew my

7    objection.

8         **THE COURT:**  I'm going to overrule the objection.

9         **(Pause)**

10   **BY MR. GOLDMAN:**

11   Q    Did you personally make an effort to have --

12        **MR. ROTHBERG:**  Your Honor, he's way beyond two

13   questions.

14        **MR. GOLDMAN:**  I move on to another question.

15        **THE COURT:**  He has.  Go ahead.

16        **MR. ROTHBERG:**  Oh, I thought he was limiting it.  I

17   thought he was finished.  I'm sorry.

18        **THE COURT:**  No.  No.

19        **MR. ROTHBERG:**  I thought the two questions and you

20   were done.

21        **THE COURT:**  No.  No.  Go ahead.

22   **BY MR. GOLDMAN:**

23   Q    Did you make an effort to correct the books of the

24   corporation so that they reflected -- that Clearsky was the

25   majority owner of SkyComm?

1   A     I looked into the papering of the transaction and realized

2   that the actual shares had not been transferred to the unit

3   holders of Clearsky.  So I brought that to Mr. Kubbernus'

4   attention.

5   Q     And what was Mr. Kubbernus' response to you?

6   A     Not to do anything about it at that point in time.

7   Q     And did he explain why you shouldn't do anything about

8   that at that point in time?

9   A     He was pretty vague.  It was right before the second

10  bankruptcy filing, or Chapter 11 filing.  And he said that we

11  would be taking care of that as we clean everything up.

12  Q     Let me ask you another question.

13        You were not an investor in SkyComm, were you?

14  A     Not personally, no.

15  Q     Were you an investor in Clearsky?

16  A     No, not personally.

17  Q     Did you have any relatives who were investors in the

18  company?

19  A     My father's a Clearsky investor.

20  Q     Your father's a Clearsky investor.

21  A     Yes.

22  Q     How much did your father invest in Clearsky?

23  A     A million dollars, U.S.

24  Q     And did there come a time when you discussed your father's

25  investment in Clearsky with Mr. Kubbernus?

TAYLOR - DIRECT                                237

1   A    Yes.

2   Q    And can you describe that conversation to the best of your

3   recollection.  Who said what.  And first of all, when did that

4   conversation occur?

5   A    Well we had multiple conversation about the Clearsky

6   ownership of the SkyComm entity, and subsequently the SkyPort

7   operating company.

8        We talked about it all the time, and all the way

9   through till I resigned, even after I resigned, into the summer

10  of 2009 through to even September of 2009.  We talked about my

11  father's investment in Clearsky and his obvious ownership in

12  SkyComm and SkyPort.

13  Q    September, 2009.

14  A    Yes.

15  Q    What was after the confirmation of the plan.

16  A    Yes.

17  Q    And you discussed your dad's investment in Clearsky with

18  Mr. Kubbernus at the time.

19  A    Yes.

20           **MR. JONES:**  Judge.  Objection.

21           **THE COURT:**  Hold on a minute.  What's your objection.

22           **MR. JONES:**  Leading.  I've let this go on.

23           **THE COURT:**  I'll sustain.  Do not lead the witness.

24  Q    What was the substance of that conversation in September

25  of 2009?

TAYLOR - DIRECT                           238

1  A    Well I was obviously concerned for my father's investment

2  I Clearsky, since I was no longer working at Balaton.  So I was

3  continuing to communicate with Mr. Kubbernus with the

4  restructuring that he was trying to achieve at SkyPort, or in

5  SkyComm.

6          Since he had moved down to Houston, we'd just be able

7  to talk by phone of email, mostly by phone when I was able to

8  get a hold of him.  And I would ask him periodically and

9  frequently on how's the restructuring going?  Is the investment

10  of my father, with which was in Clearsky okay.  And he would

11  reassure me that everything was fine and working out.

12  Q    I'm trying to separate out in the conversation September

13  of 2009 after the confirmation order had been issued.

14          That confirmation order, in particular.  Can you

15  recall what was said?

16  A    His tone hadn't changed.  It was pretty much the same

17  conversation as we normally had.  His tone was that everything

18  was going along.  It takes a long time.  My father's investment

19  was still okay, which was in Clearsky again.  And that he had

20  achieved some -- some ground, or some -- made up some ground in

21  August in the bankruptcy proceedings.

22          I was out of the country on business, so I wasn't

23  able to attend those proceedings.

24  Q    Did he tell you that he had testified in the bankruptcy

25  case that Clearsky had no interest in SkyComm?

TAYLOR - DIRECT                                239

1   A    No.

2   Q    Did he tell you that, in fact, the confirmation order and

3   plan did not address the Clearsky investment that your dad had?

4   A    No.

5   Q    Let me switch topics with you just a little bit.

6        Do you know what Balaton paid for its -- the

7   Centurytel debentures?

8   A    Yes.

9   Q    What did they pay for the Centurytel debentures?

10       **MR. RAY:**  I'm going to object.  The only way he would

11  know that is by looking at the debenture documents.  I don't

12  think he was there.

13       **THE COURT:**  Do you want to take him on *voir dire?*

14       **MR. RAY:**  Briefly, your Honor, if I may.

15       **THE COURT:**  All right.

16       **MR. GOLDMAN:**  I can switch the question, maybe try to

17  save some time.

18       **THE COURT:**  All right.

19  **BY MR. GOLDMAN:**

20  Q    Did you have any personal conversations with Mr. Kubbernus

21  regarding the transaction where Balaton acquired the Centurytel

22  debentures?

23  A    Yes.

24  Q    Were you involved in that transaction?

25  A    Yes.

TAYLOR - DIRECT                          240

1   Q    You were actively involved in that transaction.

2   A    Yes.

3   Q    Do you know, from your own personal knowledge, not by

4   reading documents, but from Mr. Kubbernus, or from your own

5   personal knowledge, what Balaton paid for the Centurytel

6   debentures?

7   A    Yes.

8   Q    What did Balaton pay for the Centurytel debentures?

9        **MR. RAY:**  Your Honor, at this point I object again on

10  the basis of relevancy.  I don't see how this has anything to

11  do with why we're here today.

12       **THE COURT:**  Go ahead and respond.

13       **MR. GOLDMAN:**  Yeah.  I will respond, your Honor.

14       Mr. Kubbernus testified that Centurytel was a

15  creditor in this case for $2 ½ million.  I'm addressing that

16  issue.  They filed a, you know, they filed --

17       **MR. RAY:**  Your Honor?

18       **MR. GOLDMAN:**  They filed a --

19       **MR. RAY:**  Your Honor --

20       **THE COURT:**  All right.  Listen, Mr. Goldman.

21       **MR. GOLDMAN:**  Sorry.

22       **THE COURT:**  You need to speak to me.

23       **MR. GOLDMAN:**  I apologize.

24       **THE COURT:**  If you turn around and speak to them,

25  one, we don't pick you up on the mic.  And two, it ain't

1    proper.

2              **MR. GOLDMAN:**  I'm bad.  I'm sorry.

3              **THE COURT:**  Okay.  So I'm going to overrule the

4    objection.  Go ahead.  You can answer the question.

5              **THE WITNESS:**  Can you repeat the question now?

6         **(Pause)**

7    **BY MR. GOLDMAN:**

8    Q    My question was, Balaton, to your knowledge, owed

9    Centurytel $3 million --

10             **MR. JONES:**  Objection.

11             **MR. GOLDMAN:**  -- as part of the acquisition of the

12   Centurytel debentures, is that what you were -- had just

13   stated.

14             **THE COURT:**  Okay.

15             **MR. GOLDMAN:**  I'm trying to refresh to try to get

16   back on here.

17             **THE COURT:**  You can't lead your witness.

18             **MR. GOLDMAN:**  Sorry.

19             **THE COURT:**  He is not an adverse witness.  You can't

20   lead him.

21             So if you do it again, I'm going to cut you off.

22   You're experienced enough.  Don't lead you own witness.

23             **MR. GOLDMAN:**  I won't -- I will not do it again.

24             **THE COURT:**  You can sit down, Mr. Jones.

25             **MR. GOLDMAN:**  I will not do it again.

TAYLOR - DIRECT                                      242

1        **(Pause)**

2    **BY MR. GOLDMAN:**

3    Q    Do you know from your own personal knowledge or from

4    Mr. Kubbernus, what happened to that Balaton $3 million

5    obligation to Centurytel?

6    A    in what terms?  By what happened to it, what do you mean/

7    Q    Was it paid?

8    A    It was not paid, no.

9    Q    Did it continue on Balaton's books as an obligation of

10   Balaton?

11   A    No.  It ended up being an obligation of SkyPort.

12   Q    So the $3 million Balaton obligation became an obligation

13   of SkyPort.  Can you explain how that happened?

14        **MR. JONES:**  Judge, objection to form.  Objection to

15   leading.

16        **THE COURT:**  It is leading.

17        **MR. GOLDMAN:**  I'm sorry.  I just repeated the answer.

18   But I'm trying not to do that.

19        I'm sorry.

20        **THE COURT:**  Okay.

21        **MR. GOLDMAN:**  Okay.

22        **THE COURT:**  I play by the rules.  And if people

23   object --

24        **MR. GOLDMAN:**  Absolutely.  I, you know, I thought

25   there's some latitude to repeat the last one and go to the next

TAYLOR - DIRECT                                    243

1   one, but I will not repeat that last one.

2        **THE COURT:**  Okay.

3   **BY MR. GOLDMAN:**

4   Q    Do you know how that happened?

5   A    No.

6        **(Pause)**

7   **BY MR. GOLDMAN:**

8   Q    Now let me ask you this.  You familiar with the law firm

9   of Wilson Vukelich?

10  A    Yes.

11  Q    Can you tell me did they perform services for, let's see,

12  SkyComm?

13  A    For SkyComm directly?

14  Q    Yes.

15  A    I'm not sure.

16  Q    Did they perform any services on the SkyComm transaction

17  for Balaton?

18  A    Yes.  Wilson Vukelich was the primary counsel to Balaton

19  for many things.

20  Q    I see.  And who was the primary counsel to Clearsky?

21  A    Wilson Vukelich.

22  Q    Okay.  To your knowledge, did Wilson Vukelich close the

23  transaction whereby Balaton acquired title to the controlling

24  interest in -- in SkyComm?

25  A    Yes.  They actually supplied me the closing book.

TAYLOR - DIRECT/CROSS                    244

1   Q    To your knowledge, did Wilson Vukelich document the

2   ownership of Clearsky of the controlling interest in SkyComm?

3   A    No.  that was the -- that was what I had brought to

4   Mr. Kubbernus attention that he told me not to worry about, or

5   going to take are of that in the restructuring in the second

6   round in late 2008.

7   Q    All right.

8            MR. GOLDMAN:  Thank you.  I have no more questions.

9            THE COURT:  All right.  Mr. Rothberg, do you have any

10  questions?

11           MR. ROTHBERG:  No questions, your Honor.

12           THE COURT:  Mr. Ray?

13           MR. RAY:  Thank you.

14                        CROSS EXAMINATION

15  BY MR. RAY:

16  Do you have the white book in front of you?

17  A    This one?

18  Q    Yes.  Can you turn to tab three in that white book?

19  A    I'm there.

20  Q    Can you turn to the page that says page 8 of 12?

21       (Pause)

22  BY MR. RAY:

23  Q    You there?

24  A    Yeah.  I'm just checking what this document is.

25  Q    I'm just going to ask you one question.

TAYLOR - CROSS                                    245

1          Go down right in the middle on the third line, do you

2    see an address in New York?

3    A    Yes.

4    Q    What's the name of the company in New York?

5    A    Middle of the third line, it's Gloster Holdings, LLC.

6    Q    Who's Gloster Holdings, LLC run by?  Do you know?

7    A    I believe it's Mr. Sam Goldman.

8    Q    Okay.

9    A    I'm not perfectly sure, though.

10   Q    Now you were here for the entire testimony and the

11   argument, we didn't invoke the rule at the beginning.  You were

12   here for the argument at the beginning of the case; is that

13   correct?

14   A    Today?

15   Q    Yes.

16   A    Yes.

17   Q    Since 9:00 a.m. you've been here.

18   A    Yes.

19   Q    And for that I apologize.

20        You have heard repeatedly that Clearsky was -- that

21   Clearsky Draco transaction was accepted for the discharge

22   injunction, correct?

23   A    And what do you mean by that, sorry, clarify.

24   Q    Did you hear those words?

25   A    That -- repeat them?

TAYLOR - CROSS                                    246

1   Q    Did you hear that the Clearsky Draco's transaction's

2   accepted from the discharge injunction.

3   A    Yeah.  I believe those words were said --

4   Q    Okay.

5   A    -- said this morning.

6   Q    Now with Clearsky, you said you were intimately familiar

7   with it.  Did $10 million get raised, or was $7 million raised

8   in the Clearsky transaction?

9   A    Around $7 million would be more accurate.

10  Q    So $10 million was not raised.

11  Q    Okay.  But it was not raised.

12  A    No.

13  Q    Okay.  And shares were not going to be issued if $10

14  million was not raised, correct?

15  A    I'm not sure of that.

16  Q    Okay.  Now you have a business degree, right?

17  A    I do.  A BBA, yeah.

18  Q    Okay.  Have you ever held a share certificate of SkyComm

19  that said Clearsky is a shareholder?

20  A    No.  I was involved with the issuance of the shares,

21  though.

22  Q    But you never -- there was never a share with the word

23  Clearsky on it.

24  A    No.  I was instructed to issue the Clearsky shares in

25  Balaton to hold in favor of Clearsky.

TAYLOR - CROSS                                    247

1   Q     There are no shares with Clearsky's name on it.

2   A     Correct.

3   Q     Okay.  You were given a closing book by Wilson Vukelich to

4   close a transaction, correct?

5   A     I was given a closing book after the closing had happened.

6   Q     Okay.  You were in Ontario, Toronto, right?

7   A     When?

8   Q     When you worked at Balaton?

9   A     Yes.  Yeah.  Sorry.  The head office.

10  Q     When you received the closing book?

11  A     I did receive the closing book.

12  Q     And Wilson Vukelich was in Toronto when you received the

13  closing book, too.

14  A     They shipped it to me.

15  Q     Okay.

16  A     From their office in Marcum (phonetic).

17  Q     Which is near Toronto?

18  A     Just outside, yeah.

19  Q     Okay.

20        **(Pause)**

21  **BY MR. RAY:**

22  Q     You were aware of this bankruptcy from its inception,

23  correct?

24  A     This one, the second SkyPort?

25  Q     The current bankruptcy.  Well you were aware of both

TAYLOR - CROSS/REDIRECT                               248

1   bankruptcies?

2   A     Yes.

3   Q     From inception?

4   A     Yes.

5           **MR. RAY:**  Nothing further.

6           **THE COURT:**  Mr. Jones, any questions?

7           **MR. JONES:**  Judge, no questions.

8           **THE COURT:**  All right.  Any redirect?

9           **MR. GOLDMAN:**  Your Honor, I have one question, I

10  believe.

11          **(Pause)**

12                     **REDIRECT EXAMINATION**

13  **BY MR. GOLDMAN:**

14  Q     To you personal knowledge, do you know why $7 million was

15  not raised in Clearsky?

16  A     To my knowledge, about 7 million was raised.

17  Q     Do you know why more than 7 million wasn't raised?

18  A     Yes, we were -- we, as Balaton, we were raising additional

19  funds for SkyPort or SkyComm in a direct private placement to

20  start stepping up the valuation to realize some --

21  Q     Okay.

22  A     -- increased valuation.

23  Q     Who made the decision not to raise more than 7 million in

24  Clearsky?

25  A     Mr. Kubbernus.

1       **(Pause)**

2    **BY MR. GOLDMAN:**

3    Q    Did Mr. Kubbernus ever tell you --

4           **MR. ROTHBERG:**  Your Honor, he said one question.

5    He's now on four or five.

6           **THE COURT:**  I understand.

7    **BY MR. GOLDMAN:**

8    Q    Did Mr. Kubbernus ever tell you in your years of

9    employment with him as the asset manager for this entity, did

10   he ever tell you that Clearsky did not get an interest in

11   SkyComm because the full ten million was not raised?

12   A    No.

13   Q    Did Mr. Kubbernus tell you in September of 2009, after the

14   confirmation order and plan that Clearsky had no interest in

15   SkyComm?

16          **MR. RAY:**  Your Honor, I think that's leading

17   question.

18          **MR. GOLDMAN:**  My last question.

19          **THE COURT:**  I'll sustain.

20          **MR. GOLDMAN:**  Thank you, your Honor.

21          **THE COURT:**  Yeah.  You can step down.

22      **(Witness steps down)**

23          **THE COURT:**  Mr. Goldman, any other witness.

24          **MR. GOLDMAN:**  No, that's it, your Honor.

25          **THE COURT:**  All right.  Mr. Jones, do you have any

1    witnesses?

2         **MR. JONES:**  Do not, Judge.  We'd like a couple of

3    minutes of arguments.

4         **THE COURT:**  Yeah.  For sure.

5         **MR. RAY:**  Your Honor?

6         **THE COURT:**  Yeah.

7         **MR. RAY:**  Before we close evidence, I had earlier

8    held up these log reports.

9         **THE COURT:**  Yes.

10        **MR. RAY:**  I have little stickers.  I need not going

11   to mark them as any kind of evidence.  But they were

12   demonstrative.  We've been accused of rewriting the complaint

13   or whatever.  I don't want you to think they're evidentiary,

14   but I would like to mark them.

15        **THE COURT:**  I'll admit them as demonstrative.

16        **MR. RAY:**  Thank you.  I have --I'm marking the

17   mismanagement slide as Exhibit 15.  The Clearsky and SkyComm as

18   16.  And then the ones I held up without each of the texts have

19   been marked at 17 through 26, inclusive.

20        **THE COURT:**  All right.  Bear with me here.

21        **(Pause)**

22        **(Voices whispering)**

23        **MR. RAY:**  Yes, your Honor.  And I want to reiterate,

24   17 through 26 referenced paragraphs in the petition.  But they

25   are summaries.  They are not -- we are not saying that that is

1  the exact words.

2  **THE COURT:**  In your booklet, you've got 14 exhibits.

3  How many -- you've got Exhibit 15, 16 --

4  **MR. RAY:**  Through 26.

5  **THE COURT:**  Fifteen, Sixteen, Seventeen, Eighteen,

6  Nineteen, Twenty, Twenty-one, Twenty-two, Twenty-three, Twenty-

7  four, Twenty-five, and Twenty-six.  And these are solely

8  demonstrative exhibits.

9  **MR. RAY:**  Yes, your Honor.

10  **(Voices speaking off the record)**

11  **(Pause)**

12  **THE COURT:**  All right.  Those exhibits are admitted

13  for demonstrative purposes.

14  **(Centurytel's Exhibit Numbers 15 through 26 were received**

15  **into evidence for demonstrative purposes only)**

16  **THE COURT:**  Have you provide Mr. Smith and

17  Mr. Goldman with copies of them?

18  **MR. RAY:**  I will have them emailed tonight, your

19  Honor.

20  **THE COURT:**  Okay.  Please.  Okay.  Does everyone

21  rest?

22  Mr. Rothberg?

23  **MR. ROTHBERG:**  Yes, your Honor.

24  **THE COURT:**  Mr. Ray?

25  **MR. RAY:**  Your Honor, I've previously admitted my

CLOSING ARGUMENT                    252

1   documents into evidence that is my chief evidence and I rest.

2          THE COURT:  All right.  Mr. Goldman, Mr. Smith?

3          MR. SMITH:  Yes, sir.  We do.

4          THE COURT:  Mr. Jones?

5          MR. JONES:  Yes, your Honor.

6          THE COURT:  Okay.  Let me go ahead and hear closing

7   arguments.  I'm focused obviously on the injunction that

8   Mr. Rothberg has requested, also focused on the Motion to

9   Dismiss.

10          Mr. Rothberg, you go first.  And then I'll allow

11   Mr. Ray to go second, Mr. Jones to go third.  Either Mr. Smith

12   or Mr. Goldman goes fourth.  Please.

13          MR. ROTHBERG:  Thank you, your Honor.

14          I think we have, and I'll try to be as brief as

15   possible.  We have to focus in the white book Exhibit 7, which

16   is the order confirming the plan.

17          And the order incorporates the plan itself and

18   approves it.  And I want to point the Court to a few provisions

19   in there.  The first one would be on the top at page 32 of 43,

20   effective confirmation.

21          THE COURT:  Hold on a minute.  Let me get there.

22          MR. ROTHBERG:  Okay.

23      (Pause)

24          THE COURT:  All right.  I'm there.

25          MR. ROTHBERG:  Okay.  As provided for in Section

CLOSING ARGUMENT                              253

1 | 1141(d),

2 | &ldquo;The provisions of the plan shall bind the Debtor,

3 | any entity acquiring property under the plan, and any

4 | creditor, equity holder of the Debtor, whether or not

5 | such claim or interest is impaired under the plan.

6 | 13.2.  Holders of claims in interest shall receive

7 | distributions provided for in this plan, if any, in

8 | full settlement and satisfaction of all such claims,

9 | and any interest accrued and all such interests.&rdquo;

10 | Your Honor, as to the -- back to the confirmation

11 | order, let me -- let me comment on that first, your Honor.  I

12 | believe that the -- despite what Mr. Smith and Mr. Goldman say,

13 | if you read the petition in its whole, in its entirety, they

14 | are not just trying to sue Mr. Kubbernus for alleged

15 | misrepresentations in Clearsky.

16 | They allege a full array of looting, fraud,

17 | mismanagement, breach of fiduciary duty, all related to

18 | SkyPort.  It's undisputed that they all received notice of this

19 | bankruptcy case.  Hey received the plan.  Mr. Goldman, through

20 | his entity, Gloster Holding, is a -- was a shareholder.  The

21 | certificates of service show that he received the plan.

22 | And what did they do.  They laid behind the log, did

23 | not come to this Court, and object to confirmation, seek

24 | appointment of the Trustee, file an adversary proceeding, did

25 | nothing while they already knew.  The testimony from

1    Mr. McCrary, from Mr. Taylor, they knew all of these facts that

2    they brought to you prior to the bankruptcy case.

3              Yet that sat and did nothing, laid on their rights,

4    laid behind the log, and then filed a petition which, in my

5    view, completely upsets the plan.  They are trying to take over

6    SkyPort.

7              The plan says that their interests -- what they

8    received under the plan was in full and final satisfaction of

9    their claims.

10             So now we have a lawsuit that is, if you read the

11   totality of it, it's -- despite them saying, no, we're only

12   suing direct, violates this plan.  It specifically asks for

13   appointment of a Trustee or receiver over SkyPort.

14             Okay.  If we look at the confirmation order itself,

15   which is that same Exhibit 7, page 8 of 45.

16             **THE COURT:**  Bear with me.

17        **(Pause)**

18             **THE COURT:**  All right.

19             **MR. ROTHBERG:**  Okay.  This is the plan injunction.

20   And I'm looking at paragraph 30(ii).  There's an injunction.

21             "Parties are permanently enjoined from enforcing,

22             attaching, collecting, or recovering in any manner

23             any judgment, award, decree, or other award against

24             the Debtor or its properties."

25             They are trying to attach, collect, and recover from

CLOSING ARGUMENT                              255

1   the Debtor by asking for appointment of a Trustee over the

2   Debtor.  There can be no other possible interpretation of that

3   provision.  So they have violated that provision of the -- of

4   the order specifically.

5          And then I would say that by alleged -- and then the

6   other point, your Honor, is with respect to the derivative

7   claims.  We believe that once you look at the petition, that

8   all of the claims listed there, except for the Clearsky ones,

9   mismanagement, breach of fiduciary duty are traditional

10  derivative claims.  Those are all claims that were reserved in

11  the plan to the reorganized Debtor.  And then were released.

12  And that is in Section, I believe it's 13.7 of the plan, which

13  is on page 34 of 35 -- 45, rather.

14      **(Pause)**

15          **THE COURT:**  Okay.

16      **MR. ROTHBERG:**  And the release that's set forth there

17  applies to Robert Kubbernus and the Balaton Group who have been

18  sued in the -- in the petition.  So there is violation number

19  two.  They cannot pursue derivative claims against Kubbernus

20  and Balaton under the terms of the confirmation order.

21          As we've talked about, your Honor, Mr. Goldman went

22  on and on about Clearsky.  Okay.  I was very enticed to waste

23  this Court's time putting Mr. Kubbernus back on the witness

24  stand to testify about Clearsky.  But I didn't.  Why?  Because

25  it is totally, completely irrelevant to this case because the

1  confirmation order specifically carves that out.  'Cause you

2  raised that point at the confirmation hearing.

3           We agreed with your Honor that those types of claims

4  could not be released.  So in paragraph 32 of the confirmation

5  order, I'm sorry --

6           **THE COURT:**  Give me the page number.

7           **MR. ROTHBERG:**  Page okay, 9 of 45.

8       **(Voices whispering)**

9       **(Pause)**

10          **THE COURT:**  Okay.

11          **MR. ROTHBERG:**  Okay.  At the very top there's a

12 sentence that starts,

13          "Notwithstanding anything else contained herein, the

14          exculpation provisions approved hereby shall not act

15          to exculpate Balaton Group, Robert Kubbernus, or

16          Clearsky Management,"

17 That was the general partner.

18          "With respect to any claims, or transactions,

19          dealings, or relationships with Draco, Clearsky, LP,

20          their investors or affiliates."

21          So they are not violating this Court's order.  If

22 they to go sue Mr. Kubbernus, and Clearsky -- and Clearsky

23 Management regarding the Clearsky transactions.  But that --

24 this complaint is not limited to that.

25          This complaint is -- is broad and complains of

CLOSING ARGUMENT                    257

1   numerous, numerous things involving the Debtor during the

2   bankruptcy case, which are specifically released prior to the

3   bankruptcy case, all of which they had notice of.

4         And now paragraph 32, right below that, also contains

5   the same language with respect to the releases contained in

6   Section 13.7 of the plan.

7         So we would say, your Honor, that the petition

8   itself, we believe in its entirety has violated the plan

9   injunction.  Has violated the confirmation order, has violated

10  the Court order.  We believe that the Court should deny the

11  Motion to remand, consolidate all the adversaries, dismiss the

12  case, and set a further hearing to determine what sanctions

13  should be assessed against the Plaintiffs for filing this suit,

14  with the proviso in that order, that if they want to go out and

15  file a limited suit that's limited to Clearsky Investments in

16  some other Court, that may or -- that's appropriate, that they

17  have the right to do that.

18        Thank you.

19        **THE COURT:**  Thank you.

20        Mr. Ray?

21     **(Pause)**

22        **MR. RAY:**  Thank you, your Honor.  Thank you.

23        If you -- you're on page 8 of the confirmation order,

24  and you're looking at paragraph 30, which was in bold face and

25  apparently sent to all the Plaintiffs or almost all of them,

1   there's an interesting word I want to read here.  It says,

2          "As of the confirmation date, all entities which have

3          held, currently hold, or may hold a claim or other

4          debt or liability against the Debtor that is

5          discharged."

6          So that's the category of people.  People who had

7   claims against the Debtor, that is discharged.  That would

8   include people with derivative claims against the Debtor, or

9   people with claims of wrongdoing for FCC licenses against the

10  Debtor.  That would include any third party with a claim

11  against the Debtor that is discharged.

12         They're enjoined from the following things.  There's

13  a list here of all the things they're enjoined from.  One of

14  the things that they're enjoined from in paragraph 30 at the

15  very last sentence of paragraph 30, is,

16         "Commencing or continuing any action, including

17         manner in any place that does not comply with, or is

18         inconsistent with, the plan."

19         Any place, any action, any manner, any kind of

20  proceeding, or commencing any proceeding that is inconsistent

21  with the plan.  These people had claims that were discharged.

22  And that is precisely that we have here, something inconsistent

23  with the plan.

24         The say they have shares in a company that they don't

25  have shares in because of the plan.  They say that they lost

1    their investment because of the bankruptcy.

2            Now, your Honor, paragraph 13.16 of the plan says,

3            "The confirmation order shall include a permanent

4            injunction prohibiting the collection of claims in

5            any manner other than as provided for in the plan."

6            These people had their claims -- their shares

7    extinguished in the bankruptcy.  Their claims were in the

8    bankruptcy.  They are now not proceeding in the bankruptcy, but

9    proceeding in a parallel forum.

10           The plan of reorganization says in 4.5.2,

11           "Holders of equity interest shall receive no

12           distribution, or any property under the plan, on

13           account of said equity interests.  Said equity

14           interests shall be cancelled.  And new common stock

15           in the reorganized Debtor shall be issued to Balaton

16           as other provided in the plan."

17   That's 4.5.2.  That should end the inquiry.  Their equity

18   interests were cancelled.

19           There's a merger provision, paragraph 6.3.  "The

20   Debtor is a wholly owned subsidiary of SkyComm," and then it

21   continues on,

22           "The merger will be accomplished by the vote of

23           Balaton, as shareholder of SkyComm.  Once merged, the

24           Debtor's equity interests will be cancelled."

25           **(Pause)**

CLOSING ARGUMENT                    260

1              "The plan contained a specific release for

2              Mr. Kubbernus and Balaton that reached back to the

3              beginning of time and released all claims through

4              confirmation."

5   That's 13.7.  It says,

6              "The Debtor, and to the maximum extent provide by

7              law, its agents, release and forever discharge all

8              claims."

9   13.7.1.

10             "Robert Kubbernus and bankruptcy group, in

11             conjunction with any and all claims, and causes of

12             action arising on or before the confirmation date,

13             that may be asserted by or on behalf of the Debtor,"

14  That would include derivative claims, your Honor.

15             "Or the bankruptcy estate, and/or on account of the

16             Debtor's case."

17             On account of the Debtor's case is important because

18  we have six pages of allegations that have this State Court

19  complaint on account of the Debtor's case.  We have all of the

20  damages of the non-Clearsky plaintiffs are based on the

21  Debtor's case.  They are on account of Debtor's case.

22             They say we lost our investment on account of the

23  Debtor's case.

24      **(Pause)**

25             **MR. RAY:**  And then there's 13.8.  That's the

1    exculpation for anything that happens in the bankruptcy.

2              "Neither the Debtor, the insider, the inside parties,

3              early release the parties, nor any of their

4              respective present members, officers, directors, or

5              employees, shall have or incur any liability to any

6              holder, or have any claim or interest,"

7    That includes shareholders who are interest holders, obviously,

8              "For any act or omission, including negligence and

9              gross negligence in connection with, relating to, or

10             arising out of the Chapter 11."

11             Now, your Honor, remember where we started.  This

12   Court must determine, I believe it's critical, this Court must

13   first determine if it has jurisdiction.  Second, if the Court

14   determines that jurisdiction is proper, the Court must

15   determine if the removal was procedurally correct.  Was the

16   removal filed with the right court.

17             Third, if the removal was correct, should the Court

18   remand because the Court should not be the right Court to

19   enforce whatever issue, whatever order, you're enforcing.

20   Fourth, is there a violation.

21             And, your Honor, I will reiterate what I said

22   earlier.  If there's one violation of this Court's order, the

23   question goes, is there a remedy.  Will this Court enforce its

24   order.  That is the question.

25             So we have, I think, on the face of the petition many

CLOSING ARGUMENT                    262

1    things which we -- and your Honor's read, has read, will read,

2    I'm afraid the law clerks may also read the 111 page petition.

3              And on its face, does it have something that is

4    contrary to the plan.  That is, to quote the language of

5    paragraph 30, "inconsistent with the plan."  I'm quoting from

6    the paragraph 30 of the confirmation order.

7              Is this inconsistent with the plan.  Does it allege

8    something that the Court needs to take care of, not some State

9    Court.  If there's a violation of the confirmation order, the

10   discharge injunction, one violation on its face, then we're

11   entitled to a remedy.  What should that remedy be.

12             Your Honor, I think the proper remedy is this.

13   Rather than try to divvy the case up into what is and is not

14   released, and what or is not violative, I think the Court

15   should just say first, what I have in front of me, all 110

16   pages, you could have amended under Rule 15.  You have alleged

17   none of it has anything to do with -- with bankruptcy.  The

18   Court disagrees.  And the result is, the whole thing's

19   dismissed.

20             They can refile at in terrorem.  That's a Latin

21   phrase from family law  In terrorem is what happens if someone

22   contests a will and loses, they lose their inheritance.

23             And the issue here is if someone wants to play with

24   the discharge injunction and thinks they can tiptoe around it,

25   the consequences should be dire, especially since they had

1   notice of the bankruptcy, especially since they were part of

2   the bankruptcy, had the pleadings sent to them.

3           If the Court doesn't dismiss the whole chalupa, if it

4   keeps some portion of this, the reasoning behind that would be

5   that there is a fact issue and that I have a Motion for Summary

6   Judgment.

7           The Motion for Summary Judgment asks what on the face

8   in the petition is as a matter of law, and clear to any reader

9   of average intelligence a violation of the discharge

10  injunction.

11          But then there may be things that the Court is unsure

12  about.  And to the extent you want a in terrorem is what

13  happens if someone contests a will and loses, they lose their

14  inheritance that some portion of this survives, notwithstanding

15  the fact it was filed in violation of the discharge injunction,

16  we should continue on.  And we should have a bifurcation.  And

17  that -- the discovery on that issue should proceed before we

18  have the underlying merits of the case tried.

19          So that's my proposal.  I cannot imagine that this

20  Court does not have jurisdiction to enforce its order.  I

21  cannot imagine that the procedure of filing it with a District

22  Clerk separate from the Bankruptcy Clerk was violated.

23          I cannot image that remand would make sense if there

24  is a question about this Court's order.  The only question is,

25  is there a violation.  We have put our evidence on in the form

CLOSING ARGUMENT                          264

1  of the documents that you are taking in the Motion for Summary

2  Judgment that you're taking judicial notice of.  And that is

3  all we have to say.

4      We would ask that you read the documents and that you come

5  to a conclusion.  To the extent your Honor's going to award

6  sanctions.  And I don't think it's -- I don't know if your

7  Honor's going to render any decision tonight or not.  But to

8  the extent your Honor is going to award sanctions, we would

9  like the opportunity to have a hearing and present evidence as

10  to what the proper sanction is as the minimum sanction

11  necessary to deter further violations, or necessary to make the

12  party who has been injured as a result.

13          That you, your Honor.

14          **THE COURT:**  Mr. Ray.  Mr. Jones?

15      **(Pause)**

16          **MR. JONES:**  Thank you, Judge.  On behalf of Wilson

17  Vukelich, specially appearing subject to the Motion to Dismiss.

18          Judge, I want to go a little different direction.

19  Because I think when you look at the complaint.  And although

20  you can argue that we said we didn't mean it, and we'll fix it

21  if we did, and we're not responsible even if we are.

22          You read the complaint, Judge.  And there isn't any

23  question that the Plaintiff's overstepped.  There are claims

24  that you can't, with a straight face before this Court, get up

25  and argue aren't derivative claims and don't run afoul of the

CLOSING ARGUMENT                                265

1   discharge injunction.

2          You obviously have jurisdiction to enforce your own

3   order.  You have jurisdiction to enforce the confirmation

4   order.  And there isn't any real issue that you before you

5   multiple violations of each.  You have acts of contempt that

6   can be addressed.

7          And, Judge, unfortunately, now you've got evidence

8   before the Court that, having come from New York to Texas, and

9   submitted itself to jurisdiction, and the disciplinary rules

10  within the sate of Texas, you've not got evidence before the

11  Court that rule 308's been violated.  And that's something that

12  you just can't ignore.

13         But, Judge, getting to the substance of the Motion to

14  Dismiss, Judge, I want to cite you to the case of *Job v ATR*

15  *Marketing*.  It is a Fifth Circuit case, 87 F.3d 751.  And it

16  talks about the standards when you -- when there is a dismissal

17  or a motion for dismissal based on a lack of personal

18  jurisdiction.

19         And, Judge, you probably wondered why I stood up

20  three times and said we're hearing the entire motion.  Just

21  want to make clear.  And the reason I asked that question,

22  Judge, is because when the allegation is made to dismiss, it is

23  the Plaintiff's burden to establish personal jurisdiction.

24         Now what have we heard with respect to Wilson

25  Vukelich?  They office in Canada.  They have no office here.

CLOSING ARGUMENT                                266

1   They've conducted no business here.  They closed the

2   transaction in Canada.  They've delivered documents in Canada.

3   They received money in Canada.

4            Not one of the systematic contacts that are required

5   to establish personal jurisdiction.  And so, Judge, when you

6   get right down to it, Plaintiffs haven't met their burden to

7   refute the Motion to dismiss as to the Wilson Vukelich Law

8   Firm.

9            Now with respect to the claims asserted, with respect

10  to the discharge injunction, I'll let those folks argue that.

11  However, you've got the other issue regarding the violation of

12  the plan injunction and the violation of 524, which obviously

13  rests here.

14           And, Judge, I agree with Mr. Ray.  And I know that

15  happens very rarely.  But I agree that the appropriate remedy

16  in this particular matter is to dismiss the adversary,

17  reserving the issue for sanctions, and setting a briefing

18  schedule, and a -- and a discovery schedule, whatever folks

19  want to -- because I'm sure there'll be attorneys fees.  And

20  we'll all file Motions for Sanction.

21           But, Judge, with respect to the Motion to Dismiss,

22  which is what you have before you, you have clear violation of

23  the discharge injunction.  And you have the lack of any

24  evidence whatsoever with respect to establishing in personam

25  jurisdiction.

1          Thank you, Judge.

2          **THE COURT:**  Thank you.

3          Mr. Smith or Mr. Goldman.  Mr. Smith.

4          **MR. SMITH:**  Your Honor, first let's do the Motion to

5   Dismiss.  Yes, it was sent I think three times we are hearing

6   the Motion to Dismiss.

7          My understanding of the Motion to Dismiss is that it

8   was filed on behalf of all but the Vukelich Law Firm.

9   Yesterday a Motion to Dismiss was filed by the Vukelich Law

10  Firm.  We have not responded to that.  So I hope that the Court

11  is not considering our failure to put on evidence today.  It's

12  just not right.

13         **THE COURT:**  It's not.  I'm only looking at the

14  pleadings that are before me today.

15         **MR. SMITH:**  Thank you.

16         Your Honor, with a straight face I will tell you that

17  these are all direct claims.  I will say that until I'm blue in

18  the face.  The other counsel will stand up here and say it's

19  derivative until they're blue in the face.

20         It really comes down to you.  You're going to have to

21  read this.  And you're going to have to decide if the cases

22  that we have cited that say the way we have pled this, this is

23  the basis for direct claims, not derivative claims.  Yes, they

24  may support a derivative claim, but they also support a direct

25  claim.  That is what we have found.  We know that we cannot

1   prosecute derivative claims.  And we have not tried to do so.

2          As far as the injunction is concerned, your Honor, we

3   have taken no action against the Debtor.  Again, what they

4   point to is the accounting and the receiver.  And again, we

5   have shown those to be as part of the remedy against, and

6   they're under the Kubbernus counts.

7          We are not seeking to have any kind of remedy other

8   that -- in this case, other than to attach the assets of

9   Mr. Kubbernus if we are successful in establishing his

10  liability.

11         As for a violation of the discharge order, your

12  Honor, I think if you find that these are direct claims again

13  third parties, we haven't violated anything.  We are not

14  seeking to move against the Debtor or property of the Debtor.

15         Thank you, your Honor.

16         **THE COURT:**  All right.  Thanks.

17         Let's see.  Let me start with some law.  The Fifth

18  Circuit teaches us that in the post-confirmation period, _U.S._

19  _Brass_ 301 F.3d 296 and _In re: Craig Stores of Texas, Inc._ 266

20  F.3d 388, that's sort of the two watershed Fifth Circuit cases

21  on the post-confirmation jurisdiction of a Bankruptcy Court.

22  Judge Barbara Houser (phonetic) also wrote an opinion _In re:_

23  _Coho Energy, Inc._ (phonetic) 309 B.R.217-220.  And I actually

24  wrote an opinion, _In re: Encompass Services_, where it's 337

25  B.R.864, where I reviewed six pertinent factors based upon

1   *Craigs Stores* and *U.S. Brass* to determine subject matter

2   jurisdiction post-confirmation.

3        But let's go back to the Fifth Circuit, because

4   obviously it's the Fifth that governs.

5        **(Pause)**

6        **THE COURT:**  The Fifth Circuit said in *Craig Stores*, I

7   guess this is the best quote I found, the Fifth Circuit says,

8        "Some circuits have utilized this theory, meaning the

9        expansive definition of related-to, which originated

10       to describe the scope of bankruptcy jurisdiction

11       during the pendency of the case to assess

12       jurisdiction after confirmation of a reorganization

13       plan."

14       But they have not applied it post-confirmation facts

15   like those before us.

16       "The more persuasive theory of post-confirmation

17       jurisdiction, however, attached critical significance

18       to the Debtor's emergency from bankruptcy protection.

19       As the Seventh circuit put it, once the Bankruptcy

20       Court confirms a plan or reorganization, the Debtor

21       may go about its business without further supervision

22       or approval.  The firm also is without the protection

23       of the Bankruptcy Court.  It may not coming running

24       to the bankruptcy judge every time something

25       unpleasant happens."

RULING                                             270

1   The Fifth Circuit goes on,

2           "After a Debtor's reorganization plan has been

3           confirmed, the Debtor's estate and, thus, bankruptcy

4           jurisdiction, ceases to exist."

5   And here's the key carve out.

6           "Other than for matters pertaining to the

7           implementation or execution of the plan no longer is

8           expansive Bankruptcy Court jurisdiction required to

9           facilitate administration of the Debtor's estate

10          where there is no estate to reorganize.

11          This theory has antecedents in our courts of

12          jurisprudence, which has observed that the

13          reorganization provisions of the former Bankruptcy

14          Act envisage that out of the proceedings will come a

15          newly reorganized company capable of sailing forth in

16          the cold cruel business world with no longer the

17          protective wraps of the Federal Bankruptcy Code.

18          Because it comports more closely with the effect of a

19          successful reorganization of the Bankruptcy Code than

20          the expansive jurisdiction cases, we, i.e., the Fifth

21          Circuit, adopt this more exacting theory of post-

22          confirmation bankruptcy jurisdiction."

23          So what the Fifth Was telegraphing was that post-

24  confirmation, if there is a suit that's filed post-

25  confirmation, the Bankruptcy Court doesn't have jurisdiction as

RULING                                271

1   easily as it was prior to *U.S. Brass*.  It used to be, you know,

2   if someone defaulted under the plan, you know, let's say the

3   reorganized Debtor failed to make payment to one of the

4   creditors that it promised to pay out of the plan, it used to

5   be you could go back to the Bankruptcy Court, either as the

6   Debtor or as a creditor, say hey, plan's not being complied

7   with.  Do something about it.

8           And used to be you could, at least in this Circuit,

9   and still true from other circuits, Bankruptcy Court has

10  jurisdiction.  The Fifth teaches us that's no longer true.

11          Bankruptcy Courts are supposed to focus on whether

12  the lawsuit filed post-confirmation pertains to the

13  implementation or execution of the plan, or the interpretation

14  of the plan is also a phrase that I have seen used.

15          So that's the issue is whether the lawsuit that was

16  removed to me, which is *Adversary 10-3150*, filed initially in

17  the Harris County District Court of the State of Texas, whether

18  that suit goes to the interpretation, the implementation, the

19  enforcement of the plan.  And the -- if it does, then I've got

20  jurisdiction.  If it doesn't then I don't.

21          So the question then is, is -- does this lawsuit

22  pertain to the implementation, execution, or interpretation of

23  the confirmed plan from August of 2009.

24          So I need to go to the pleading that's before me that

25  was filed in Harris County, but was removed to this Court,

1   because that's now the live petition.  In Federal Court we call

2   it a complaint.  But it's the live pleading of the Plaintiff.

3            Now this pleading is either very deceitfully drafted

4   or very disingenuously drafted, maybe both.  Because it is

5   correct to say the reorganized Debtor is not a named party.

6   But, and I look at page 72.  And it says,

7                "Wherefore, all the Plaintiffs that the Court enter

8                an order, judgment, and decree granting the following

9                relief against the Kubbernus Defendants.

10               D.  An order appointing a provisions director,

11               Trustee, managing agent, fiscal agent, or other

12               Court-appointed fiduciary for SkyComm and SkyPort."

13           My confirmation order which confirmed the plan

14   expressly says that SkyComm and SkyPort will merge.  So there

15   is no longer any SkyComm.  This pleading before me, filed in

16   Harris County District Court was telegraphing to a State Court

17   Judge, and if a jury request is made to a State Court jury that

18   part of the relief the Plaintiffs were seeking was to appoint a

19   director, a Trustee, a managing agent, a fiscal agent, or other

20   Court-appointed fiduciary.  The Court-appointed being appointed

21   by the State Court for SkyComm and SkyPort.

22           To tell a State Court judge and jury that SkyComm

23   exists, which is what this pleading does, violates, goes

24   against, contradicts, the plan that I approved in August of

25   2009.

RULING                                      273

1          And to use the excuse that gee we didn't make

2    SkyPort, the reorganized Debtor, a party Defendant in the State

3    Court suit is very disingenuous.  It's very distasteful to me.

4    There's no question, based upon the testimony of Mr. McCrary,

5    put aside the credible testimony Mr. Rothberg's legal

6    assistant, notice was given to the equity holders of SkyPort.

7          They knew about this bankruptcy.  They have an

8    opportunity to come in and object to the plan.  And

9    Mr. McCrary's testimony is very interesting.  He said he had

10   this two page document, which he worked up.

11         You know, one of the best devices for conducting

12   discovery is in bankruptcy.  And it's called a 2004

13   examination.  And so, Mr. McCrary and the other equity holders,

14   had the opportunity to take 2004 examinations from here to

15   eternity of Mr. Kubbernus, and of anybody else whom they

16   thought were committing skullduggery.  And they failed to do

17   it.

18         What they did is, they waited, chose not to

19   participate in the bankruptcy, and the post-confirmation,

20   hauled off and filed a suit saying to a State Court judge that

21   he or she ought to appoint a Trustee, or managing agent, for an

22   entity that no longer exists, SkyComm, because my plan

23   extinguished SkyComm shares, that is, the plan that I

24   confirmed.  And also telegraphing to a State Court judge that

25   that judge should appoint a fiduciary or Trustee for SkyPort

RULING                                                    274

1    when I had confirmed a plan.

2           And so to ask a State Court judge to appoint a

3    Trustee to SkyPort for acts that occurred prior to the

4    confirmation of the plan, is a direction violation of the plan

5    and of the order confirming the plan.

6           The allegations in this petition, which is now the

7    live pleading before me, clearly set forth, I'm looking at

8    pages 59, and 60, and 61, that,

9              "Mr. Kubbernus and Balaton made numerous false and

10             misleading statements to the Bankruptcy Court,

11             including Balaton and Kubbernus deliberately mixed

12             and mingled the shareholders and creditors of

13             SkyPort, which was a bankruptcy Debtor, with the

14             shareholders and creditors of SkyComm, which was not.

15             Balaton and Kubbernus fraudulently represented that

16             they owned the majority of the shares in SkyComm.

17             Balaton and Kubbernus misled the Court into assuming

18             jurisdiction over, and affecting the rights of the

19             shareholders and creditors of SkyComm, even though it

20             was not a Debtor in bankruptcy.

21             Balaton and Kubbernus fraudulently claimed to be owed

22             approximately 2 million by SkyPort when no such debt

23             had been previously disclosed or shown on SkyComm's

24             consolidated financial statements.

25             Balaton and Kubbernus listed LaVelle as a creditor of

RULING                                                    275

1              SkyComm for 515,000, even though their prior

2              communications had indicated the debt ran from

3              LaVelle and SkyComm."

4         We go on, and on, and on at page 60 and 61.  All of

5    these allegations are that Mr. Kubbernus, Balaton, Centurytel,

6    duped me, tricked me, lied to me, in order to get me to confirm

7    a plan, particularly and specifically the plan that I confirmed

8    at a hearing on August 7, 2009, after listening to testimony,

9    and after hearing, and after giving everyone an opportunity to

10   participate, and vote.

11        So there is no question that the petition before me

12   that was filed in Harris County at a minimum in paragraphs 321

13   through 334 go right to the plan confirmation process.  And

14   clearly say that among other things Mr. Kubbernus defrauded

15   this Court, lied to this Court, made misrepresentations to this

16   Court.

17             And Section 1144 of the Bankruptcy Code says,

18             "On request of a party-in-interest at any time before

19             180 days after the date of the entry of the order of

20             confirmation and notice and hearing, the Court may

21             revoke such order, if and only if, such order was

22             procured by fraud."

23        The order was entered on the docket on August 12th,

24   2009.  If you count 180 days forward, that gets you to February

25   8th, February 9th.  And after that date, you can't revoke a

RULING                                                          276

1   confirmation order.

2              And so the petition that was filed in March in Harris

3   County is an end run around 11 U.S.C. §1144.  And at least

4   insofar as it says to a State Court judge and any jury, hey,

5   Mr. Kubbernus and these others lied to the Bankruptcy Court,

6   obtained a confirmed plan by fraud.

7              There is no way that these allegations are not an

8   attack on the plan that I confirmed.  They are indeed a full

9   frontal attack on the plan confirmation order that I signed.

10             Why?  The elements of 1129(a) have to be proved up.

11  Eleven twenty-nine (a)(5) says the following:

12             "The Court shall confirm a plan only if all of the

13             following requirements are met:  The proponent of the

14             plan,"

15  in this case, SkyPort,

16             "Has disclosed the identity and affiliations of any

17             individual proposed to serve"

18  in this case, Mr. Kubbernus,

19             "after confirmation of the plan as a director,

20             officer, or voting Trustee of the Debtor, an

21             affiliate of the Debtor participating in a joint

22             plan, with the Debtor, or a successor to the Debtor

23             under the plan, and the appoint to, or continuance

24             in, such office of such individual is consistent with

25             the interest of creditors and equity security

1          holders, and with public policy."

2          I made an express finding on August 7, 2009, based

3     upon the testimony and the evidence presented to me on that

4     day, that among other, Mr. Kubbernus' appointment to continue

5     to stay as an officer of the reorganized Debtor, was

6     statutorily consistent with the interest of creditors and the

7     equity security holders under the Debtor at that time, and with

8     public policy.

9          So to now go in State Court more than six months

10    later and say that Mr. Kubbernus duped me, is attacking the

11    findings of fact and conclusions of law I made in order to

12    confirm the plan back in August of 2009.

13         The very reason 1129(a)(5) exists is to allow

14    creditors, and equity security holders, and other parties-in-

15    interest, to come into Bankruptcy Court and test whether

16    someone like Mr. Kubbernus ought to stay in control of a

17    reorganized entity.

18         The language in the -- with the interest of

19    creditors, and equity security holders, and with pubic policy,

20    consistent with the interest of creditors, and equity security

21    holders, and with public policy.  That was the time to litigate

22    the issue.

23         Whether Mr. Kubbernus was a liar, a cheat, a

24    scoundrel, who had committed skullduggery.  You don't get to

25    lay behind the log, and to use Mr. Rothberg's expression, don't

RULING                                    278

1   participate in the bankruptcy.  Wait and then haul off and file

2   suit in Harris County District Court or any other forum and

3   make allegations that Mr. Kubbernus is a liar, a cheater, and

4   tricked the Bankruptcy Court into confirming a plan.

5           The issue is collateral estoppel and *res judicata*.

6   *Shoaf*, which is a Fifth Circuit case from back in the mid-'80's

7   stands for the proposition that creditors and parties-in-

8   interest, if they are given notice of the bankruptcy, are bound

9   by the terms of the plan.  And that includes findings of fact

10  and conclusions of law that are made at the plan confirmation

11  hearing.

12          In the *Shoaf Case*, the plan violated the law because

13  it expressly released an individual guarantor of the corporate

14  Debtor, which is a violation of 524.  The bank that held the

15  guarantee, then subsequently sued on the guarantee, and the

16  guarantor said you can't do that, because the plan released me.

17  And the bank said yeah, we can.  That's a violation of the

18  Code.

19          And the Fifth Circuit said, sorry.  It may be a

20  violation of the Code.  But it's an order that became final.

21  And the bank had notice of the confirmation hearing.  And if I

22  recollect the facts, the bank had participated at the

23  disclosure statement hearing.

24          Recent case from the Supreme Court, *Espinoza*, pretty

25  much stands for the 2010 version of *Shoaf*.  There a Bankruptcy

1  Court signed an order providing that the Debtor was to get a

2  discharge or a student loan, when the record didn't reflect he

3  should have.

4        And, in fact, what the Supreme Court said is

5  Bankruptcy Court violated -- signed an order that he shouldn't

6  have.  But it became a final order.  And the creditor that held

7  the loan was bound by it.  And it may be violative of the law.

8  But you can't come back because of the public policy that we

9  need finality in our orders.

10        In other words, when you compare and balance what's

11  more important, an order that proves something that's unlawful

12  and violative of the statute versus an order we want finality

13  to that order even if that's wrong.  And the Supremes have said

14  the latter governs.

15        Now they're directing bankruptcy judges to read their

16  orders.  But nevertheless, they're saying it's a final order.

17  Well that goes doubly true here.  Because here the testimony is

18  clear from Mr. Rothberg's paralegal she gave notice to all

19  these folks.  Mr. McCrary, honest guy.  Clearly admitted that,

20  and his testimony is very credible, that he got notice of the

21  bankruptcy, even wrote down two pages of feelings about clearly

22  his concerns about the company and Mr. Kubbernus' credibility

23  and honest.  But he didn't do anything about it.  He waited.

24        He did say he gave it to Mr. Goldman, who's an

25  attorney at law, and also a shareholder.  And so Mr. Goldman

RULING                                    280

1   stands in the same shoes as the other equity holders, or his

2   company or entity does.

3          They had the opportunity to come in and complain, and

4   to take depositions.  A 2004 examination is a licenses fishing

5   expedition under certain judicially creative bankruptcy laws.

6          So if they wanted to take Mr. Kubbernus' 2004

7   examination, and then come in here and show me that he is a

8   liar, a cheater, a scoundrel, and therefore object to the plan,

9   they should have done it.  And they had the opportunity to do

10  it, but they didn't do it.

11         So now coming into my Court and tell me that the

12  allegations about Mr. Kubbernus in the paragraph 321 through

13  334 isn't an attack on my order, falls on my death ears.  It's

14  a clear attack.  And therefore, it goes to enforcing -- the

15  enforcing of the confirmation order, the interpretation of it.

16         If I can make findings of fact and conclusions of the

17  law only to have them totally disregarded months later in a

18  State Court, then the system fails.  The concept of *res*

19  *judicata* and collateral estoppel goes down the drain.  That

20  can't be.

21         So my legal conclusion is, is that the lawsuit that

22  was filed in Harris County that's been removed to me, I do have

23  jurisdiction, however, because it pertains to the

24  implementation, interpretation and execution of the plan that I

25  confirmed in August of 2009.

RULING                                      281

1         I'm going to cite some additional case law.  There's

2    a case called *Konop*, K-o-n-o-p, *versus Hawaiian Airlines, Inc.*

3    2009 Westlaw 943287, which supports my ruling.

4         Let me to go one I think it's very important to

5    mention.  I distinguish it because it was written by District

6    Judge Werlein, which is the District Judge here in the same

7    courthouse that I'm in.  It's *Jerry Malesovas,*

8    M-a-l-e-s-o-v-a-s.  It's May 16, 2005, 2005 Westlaw 1155073.

9    very similar facts insofar as action filed in State Court,

10   removed over the District Court, and argument made by the

11   reorganized Debtor.  Hey, we had a release provision.  And

12   don't remand.  And Judge Werlein says nope.  Bankruptcy Court,

13   District Court doesn't have jurisdiction.  Let me read some

14   commentary to you.

15            "The source of the District Court, Bankruptcy Court

16            subject matter jurisdiction is neither -- is not the

17            express terms of the plan.  The source is 28 U.S.C.

18            1334.  And he reviews that the District Court and the

19            Bankruptcy Court's jurisdiction extends to four

20            types, cases arriving under Title 11, proceedings

21            arising under Title 11, proceedings arising in, and

22            proceedings relating to."

23         And he says, and he cites the *U.S. Brass Case, the*

24   *Craig Store Case.*  And he says,

25            "In deciding Plaintiff's Motion to Remand, the Court

RULING                                        282

1              must apply the well pleaded complaint rule."

2              Everyone's been telling me you got to, you know, look

3     at the well pleaded complaint.  And I will say that this

4     complaint before me is well pleaded.  It's so detailed, it's

5     amazing in a way.

6              If anything, I was taught, at least by my mentors

7     practicing in State Court to try to plead as little as

8     possible.  But this one is as specific as you can get.  Judge

9     Werlein writes,

10             "In deciding Plaintiff's Motion to Remand, the Court

11             must apply the well pleaded complaint rule and

12             determine whether a matter pertaining to the

13             implementation or execution of the contour plan has

14             been raised on the face of Plaintiff's original

15             petition, without considering any defenses Sanders

16             may have.

17             Thus, assuming arguendo that the defenses raised by

18             Sanders provide a base for federal jurisdiction under

19             §1334, Sanders was not entitled to remove the claims

20             on the basis of those defenses.

21             Rather Plaintiff's original petition must on its face

22             pertain to the implementation or execution of the

23             contour plan in order to confer bankruptcy

24             jurisdiction on this Court."

25    And Judge Werlein goes on in his case.

RULING                                    283

1              "Plaintiffs assert various state law tort claims

2              against Defendants in their individual capacity as a

3              former officers and directors.  Plaintiffs do not

4              assert claims against Contour.  And Plaintiffs do not

5              purport to bring claims on behalf of Contour"

6    meaning the reorganized Debtor.

7              "Plaintiffs do not seek to modify or revoke the

8              plan."

9              So Judge Werlein says, therefore, it doesn't fit

10   within *U.S. Brass*, therefore, back to State Court it goes.

11             Here's how we distinguish our case is in this

12   instance, this pleading that was filed in State Court does, in

13   fact, attempt to modify and revoke the confirmed plan.

14             It says Mr. Kubbernus duped me, tricked me, lied to

15   me.  And asked a State Court judge to appoint a receiver or

16   someone else to take over SkyPort, the reorganized Debtor.

17   That's a clear attack on my plan.

18             Now what is not discussed in Judge Werlein's case is

19   I don't know how much went on pre-confirmation by the

20   Plaintiffs in that case.  Here the plaintiffs clearly got

21   notice of the bankruptcy, clearly had an opportunity to prove

22   to me that Mr. Kubbernus, and anyone else working for SkyPort,

23   was not worthy of staying on board, and that the plan shouldn't

24   have been confirmed.

25             So I want to make reference to Judge Werlein, because

RULING                                            284

1   I -- it's very important to me that the district judges in my

2   courthouse, that is, in the courthouse in which I sit, that I

3   pay heed to their case, the opinions they write.  And I agree

4   with how Judge Werlein has applied the law.  I think I do have

5   to look at §1334, *U.S. Brass and Craig Stores*, and in so doing,

6   I expressly conclude that this lawsuit filed in Harris County

7   is a -- does attempt to modify or revoke the plan because it is

8   making allegations that fly against the findings of fact and

9   conclusions of law I made in order to convince a State Court

10  judge to take action, specifically to appoint a receiver on the

11  reorganized SkyPort.

12          Now as I've also said, it's a violation of 1144, an

13  attempt to do an end run around, 1144.  I also want to note,

14  SkyPort is not a named party in this State Court lawsuit.  But

15  there is no question that there is a concept called necessary

16  parties, whether you're under state law or federal law.

17          If you're going to seek relief against somebody like

18  appointing a receiver, they're a necessary party.  And that's

19  why I say this pleading is either disingenuous or deceptive.

20          Because to go into State Court and say give me a

21  receiver for SkyPort, but not to put SkyPort in as a named

22  party, I guess my response is give me a break.  Of course,

23  SkyPort is a necessary party.  And to argue to a State Court

24  that we ought to appoint a receiver to SkyPort, without naming

25  SkyPort as a party, I think is a very disingenuous thing to do.

RULING                                          285

1    And anyone knows that SkyPort's a necessary party under the

2    applicable rules, either federal or state when you're seeking

3    that kind of relief.

4            I also want to cite a Supreme Court of Texas case,

5    _Browning v. Prostach_, 165 SW 3rd 336.  When the Supreme Court

6    of Texas talks about collateral attacks on a Bankruptcy Court's

7    judgment, and talks about extrinsic fraud and intrinsic fraud.

8    And what the Supreme Court of Texas says, you don't find too

9    many Supreme Court of Texas cases talking about bankruptcy.

10   But this one is very much en pointe.

11           And there is where Mr. Prostach, someone sort of like

12   in the position of Mr. McCrary went after a reorganized Debtor.

13   And the Supreme Court of Texas says look, if he knew about

14   violations of fiduciary duty prior to the confirmation hearing,

15   he can't go collaterally attack.  He can't go file suit in

16   State Court.  'Cause it's a collateral attack on the Court's

17   order.

18           So I cite that case for -- from the State Court side.

19   We actually have the Supreme Court of Texas.  So if this

20   lawsuit were allowed to stay in in State Court, at least as I

21   read the Supreme Court's ruling, if it got up there, were any

22   judge in the State Court bound to apply this case, ought to be

23   saying hey, you can't do this.

24           I am also very bothered, and again, this is why I say

25   I think this pleading is very disingenuous if not deceptive,

RULING                                          286

1   the allegations made to the State Court in this pleading are

2   that all of these equity shareholders, these Plaintiffs, the

3   allegations are that they are presently holding shares of

4   SkyComm.  That is a direct contradiction of the provision in

5   the plan that I confirmed that says shares extinguished.  Going

6   back to *Shoaf,* going back to *Espinoza*, we've got a confirmed

7   plan that extinguished the shares of SkyComm in August of 2009.

8   That order was not appealed.  It's a final order.

9           So even if these -- all of these causes of action in

10   the State Court are personal and not derivative, I'm still

11   bothered by the fact that I'm seeing a pleading that is

12   thumbing its nose at my findings of fact and conclusions of

13   law, and at the plan provisions that I confirmed.  That ain't

14   right.  That's now how you're supposed to play the game.

15          All these Plaintiffs could have participated in the

16   process and they didn't.  If they didn't want to lose their

17   shares of SkyComm, they should have read the plan.  They should

18   have come in and complained.  They didn't do it.

19          And so what the factual allegations are in this

20   complaint that they are presently holding shares of SkyComm, is

21   dead, dead, contradictory of the plan provision that

22   extinguished those shares.  That really bothers me.

23          And as I said, that's why I find this pleading to be

24   either deceptively, or at a minimum, disingenuously drafted.

25      **(Pause)**

RULING                                287

1      **THE COURT:**  There's no question there is a merger

2  paragraph in the plan.  SkyComm and SkyPort were merged.  And

3  the folks who owned shares in SkyComm had to come in and

4  complain about it.  If they didn't, they're bound.

5      I should also say that I made a finding under

6  1129(a)(3), that the plan was filed in good faith.  Once again,

7  the reason 1129(a)(3) exists, is to allow creditors and parties

8  in interest to come in and say this plan's not filed in good

9  faith.

10     And if you don't do it, and I then make a ruling that

11 it was in good faith, which I did, then you can't go back in

12 State Court months later and make factual allegations that fly

13 in the face of my findings of fact and conclusions of law.

14     I might add, I'm supposed to look at the plain

15 meaning of statutes.  That also applies to the plain meaning of

16 pleadings.  To tell me that this pleading before me doesn't

17 seek relief against SkyPort, doesn't seek to appoint a Trustee

18 in SkyPort, is an incredible argument that has absolutely no

19 merit.

20         "Wherefore, all the Plaintiffs pray that the Court

21         enter an order, judgment, and decree granting the

22         following relief against the Kubbernus Defendants,

23         and order appointing a provisional director, Trustee,

24         managing agent, fiscal agent, or other Court-

25         appointed fiduciary for SkyComm and SkyPort."

1             Pretty plain meaning there.  There's no ambiguity

2    there.  What these Plaintiffs were trying to do in State Court

3    was get that State Court judge or a jury to appoint a

4    provisional director, or Trustee, or managing agent of SkyPort

5    and SkyComm.  And that's a direct violation of the very intent

6    of my plan that I confirmed, which is that SkyPort and SkyComm

7    were merged.

8             So what we've got here are Plaintiffs who have sat on

9    their hands, lay behind the log, and then made a collateral

10   attack that undermines the bankruptcy process, undermines the

11   integrity of the plan confirmation process, and there is no

12   question that -- that it shouldn't have been done.

13            There is clearly a carve out for Clearsky and Draco.

14   And there is no reason that that kind of litigation can't go on

15   in Harris County Court or some other Court.  But as for many of

16   the counts in this pleading before me, they are derivative.

17            And pursuant to the plan, if they are derivative,

18   they belong to the Debtor at the most.  And I think more likely

19   have been extinguished pursuant to the plan.  They sure the

20   heck don't belong to these individual Plaintiffs.

21            I'll fully concede that it's a gray area in many

22   instances, not only this case, but other lawsuits as to what's

23   derivative and what's personal.  And sometimes they overlap.

24            But there's one thing I know that doesn't overlap,

25   and that's claiming that Mr. Kubbernus and Balaton defrauded,

1  and made misrepresentations to me, and that a receiver ought to

2  be appointed by a State Court judge.  And the factual

3  allegations are made that directly contradict my findings and

4  conclusions.

5          So there's no question I've got jurisdiction over

6  this action.  Because even if everything is a personal cause of

7  action, there are allegations that are being made that the

8  Plaintiffs are estopped from making.  They're barred from

9  saying that they hold shares of SkyComm.  They are barred from

10 contesting that Mr. Kubbernus lied to me because of my plan

11 confirmation order.

12         So this pleading, even if all the causes of action

13 are personal, and they aren't.  But even if they are, it's

14 still nevertheless in a matter that pertains to the

15 implementation, execution or interpretation of the plan.  And

16 it attacks it.  Because it disregards my findings of fact and

17 conclusions of law in order to get relief in State Court.

18         That ain't right.  That does not pass muster under

19 any rationale for collateral estoppel and *res judicata.*  So

20 I've got jurisdiction.  And let me say, in the first instance,

21 I find that there are derivative causes of action, certainly

22 the one about the plan having been obtained through fraud, and

23 there are others.

24         So in the first instance, I've got jurisdiction

25 because it pertains to the implementation, interpretation, and

1    enforcement of the plan, because it attempts to bring

2    derivative causes of action in violation of the release

3    provision.

4           And then in the alternative, even if all the causes

5    of action are personal, it still goes to the implementation,

6    enforcement, and execution of the plan because it contains

7    allegations that directly contradict findings of fact and

8    conclusions of law that I make that the Plaintiffs had the

9    opportunity to deal with and chose not to.

10          So they are bound by principals of *res judicata* and

11   collateral estoppel.  And that pleading that is before mow that

12   was filed in Harris County can't stand.

13          Was the removal correct?  Yes, it was.  You remove

14   the entire lawsuit to this Court.  And that's a legal

15   conclusion I made.  There's ample case law for that.  We have a

16   standing order that matters are referred to this Court from the

17   District Court.  So I'm comfortable with that legal conclusion.

18          Should I remand this suit?  No way.  It has got

19   allegations in it that should not be made, that the Plaintiffs

20   are barred from making, not the least of which is that they are

21   presently holding shares of SkyComm.

22          So with respect to the injunction that is sought in

23   *10-3225,* the four elements that must be met are there's a

24   substantial likelihood that the Plaintiffs in this case,

25   reorganized Debtor, because that's what we are in *Adversary*

1 | *3225.*  Four elements.

2 | There's substantial likelihood that Plaintiff will

3 | prevail on the merits.  There's substantial threat that

4 | irreparable harm will result if the injunction is not granted.

5 | The threatened injury outweighs the threat and harm to the

6 | Defendants.  And the preliminary injunction will not disserve

7 | the public interest.

8 | That's the Fifth Circuit.  Plenty of case law.

9 | Element one, there's a substantial likelihood that the

10 | Plaintiffs will prevail on the merits.  There certainly is.

11 | This pleading that they filed in *Adversary 3150,* is a

12 | clear attack on my confirmation order, and the provisions in

13 | the plan.  And the Plaintiffs have a right, the reorganized

14 | Debtor has the right, to stop it.

15 | There's no question there's a substantial likelihood,

16 | based upon the recitations I've just made, the Plaintiff will

17 | prevail on the merits.  There's a substantial threat that

18 | irreparable harm will result if the injunction's not granted.

19 | Mr. Kubbernus gave testimony that the reorganized

20 | Debtor could be harmed because people are calling, some

21 | vendors, and folks who are referring business to the

22 | reorganized Debtor.  But over and above that, there's also

23 | substantial threat that irreparable harm will occur to the

24 | system.  The integrity process is harmed, if I'm going to let

25 | my confirmation orders effectively be ridden roughshod over.

RULING                                    292

1          My findings of fact and conclusion of the law that

2     led me to confirm a plan be ridden over.  Element two,

3     therefore, is meant.  Threatened injury outweigh threatened

4     harm to the Defendant.  Here it does.

5          The Defendants had the right to oppose the plan and

6     participate, and take discovery, and they didn't.  And now

7     they're coming in and complaining about Mr. Kubbernus.  They

8     have the right to do it.  They didn't do it back in the plan

9     confirmation process.

10         The threat and injury to the reorganized Debtor,

11     therefore, outweighs the threat and harm because of the

12     testimony given by Mr. Kubbernus.  He needs to focus his

13     efforts on getting claims paid pursuant to a plan.  He can't do

14     that if he's going to be sued for derivative causes of action

15     that were supposed to have been extinguished last August when

16     the plan was confirmed.

17         Fourth element of preliminary injunction, will not

18     disserve the public interest.  Here it will not only not

19     disserve the public interest, it'll promote the public

20     interest.  We need to have finality in our orders.  Due process

21     was given to these equity holders when they got notice of the

22     bankruptcy.  They could have participated.  They chose not to.

23     And to allow them to attack collaterally months later,

24     disserves the public interest.

25         So the four elements have been met, based upon the

RULING                                    293

1   testimony of Mr. Rothberg's legal assistant and Mr. Kubbernus,

2   and for that matter, Mr. McCrary, who clearly said he had

3   notice of the bankruptcy, wrote down notes because he was

4   concerned about things going on under Mr. Kubbernus'

5   leadership, and still chose not to participate.

6            So I'm going to grant the injunction.  With respect

7   to the Motion to Dismiss, or Alternatively for Summary

8   Judgment, the motion is granted.  The complaint, the live

9   pleading before me, is dismissed.

10           Now I'm going to dismiss with prejudice the

11   derivative causes of action.  I'm going to dismiss without

12   prejudice the personal causes of action.  I'm certainly going

13   to dismiss without prejudice the personal causes of action.

14   I'm certainly going to dismiss without prejudice any causes of

15   action that were brought, pursuant to the carve out.

16           But the derivative causes of action which were

17   extinguished, need to be dismissed with prejudice.  The

18   question is, which ones are to be dismissed with prejudice.

19   I'm not going to say tonight.  I'm going to sit down and go

20   through each and every one of them.  And I'll issue a written

21   ruling.  So that if people want to appeal me, they can.

22           And then finally, the Motion to Dismiss, Request

23   Sanctions, and I will grant the sanctions, a separate hearing,

24   to the extent that the Defendants and the reorganized Debtor in

25   *Adversary 3150,* that is, the suit that was removed, want to

1   seek sanctions.

2         They should file -- first they should provide

3   invoices for legal services rendered to Mr. Smith, and

4   Mr. Goldman, and Mr. Fryar.  And that's the minimum sanctions

5   that's going to be awarded are the reasonable attorneys fees

6   and expenses incurred in getting the Motion to Dismiss granted.

7         Now Mr. Smith is right, the Motion to Dismiss

8   Mr. Jones' client -- Mr. Jones and Miss Freeman filed for their

9   client, hadn't been heard yet, wasn't set for today.

10         I can certainly draw on the testimony from today, but

11   I will also give the parties a separate hearing.  And testimony

12   can be elicited.  But I obviously don't come to that hearing

13   with a clean slate.  I come to that hearing based upon my

14   ruling today.

15         But with respect to the attorneys fees and time

16   spent, and any costs incurred for bringing the Motion Dismiss,

17   I will impose sanctions at a minimum of reasonable attorneys

18   fees and costs.  Those'll be determined at a separate hearing

19   if the parties can't agree.  And I'll give you a hearing date.

20         To the extent any additional actions are sought, over

21   and above reasonable attorneys fees and expenses, file a

22   separate pleading, so that parties can see what is being

23   sought.  And I'll set that for a hearing as well.

24         So those are my findings of fact and conclusions of

25   law that I make under Bankruptcy Rule 7052.  And to the extent

1  any finding of fact is construed as conclusion of law, it's

2  adopted as such.  And visa versa.  And I reserve the right to

3  make additional findings and conclusions as I deem appropriate.

4  And I may well do so in written form.

5        I am very candidly put out with having my

6  confirmation order violated to the extent it has been.  And it

7  shouldn't have been filed -- that complaint shouldn't have been

8  filed.

9        I practiced in State Court a fair amount.  And State

10  Court don't know much about bankruptcy.  And you can amend your

11  pleadings very quickly.  And at the last moment, much more so

12  than in Federal Court.  And the way this pleading reads, any

13  judge or jury would think that SkyPort needed to have, based

14  upon these allegations, a receiver appointed.

15        And that ain't right, given the plan that I

16  confirmed.  So let me ask if there's any questions about my

17  ruling first.

18        Mr. Rothberg?

19        **MR. ROTHBERG:**  No, questions, your Honor.

20        **THE COURT:**  Mr. Ray?

21        **MR. RAY:**  No questions.

22        I need to correct your Honor on a factual statement

23  you made.  You said the State Court petition was filed in

24  March.  It was actually filed in February.

25        **THE COURT:**  Okay..  In any event, I guess the

1   question is, was it filed more than 180 days after the entry on

2   the docket of the confirmation order.  Do you know?

3          MR. RAY:  It was filed on February 10th, your Honor.

4          THE COURT:  So was that 180 days or more than 180

5   days?

6          MR. RAY:  I don't know.

7          THE COURT:  Well let's try to pin that down on the

8   record.

9          MR. ROTHBERG:  The confirmation was entered on August

10  the 12th.

11         THE COURT:  So if we go August the 12th, 31 days

12  minus 12 is 19, pl 30 days for September, 31 days for October,

13  30 days for November, 31 days for December, 31 days for

14  January, that gets up to February 8th of 2010.  Let's see if

15  that was a weekend.

16     **(Pause)**

17         THE COURT:  February 8th was a Monday.  So the

18  petition was filed on February 10th.

19         MR. RAY:  Yes, your Honor.

20         THE COURT:  My finding stands it was filed more than

21  180 days after the entry on the docket.  So I'll stand by my

22  comments about §1144, which says, 180 days after the date of

23  the entry of the order of confirmation.

24         So my finding stands.  But I appreciate your

25  correcting my erroneous finding that it was filed in March.

297

1              Mr. Smith, Mr. Goldman, any question about my ruling.

2         **MR. SMITH:**  I have no question, your Honor.

3         **THE COURT:**  All right.  Mr. Jones, any questions

4    about the ruling?

5         **MR. GOLDMAN:**  Your Honor, if I may?

6         **THE COURT:**  All right.  Mr. Goldman.

7         **MR. GOLDMAN:**  Just a personal statement to the Court.

8              I do apologize, as profusely as I can, for putting a

9    pleading that the Court found to be offensive.  I am not a

10   bankruptcy lawyer.  I was informed, and that was, you know,

11   using advise of people who were, that we had an absolute right,

12   especially after the Court's statements at the confirmation

13   hearing, to bring direct claims in that State Court.

14             Now I realize that we did make statements about what

15   happened in the Bankruptcy Court.  Our understanding, which is

16   expressed in the -- in the papers that we put in, our Motion to

17   Remand, is that it was based on extrinsic evidence.  And it

18   was, you know, not attacking the plan, per se, but saying that

19   there were frauds that occurred before the plan that got

20   expressed in the bankruptcy proceeding.

21             So that was our understanding, your Honor.  And if we

22   misunderstood, then obviously we bear the consequences of that.

23   But what I do want to make very clear, is we did not in any way

24   intend to ask for a State Court receiver, or to in any way

25   attack the integrity of the plan.

298

1          I think the whole concept of what we were doing was

2    we accept the decision of the plan.  And now we'll plead the

3    claims that are left, which is what we understood the Court to

4    say when it said I don't want you, Mr. Rothberg, coming into

5    any other Court and saying there was something decided here

6    that affect the, you know, what we took as the ability to plead

7    directly.

8          So we studied that, your Honor.  And we thought that

9    we were -- there's nothing in here that requires any change in

10   the plan.  There's nothing in here that requires any

11   modification.  And we offered -- the moment they raised the

12   issue of the State Court receiver, we told them we'll take that

13   out.  We told that to them.  And I put it in writing, your

14   Honor.

15         So it really was one of those things where, you know,

16   you do something.  You understand the implications of it are.

17   And it could be misinterpreted.  That was not our intent.  We

18   told them about that.  And in effect, that was very early in

19   the process.

20         I'm saying that only in, you know, I do think that it

21   goes to the issue of sanctions.  Because we did offer to take

22   that out.  And in our very first pleading before your Honor, we

23   said anything else that is objectionable to the Court, we

24   didn't intend to do anything objectionable to the Court.

25   Anything else we will take it out.

1           And so we apologize for doing things that we

2    understand are offensive to the Court.  We do understand that

3    now.  But that was our best understanding at the time, was that

4    what we were doing was asserting direct claims, that that was

5    permitted.  And we certainly didn't intend to do anything that

6    was offensive to the Court, or impinge on the Debtor.  And we,

7    as soon as this issue arose, we told them we'll remove it.

8           And I -- I wish I was more artful in drafting my

9    petition.  Of course, then we wouldn't have been here.  And I

10   wanted to say that, because I do think it needs to be

11   expressed.

12          Hopefully it will carry some persuasive weight with

13   the Court on the sanctions issue.  But I also, irrespective of

14   that, did want to apologize to the Court.  Because it wasn't

15   the intent to attack the Court's ruling in any respect.

16          We thought we were bringing claims that were left

17   after the Court's ruling.

18          **THE COURT:**  Okay.  As you know, I've listened to the

19   evidence.  I've got the exhibits in front of me.  I've got the

20   live pleading in front of me.  I make my ruling based upon

21   what's in front of me in terms of testimony, in terms of

22   exhibits, and in terms of the live pleadings.

23          All right. Mr. Jones, any questions?

24          **MR. JONES:**  Judge, no questions.  But the statement

25   that was just made is on the record.  And although he wasn't

1    sworn, we're going to take that as a statement, 'cause he will

2    be a witness.

3              **THE COURT:**  Well.

4              **MR. JONES:**  Fair warning.

5              **THE COURT:**  There is nothing in record today, no

6    testimony give.

7              **MR. JONES:**  Well, Judge he got up -- and he got up he

8    testified.

9              **THE COURT:**  I understand he made a statement to me.

10   It's not evidence.  I don't take attorneys' statements as

11   evidence, unless the attorney is sworn in and takes the stand

12   right there.  That's the evidence.

13             **MR. JONES:**  I understand.

14             **THE COURT:**  That's what I was trained to do as a

15   lawyer.  And that's what I do as a judge.  Attorney

16   representations to me at that podium and at that table are not

17   evidence.  So --

18             **MR. JONES:**  It's a statement of a lawyer.

19             **THE COURT:**  It's his statement.  And he's allowed to

20   make it.  But it's not part of the evidentiary record that I

21   based my ruling on.

22             **MR. JONES:**  I agree.  Thank you, Judge.

23             **THE COURT:**  Mr. Rothberg, I need an order from you,

24   that with respect to *Adversary 10-3225*, that I have made on the

25   preliminary injunction request, I've made a list of the

1    evidence, made findings of fact, conclusions of law on the

2    record.  That I have found that the four elements of

3    preliminary injunction have been met, that that, therefore, an

4    injunction is imposed preventing these Plaintiffs -- these

5    Defendants in this adversary proceeding from taking action

6    violative of the provisions of the plan, including, but not

7    limited to, derivative losses.

8         I need you to draft that order and have Mr. Smith or

9    Mr. Goldman sign off, and Mr. Jones and Mr. Ray, since they

10   participated, sign off as to form only.  I need it within ten

11   days.

12        **MR. ROTHBERG:**  Certainly, your Honor.

13        **MR. RAY:**  Your Honor?

14        **THE COURT:**  Yeah.

15        **MR. RAY:**  A technical matter.  Is the Motion to

16   Consolidate by Mr. Rothberg granted?

17        **(Pause)**

18        **THE COURT:**  I'm willing to grant the Motion to

19   Consolidate.  Since what I've heard at the beginning of today

20   that no one opposed, that the parties wanted it as such.

21        So I'll sign that order.  But Mr. Rothberg, I would

22   like an order submitted saying that the parties represented to

23   me that they wanted consolidation.  There was no opposition to

24   it.

25        And I need that as a separate order in seven days.

1  With respect to the Motion to Dismiss, Mr. Ray, I look to you

2  draft an order memorializing that I made findings an

3  conclusions after listening to the evidence, and reviewing

4  exhibits, and listening to closing arguments, and that the

5  motion is dismissed, so that the motion is granted.

6          And that the Court will issue a separate order --

7  well I'll tell you what I'll do.  I will give the parties two

8  weeks.  If you can reach an agreement as to which causes of

9  action are derivative and, therefore, are dismissed with

10 prejudice, and which ones aren't.

11         If you can't reach it, then I'll have -- I'll make my

12 own decision.  So obviously the parties agree that there are

13 some causes of action that are not derivative.  You've already

14 said that on the record.

15         And to the extent that you all can reach an

16 agreement, fine.  And what I'll do is set down a hearing for a

17 couple of weeks from now.  And you all come back in and either

18 say you've got agreement or you don't.  If you don't, then I'll

19 issue the order.

20         Does that make sense?

21     **MR. RAY:**  Yes, your Honor.  Thank you.

22     **THE COURT:**  Why don't I give you a date for that

23 right now.  It is --

24     **(Pause)**

25         **THE COURT:**  May 27th.  Why don't we -- I'll throw out

1  these dates and you can tell me whether it's acceptable to you

2  or not.

3          Why don't we got into June.  And I can do --

4      **(Pause)**

5      **(Voices whispering)**

6          **THE COURT:**  I can do Wednesday, June the 16th if you

7  want.  Gives you a little more than two weeks.  Let me see if

8  that's an acceptable date to you all?

9          **MR. SMITH:**  Your Honor, I think that's the end of a

10  deposition in D.C.  So I just turned my Blackberry back on.

11          **THE COURT:**  Yeah.  Okay.  Turn your Blackberries on.

12  I want to make sure we get a date that everybody is comfortable

13  with.

14          I'll start throwing out other dates.  Monday, well

15  let's see, Mr. Smith, you're not going to be there.  So we

16  could do Friday June 11th in the afternoon.

17          **MR. SMITH:**  I'm in Monterey Prison for a deposition.

18          **THE COURT:**  Okay.  I can to Tuesday June 8th in the

19  afternoon or the morning.

20          **MR. RAY:**  Your Honor, I have a hearing -- a major

21  hearing in Lafayette, Louisiana that I have to -- have to

22  attend.

23          **THE COURT:**  Okay.

24          **MR. GOLDMAN:**  I have to be in New York that day.

25          **THE COURT:**  Okay.  How about the week of June 21?

1   Any of those dates work for you all, Monday the 21st, Tuesday

2   the 22nd, Wednesday the 23rd, Thursday the 24th, Friday the 25th?

3          **(Pause)**

4          **MR. RAY:**  They're all acceptable with me, your Honor,

5   except for three o'clock on Thursday, June 24th where I have to

6   be down in Judge Isgur's Court, other than that.

7          **THE COURT:**  Mr. Smith, Mr. Goldman, Mr. Jones,

8   Mr. Rothberg?

9          **MR. SMITH:**  Go ahead.

10         **MR. GOLDMAN:**  I have to be in Miami that Friday.  So

11  other than that, I think I'm okay.

12         **THE COURT:**  Okay.  Mr. Rothberg, Mr. Smith?

13         **MR. SMITH:**  Go ahead.

14         **MR. ROTHBERG:**  Your Honor, the 21st and the 24th are

15  both available.

16         **THE COURT:**  Okay.

17         **MR. RAY:**  I just realized the 23rd I am not

18  available, your Honor.

19         **MR. ROTHBERG:**  And the 25th.

20         **THE COURT:**  Monday the 21st, Mr. Ray, you are.

21         **MR. RAY:**  Yes, your Honor.  There's a hearing in

22  Dallas.  I can have someone else attend to that one.

23         **THE COURT:**  All right.  Mr. Smith, you're okay?

24         **MR. SMITH:**  I'm in panel all day on the 21st, your

25  Honor.  And I've got a hearing on the 23rd.  Everything else

1    that week is open.

2             THE COURT:  Twenty-second?  That day is Tuesday.

3             MR. SMITH:  Yes, sir.

4             MR. RAY:  Sold.

5             THE COURT:  Okay.  Mr. Jones, I haven't heard from

6    you.

7             MR. JONES:  I am never a problem, Judge.

8             THE COURT:  All right.  Then let's do Tuesday, June

9    22nd at --

10            MR. ROTHBERG:  Your Honor, the later in the day the

11   better for me.

12            THE COURT:  All right.  That's fine.  Then why don't

13   we do four o'clock.

14            MR. ROTHBERG:  Okay.

15            THE COURT:  Now by that time, Mr. -- well before that

16   I need the order on the prelim injunction and the order on the

17   consolidation.

18            MR. RAY:  Right.  I think you gave us ten days.  But

19   we'll have that within ten days.

20            THE COURT:  The purpose of this hearing is solely for

21   you all to tell me here's an order dismissing, with Exhibit A

22   is the list of causes of action that are dismissed with

23   prejudice and Exhibit is the list of causes of action that

24   dismissed without prejudice.

25            If you can't reach agreement, then I will issue such

1   an order.  Okay.

2          Now let's also give you a deadline for sending fee

3   bill statements so that we don't let that sit.  Today is May

4   27th.  Why don't I ask you all to send the fee statements by no

5   later than Friday, June 11th.  Is that fair?

6          **MR. GOLDMAN:**  Your Honor, I'm sorry I didn't hear the

7   beginning of --

8          **THE COURT:**  Yes.

9          **MR. GOLDMAN:**  -- your fee statements.

10          **THE COURT:**  I just want to set a deadline for when

11   the invoice for fees and expenses --

12          **MR. GOLDMAN:**  Okay.

13          **THE COURT:**  -- can be sent to you, and Mr. Smith, and

14   Mr. Fryar.

15          **(Pause)**

16          **MR. RAY:**  That's acceptable, your Honor.

17          **THE COURT:**  All right.  Mr. --

18          **MR. ROTHBERG:**  Yes, sir.  That's fine.

19          **THE COURT:**  Let's do it by June 11th.  And why don't

20   we do this.  I'll give you, Mr. Smith, and Mr. Fryar, and

21   Mr. Goldman till the end of the month till June 30.  We either

22   say we agree they're reasonable or we don't we want a hearing.

23          Mr. Jones.

24          **MR. JONES:**  Judge, so that I'm clear, is -- that will

25   not pertain to me.  I will be filing my separate Motion to

1    Sanctions.

2          **THE COURT:**  That's correct.

3          **MR. JONES:**  Okay.  Thank you, Judge.

4          **THE COURT:**  Yeah.  Fair point.

5          And what I need by June 30, which is a Wednesday,

6    Mr. Smith, I'll put the burden on you to file it, is to file a

7    certificate saying we agree, they're reasonable, no need for a

8    hearing.  Or we don't agree, we want a hearing.

9          **(Pause)**

10         **MR. SMITH:**  Yes, sir.

11         **THE COURT:**  All right.  And then if we have the need

12   for a hearing, I'll have Miss Stennis, I'll get with her, and

13   we'll set down a hearing either in July or August.

14         Now I'll give -- if you want additional sanctions,

15   I'll give you until June 30th to file a motion and set forth

16   specifically what additional sanctions you want.  I'm not

17   saying I'll grant them.

18         And then I'll need responses to that motion by July

19   16, excuse me, July 23rd.  I'm sorry.  July 23rd.  And then

20   once -- if the motions are filed, if we then get responses by

21   July 23rd, then I'll get with Miss Stennis.  And we'll set it

22   down for a hearing some time in August.

23         Miss Attaway will be putting these part of the

24   minutes, and let's just repeat them so that there's no

25   misunderstanding.  Fee invoice for relating to the prosecution

1  of the Motion to Dismiss and the Motion -- the application for

2  preliminary injunction need to be sent over by June 11th 2010.

3        By June 30th, Mr. Smith will file his certificate

4  saying we agree, they're reasonable, we'll pay them.  Or no, we

5  won't.  They're not reasonable, we want a hearing.

6        By June 30, Mr. Ray, Mr. Rothberg, if you want

7  additional sanctions, you must file a separate motion setting

8  forth what you want.  And if you do so, then by July 23,

9  Mr. Smith, Mr. Goldman, Mr. Fryar, you need to file responses.

10 We will then set a hearing in August to make -- I'll have Miss

11 Stennis communicate with everybody and make we get dates

12 everybody can live with.

13     **(Pause)**

14     **(Voices speaking off the record)**

15     **THE COURT:**  The Motion for Separate Trial, Docket 7

16 today in *Adversary 3150,* I need a separate order on that.  The

17 Motion to Remand, Abstain, and for Sanctions, Docket 14 is also

18 moot.

19        And I'll need a separate order on that.  Mr. Ray,

20 I'll give you the laboring oar on those orders.

21     **MR. RAY:**  I will have those circulated to opposing

22 counsel probably on Monday or Tuesday, your Honor.  And

23 probably submit them --

24     **THE COURT:**  I just need them within ten days.

25     **MR. RAY:**  Yes, your Honor.  Within ten days.

1          **THE COURT:**  I think that squares the circle on all

2     the matters set for today.  But let me make sure you all agree.

3          **MR. ROTHBERG:**  Yes, your Honor.  I agree.

4          **MR. RAY:**  Yes, your Honor.  I agree.

5          **THE COURT:**  Mr. Smith, can you think of anything

6     else?

7          **MR. SMITH:**  No, sir.

8          **THE COURT:**  Mr. Goldman?

9          **MR. GOLDMAN:**  Thank you, your Honor.

10          **THE COURT:**  Mr. Jones?

11          **MR. JONES:**  Nothing else, your Honor.

12          **THE COURT:**  I know it's late.  No one likes to stay.

13     And my staff has been staying late this week.  We've had a lot

14     of hearing that -- but we need to give people, it's my judgment

15     at least, hearings and due process.  And so -- and I also

16     wanted to get to this.  I know you all wanted some

17     continuances.  But my attitude is we need to get a move on,

18     particular in a post-confirmation dispute like this.

19          So I appreciate everyone's hard work.  I appreciate

20     your patience today for waiting for my concluding some other

21     hearings.  I'll look forward to getting the orders.

22          And as I said, we'll also be ruminating within

23     chambers.  So that if we don't have agreement by the time we

24     have the hearing on the -- the order, then I'll issue my own

25     ruling.

310

1          Thanks.  You all have a safe and happy Memorial Day

2   weekend.

3          **UNITED STATES MARSHAL:**  All rise.

4      **(This proceeding was adjourned at 9:18 p.m.)**

311

1                    <u>CERTIFICATION</u>

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6

7

8        /s/Cheryl Battaglia            June 1, 2010

9           Transcriber                        Date

10   10-3150-H4-ADV

11   05/27/10 - 06/01/10